UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

DEVIN G. NUNES,                                            :
                                                           :        Case No.: 22-cv-1633 (PKC)
                            Plaintiff,                     :
                                                           :        Hon. P. Kevin Castel
            - against -                                    :        United States District Judge
                                                           :
NBCUNIVERSAL MEDIA, LLC,                                   :        **ORAL ARGUMENT REQUESTED**
                                                           :
                            Defendant.                     :
------------------------------------------------------------ x


# MEMORANDUM OF LAW IN SUPPORT OF NBCUNIVERSAL MEDIA, LLC's
MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Elizabeth A. McNamara
Jeremy A. Chase
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY  10020-1104
Phone:       (212) 489-8230
Fax:         (212) 489-8340
Email:       lizmcnamara@dwt.com
             jeremychase@dwt.com

Selina MacLaren (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, CA  90017
Phone:       (213) 633-6800
Fax:         (213) 633-6899
Email:       selinamaclaren@dwt.com

*Attorneys for Defendant*
*NBCUniversal Media, LLC*

# <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 4

     A.    The Parties ........................................................................................ 4

     B.    Amid Investigations Into Russian Interference, Nunes Receives A Package From Andriy Derkach........................................................................ 5

     C.    The House Intelligence Committee Questions Nunes; He Refuses To Answer..... 6

     D.    The Intelligence Reports On Election Interference Are Released ......................... 8

     E.    NBCU Reports On The DNI Report And The Allegations Made During The Intelligence Committee Meeting.......................................................... 8

     F.    Plaintiff's Lawsuit............................................................................ 9

ARGUMENT ..................................................................................................................... 10

I.    The Complaint Fails To State A Claim For Defamation ................................. 11

     A.    The Statements Are Absolutely Privileged As A Fair And True Report Of The Allegations In The DNI Report And Intelligence Committee Meeting................ 11

          1.    The Segment Reported On An Official Report And Proceeding.............. 14

          2.    The Segment Was A Fair And True Report.............................................. 14

     B.    Rhetorical Questions And Subjective Statements Cannot Form The Basis Of A Defamation Claim............................................................................. 20

II.    In The Alternative, Plaintiff's Complaint Must Be Dismissed Because He Failed To Plead Actual Malice......................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adelson v. Harris,*
 774 F.3d 803 (2d Cir. 2014)..............................................................21

*Arpaio v. Zucker,*
 414 F. Supp. 3d 84 (D.D.C. 2019) .......................................................23

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009)..............................................................10, 11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
 493 F.3d 87 (2d Cir. 2007)..............................................................10

*Bell Atl. Corp. v. Twombly,*
 550 U.S. 544 (2007)..............................................................11

*BYD Co. v. Vice Media LLC,*
 531 F. Supp. 3d 810 (S.D.N.Y. 2021)................................................14, 22

*Celle v. Filipino Reporter Enters., Inc.,*
 209 F.3d 163 (2d Cir. 2000)..............................................................24

*Chaiken v. VV Publ'g Corp.,*
 907 F. Supp. 689 (S.D.N.Y. 1995), *aff'd,* 119 F.3d 1018 (2d Cir. 1997) ..............................19

*Cummings v. City of N.Y.,*
 2020 WL 882335 (S.D.N.Y. Feb. 24, 2020)................................................12, 13, 14

*Davis v. Costa-Gavras,*
 580 F. Supp. 1082 (S.D.N.Y. 1984)..............................................................11

*Epstein v. N.Y. City Dist. Council of Carpenters Benefit Funds,*
 2016 WL 1718262 (S.D.N.Y. Apr. 28, 2016) (Crotty, J.) ......................................6

*Farah v. Esquire Magazine, Inc.,*
 863 F. Supp. 2d 29 (D.D.C. 2012), *aff'd,* 736 F.3d 528 (D.C. Cir. 2013)..............................6

*Fine v. ESPN, Inc.,*
 11 F. Supp. 3d 209 (N.D.N.Y. 2014)..............................................................14

*Friedman v. Bloomberg L.P.,*
 180 F. Supp. 3d 137 (S.D.N.Y. 2016), *aff'd in relevant part,* 884 F.3d 83 (2d
 Cir. 2017) ..............................................................14

*Garber v. Legg Mason, Inc.*,
   347 F. App'x 665 (2d Cir. 2009) ................................................................6

*Gubarev v. BuzzFeed, Inc.*,
   340 F. Supp. 3d 1304 (S.D. Fla. 2018) ...................................................14

*Guccione v. Hustler Magazine, Inc.*,
   800 F.2d 298 (2d Cir. 1986)....................................................................15

*Halebian v. Berv*,
   644 F.3d 122 (2d Cir. 2011).....................................................................6

*Herring Networks, Inc. v. Maddow*,
   8 F.4th 1148 (9th Cir. 2021) ...................................................................21

*Houston Cmty. Coll. Sys. v. Wilson*,
   142 S. Ct. 1253 (2022)...............................................................................3

*Idema v. Wager*,
   120 F. Supp. 2d 361 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002)........................12

*Jewell v. NYP Holdings, Inc.*,
   23 F. Supp. 2d 348 (S.D.N.Y. 1998)........................................................18

*Kinsey v. N.Y. Times Co.*,
   2020 WL 1435141 (S.D.N.Y. Mar. 3, 2020), *aff'd*, 991 F.3d 171 (2d Cir. 2021) ........................14

*Kinsey v. N.Y. Times Co.*,
   991 F.3d 171 (2d Cir. 2021)........................................................11, 12, 14

*Lawrence v. Altice USA*,
   841 F. App'x 273 (2d Cir. 2021) .............................................................18

*Lawrence v. Hearst Commc'ns, Inc.*,
   2022 WL 894716 (2d Cir. Mar. 28, 2022) ..........................................15, 18

*Machleder v. Diaz*,
   801 F.2d 46 (2d Cir. 1986).......................................................................11

*Masson v. New Yorker Magazine, Inc.*,
   501 U.S. 496 (1991) .................................................................................15

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990).....................................................................................20

*Mills v. Alabama*,
   384 U.S. 214 (1966)...................................................................................3

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ........................................................................................22

*Nunes v. Benjamin Meredith and Twitter, Inc.*,
    21-cv-00078 (E.D. Cal. filed Jan. 20, 2021) ..............................................................4

*Nunes v. Cable News Network, Inc.*,
    520 F. Supp. 3d 549 (S.D.N.Y. 2021), *aff'd*, 31 F.4th 135 (2d Cir. 2022) ........................4, 11

*Nunes v. Fusion GPS*,
    531 F. Supp. 3d 993 (E.D. Va. 2021) .......................................................................4

*Nunes v. Lizza*,
    12 F.4th 890 (8th Cir. 2021) ................................................................................4

*Nunes v. WP Co. LLC*,
    2021 WL 3550896 (D.D.C. Aug. 11, 2021) ........................................................4, 22, 24

*Nunes v. WP Co. LLC*,
    513 F. Supp. 3d 1 (D.D.C. 2020) (per curiam),
    *aff'd*, 2022 WL 997826 (D.C. Cir. Apr. 1, 2022) ............................................................4, 22

*Printers II, Inc. v. Prof'l Publ'g, Inc.*,
    784 F.2d 141 (2d Cir. 1986) ................................................................................18

*Rolon v. Hennenman*,
    517 F.3d 140 (2d Cir. 2008) ................................................................................10

*Seymour v. Lakeville Journal Co.*,
    2004 WL 2848537 (S.D.N.Y. Dec. 9, 2004),
    *aff'd*, 150 F. App'x 103 (2d Cir. 2005) ......................................................................14

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) ........................................................................................22

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
    864 F.3d 236 (2d Cir. 2017) ................................................................................15

*Torain v. Liu*,
    279 F. App'x 46 (2d Cir. 2008) ..............................................................................21

*Zappin v. NYP Holdings Inc.*,
    2018 WL 1474414 (S.D.N.Y. Mar. 26, 2018),
    *aff'd*, 769 F. App'x 5 (2d Cir. 2019) ........................................................................13

**State Cases**

*301 Fulani v. N.Y. Times Co.*,
   260 A.D.2d 215 (1st Dep't 1999) ........................................................................15

*Becher v. Troy Publ'g Co.*,
   183 A.D.2d 230 (3d Dep't 1992) .........................................................................18

*Brian v. Richardson*,
   87 N.Y.2d 46 (1995) ...........................................................................................21

*Cholowsky v. Civiletti*,
   69 A.D.3d 110 (2d Dep't 2009) .....................................................................12, 13

*Cucinotta v. Deloitte & Touche, LLP*,
   20 Misc. 3d 1144(A), 2008 WL 4210485 (Sup. Ct. N.Y. Cty. Sept. 15, 2008) .....................11

*Daniel Goldreyer, Ltd. v. Van de Wetering*,
   217 A.D.2d 434 (1st Dep't 1995) ........................................................................14

*Gross v. N.Y. Times Co.*,
   82 N.Y.2d 146 (1993) ....................................................................................20, 21

*Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*,
   49 N.Y.2d 63 (1979) ....................................................................12, 13, 17, 19

*Immuno AG. v. Moor-Jankowski*,
   77 N.Y.2d 235 (1991) .........................................................................................21

*Jennings v. Telegram-Tribune Co.*,
   164 Cal. App. 3d 119 (1985) ...............................................................................18

*Liberman v. Gelstein*,
   80 N.Y.2d 429 (1992) .........................................................................................24

*Miller v. Journal-News*,
   211 A.D.2d 626 (2d Dep't 1995) ...................................................................12, 18

*Misek-Falkoff v. Am. Lawyer Media, Inc.*,
   300 A.D.2d 215 (1st Dep't 2002) ........................................................................14

*Mulder v. Donaldson, Lufkin & Jenrette*,
   161 Misc. 2d 698 (Sup. Ct. N.Y. Cty. 1994), *aff'd*, 208 A.D.2d 30 (1st Dep't
   1995) ...................................................................................................................13

*Nunes v. Twitter, Inc.*,
   103 Va. Cir. 184 (2019) .........................................................................................4

*Nunes v. Twitter, Inc.*,
105 Va. Cir. 230 (2020) ...........................................................................................4

*Orr v. Lynch*,
60 A.D.2d 949 (3d Dep't 1978), *aff'd*, 45 N.Y.2d 903 (1978) ................................13

*Pelayo v. Celle*,
270 A.D.2d 469 (2d Dep't 2000) ...........................................................................13

*Posner v. N.Y. Law Publ'g Co.*,
228 A.D.2d 318 (1st Dep't 1996) ...........................................................................19

*Rakofsky v. Wash. Post*,
2013 WL 1975654 (Sup. Ct. N.Y. Cty. Apr. 29, 2013) ..........................................13

*Sackler v. ABC, Inc.*,
71 Misc. 3d 693 (Sup. Ct. N.Y. Cty. 2021) ...........................................................23

*Sandals Resorts Int'l Ltd. v. Google, Inc.*,
86 A.D.3d 32 (1st Dep't 2011) ...............................................................................21

*Sipple v. Found. for Nat'l Progress*,
71 Cal. App. 4th 226 (1999) .............................................................................12, 17

*Stepanov v. Dow Jones & Co.*,
120 A.D.3d 28 (1st Dep't 2014) ........................................................................15, 19

*Turner v. KTRK Television, Inc.*,
38 S.W.3d 103 (Tex. 2000) .....................................................................................18

**Federal Statutes**

47 U.S.C. § 230 .............................................................................................................4

RICO .............................................................................................................................4

**State Statutes**

N.Y. Civ. Rights Law § 74 ..................................................................................... *passim*

N.Y. Civ. Rights Law § 76-a(2) ...................................................................................22

**Rules**

Fed. R. Civ. Proc. 8......................................................................................................22

Fed. R. Civ. Proc. 12(b)(6) ............................................................................................1

**Regulations**

EO 13848 .................................................................................................................................5

**Constitutional Provisions**

First Amendment .................................................................................................................3, 21

**Other Authorities**

"Foreign Interference Targeting Election Infrastructure or Political Organization,
   Campaign, or Candidate Infrastructure Related to the 2020 US Federal
   Elections" (Mar. 2021), available at https://www.justice.gov/opa/press-
   release/file/1376761/download .................................................................................8

"Foreign Threats to the 2020 US Federal Elections" (Mar. 10, 2021), available at
   https://www.dni.gov/files/ODNI/documents/ assessments/ICA-declass-
   16MAR21.pdf .................................................................................................................8

www.devinnunes.com .................................................................................................................23

Defendant NBCUniversal Media, LLC ("NBCU") submits this memorandum of law in support of its motion to dismiss the Second Amended Complaint ("SAC") pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Plaintiff Devin Nunes is a former U.S. Congressman and serial libel plaintiff with numerous libel lawsuits to his name, including against the Washington Post, Twitter, McClatchy Company, CNN, and Hearst. With this new action, he continues his pattern of vexatious lawsuits designed to quell press coverage critical of his actions while in elected office.

This lawsuit centers on three statements that aired in a March 2021 segment of *The Rachel Maddow Show* on MSNBC (the "Segment"), reporting on a newly issued federal government intelligence report concluding that Russia had attempted to influence the 2020 U.S. elections. As the Segment reveals, the government report identified Andriy Derkach as a prominent player in Russia's election interference operations. The Segment then tied this new information to previously published reports concerning an official House Intelligence Committee meeting where it was discussed that then-Representative Nunes had received a package from Derkach, and that he refused to turn it over to members of the intelligence community. Indeed, the transcript of that meeting reflects that Nunes refused to answer any questions about the package. Moreover, top Democratic lawmakers, evidently believing that the FBI was unaware of the Derkach package sent to Nunes, sent a letter formally alerting the FBI to this and other packages received by lawmakers.

Nunes does not dispute that (1) Derkach sent a package addressed to him, (2) he refused to answer questions about it, and (3) he refused to hand it over to certain members of the House Intelligence Committee. Instead, Nunes focuses on one other statement in the 28-minute long Segment stating that "[Nunes] has refused to hand [the Derkach package] over to the FBI." Despite his steadfast refusal for almost a year to address questions surrounding his handling of the Derkach

package, for the first time Nunes now alleges in this action that he and/or his staff member did, in fact, deliver the Derkach package to the FBI.  SAC ¶ 13.  Nunes thus brings this defamation action based on this FBI statement and related statements that cannot support a defamation claim for at least three reasons:

*First*, as a threshold matter, New York's statutory fair report privilege applies here.  This absolute privilege applies to any substantially accurate report on official proceedings, so long as the report accurately captures the gist of the government records, regardless of whether the news report contains minor inaccuracies or if the statements contained in the underlying official records are false.  *See* Section I.A., *infra*.  Because the Segment fairly reported on the intelligence report and Congressional actions related to the investigation, it is fully protected as privileged.  The gist of the Segment's reporting on the official investigation is that Nunes had received a package from a Russian operative and refused to share the package with the "intelligence community."  That is indisputably true and privileged.  Thus, even if Nunes *did*, in fact, turn the package over to *the FBI*, this alleged false statement carries no different defamatory sting than the true report that he received the package and refused to share it with other members of the "intelligence community," specifically his fellow members on the Intelligence Committee.  *See* Section I.A. *infra*.  Relatedly, even in the absence of the fair report privilege, the statements are nonactionable because they are substantially true based on the factual allegations in the SAC.  SAC ¶ 13, n.5.  It is axiomatic that the gist of a statement must be false for a defamation claim to survive a motion to dismiss.

*Second*, Statements such as "How does that stand? How does that stay a thing?" with reference to Nunes staying on as ranking member of the House Intelligence Committee, and subjective assessments such as "what you should do if you get something from somebody who is

sanctioned by the U.S. as a Russian agent" (SAC ¶ 2) are exactly the kind of rhetorical hyperbole and opinion protected under the First Amendment and New York law.  *See* Section I.B., *infra*.

*Finally*, Nunes does not dispute that he is a public official and thus must plead facts that, if true, could establish actual malice.  His SAC only includes conclusory contentions that Maddow somehow "knew" the statements were false and made them up "out of whole cloth," (SAC ¶ 25(a)), or that Maddow failed to adequately investigate the statements and instead published them with a purported "hostility" toward Nunes (SAC ¶ 25(b)-(g)).  Courts regularly dismiss actions based on similarly conclusory allegations, bald claims of bias or ill-will, or suggestions that an investigation of a story was not sufficiently thorough.  *See* Section II, *infra*.

Ultimately, "[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement" that it was adopted in part to "protect the free discussion of governmental affairs."  *Mills v. Alabama*, 384 U.S. 214, 218 (1966).  The Segment reports on the intersection of foreign interference in the democratic process, executive branch intelligence reports, and a congressional hearing, and thus falls squarely within this constitutional protection.  As the U.S. Supreme Court recently observed:

> In this country, we expect elected representatives to shoulder a degree of criticism about their public service from their constituents and their peers—and to continue exercising their free speech rights when the criticism comes. … When individuals 'consent to be a candidate for a public office conferred by the election of the people,' they necessarily 'pu[t] [their] character in issue, so far as it may respect [their] fitness and qualifications for the office.

*Houston Cmty. Coll. Sys. v. Wilson*, 142 S.Ct. 1253, 1261 (2022).  Nunes was an elected official and he cannot wield litigation to silence coverage he dislikes.  The SAC should be dismissed.

## STATEMENT OF FACTS

### A.    The Parties

Nunes is a former U.S. Congressman and Ranking Member of the House Permanent Select Committee on Intelligence (the "House Intelligence Committee").  SAC ¶¶ 1, 8.  In this capacity, he was involved in intelligence-related activities concerning the national security of the United States Government, including "oversight of the U.S. national security apparatus."  SAC ¶ 8.  He announced his resignation from Congress on December 6, 2021.[1]  He is also a frequent defamation plaintiff, having sued multiple media companies,[2] and courts have repeatedly granted motions to dismiss these lawsuits.[3]

Defendant NBCUniversal Media, LLC, is a limited liability company with its principal place of business in New York.  SAC ¶ 9.  It owns and operates the cable network MSNBC, which

---

[1] DEVIN G. NUNES, Plaintiff, v. NBCUNIVERSAL MEDIA, LLC, Defendant., 2022 WL 269101, at *1 (E.D. Tex. Jan. 28, 2022).

[2] *See*, *e.g.*, *Nunes v. Lizza*, 12 F.4th 890 (8th Cir. 2021) (defamation action stemming from magazine article discussing alleged employment of noncitizens on a Nunes family farm); *Nunes v. WP Co. LLC*, 513 F. Supp. 3d 1 (D.D.C. 2020) (defamation action stemming from article concerning purported conversation that Nunes had with then-President Trump regarding a classified intelligence briefing) *aff'd sub nom. Devin G. Nunes v. WP Company LLC*, 2022 WL 997826 (D.C. Cir. Apr. 1, 2022); *Nunes v. WP Co. LLC*, 2021 WL 3550896, at *1 (D.D.C. Aug. 11, 2021) (defamation action stemming from a different Washington Post article about the selection of Nunes's former chief of staff as general counsel of the NSA); *Nunes v. Cable News Network, Inc.*, 520 F. Supp. 3d 549 (S.D.N.Y. 2021) (defamation action stemming from CNN article reporting on alleged meeting between Nunes and a former Ukrainian prosecutor to discuss "digging up dirt" on Joe Biden); *Nunes v. Twitter, Inc.*, 103 Va. Cir. 184 (2019) (defamation claim against Twitter and Twitter user stemming from social media posts); *Nunes v. Meredith, Twitter*, 2021-cv-00078 (E.D. Cal) (same); *Nunes v. McClatchy Company et al.*, CL 19000629-00 (Virginia Circuit Ct., filed Apr. 8, 2019).

[3] *See*, *e.g.*, *Nunes v. Cable News Network, Inc.*, 31 F.4th 135, 138 (2d Cir. 2022) (affirming dismissal in full for failure to comply with the California retraction statute and failure to plead special damages); *Nunes*, 513 F. Supp. 3d at 1 (granting motion to dismiss for failure to adequately allege actual malice and denying leave to amend as futile); *Nunes v. Fusion GPS*, 531 F. Supp. 3d 993 (E.D. Va. 2021) (after allowing Nunes to amend the complaint twice, dismissing in full for failure to state a claim and holding that Nunes failed on every element of his RICO claim); *Nunes v. Twitter, Inc.*, 105 Va. Cir. 230 (2020) (granting dismissal of defamation and negligence claims on the basis of 47 USC Section 230 immunity).  *See also Nunes*, 2021 WL 3550896, at *9 (granting in part and denying in part dismissal motion).

delivers perspective news programming and breaking news to millions of households worldwide.

*Id.*  MSNBC airs a news commentary program, *The Rachel Maddow Show*.  *Id.*

**B.**     **Amid Investigations Into Russian Interference, Nunes Receives a Package from Andriy Derkach**

On September 12, 2018, by Executive Order 13848, the President declared a national emergency to deal with the unusual threat to national security posed by the threat of foreign interference in United States elections.  *See* EO 13848.[4]  This Executive Order required the Director of National Intelligence to investigate "any information indicating that a foreign government, or any person acting as an agent of or on behalf of a foreign government, has acted with the intent or purpose of interfering in" U.S. elections.  *Id.*

According to the SAC, on December 11, 2019, while the investigation was ongoing, Nunes received a package from Derkach addressed to him, and had "strong reason to believe that the sending of this package is part of a foreign disinformation campaign that included participation by Americans."  SAC ¶ 13.  The SAC alleges—as Nunes' first public statement on the topic—that a member of his staff delivered the Derkach package to the FBI in December 2019.  SAC ¶ 13.  It also alleges that Nunes, along with unnamed top Republican staff on the House Intelligence Committee "briefed the FBI on their concerns about the package" in January 2020.  SAC ¶ 13.  Prior to the filing of this lawsuit, however, Nunes refused to answer any questions about this package from his fellow members of the House Intelligence Committee or from various media outlets.  *See* Chase Decl., Exs. D, E, G.

Apparently believing that the recipients of the packages (including Nunes) took no action in the intervening months, by letter dated July 13, 2020, top Democratic congressional lawmakers

---

[4] Executive Order 13848, "Imposing Certain Sanctions in the Event of Foreign Interference in a United States Election" (Sept. 12, 2018), available at https://www.govinfo.gov/content/pkg/DCPD-201800593/pdf/DCPD-201800593.pdf.

including the Chairman of the House Intelligence Committee alerted the FBI to a potential

"concerted foreign interference campaign."  Chase Decl., Ex. C.  The letter contained a classified

addendum setting forth "concrete, specific, and alarming reporting" regarding the elections.  *See*

Chase Decl. Ex. D at 5.  On July 23, 2020, Politico reported that the classified addendum described

the Derkach package sent to Nunes.  Chase Decl., Ex. C.[5]  Noting that Nunes "declined repeated

requests for comment," the Politico article further reported:  "One person familiar with the matter

said the information was not turned over to the FBI.  The FBI declined to comment."  *Id.*

**C.**  **The House Intelligence Committee Questions Nunes; He Refuses To Answer**

Less than a week after Politico reported that Nunes received the Derkach package and did

not turn it over to the FBI, on July 29, 2020, the House Intelligence Committee held a closed-door

meeting (the "Intelligence Committee Meeting").  During the Intelligence Committee Meeting,

Chairman Adam Schiff (D-CA) raised concerns that Russia was "trying to interfere in the

Presidential election and seeking to divide Americans," and described the July 13 letter he and

other top lawmakers sent to the FBI.  Chase Decl. Ex. D at 4-5.  The Intelligence Committee then

voted along party lines to share the contents of the classified addendum to the letter with the rest

of the House of Representatives.  *Id.* at 16-18.  Prior to the roll-call vote, Nunes opposed releasing

the addendum to other members, calling it a "politicization of intelligence" designed to "provide

---

[5] The court may take judicial notice of this July 23, 2020 Politico article.  The Court may consider documents that were attached, incorporated by reference, or relied upon by Plaintiff in his pleading, and any judicially noticeable matters.  *See Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011).  Here, the Complaint relies on and incorporates by reference two news articles—the July 30, 2020 Politico article and the July 29, 2020 Breitbart article—which both link to the July 23 Politico article.  SAC ¶ 16.  In addition, courts may take judicial notice of public records like the Intel Committee Hearing Transcript, the July 13, 2020 Letter from Pelosi and others to the FBI, and the DNI and DOJ Intelligence Reports.  *Epstein v. N.Y. City Dist. Council of Carpenters Benefit Funds*, 2016 WL 1718262, at *2 (S.D.N.Y. Apr. 28, 2016) (Crotty, J.), as well as related website pages and news articles.  *See, e.g., Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29, 35 (D.D.C. 2012) (taking judicial notice of "various Internet postings"), *aff'd*, 736 F.3d 528, 534 (D.C. Cir. 2013); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) (taking judicial notice of press articles "to show that information [at issue] was publicly available").

classified material to support the Democrats' agenda" as it "focuses entirely on Russia while ignoring potential election meddling by any other nations." *Id.* at 7.

After the vote to release the addendum, a member of the committee, Representative Sean Patrick Maloney (D-N.Y.), asked Nunes if he had received materials from Derkach and "whether he is prepared to share them with the rest of the committee." Chase Decl., Ex. D. Nunes refused to respond. *Id*. ("Did you receive a package from Andrii Derkach or not? And would you share with the committee or not? Well, I guess this is a case where silence speaks volumes."); *see also* SAC ¶ 13 n.5 (conceding that at the meeting, "Plaintiff stated that he did not wish to respond.").

Several news outlets, including Breitbart and Politico, reported on Nunes' exchange with Maloney. SAC ¶ 16; Chase Decl., Exs. F-H. The same day as the hearing, July 29, 2020, Breitbart reported that Rep. Maloney "verbally accost[ed] Nunes," and quoted Representative Rick Crawford (R-AZ) as describing the "standard practice" for handling foreign packages. Chase Decl., Ex. F. According to Breitbart, Rep. Crawford stated, "you follow the protocol, which is you turn that over to the FBI. That's what happened." *Id*. The Breitbart article, however, did not describe Rep. Crawford's basis for this statement, nor did it state that he was purporting to speak on behalf of Nunes. The article also re-reported the quote from the July 23 Politico article that "One person familiar with the matter said the information was not turned over to the FBI. The FBI declined to comment." *Id*. On July 30, 2020, Politico reported that Rep. Crawford's quote "suggested that Nunes turned [the Derkach package] over to authorities," but also again reported that Nunes "declined requests to respond to inquiries about whether" he had received the Derkach package and whether "he or his aides delivered it to the FBI for vetting." Chase Decl., Ex. G. Further, the July 30 Politico article included a hyperlink to the July 23 Politico article containing the quote that "the information was not turned over to the FBI."

**D.      The Intelligence Reports On Election Interference Are Released**

In accord with Section 1(a) of the Executive Order on foreign interference in U.S. elections, on January 7, 2021, the National Intelligence Counsel, in coordination with several intelligence agencies, issued a classified report on foreign actors' intentions and efforts to interfere with the 2020 U.S. federal elections.  A declassified version of that report was released on March 10, 2021. *See* Chase Decl., Ex. I (the "DNI Report").[6]  In accord with Section 1(b) of the Executive Order, the Justice Department, including the Federal Bureau of Investigation (FBI), and the Department of Homeland Security issued a joint report evaluating foreign attempts to interfere with the 2020 election.   *See* Chase Decl., Ex. J (the "DOJ Report") (together with the DNI Report, the "Intelligence Reports").[7]

The Intelligence Reports found no evidence that any foreign actor prevented voting, changed votes, or otherwise compromised the integrity of ballots cast in the 2020 federal elections. *See*, *e.g.*, DOJ Report at 3.  The DNI Report did, however, identify "influence operations" by the Russian state, designed to favor one political party over the other and undermine public confidence in the electoral process.  DNI Report at 2.  In discussing these "influence operations," the DNI Report specifically identified Andriy Derkach.  DNI Report at 2.

**E.      NBCU Reports on the DNI Report and the Allegations Made During the Intelligence Committee Meeting**

A week later, on March 18, 2021, *The Rachel Maddow Show* reported the Segment on the recently-released DNI Report.  Chase Decl., Ex. B.  The Segment reported that the Intelligence

---

[6] National Intelligence Council Intelligence Community Assessment, "Foreign Threats to the 2020 US Federal Elections" (Mar. 10, 2021), available at https://www.dni.gov/files/ODNI/documents/assessments/ICA-declass-16MAR21.pdf.

[7] Joint Report of the Department of Justice and the Department of Homeland Security, "Foreign Interference Targeting Election Infrastructure or Political Organization, Campaign, or Candidate Infrastructure Related to the 2020 US Federal Elections" (Mar. 2021), available at https://www.justice.gov/opa/press-release/file/1376761/download.

Reports concluded that, just as in 2016, the Russian government employed a range of measures to influence the 2020 U.S. elections in favor of former-President Trump.  The Segment further discussed how the DNI Report identified Derkach as being under "the purview of Russian President Vladimir Putin."  The Segment continued, observing that:

> [Derkach and other Russian proxies] sought to use prominent U.S. persons and media conduits to launder their narratives to US officials and audiences.  These Russian proxies met with and provided materials to Trump administration-linked US persons to advocate for formal investigations . . . and attempted to make contact with several senior US officials.

DNI Report at 8.  After Maddow reported that Derkach had publicly been promoting Russian intelligence disinformation, the Segment turned to the revelations from the previous summer that Nunes had also received a package from Derkach and had been less than forthcoming with the press and members of the intelligence community.  The Segment recounted that Nunes had refused to turn the package over to "the intelligence community," including the members of the House Intelligence Committee and the FBI, and displayed a headline from CNN: "Devin Nunes declines to say whether he received foreign information meant to damage Biden."  Chase Decl., Ex. H.  That CNN article included a hyperlink to a transcript of the Intelligence Committee meeting.  *Id.*

**F.      Plaintiff's Lawsuit**

On August 3, 2021, Nunes filed this lawsuit against NBCU in the Eastern District of Texas, alleging that several of the statements in the Segment were defamatory.  Dkt. No. 1.  NBCU moved to dismiss the case for lack of personal jurisdiction and improper venue on October 28, 2021, Dkt. No. 5, and the case was transferred to this Court in February 2022.  Dkt. No. 22.  On March 28, 2022, Nunes filed a First Amended Complaint against NBCU.  Dkt. No. 28.  On May 12, 2022, in accordance with this Court's April 28, 2022 Minute Entry, and in response to NBCU's pre-motion letter, Nunes filed the operative Second Amended Complaint against NBCU.  Dkt. No. 40.  In the

SAC, Nunes largely repeats his earlier allegations and alleges that three specific statements in the

Segment, and one statement from a subsequent Tweet, are defamatory:

> (1) "Andriy Derkach is sanctioned by the U.S. government as a Russian agent. He
> is singled out by name by the Director of National Intelligence as someone under
> Vladimir Putin's direct purview who helped run this organization targeting our
> election last year. Congressman Nunes accepted a package from him. What was in
> it?"

> (2) "Congressman Nunes has refused to answer questions about what he received
> from Andriy Derkach. He has refused to show the contents of the package to other
> members of the intelligence community. He has refused to hand it over to the FBI
> which is what you should do if you get something from somebody who is
> sanctioned by the U.S. as a Russian agent."

> (3) "Still, the Republicans have kept Mr. Nunes on as the top Republican on the
> intelligence committee. How does that stand? How does that stay a thing?"

> (4) "How do Republicans keep Devin Nunes on as the ranking member of the
> Intelligence Committee given his unexplained interactions with Andriy Derkach?"

SAC ¶¶ 2, 5 (the "Statements").  NBCU now moves to dismiss Nunes's meritless SAC.

## ARGUMENT

To survive a motion to dismiss, "a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  While the

Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiff's

favor, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), the Court is not

obligated to accept as true legal conclusions couched as factual allegations.  *Rolon v. Hennenman*,

517 F.3d 140, 148–49 (2d Cir. 2008); *see also Iqbal*, 556 U.S. at 678.  Unless a plaintiff's well-

pleaded allegations have "nudged [his] claims across the line from conceivable to plausible, [the

plaintiff's] complaint must be dismissed."  *Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 680.[8]

---

[8] Although no material conflict exists between the laws of New York, California (the state of
Nunes' domicile), and the District of Columbia (where Nunes now alleges he suffered the most harm), New

## I.    THE COMPLAINT FAILS TO STATE A CLAIM FOR DEFAMATION

Plaintiffs' Complaint contains no plausible claim for relief against NBCU.  To state a defamation claim, Plaintiff must plead and prove (1) a false and defamatory statement of fact, (2) of and concerning him, (3) published to a third party, (4) made with some degree of fault, and (5) that causes him injury, unless the statement is defamatory per se and therefore actionable regardless of harm.  *Cucinotta v. Deloitte & Touche, LLP*, 20 Misc. 3d 1144(A), 2008 WL 4210485, at *2 (Sup. Ct. N.Y. Cty. Sept. 15, 2008).  Here, each of the challenged Statements are protected by New York's fair report privilege because they accurately report on the allegations in the Intelligence Committee Meeting and the DNI Report, and/or they are substantially true.  Two Statements are protected opinion.  Lastly, Nunes fails to plausibly allege actual malice.

### A.    The Statements Are Absolutely Privileged as a Fair and True Report of the Allegations In The DNI Report And Intelligence Committee Meeting

New York has codified an absolute fair report privilege, providing that "[a] civil action may not be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative or other official proceeding[.]"  N.Y. Civ. Rights Law § 74 ("Section 74").  *See also Cholowsky v. Civiletti*, 69 A.D.3d 110, 114 (2d Dep't

---

York law plainly applies to this case under New York's choice of law rules.  In multi-state defamation cases, like this one, New York courts apply the law of the state with the most significant interest in the case, and consistently recognize a strong policy interest in protecting publishers and journalists located in New York.  *See*, *e.g.*, *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1092-93 (S.D.N.Y. 1984) ("libel is less plaintiff-centered than other torts," and "New York, as the national center of the publishing industry, has a significant interest in assuring that the risks and liabilities flowing from publishing and related options contracts, negotiated and largely performed here, will be uniform"); *Machleder v. Diaz*, 801 F.2d 46, 52 (2d Cir. 1986) ("CBS accurately asserts that New York has a strong interest in this litigation" given its operations in New York).  In *Kinsey*, a defamation claim over a *New York Times* article reporting on events centered in the District of Columbia, the Second Circuit applied New York law because the *Times* is domiciled in New York and the statements at issue emanated from there, notwithstanding the plaintiff alleged the article harmed his employment in D.C.  *Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 177–78 (2d Cir. 2021); *compare Nunes v. Cable News Network, Inc.*, 31 F.4th at 141–42 (applying California law under Virginia's *lex loci delicti* choice of law rules).  Because the Statements at issue here likewise emanated from this state, New York law controls.

2009) ("The case law has established a liberal interpretation of the 'fair and true report' standard of Civil Rights Law § 74 so as to provide broad protection to news accounts of judicial or other official proceedings.") (citation omitted).  The New York legislature enacted this statute in order to avoid stifling "an active, thriving and untrammeled press" in its reporting on official proceedings and to ensure that the press receives "broad protection."  *Idema v. Wager*, 120 F. Supp. 2d 361, 365 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002); *see also Cummings v. City of N.Y.*, 2020 WL 882335, at *15 (S.D.N.Y. Feb. 24, 2020).

New York courts have articulated a number of fundamental principles underlying Section 74.  ***First***, Section 74 applies to a news report of an official proceeding so long as "the substance of the article [is a] substantially accurate" account of the official proceeding itself.  *Kinsey*, 991 F.3d at 178; *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 67 (1979).  When determining whether a report is substantially accurate, the claims should "be assessed on the publication as a whole, not isolated portions of it."  *Miller v. Journal-News*, 211 A.D.2d 626, 627 (2d Dep't 1995) (citation omitted); *see also Sipple v. Found. for Nat'l Progress*, 71 Cal. App. 4th 226, 238 (1999) (rejecting ex-spouse's libel claims over incidents of abuse detailed by ex-wives since the descriptions were consistent with the "gist" of their court testimony that plaintiff had physically and emotionally abused them).  Moreover, the language used "should not be dissected and analyzed with a lexicographer's precision" but, rather, should be afforded some degree of liberality.  *Holy Spirit*, 49 N.Y.2d at 68.  A report is "substantially accurate" with respect to the official proceeding if it would not "produce a different effect on a reader than would a report containing the precise truth."  *Cholowsky*, 69 A.D.3d at 115.

***Second,*** Section 74 protects reporting on the charges and allegations made in official proceedings regardless of whether the underlying allegations are in fact true or false. *See*, *e.g.*,

*Cummings*, 2020 WL 882335, at *16; *Mulder v. Donaldson, Lufkin & Jenrette*, 161 Misc. 2d 698, 705 (Sup. Ct. N.Y. Cty. 1994) ("The question is not whether or not the statement is 'true.' The question is whether it is a substantially accurate description of the claims made in the . . . proceeding."), *aff'd*, 208 A.D.2d 30 (1st Dep't 1995).

**Third**, Section 74 does not require that a news report be unbiased: "[t]here [is] 'no requirement that the publication report the plaintiff's side of the controversy,'" just that the publication report on the official proceeding with substantial accuracy. *Zappin v. NYP Holdings Inc.*, 2018 WL 1474414 (S.D.N.Y. Mar. 26, 2018), *aff'd*, 769 F. App'x 5, 10 (2d Cir. 2019) (quoting *Cholowsky*, 69 A.D.3d at 115). Indeed, the failure to include facts favorable to one party involved in an official proceeding will not remove a report from Section 74's protections so long as the "omissions d[o] not alter the substantially accurate character of the article." *Rakofsky v. Wash. Post*, 2013 WL 1975654, at *9 (Sup. Ct. N.Y. Cty. Apr. 29, 2013) (citation omitted).

**Fourth**, the Section 74 privilege is "absolute" and is "not defeated by the [Plaintiff's] allegations of malice or bad faith." *Pelayo v. Celle*, 270 A.D.2d 469, 469 (2d Dep't 2000); *Zappin*, 2018 WL 1474414, at *5; *Orr v. Lynch*, 60 A.D.2d 949, 950 (3d Dep't 1978) ("Further, in reporting a newsworthy event, the belief or doubt of the reporter is not important since he is reporting the news event, not assuming responsibility for the veracity of the quoted remark."), *aff'd*, 45 N.Y.2d 903 (1978).

**Last**, whether an article presents a fair and true report of an official proceeding is a question of law for the court to decide. *See*, *e.g.*, *Holy Spirit*, 49 N.Y.2d at 65–68. As such, courts in New York and the Second Circuit regularly dismiss defamation actions based on this privilege alone.[9]

---

[9] *See Kinsey v. N.Y. Times Co.*, 2020 WL 1435141 (S.D.N.Y. Mar. 3, 2020), *aff'd*, 991 F.3d 171, 178 (2d Cir. 2021); *Friedman v. Bloomberg L.P.*, 180 F. Supp. 3d 137, 152 (S.D.N.Y. 2016), *aff'd in relevant part*, 884 F.3d 83, 94 (2d Cir. 2017); *Seymour v. Lakeville Journal Co.*, 2004 WL 2848537, at *5 (S.D.N.Y. Dec. 9, 2004), *aff'd*, 150 F. App'x 103, 104 (2d Cir. 2005); *Cummings*, 2020 WL 882335, at

Here, the fair report privilege applies to the Segment because it reports on official proceedings, and the Segment is a fair and true report of those proceedings.

### 1.    The Segment Reported on an Official Report and Proceeding

The fair report privilege extends to the Segment because it reports on allegations that arose in the context of the Intelligence Committee Meeting and the DNI Report.  There is no question that the DNI Report, Pelosi's letter to the FBI, and the Intelligence Committee Meeting at issue here qualify as official proceedings under the liberal standard of Section 74.  *Fine v. ESPN, Inc*., 11 F. Supp. 3d 209, 215 (N.D.N.Y. 2014) (collecting cases finding that investigations are official proceedings under Section 74).

Here, the Segment reported on a U.S. intelligence investigation into Russia's "influence operations" on U.S. elections.  The Segment discusses and even displays the DNI Report and reports summarizing the intelligence community's official investigation into Russian attempts at election interference in explaining that Derkach was identified as a key player in these operations, and further explains that Nunes was accused of receiving the Derkach package and refusing to turn it over to members of the "intelligence community."[10] It therefore falls within the scope of the privilege.  *Kinsey*, 991 F.3d at 179 (affirming dismissal of defamation claim on fair report grounds where clear to "ordinary reader" that article in suit was "a report of an official proceeding").

### 2.    The Segment Was a Fair and True Report[11]

---

*15; *BYD Co. v. Vice Media LLC*, 531 F. Supp. 3d 810, 822, 827 (S.D.N.Y. 2021); *Misek-Falkoff v. Am. Lawyer Media, Inc*., 300 A.D.2d 215 (1st Dep't 2002); *Daniel Goldreyer, Ltd. v. Van de Wetering*, 217 A.D.2d 434, 435 (1st Dep't 1995).

[10] The Segment displays a CNN article, which discusses the Intelligence Committee Meeting including a hyperlink to the transcript.  While the CNN article is not an official proceeding, a report is shielded by the privilege if its source conspicuously incorporates the official proceeding.  *Gubarev v. BuzzFeed, Inc.*, 340 F. Supp. 3d 1304, 1319 (S.D. Fla. 2018) (online article protected under New York's fair report privilege when it contained a hyperlink to a CNN article that relied on official proceedings; an ordinary reader would conclude that the article concerned official action).  Chase Decl., Exs. A, H.

[11] Even if Section 74 did not supply an absolute privilege here, the Statements do not give rise to a claim for defamation because they are substantially true.  Substantial truth is an "absolute, unqualified

### a. The Statement that "Nunes accepted a package from [Derkach]" is both a fair and true report, and verifiably true.

The Statement that "Congressman Nunes accepted a package from [Derkach]" is verifiably true. SAC ¶ 13 (stating in purported letter from Nunes to Barr that the "House Intelligence Committee today received a package from foreign individuals addressed to me," *i.e.*, Nunes); *id.* ¶ 16 (referring to the package as "the package received from Derkach"). It is also a fair and true report of the Intelligence Committee Meeting transcript and the DNI Report. *See, e.g.*, Chase Ex. D (discussing whether Nunes "received a package from Andrii Derkach or not"); DNI Report at 3 (Derkach and others "provided materials to Trump administration-linked US persons" and "attempted to make contact with several senior US officials").[12]

### b. The Statement that Nunes "has refused to answer questions about what he received from Andriy Derkach" and "refused to show the contents of the package to other members of the intelligence community" is a fair and true report.

The statement that Nunes "refused to show the contents of the package to other members of the intelligence community," SAC ¶ 13, is a fair and true report of the Intelligence Committee Meeting, which makes clear that Nunes had not shared the package with at least the Democratic

---

defense" to a libel claim. *See Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir. 1986) (citation omitted); *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 34 (1st Dep't 2014). As with evaluating whether a report is "fair" under the privilege, when evaluating substantial truth, courts also consider the statement's "gist" or "sting" rather than parsing individual words. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) ("Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'") (citation omitted); *301 Fulani v. N.Y. Times Co.*, 260 A.D.2d 215, 216 (1st Dep't 1999) (requiring the "'gist' or 'sting'" of the statement to be false). Under this doctrine, too, the "gist" or "sting" standard is satisfied when "minor errors [] do not change a reader's perception of the statement." *Lawrence v. Hearst Commc'ns, Inc.*, 2022 WL 894716, at *2 (2d Cir. Mar. 28, 2022) (quoting *Strada v. Conn. Newspapers, Inc.*, 193 Conn. 313, 322 (1984)). The Statements easily meet this standard.

[12] Although Nunes evidently takes issue with the use of the term "accepted" as opposed to "received," such minor disagreements on word choice do not amount to falsity so long as 'the substance, the gist, the sting, nor do they remove a news story from the protection of the fair report privilege. "When the truth is so near to the facts as published that fine and shaded distinctions must be drawn and words pressed out of their ordinary usage to sustain a charge of libel, no legal harm has been done." *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242–43 (2d Cir. 2017) (citation omitted). The ordinary reader understands these terms to be interchangeable in the context of a package delivery.

Intelligence Committee members at the time of the meeting.  Likewise, the Hearing Transcript also confirms that Nunes "refused to answer questions about what he received from Andriy Derkach" or share it with the Committee, and therefore the Statement is indisputably a fair and true report.  Chase Decl., Ex. D.  Notably, other than a conclusory allegation that this Statement is false, the SAC nowhere alleges that Nunes showed the package to the members of the Intelligence Committee.  To the contrary, Nunes concedes that when asked if he was "'prepared to share [the package] with the rest of the committee,'" Nunes "stated that he did not wish to respond."  SAC ¶ 13 n.5 (citing *Unclassified Transcript*, pp. 19-20).

Nunes once again splits hairs by alleging that the official definition of "intelligence community" excludes the House Intelligence Committee.  The fair report privilege, however, concerns itself only with the effect on the mind of the reasonable viewer—not official definitions or hyper-technical distinctions.  Nunes concedes the House Intelligence Committee is charged with oversight of the agencies that he claims make up the "intelligence community."  SAC ¶ 3 n.1. Nunes does not and cannot deny that the average viewer would understand the phrase "intelligence community" to mean the group of people working on U.S. intelligence matters, including, *e.g.*, members of the House Intelligence Committee.  Because the Segment reports accurately on the gist of the official proceedings as reflected in the transcript, and the Statement "does not produce a different effect on a reader" than the language used in those proceedings, this Statement is absolutely privileged under Section 74, and also, in the alternative, is substantially true.

        **c.**      **The Statement that Nunes "refused to hand [the package] over to the FBI" is a fair and true report.**

Given that Nunes' refusal to hand the Derkach package over to members of the "intelligence community" is a privileged Statement, it follows that the Statement that he refused to hand the package over to the FBI is also a privileged fair and true report.  Since the FBI is

indisputably part of the intelligence community, the sting of the FBI Statement is no different than the true Statement that Nunes refused to share the package with the "intelligence community," even if one accepts that Nunes did not literally refuse to turn it over to the FBI.  Courts routinely reject the notion that minor factual inaccuracies can defeat the fair report privilege.  Instead, what matters is *only* that the report is a "fair" description *of the gist of the official proceeding*.

For example, in *Sipple*, the plaintiff brought a defamation claim against a magazine that published an article on his custody dispute with his first wife, revealing testimony that he had physically and verbally abused his first and second wives.  71 Cal. App. 4th at 238.  He alleged that the article defamed him by omitting key details from the hearing and straying far beyond the specific allegations made during the custody hearing to include out-of-court interviews and present a "litany of egregious incidents as if they were fact."  *Id*. at 235, 245.  The court declined to parse specific statements in the article, instead finding that the absolute privilege applied to the entire article because it adequately portrayed the "sting" of the official proceeding:

> We find that the gist or sting of the testimony … at the Sipple custody hearing was that appellant physically and emotionally abused his ex-wives.  The article expanded on the theme but did not otherwise alter the substance of the privileged material such that a reader would be affected differently if the information garnered by interviews surrounding the wife-beating allegations were not included.

*Id.* at 245; *see also Holy Spirit*, 49 N.Y.2d at 68 (a "fair report which is not misleading, composed and phrased in good faith" may not "be thereafter parsed and dissected on the basis of precise denotative meanings which may literally, although not contextually, be ascribed to the words used"; even though the "use of phrases … could be considered imprudent," this did not render the reports "unfair").

Indeed, courts routinely find that even *significant* factual inaccuracies do not remove a fair report of an official proceeding from the ambit of the privilege, so long as the sting of the report is substantially accurate.  *See also Jennings v. Telegram-Tribune Co.*, 164 Cal. App. 3d 119, 124,

127 (1985) (statement that plaintiff was convicted of "tax fraud" for failing to report $435,000 of income was substantially true even though he was actually convicted of a misdemeanor for failing to report a smaller amount, since "the gist or sting of the articles is that [plaintiff] was convicted [of] several serious tax crimes"; *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 123 (Tex. 2000) ("An average viewer…would not view a 1.7 million dollar insurance swindle – or even an $875,000 insurance swindle – with any less opprobrium than a 6.5 million dollar swindle.").  New York courts also consistently find that the "gist" or "sting" is substantially accurate when "minor errors [] do not change a reader's perception of the statement."  *Lawrence v. Hearst Commc'ns, Inc.*, 2022 WL 894716, at *2 (2d Cir. Mar. 28, 2022) (citation omitted).[13]

The alleged factual inaccuracy at issue here is far more minor than these examples:  Nunes alleges that the Segment inaccurately stated that he did not turn the package over to the FBI, but cannot plausibly deny that he refused to turn it over to other "members of the intelligence community."  This minor alleged factual inaccuracy does not remove the Segment from the ambit of the privilege because the Segment fairly captures the "gist" or "sting" of the House Intelligence Committee Meeting: namely, that Nunes withheld the Derkach package from intelligence community members.  A viewer's perception of the statement that Nunes did not hand over the package to "members of the intelligence community" is not changed by whether those rebuffed

---

[13] *See, e.g.*, *Becher v. Troy Publ'g Co.*, 183 A.D.2d 230, 233 (3d Dep't 1992) (inaccurate report that plaintiff indicted on felony bribery charges carried same gist as misdemeanor of making a false sworn statement and therefore privileged); *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 369 (S.D.N.Y. 1998) (statement that plaintiff was "main" or "prime" suspect substantially true where plaintiff admits to being "a" suspect); *Miller*, 211 A.D.2d at 627 (statement that plaintiff was "suspended" substantially true where plaintiff was placed on "administrative leave"); *Printers II, Inc. v. Prof'l Publ'g, Inc.*, 784 F.2d 141, 146–47 (2d Cir. 1986) (even though statement was "literally false" and "may have impliedly misrepresented" that plaintiff was overdue in paying its bills, statement was nonetheless substantially true because plaintiff was disputing the bills "with such vigor" that plaintiff had no intention of paying the bills when due); *Lawrence v. Altice USA*, 841 F. App'x 273, 275 (2d Cir. 2021) (report that plaintiff had been arrested for "stalking" was substantially true where "the totality of [his] conduct" in multiple incidents of "repeated, unsolicited, and frightening behavior toward women" was "fairly described as stalking," as that term was commonly understood).

government officials are members of the FBI or the Intelligence Committee overseeing the FBI. This Court should reject Nunes's attempt to "parse[] and dissect[] on the basis of precise denotative meanings" taken out of context. *Holy Spirit*, 49 N.Y.2d 63 at 68. Put simply, this Statement is absolutely privileged under Section 74.

> d.      **The Statement that Nunes had "unexplained interactions" with Derkach is a fair and true report.**

Like the Statement regarding Nunes "accepting" the Derkash package, the Statement that Nunes had "unexplained interactions" with Derkach is true and refers to the same undisputed event. Nunes admits that Derkach sent a package addressed to him. *See* Section I.A.2.a., *supra*. The average reader would understand that receiving a package is one possible type of "interaction." *See Posner v. N.Y. Law Publ'g Co.*, 228 A.D.2d 318, 318 (1st Dep't 1996). Nunes cannot reasonably dispute that the interaction was "unexplained," because the transcript demonstrates his unwillingness to acknowledge, let alone "explain," his receipt of the package. Chase Decl., Ex. D.[14]

*      *      *

In sum, the Statements are fair and true reports of the Nunes-Derkach chapter of the intelligence community's years-long investigation into Russian attempts at election interference. For all of the foregoing reasons, the Segment cannot, as a matter of law, give rise to liability

---

[14] Nunes also challenges the alleged implication that he "violate[d] any rule, practice, procedure or protocol or act[ed] illegally, improperly or unethically …." SAC ¶ 13. As this statement appears nowhere in the Segment, he "must make a *rigorous showing* that the language of the communication as a whole can be reasonably read both to impart a defamatory inference and to affirmatively suggest that the author intended or endorsed that inference." *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 37–38 (1st Dep't 2014) (emphasis added) (affirming motion to dismiss); *Chaiken v. VV Publ'g Corp.*, 907 F. Supp. 689, 698 (S.D.N.Y. 1995), *aff'd*, 119 F.3d 1018 (2d Cir. 1997). Nunes fails to allege that the Segment intended to create or endorsed the alleged implication. But even assuming *arguendo* that the implication exists, the Segment is an accurate representation of the allegations lodged against Nunes during the course of the official intelligence investigation, and any implication of wrongdoing is inherent in those allegations. Chase Decl., Ex. D (Rep. Maloney: "Did you receive a package from Andrii Derkach or not? And would you share with the committee or not? Well, I guess this is a case where silence speaks volumes.").

pursuant to Section 74.  And even in the absence of this absolute privilege, the Statements are not actionable because they are substantially true.  *See* note 11, *supra*.

**B.     Rhetorical Questions and Subjective Statements Cannot Form the Basis of a Defamation Claim.**

The Segment's rhetorical questions—"What was in it?"; "How does that stand? How does that stay a thing?"—and the Statement on what one "*should* do if you get something from somebody who is sanctioned by the U.S. as a Russian agent," are not defamatory statements of fact but, rather, rhetorical hyperbole and opinion that cannot give rise to a libel claim.  SAC ¶ 2 (emphasis added).  "[A] statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved."  *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 19–20 (1990).  This "ensures that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection" and "provides assurance that the public debate will not suffer for lack of imaginative expression or the rhetorical hyperbole which has traditionally added much to the discourse of our Nation."  *Id*. at 20 (citation and internal quotation marks omitted); *Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152 (1993) (observing that New York embraces a "more flexible" and "decidedly more [speech] protective" test for what constitutes a nonactionable statement of opinion).

In drawing the line between fact and opinion, the relevant inquiry is "whether a reasonable listener is likely to have understood the statements as conveying provable facts about the plaintiff." *Torain v. Liu*, 279 F. App'x 46, 46 (2d Cir. 2008); *Gross*, 82 N.Y.2d at 152.  New York courts look to the following factors in making this inquiry:

(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statements appear[] or the broader social context and surrounding circumstances

> are such as to 'signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact[s]'.

*Brian v. Richardson*, 87 N.Y.2d 46, 51 (1995) (citing *Gross*, 82 N.Y.2d at 153 (quoting *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 292 (1986))).  The Court must "look[] at the content of the whole communication, its tone and apparent purpose" to "determine whether a reasonable person would view them as expressing or implying *any* facts."  *Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991).  Thus, the Court must not only consider the statement itself, but its "broader social setting" as well as its "immediate context."  *See id.* at 253.

Here, the rhetorical questions and descriptions of what one "should" do under a hypothetical scenario are exactly "the sort of rhetorical hyperbole and unfalsifiable opinion protected by the First Amendment."  *Adelson v. Harris*, 774 F.3d 803, 807 (2d Cir. 2014); *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 42 (1st Dep't 2011) (statements would be read as opinion in part because they were "replete with rhetorical questions").  Such rhetorical questions are incapable of being proven true or false.  Further, the statements were made on a political news perspective program in the heat of a highly partisan political debate.  As the Ninth Circuit recently observed, "Although MSNBC produces news, Maddow's show in particular is more than just stating the news—Maddow 'is invited and encouraged to share her opinions with her viewers,'" and in turn, "to persuade others to [her] position[ ] by use of epithets, fiery rhetoric or hyperbole." *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1157–58 (9th Cir. 2021) (citations omitted). This context suggests that a reasonable viewer would not conclude the Statements to suggest an assertion of fact.  Put simply, the rhetorical questions and statements of what one "should" do are non-actionable opinion that cannot form the basis of a defamation claim.

## II.   IN THE ALTERNATIVE, PLAINTIFF'S COMPLAINT MUST BE DISMISSED BECAUSE HE FAILED TO PLEAD ACTUAL MALICE.

Even if Nunes could overcome the hurdles described above, his defamation claim still fails.

Under controlling constitutional principles and New York law, as a public official, Nunes must plead facts sufficient to demonstrate that each allegedly defamatory statement was published with actual malice, *i.e.*, "with knowledge of its falsity or with reckless disregard of whether it was false." N.Y. Civ. Rights Law § 76-a(2); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964) (public figure plaintiffs must plead and prove "actual malice").  Nunes's Complaint falls short.

Because he was a public official, Nunes must plead facts that would render it plausible that NBCU "in fact entertained serious doubts as to the truth of [their] publication."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  Nunes fails to meet his pleading burden.  The SAC recites a litany of allegations in an effort to cobble together a claim of actual malice, but each of them individually and collectively falls short of the heightened pleading burden.[15]

*First*, the SAC alleges that Maddow/NBCU provided no source for the FBI Statement (SAC ¶ 25(a)); did not interview unnamed "important witnesses" including Rep. Crawford (SAC ¶ 25(c)); and did not try to contact Nunes for comment (SAC ¶ 23(g)).  Courts, however, consistently have held that the mere failure to investigate is not sufficient to establish actual malice.  *See BYD Co.*, 531 F. Supp. 3d at 827 (dismissing complaint for failure to plead actual malice; rejecting imposition of "duty to investigate even in circumstances where [defendant] had no subjective reason to doubt the veracity of its sources"); *Sackler v. ABC, Inc.*, 71 Misc. 3d 693, 700 (Sup. Ct. N.Y. Cty. 2021) ("[I]t is well settled that a 'failure to investigate will not alone support a finding of actual malice.'") (quoting *Harte-Hanks*, 491 U.S. at 692).  Indeed, NBCU had no legal

---

[15] Nunes has made, and courts have rejected, these very arguments before in his prior libel cases— in one instance even with the same phrasing.  *See Nunes v. WP Co. LLC*, 513 F. Supp. 3d at 7–8 (Nunes "repeats various—largely conclusory—allegations," including that "Defendants 'manufactured the statements out of whole cloth,'" and that this failed to satisfy Rule 8 pleading requirements; "caselaw resoundingly rejects the proposition that a motive to disparage someone is evidence of actual malice" (citation omitted)); *Nunes*, 2021 WL 3550896, at *5 ("Nunes's … conclusory references to the Post's purported animus and lack of standards fare little better; actual malice requires more.").

obligation to reach out to Nunes for comment, especially where, as here, he had repeatedly declined to comment to other news outlets and even members of the Intelligence Committee.  Chase Decl., Exs. D, E, G-H.  As Nunes proudly boasts on www.devinnunes.com, a website he relies on in paragraph 7 of his Complaint, "Nunes stopped speaking to the mainstream media altogether and urged other Republicans in Congress to do the same."

*Second*, the allegations that Maddow/NBCU harbor institutional hostility toward Nunes (SAC ¶ 25(f)) and were part of a "Democratic Party operation" with a "pre-determined agenda" to spread "disinformation" in order to distract from a different "controversy" concerning an unrelated congressman and his purported "ties to Communist China" (SAC ¶ 25(e)) not only crosses the line to allege an implausible, rank conspiracy, but is also legally deficient.  *See Harte-Hanks*, 491 U.S. at 665 ("[A defendant's] motive in publishing a story … cannot provide a sufficient basis for finding actual malice."); *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 92 (D.D.C. 2019) ("[T]he motivations behind defendants' communications—inspired by political differences or otherwise— do not impact whether defendants acted with actual malice as a matter of law.").

*Third*, Nunes peppers the SAC with speculative allegations and bombastic rhetoric, including that Maddow "made [the Statements] up out of whole cloth" (SAC ¶ 25(a)); that NBCU somehow "knew from their review of prior reporting" that he had turned the Derkach package over the FBI, based on the hearsay Rep. Crawford quote in a Breitbart article (SAC ¶ 16).  As Nunes knows from his prior litigations, such conclusory "bald assertions" are "no more than 'labels and conclusions' referencing the relevant legal standard," and cannot establish actual malice.  *Nunes*, 2021 WL 3550896, at *5.

Moreover, the only "prior reporting" Nunes alleges in the SAC was a single quote from Representative Crawford in the Breitbart article, and republished in Politico on July 30, 2020: "you

23

follow the protocol, which is you turn that over to the FBI.  That's what happened."  SAC ¶ 16.

But the Breitbart article reiterated that Nunes had *not* turned the Derkach package over to the FBI,

and both the Breitbart article and the July 30 Politico article linked to the same July 23 Politico

article that first reported his failure to turn over the Derkach package to the FBI as fact.  Chase

Decl., Ex. E ("One person familiar with the matter said the information was not turned over to the

FBI. The FBI declined to comment.").  Given the statements within this "prior reporting" that

Nunes had *not* turned the package over to the FBI, and the FBI's and Nunes's repeated refusal to

comment on the matter to the press, a single three-word hearsay quote from Nunes's colleague

buried in non-NBCU news coverage falls far short of the "clear and convincing proof" of actual

malice that Nunes must show here.  *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 183 (2d

Cir. 2000); *cf. Liberman v. Gelstein*, 80 N.Y.2d 429, 438 (1992) ("[T]here is a critical difference

between not knowing whether something is true and being highly aware that it is probably false.

Only the latter establishes reckless disregard in a defamation action.").[16]  Accordingly, Nunes

failed to meet his burden of pleading actual malice.  His lawsuit must be dismissed for this

additional reason.

---

[16] Moreover, Maddow had reason to doubt Rep. Crawford's statement.  As Maddow observed in the Segment, during the relevant time period, Attorney General William Barr and other intelligence officials in the Republican Party were publicly claiming that China – not Russia – was the "most aggressive" in meddling in the 2020 election and based this claim on "intelligence" they had reviewed.  *See* Chase Decl., Ex. A; *see also* SAC ¶ 25(e) (discussing a "controversy" surrounding a congressional representative's purported "relationship with the Chinese Communist Party" and efforts to remove said representative from the House Intelligence Committee).  The Intelligence Reports, however, concluded that the exact opposite: "China did not attempt to influence the Presidential election outcome."  *See, e.g.*, DOJ Report at 7.  In the Segment, Maddow discussed her perspective that Republican officials were deliberately misleading the American public about China interfering in the election, and that Nunes's opposition to releasing the letter at the Intelligence Committee Meeting on the grounds that the letter "ignor[es] potential election meddling by . . . nations" other than Russia.  *See* Chase Decl., Ex. A; Ex. D at 7.  Thus, aside from there being no indication that Crawford had any basis for the statement, the Segment established that Maddow had reason to distrust the statements of Republican intelligence officials as it pertained to Russia election interference.

## CONCLUSION

For the foregoing reasons, Defendant NBCU respectfully requests this Court enter an order dismissing the Second Amended Complaint against it, with prejudice, and for such other and further relief as the Court deems just and proper.

Dated: May 27, 2022            Respectfully submitted,

By:   /s/ Elizabeth A. McNamara
Elizabeth A. McNamara
Jeremy A. Chase
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY  10020-1104
Phone: (212) 489-8230
Fax:    (212) 489-8340
Email: lizmcnamara@dwt.com
        jeremychase@dwt.com

Selina MacLaren (*pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
865 S. Figueroa Street, Suite 2400
Los Angeles, CA  90017
Phone:  (213) 633-6800
Fax:    (213) 633-6899
Email:  selinamaclaren@dwt.com

*Attorneys for Defendant NBCUniversal Media, LLC*