IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------x
DEVIN G. NUNES                          :
                                        :
          Plaintiff,                    :
                                        :
v.                                      :        Case 1:22-cv-01633-PKC
                                        :
                                        :
NBCUNIVERSAL MEDIA, LLC                 :
                                        :
          Defendant.                    :
-------------------------------------------------------x
```

# PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff, Devin G. Nunes ("Plaintiff" or "Nunes"), by counsel, respectfully submits this Memorandum in Opposition to the motion to dismiss second amended complaint pursuant to Rule 12(b)(6) [*ECF No. 44*] filed by defendant, NBCUniversal Media, LLC ("NBCU").

## I.  INTRODUCTION

"Freedom of the press under the First Amendment does not include absolute license to destroy lives or careers." *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 170 (1967) (Warren, C.J., Concurring).  The press has no "special immunity from the application of general laws", nor does it have a "special privilege to invade the rights and liberties of others." *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972).  "No man has a right to state of another that which is false and injurious to him.  A fortiori no man has a right to give it a wider and more mischievous range by publishing it in a newspaper … The liberty of speech and the liberty of the press do not authorize malicious and injurious defamation."

*Dexter v. Spear*, 7 F. Cas. 624-625 (1st Cir. 1825) (Story, J.); *Murphy v. Boston Herald, Inc.*, 449 Mass. 42, 865 N.E.2d 746, 767 (Mass. 2007) ("No one would disagree with the importance of upholding the freedom of the press.  Nor would anyone disagree about the media's right (and duty) to examine the affairs of the judicial branch of government and to criticize activities of judges and other court officials that do not meet the high standards expected of judges and the courts.  The press, however, is not free to publish false information about anyone (even a judge whose sentencing decisions have incurred the wrath of the local district attorney), intending that it will cause a public furor, while knowing, or in reckless disregard of, its falsity."),

Personal reputation derives from the common consent of humankind and has ancient roots.  The common law powerfully supports it.  A person's reputation is a value as old as the Pentateuch and the Book of Exodus, and its command as clear as the Decalogue: "Thou shall not bear false witness against thy neighbor."  The personal interest in one's own good name and reputation surpasses economics, business practices or money.  It is a fundamental part of personhood, of individual standing and one's sense of worth. *Laumwood Medical Center, Inc. v. Sadow*, 43 So.2d 710, 729-732 (Fla. 4th DCA 2010).  In *Rosenblatt v. Baer*, the United States Supreme Court emphasized that:

> "'Society has a pervasive and strong interest in preventing and redressing attacks upon reputation.'  The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty … Surely if the 1950's taught us anything, they taught us that the poisonous atmosphere of the easy lie can infect and degrade a whole society."

383 U.S. 75, 92-93 (1966); *see Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 11-12 (1990) ("Good name in man and woman, dear my lord, Is the immediate jewel of their

souls") (quoting WILLIAM SHAKESPEARE, OTHELLO, act 3 scene 3)); *Fuller v. Edwards*, 180 Va. 191, 198, 22 S.E.2d 26 (1942) ("[o]ne's right to an unimpaired limb and to an unimpaired reputation are, in each instance, absolute and has been since common law governed England. Indeed, an impaired reputation is at times more disastrous than a broken leg.").

Nunes commenced this action because NBCU defamed him to millions of viewers of *The Rachel Maddow Show* and to millions more subscribers and followers via social media. On March 28, 2022, with leave of Court, he filed a second amended complaint, alleging a claim of defamation. [*ECF No. 40 (Second Amended Complaint) ("SAC")*]. The matter is before the Court on NBCU's motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). [*SAC, ¶¶ 8, 9, 10*]. As is explained in detail below, viewed in a light most favorable to Nunes, he has plausibly alleged a claim of defamation against NBCU. Nunes's claim is not barred by the fair report privilege and he has sufficiently alleged that NBCU published materially false and defamatory[1] statements with actual malice: that is, with knowledge that the statements were false or with reckless disregard for the truth. The Court should DENY NBCU's motion.

## II.  BACKGROUND

This memorandum summarizes the allegations in the second amended complaint, which, for purposes of NBCU's motion to dismiss, must be accepted as true, with all reasonable factual inferences drawn in favor of Nunes as the non-movant.

---

[1]     NBCU does not argue in its motion, and therefore concedes that the statements at issue [*SAC, ¶¶ 2, 5*] are defamatory.

A.     __The Parties__

In March 2021, Devin Nunes served as Ranking Member of the House Permanent Select Committee on Intelligence (the "House Intelligence Committee").  As a United States Congressman, he was bound by the Rules of the House of Representatives, including the House Code of Official Conduct and the practices and protocols of the House Intelligence Committee.  As a member of the House Intelligence Committee, he participated in oversight of the U.S. national security apparatus, including the intelligence-related activities of seventeen agencies, departments, and other elements of the United States Government.  His office, where he performed his duties as Ranking Member of the House Intelligence Committee in 2020-2021, was located in Washington, D.C. [https://nunes.house.gov/about/; https://www.devinnunes.com/bio].  Nunes's career as a United States Congressman is distinguished by his honor, dedication and service to his constituents and his country, his honesty, integrity, ethics, and reputation for truthfulness and veracity. [*SAC, ¶¶ 1, 8*].[2]

NBCU is a cable television and media conglomerate that owns and operates "MSNBC".  Reaching more than 96 million households worldwide, MSNBC offers a full schedule of live news coverage, progressive voices, and documentary programming – 24 hours a day, 7 days a week.  MSNBC delivers breaking news and information across a variety of platforms, including www.msnbc.com.  MSNBC also promotes its business and causes via Twitter and YouTube.  MSNBC's Twitter account, **@MSNBC**, now has 4,700,000 followers.   MSNBC's YouTube account now has more than 5,000,000

---

[2]      In its memorandum, p. 4, NBCU interjects immaterial and impertinent matters, including comments that Nunes is "a frequent defamation plaintiff, having sued multiple media companies, and courts have repeatedly granted motions to dismiss these lawsuits."  These gratuitous comments should be struck pursuant to Rule 12(f).

subscribers.   Rachel Maddow ("Maddow") is the host of *The Rachel Maddow Show*, which airs weeknights at 9:00 p.m. on MSNBC.   https://www.msnbc.com/rachel-maddow-show/rachel-maddow-biography-n1157621].   Maddow and her agents run a blog, https://www.msnbc.com/maddowblog, and a Twitter account with over 1,200,000 followers. [*SAC, ¶ 9*].

**B.**      **The March 18, 2021 Rachel Maddow Show**

On March 18, 2021, during a segment of *The Rachel Maddow Show*, NBCU and Maddow published the following statements of fact:

| No. | Statement |
|-----|-----------|
| 1 | "Andriy Derkach [("Derkach")] is sanctioned by the U.S. government as a Russian agent.  He is singled out by name by the Director of National Intelligence as someone under Vladimir Putin's direct purview who helped run this organization targeting our election last year.  Congressman Nunes accepted a package from him.  What was in it?" |
| 2 | "Congressman Nunes has refused to answer questions about what he received from Andriy Derkach.  He has refused to show the contents of the package to other members of the intelligence community.  He has refused to hand it over to the FBI which is what you should do if you get something from somebody who is sanctioned by the U.S. as a Russian agent." |
| 3 | "Still, the Republicans have kept Mr. Nunes on as the top Republican on the intelligence committee.  How does that stand?  How does that stay a thing?" |

[https://www.msnbc.com/rachel-maddow/watch/nunes-questions-laid-bare-as-trump-ear-obfuscation-lifts-on-u-s-intel-about-russia-108795973939 (each a "Statement",  and collectively, the "Statements")].  In addition to MSNBC's cable television subscribers and viewers, Nunes claims that NBCU and Maddow chose to target him by repeating and republishing the Statements to millions of followers and subscribers to MSNBC and Maddow's various social media properties, *e.g.*:

https://twitter.com/MaddowBlog/status/1372745804981604354
("How do Republicans keep Devin Nunes on as the ranking member of the Intelligence Committee given his unexplained interactions with Andriy Derkach?");[3]

https://www.youtube.com/watch?v=kQZqqkNiAsA
(Published to 4,240,000 subscribers).[4]

[*SAC, ¶¶ 2, 5*].  Nunes asserts that MSNBC and Maddow published the false Statements without privilege of any kind. [*SAC, ¶ 20*].

Nunes expressly alleges that the Statements are materially false [*SAC, ¶¶ 13, 14*] and defamatory. [*SAC, ¶ 6* (https://twitter.com/EricG1247/status/1374421374047903744 ("Rachel Maddow EXPOSED @DevinNunes for his not-so-secret ties to Putin.  It's unacceptable for a sitting Congressman to collude with a Russian agent")].  Viewed as a whole and in the broader context in which they were published, Nunes claims that the Statements falsely accuse him of criminal conduct (obstruction of justice and treason), serious breaches of the Code of Conduct and violations of protocols concerning the handling of information that comes to the House Intelligence Committee from foreign sources such as Derkach, concealment and deception, lack of integrity, ethical improprieties, and seriously flawed and questionable judgment.  Nunes further alleges that the Statements exposed him to public ridicule, scorn, contempt, censure and

---

[3]   As of May 12, 2012, the date Plaintiff filed his second amended complaint, the segment republished by MSNBC on Twitter via **@MaddowBlog** had been retweeted 3,067 times, quoted 266 times and liked 7,611 times. [*SAC, ¶ 5 fn. 1*].

[4]   As of May 12, 2022, the segment republished by MSNBC on its YouTube channel, **MSNBC**, had generated 330,104 views.  The segment also generated 1,027 comments, including applause for MSNBC's Statements.  Viewers, who clearly understood the defamatory meaning conveyed by the Statements, reiterated that Plaintiff had committed "TREASON"; that Plaintiff should be "thoroughly investigated" by the Department of Justice ("DOJ"); that Plaintiff was "unethical" and "immoral"; and that Plaintiff was "aiding and abetting" the enemy and belonged "in jail". [*SAC, ¶ 5, fn. 2*].

prejudiced him in his employment as a U.S. Congressman and as Ranking Member of the House Intelligence Committee.  Nunes points out that, in fact, NBCU and Maddow stated or insinuated that his misconduct was so serious that he should be removed as Ranking Member of the House Intelligence Committee and lose his clearance to classified information. [*SAC, ¶¶ 2, 4, 18, 21*].  Nunes alleges that NBCU published the Statements with actual malice for seven (7) inter-related reasons.  First, Nunes asserts that NBCU fabricated the Statements, which were merely a product of Maddow's imagination.  In other words, NBCU knew the Statements were false because the events never occurred. Second, Nunes alleges that NBCU knew from its review of prior reporting that the package had, in fact, been turned over to the Federal Bureau of Investigation ("FBI") by the House Intelligence Committee.  In spite of its actual knowledge, NBCU and Maddow told viewers, subscribers and followers that Nunes "refused" to hand over the package to the FBI.  Third, NBCU failed to contact known, available, highly credible and reliable sources, including Republican House Intelligence Committee member Representative Rick Crawford from Arkansas, who was on record stating that the package had, in fact, been turned over to the FBI.  Nunes claims that NBCU purposefully avoided the truth.[5] Fourth, Nunes alleges that NBCU's Statements that the Ranking Member of the House Intelligence Committee and Medal of Freedom recipient would blatantly "refuse" to show a package received from a known "Russian agent" to the IC and/or turn it over to

---

[5]    *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 682, 692 (1989) (a clear evasion from the truth and the failure to interview an important witness, who was easily accessible, supports a finding of actual malice) (citing *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 157 (1967) ("Although there was reason to question the informant's veracity, just as there was reason to doubt Thompson's story, the editors did not interview a witness who had the same access to the facts as the informant and did not look at films that revealed what actually happened at the game in question.")).

the FBI, and have "unexplained interactions" with this verified "Russian agent", when the whole world was watching, is "so inherently improbable that only a reckless person would have put the Statements in circulation."  Fifth, Nunes points out that NBCU had a pre-determined agenda to interfere and distract from the public controversy surrounding Democrat Eric Swalwell, and that its commitment to this purpose led NBCU "to publish the Statements about Plaintiff that they either knew to be false or that they published with reckless disregard as to whether the Statements were false."  Sixth, NBCU harbored institutional spite and ill-will for Nunes, and "intended to inflict harm" on Nunes "through knowing or reckless falsehood."  Seventh, NBCU and Maddow knowingly and intentionally abandoned all journalistic standards and ethics, including their own, in publishing the false Statements.  Nunes asserts that NBCU's Statements and conduct cumulatively give rise to an inference of actual malice. [*SAC, ¶¶ 15, 16, 17, 25*].

**C.    The House Intelligence Committee Business Meeting and The DNI Report**

As is expressly stated on its website, the House Intelligence Committee "is a committee of the United States House of Representatives."  Created in 1977, the Committee "is charged with oversight of the United States Intelligence Community".  [https://republicans-intelligence.house.gov/about/history-and-jurisdiction.htm].[6]    The United States Intelligence Community ("IC") is made up of "18 elements that each focus on a different aspect of our common mission", including Air Force Intelligence, Army Intelligence and Security Command, Central Intelligence Agency, Defense Intelligence Agency, Department of Energy Office of Intelligence and Counterintelligence, Department of Homeland Security Office of Intelligence and Analysis, Department of

---

[6]    No credible argument can possibly be made that Democrats on the House Intelligence Committee are members of the Intelligence Community.

State Bureau of Intelligence and Research, Department of Treasury Office of Intelligence & Analysis, Drug Enforcement Administration Intelligence Program, Federal Bureau of Investigation ("FBI"), Marine Corps Intelligence, National Geospatial-Intelligence Agency, National Reconnaissance Office, National Security Agency, Office of Naval Intelligence, Office of the Director of National Intelligence ("ODNI"), U.S. Coast Guard Intelligence, and U.S. Space Force.  The IC is subject to oversight by several groups, including the House Intelligence Committee, "who ensure we conduct our activities within the law and in the best interests of the country." [https://www.intelligence.gov/how-the-ic-works].  The IC does not include members of the House Intelligence Committee. [*SAC, ¶ 3 fn. 1*].[7]

On July 29, 2020, at the conclusion of a rare, open business meeting of the House Intelligence Committee, Democrat Sean Maloney ("Maloney") confronted Nunes without notice.  The transcript of the meeting shows that Maloney sprung two (2) questions on Nunes:  whether Nunes "received materials … from Derkach" and, if so, whether Nunes "is prepared to share them with the rest of the committee".  The Chairman of the House Intelligence Committee, Democrat Adam Schiff ("Schiff"), asked Nunes if he wished to respond to Maloney's questions.  Nunes stated, "no".  Nunes did not say anything else. [*Unclassified Transcript, pp. 19-20 (ECF No. 46-4)*].[8]  Maloney's questions had absolutely nothing to do with the business of the open meeting.  Nunes had no obligation

---

[7]        [*See, e.g.,* https://www.dni.gov/index.php/what-we-do/members-of-the-ic; https://www.fbi.gov/about/leadership-and-structure/intelligence-branch ("The FBI is a member of the U.S. Intelligence Community (IC)—a group of 17federal agencies that collect intelligence.")].

[8]        The Derkach package was delivered to the FBI in December 2019, over seven (7) months before the House Intelligence Committee meeting in July 2020.

to respond under House Rules to the completely out-of-order, coordinated stunt. Maloney and Schiff knew the meeting was open and that there would be a transcript. Maloney and Schiff knew that Nunes would not and could not respond to the questions because any answer risked disclosing classified information.  Importantly, the transcript of the open meeting only shows that Nunes did not wish to respond to ***Maloney's*** questions at the open meeting.  Nunes alleges, and the transcript of the open meeting reflects, that Nunes never "refused" to answer questions about what the House Intelligence Committee had received from Derkach.  "MSNBC's Statements are not and cannot possibly be a fair report of the business of the House Intelligence Committee on July 29, 2020." [*SAC, ¶ 13 fn. 5*].

During the March 18, 2021 segment of *The Rachel Maddow Show*, Maddow referenced and displayed a declassified report dated March 10, 2021 published by the National Intelligence Council, entitled "***Foreign Threats to the 2020 US Federal Elections***".     [https://www.dni.gov/files/ODNI/documents/assessments/ICA-declass-16MAR21.pdf (the "DNI Report") (*ECF No. 46-9)*].  The DNI Report, p. 2, states that "Derkach … played a prominent role in Russian election influence activities."  The DNI Report, p. 3, states that Derkach and his associates "sought to use prominent US persons to launder their narratives to US officials and audiences.  These Russian proxies met with and provided materials[9] to Trump administration-linked US persons to advocate for formal investigations … and attempted to make contact with several senior US officials".  **Nowhere in the DNI Report do NBCU's Statements appear**.  For instance, the DNI

---

[9]     It should have been obvious to NBCU and Maddow from their review of the DNI Report that the package had been shared with the IC because the DNI Report expressly confirms that the Derkach "material" had been "provided" and that Derkach had attempted to make contact with several "senior US officials".

Report does not state that Nunes "accepted" a package from Derkach *or* that Nunes refused to show the contents of the package to other members of the IC *or* that Nunes refused to hand the package over to the FBI. Based on the plain contents of the DNI Report, Nunes alleges in his second amended complaint that NBCU's Statements are not and cannot possibly be a report of the DNI Report. [*SAC, ¶ 3*].

## III. <u>MOTION TO DISMISS STANDARD OF REVIEW</u>

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. *Fairstein v. Netflix, Inc.*, 553 F.Supp.3d 48, 62 (S.D.N.Y. 2021) (Castel., J.). The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (citations omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level," *id.* (citation omitted), to one that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) ("A complaint must include non-conclusory factual allegations that 'nudge[]' its claims 'across the line from conceivable to plausible.'") (quoting *Twombly*, 550 U.S. at 570)). "While the Federal Rules of Civil Procedure require more specific pleading in certain cases,

defamation cases are not among them." *Hatfill v. New York Times*, 416 F.3d 320, 329 (4th Cir. 2005).

In considering a motion to dismiss pursuant to Rule 12(b)(6), the District Court construes the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *La Liberte v. Reid*, 966 F.3d 79, 85 (2nd Cir. 2020) (citing *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2nd Cir. 2019) (quoting *Elias v. Rolling Stone, LLC*, 872 F.3d 97, 104 (2nd Cir. 2017))).[10]

## IV.  DISCUSSION

Freedom of speech is not absolute. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942).  It does not embrace defamation. *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 245-246 (2002) ("freedom of speech has its limits; it does not embrace certain categories of speech, including defamation").  False and defamatory statements have ***never*** been entitled to ***any*** constitutional protection. *Chaplinsky*, 315 U.S. at 572 ("It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived

---

[10]     A court reviewing a motion to dismiss "may review only a narrow universe of materials."    Such materials include "documents incorporated in the complaint, matters of which judicial notice may be taken, and documents that are 'integral' to the complaint, even if they are not expressly incorporated. *Fairstein*, 553 F.Supp.3d at 62 (citation and quotation omitted).  **In its memorandum ("Statement of Facts"), NBCU completely disregards the factual allegations in the amended complaint and adopts a set of its own facts**.  Rule 12(d) of the Federal Rules of Civil Procedure provides that if, on a motion under Rule 12(b)(6), "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."   NBCU's memorandum and the attached declaration presents matters outside the second amended complaint.  The Court should convert NBCU's motion to one for summary judgment under Rule 56, and deny the motion without prejudice and allow the parties to conduct discovery and develop and submit evidence.

from them is clearly outweighed by the social interest in order and morality."); *id.*

*Herbert v. Lando*, 441 U.S. 153, 171 (1979) ("[s]preading false information in and of

itself carries no First Amendment credentials."); *Gertz v. Robert Welch, Inc.*, 418 U.S.

323, 349-350 (1974) (there is "no constitutional value in false statements of fact.").

A.    ***Nunes Plausibly Alleges A Claim of Defamation***

    The second amended complaint alleges that the Statements published by NBCU

about Nunes are actionable. [*SAC, ¶¶ 2, 5*].   The parties agree that New York law

governs Plaintiff's claim.

    "Defamation is the injury to one's reputation either by written expression, which

is libel, or by oral expression, which is slander." *Biro v. Conde Nast*, 883 F.Supp.2d 441,

456 (S.D.N.Y. 2012).   Under New York law, to recover on a claim of defamation, a

plaintiff must establish the following elements: (1) publication[11] without privilege or

authorization to a third party of a (2) false and (3) defamatory statement of and

concerning the plaintiff, (4) with the requisite fault (in this case actual malice), and (5)

special damages or per se actionability.[12] *See, e.g., Palin v. New York Times Company*,

940 F.3d 804, 809 (2nd Cir. 2019); *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163,

176 (2nd Cir. 2000).   A statement is defamatory if it exposes an individual "to public

hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism,

degradation or disgrace, or ... induce[s] an evil opinion of one in the minds of right-

---

[11]    "Under New York defamation law, 'publication is a term of art .... A
defamatory writing is not published if it is read by no one but the one defamed.
Published it is, however, as soon as read by anyone else.'" *Albert v. Loksen*, 239 F.3d
256, 269 (2nd Cir. 2001) (quoting *Ostrowe v. Lee*, 256 N.Y. 36, 175 N.E. 505 (1931)).
NBCU agrees that Nunes has alleged publication.

[12]    In its motion, NBCU does not challenge, and therefore agrees, that the
Statements are defamatory *per se*, and that Nunes has sufficiently alleged damages.

thinking persons, and ... deprive[s] one of their confidence and friendly intercourse in society." *Fairstein*, 553 F.Supp.3d at 63 (citing *Chau v. Lewis*, 771 F.3d 118, 127 (2nd Cir. 2014) (quoting *Kimmerle v. N.Y. Evening Journal, Inc.*, 262 N.Y. 99, 102, 186 N.E. 217 (1933)).  A statement is defamatory on its face (defamation *per se*) when it "suggests improper performance of one's professional duties or unprofessional conduct." *Fairstein*, 553 F.Supp.3d at 63 (citing and quoting *Frechtman v. Gutterman*, 115 A.D.3d 102, 104, 979 N.Y.S.2d 58 (2014) (further quotation omitted)); *see also Laguerre v. Maurice*, 192 A.D.3d 44, 50, 138 N.Y.S.3d 123 (2020) ("A statement is defamatory per se if it ... tends to injure the plaintiff in her or his trade, business, or profession ....").

"[U]nder New York law, pure opinion ... is not actionable because expressions of opinion, as opposed to assertions of fact, are deemed privileged and, no matter how offensive, cannot be the subject of an action for defamation." *Davis v. Boeheim*, 24 N.Y.3d 262, 269, 998 N.Y.S.2d 131, 22 N.E.3d 999 (2014).  "This is because a statement of opinion is not an assertion of fact that can be proven false, and '[a]n assertion that cannot be proved false cannot be held libelous.'" *Biro*, 883 F.Supp.2d at 459 (quoting *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913 (2nd Cir. 1977)).  Statements of "imaginative expression" or "rhetorical hyperbole" are "entitled to constitutional protection as opinion". *Daniel Goldheyer, Ltd. v. Van de Wetering*, 217 A.D.2d 434, 434-435, 630 N.Y.S.2d 18 (1995) (holding that trial court should have dismissed as a matter of law a defamation claim directed to a statement in an art review that "does not have a precise meaning, cannot be objectively characterized as true or false, appears in an immediate context, the 'Art' section of defendant Time Magazine, where the average person would understand it as, or expect to find, expression of opinion or personal taste,

14

and appears in a broader context of the public debate over the artistic merit of the restoration.").   "While a pure opinion cannot be the subject of a defamation claim, an opinion that implies that it is based upon facts which justify the opinion but are unknown to those reading or hearing it, ... is a mixed opinion and is actionable". *Davis*, 24 N.Y.3d at 269, 998 N.Y.S.2d at 136, 22 N.E.3d at 1004 (internal quotation marks omitted). "What differentiates an actionable mixed opinion from a privileged, pure opinion is the implication that the speaker knows certain facts, unknown to the audience, which support the speaker's opinion and are detrimental to the person being discussed." *Id.*   In determining whether a statement is a factual assertion – as opposed to a nonactionable pure opinion – the Court considers three factors: "(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false;[13] and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal readers or listeners that what is being read or heard is likely to be opinion, not fact."   Application of these three factors is not rigid and mechanical, and no single factor is dispositive. *Brian v. Richardson*, 87 N.Y.2d 46, 637 N.Y.S.2d 660 N.E.2d 1126, 1129 (1995) (quoting *Gross v. New York Times Co.*, 82 N.Y.2d 146, 152-154, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993); *see Flamm v. American Ass'n of University Women*, 201 F.3d 144, 152 (2nd Cir. 2000) ("we do not think it would be 'impossible to believe' that the description of Flamm as an 'ambulance

---

[13]       NBCU agrees that Statements 1 and 2 in paragraph 2 of the second amended complaint are capable of being proven true or false.  For instance, whether Nunes "refused" to turn the package over to the FBI can be adduced by evidence from Nunes and others and by documents, such as the letter to Attorney General Barr identified in the SAC, ¶ 13.

chaser' implies that he engages in unethical solicitation.  More to the point, it would not be unreasonable to think so, even if 'ambulance chaser' is a figurative way to describe it. Exaggerated rhetoric may be commonplace in labor disputes, but a reasonable reader would not expect similar hyperbole in a straightforward directory of attorneys and other professionals.  Indeed, the opposite is true.  A reasonable reader is more likely to treat as fact the description of Flamm as an 'ambulance chaser' because there is nothing in the otherwise fact-laden directory to suggest otherwise.").  The "mere recitation of prefatory phrases such as 'in my opinion' or 'I think' will not render innocent an otherwise defamatory statement." *Flamm*, 201 F.3d at 152 (citing *Milkovich*, 497 U.S. at 18-19)).

In adjudicating this motion, the Court construes the Statements as a whole and in the context in which they were published (during a prime time news program, on NBCU's official YouTube channel and on the anchor's [Maddow] social media blog). *Fairstein*, 553 F.Supp.3d at 64 (citing *Aronson v. Wiersma*, 65 N.Y.2d 592, 593-594, 493 N.Y.S.2d 1005, 483 N.E.2d 1138 (1985) ("The words must be construed in the context of the entire statement or publication as a whole, tested against the understanding of the average reader").

### 1.       The Fair Report Privilege

New York law recognizes certain privileges that shield a person or corporation from liability for defamation.  Section 74 of the New York Civil Rights Law[14] provides:

---

[14]       "The privilege afforded by Civil Rights Law § 74 is an affirmative defense to a claim of defamation." *Spitzer v. Greenberg*, 155 A.D.3d 27, 42, 62 N.Y.S.2d 372 (2017) (cited in *Lindberg v. Dow Jones & Company, Inc.*, 2021 WL 3605621, at * 10 fn. 122 (S.D/NY. 2021)).  As an affirmative defense, the applicability of the privilege cannot be resolved on a motion to dismiss under Rule 12(b)(6).  The Court should deny NBCU's motion without more, and allow the parties to conduct discovery and develop evidence.

> "A civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published."

"The fair and true report privilege has been described as an absolute privilege that is not defeated by the presence of malice or bad faith." *Biro*, 883 F.Supp.2d at 477.   A statement is deemed a fair and true report only if it is "substantially accurate." *Karedes v. Ackerly Group, Inc.*, 423 F.3d 107, 119 (2nd Cir. 2005).   "A report is 'substantially accurate' if, despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth." *Id.*   "A fair and true report admits of some liberality; the exact words of every proceeding need not be given if the substance be substantially stated." *Holy Spirit Ass'n for Unification of World Christianity v. N.Y. Times Co.*, 49 N.Y.2d 63, 424 N.Y.S.2d 165, 399 N.E.2d 1185, 1187 (1979).

In assessing whether a publication is a fair and true report of a legislative or other official proceeding, the United States Supreme Court points out that the "publisher must add nothing of his own.  He must not state his opinion of the conduct of the parties, or impute motives therefor; he must not insinuate that a particular witness committed perjury.  That is not a report of what occurred; it is simply his comment on what occurred, and to this no privilege attaches.  Often such comments may be justified on another ground,—that they are fair and bona fide criticism on a matter of public interest, and are therefore not libelous.  But such observations, to which quite different considerations apply, should not be mixed up with the history of the case.  Lord Campbell said: 'If any comments are made, they should not be made as part of the report. The report should be confined to what takes place in court; and the two things—report and comment—should be kept separate.'  And all sensational headings to reports should

17

be avoided.'". *Dorr v. U.S.*, 195 U.S. 138, 152-153 (1904) (quoting Newall on Defamation, Libel and Slander, chap. 19, § 153)).

NBCU and Maddow's Statements are not protected by the fair report privilege for several reasons.  First, even if it were proper to consider the July 23, 2020 *Politico* article on a motion to dismiss, the article is not a "proceeding" to which the fair report privilege applies.  NBCU and Maddow are liable for republishing the false statements of *Politico*.[15] It is well-established that "[a] speaker who repeats another's defamatory statements is not made immune from liability for defamation merely because another person previously made the same demeaning claim." *Watson v. NY Doe 1*, 439 F.Supp.3d 152, 161 (S.D.N.Y. 2020) (quoting *Enigma Software Grp. USA, LLC v. Bleeping Computer, LLC*, 194 F.Supp.3d 263, 287 (S.D.N.Y. 2016) (collecting cases)); *see also Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 60-61 (2nd Cir. 1980) (discussing the "black-letter rule that one who republishes a libel is subject to liability just as if he had published it originally, even though he attributes the libelous statement to the original publisher, and even though he expressly disavows the truth of the statement."); *Butowsky v. Folkenflik*, 2019 WL 2518833, at * 13 (E.D. Tex. 2019) ("It is a well-settled legal principle that one is liable for republishing the defamatory statement of another.") (citing *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 386 (1973) (a "newspaper may not defend a libel suit on the ground that the falsely defamatory statements are not its own")).  Second, the Statements are not a "fair" or "substantially accurate" report of

---

[15]        Paragraph 3 of the *Politico* article claims that an anonymous source "said the information was not turned over to the FBI."  In the context of paragraph 3 of the *Politico* article, which identifies multiple recipients of multiple packages from Derkach, it is unclear what "information" was not turned over to the FBI and by whom.  More significantly, it is a far stretch to go from "information was not turned over" to what Maddow told her audience – that Nunes "refused" to turn the package over to the FBI.

the House Intelligence Committee regular business meeting.  The transcript shows that Nunes said "no", when asked a particular question – if he wished to respond to Rep. Maloney's surprise questions.  NBCU and Maddow took that one word response completely out of context.  Nunes merely stated that he did not wish to respond to **_Maloney's_** questions at the open meeting.  Nunes said nothing else.  The transcript of the regular business meeting *nowhere states* that Nunes "refused to answer questions about what he received from Andriy Derkach" or that Nunes "refused to show the contents of the package to other members of the intelligence community."[16] *Compare Dershowitz v. Cable News Network, Inc.*, 541 F.Supp.3d 1354, 1365-1366 (S.D. Fla. 2021) (use of truncated video clip of plaintiff's argument at impeachment trial was not "fair" or "accurate").  Further, no average reader would believe that members of Congress are members of the Intelligence Community.  It is public knowledge that they are not.  Third, in its motion NBCU engages in pure sophistry.  The internally illogical argument goes like this:  because we have established that Nunes did not answer Maloney's questions at an open meeting, we conclude that Nunes "refused to show the package to the Democrats on the House Intelligence Committee", and this, apparently, proves Nunes "refused to turn over the package to the FBI".  NBCU's arguments make no sense.  Fourth, Maddow's Statement that Nunes "refused to hand [the package] over to the FBI" could not possibly be a report – fair or otherwise – of the DNI Report because **the DNI Report**

---

[16]     Even if Nunes had stated that he "refused to show the contents of the package" to Maloney – which he did not – **Maloney and the House Democrats are not members of the Intelligence Community**.  Anyway the Statement is diced, it is false and unsupported by the transcript.

**nowhere states that Nunes refused to turn over the package**.[17]   Indeed, the DNI

Report clearly reflects that the Derkach "material" was, in fact, delivered to the

Intelligence Community and was, in fact, in its possession prior to publication of the DNI

Report on March 10, 2021.  This is another reason Maddow knew or should have known

that her statements about Nunes were false.  Finally, the Statements clearly reflect a false

fact added to the narrative by Maddow – that Nunes "refused" to share the package with

the Intelligence Community.  "Refused" means that Nunes engaged in an intentional act.

[https://www.merriam-webster.com/dictionary/refuse].    Maddow  imputed  to  Nunes

intentional misconduct.  Under *Dorr*, Maddow's Statements are clearly not privileged.

*See Lan Sang*, 951 F.Supp.2d at 521 ("Section 74 does not afford protection if the

specific statements at issue, considered in their context, suggest more serious conduct

than that actually suggested in the official proceeding.") (internal quotation marks

omitted and alteration adopted).

The Court should deny NBCU's motion.

**2.      The Statements Are Materially False**

In a footnote to its memorandum, footnote 11, NBCU suggests that the Statements

do not give rise to a claim of defamation because they are "substantially true".  This

argument must be rejected without more because Nunes expressly alleges that the

Statements are "materially false". [*SAC, ¶¶ 13, 14*].

---

[17]      Maddow misled her viewers into thinking that Nunes's "refusals" were
somehow contained in the DNI Report. *Compare Kinsey v. New York Times Company*,
991 F.3d 171, 179 (2nd Cir. 2021) ("First, the Times article notes that it is reporting on a
specific court proceeding and that seven declarations were filed in that proceeding.
Second, the article then quotes from those declarations throughout and follows the
alleged defamatory language from the Woolman declaration").

As to the element of falsity, "[t]he common law of libel takes but one approach ... regardless of the form of the communication.   It overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine*, 501 U.S. 496, 516-517 (1991).  "Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Id.*  Therefore, "[a] statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id.* at 517 (quoting R. Sack, *Libel, Slander, and Related Problems* 138 (1980)).

Comparing MSNBC's false Statements (*e.g.,* Nunes "refused" to show the package to the Intelligence Community and refused to turn it over to the FBI) to the truth (Nunes immediately turned over the package to the FBI and alerted the Attorney General upon receipt),[18] it is beyond peradventure that MSNBC's Statements are materially false. *Compare, e.g., Nunes v. W.P. Company*, 2021 WL 3550896, at * 4 (D. D.C. 2021) ("A reasonable juror could conclude that there is a material difference between stating that Nunes had made a claim supported by evidence (that the Obama administration had undertaken intelligence activities related to individuals involved in the Trump campaign) and stating that Nunes had made a baseless claim (that the Obama administration had wiretapped Trump Tower).  A reasonable juror could therefore conclude that the article was materially false because it stated that Nunes had made such a baseless claim (when he had not)."); *see also Pan Am. Systems, Inc. v. Atlantic Northeast Rails and Ports, Inc.*,

---

[18]      Democratic House Intelligence Committee members are not members of the Intelligence Community.  Even if they were, it is worth noting that at the time of the July 29, 2020 business meeting of the House Intelligence Committee, there was nothing to show Rep. Maloney and his cohorts.  The Derkach package had been delivered to the Intelligence Community **unopened** seven (7) months earlier. [*SAC, ¶ 13*]

804 F.3d 59, 73 (1ˢᵗ Cir. 2015) ("All that is left to do then is compare the challenged defamatory comment … with what we take as true at this stage of the case (that plaintiffs never lost railcars carrying hazardous materials, even temporarily).  And having done this, we conclude that a sensible juror could find that a more precise explication of the TIH issue would have improved plaintiffs' public reputation—meaning we must vacate the grant of summary judgment on this article."); *Bustos v. A&E Networks*, 646 F.3d 762, 767 (10ᵗʰ Cir. 2011) (Gorsuch, J.) ("Comparing the challenged defamatory statement (membership in the Aryan Brotherhood) to the truth (conspiring with and aiding and abetting the Aryan Brotherhood), we cannot see how any juror could find the difference to be a material one—that is, likely to cause a reasonable member of the general public to think significantly less favorably of Mr. Bustos").

Unlike the situation in *Lawrence v. Hearst Communications*, 2022 WL 894716 (2ⁿᵈ Cir. 2022), where "Hearst's reporting was substantially true" (multiple women had, in fact, complained to the police about Lawrence's unwelcome behavior), here NBCU and Maddow got virtually every detail wrong because they fabricated the narrative.[19]

### 3.    Maddow's Rhetorical Questions

Maddow's rhetorical questions are actionable. [*SAC, ¶¶ 2 (Statement 3), 18*].

Rhetorical questions, where a defamatory meaning is conveyed or implied, are actionable. *See, e.g., Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d 288, 295 (Iowa App.

---

[19]    The Statement that Nunes had "unexplained interactions" with Derkach is materially false.  **Nunes had no interactions with Derkach and never touched the package.  Nunes was fully transparent with Attorney General Barr, DOJ and the FBI**. [*SAC, ¶ 13*].  Viewed in the context of the national concerns about election interference by "Russian agents", the Statement that Nunes had "unexplained interactions" with a foreign bad actor furthered the false narrative that Nunes was compromised and that he had engaged in wrongdoing with Derkach, a known high-level Putin confidante.

1985) ("'[t]he form of the language used is not controlling, and ***there may be defamation by means of a question***, an indirect insinuation, an expression of belief or opinion, or sarcasm or irony.  The imputation may be carried quite indirectly'") (quoting W. Prosser, *Law of Torts* 746-747 (4ᵗʰ ed. 1971) (emphasis added)); *Schoedler v. Motometer Gauge & Equip. Corp.*, 134 Ohio St. 78, 15 N.E.2d 958, 961 (1938) ("[a] mere insinuation is as actionable as a positive assertion, if the meaning is plain, and it has been held repeatedly that the putting of the words in the form of a question will in no w[ay] reduce the liability of the defendant.") (internal citations and quotation marks omitted).

Here, the rhetorical questions [*SAC, ¶ 2 (Statement 3)*], read together with the other Statements, were intended to impugn Nunes's integrity and ethics.  They plainly convey or imply that Nunes's actions, including his putative "refusal" to turn over the package to the FBI, were so serious that Nunes should have been removed from his position as Ranking Member of the House Intelligence Committee. *See Boulger v. Woods*, 917 F.3d 471, 480 (6ᵗʰ Cir. 2019) ("it is easy to see how commentators and journalists could use questions 'as tools to raise doubts … about a person's activities or character'") (citation and quotation omitted); *Backes v. Misko*, 486 S.W.3d 7, 26 (Tex.App.-Dallas 2015) (plaintiff provided "clear and specific evidence that many people read and understood [defendant's] "question" as a "transparent accusation against her"); *compare Solstein v. Mirra*, 488 F.Supp.3d 86, 97-98 (S.D.N.Y. 2020) (rhetorical question was susceptible of a defamatory connotation).

### 4.      Nunes Plausibly Alleges Actual Malice

"The existence of actual malice may be shown in many ways.  As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and all the

relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights, and, in an action against a newspaper, custom and usage with respect to the treatment of news items of the nature of the one under consideration." *Herbert*, 441 U.S. at 164 fn. 12.

Typically, actual malice is shown by an "accumulation" of evidence and inferences. *Celle*, 209 F.3d at 183 (in order to infer actual malice, the facts alleged "should provide evidence of 'negligence, motive and intent such that *an accumulation of the evidence and appropriate inferences* supports the existence of actual malice.'") (quoting *Bose Corp. v. Consumers Union of the United States*, 692 F.2d 189, 196 (1st Cir. 1982) (emphasis added in original)); *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2nd Cir. 1969) ("There is no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity.").

Paragraphs 16 and 25 of Nunes's second amended complaint allege multiple facts, which, accepted as true, sufficiently allege actual malice, including:

- NBCU fabricated the statements.  The events never happened.  Nunes did not breach protocol or "refuse" to turn over a package received from a known "Russian agent"
  [*SAC, ¶ 25(a)*]

  *See Weyrich v. New Republic, Inc.*, 235 F.3d 617, (D.C. Cir. 2001) ("If indeed the story is fabricated, we cannot say that it is not reasonably capable of any defamatory meaning—it arguably makes appellant appear highly volatile, irrational, unsound and otherwise 'odious, infamous, or ridiculous.'")

- The Statements were disinformation, deliberate falsehoods purposefully designed by NBCU to interfere with and distract from House Bill 243 [*SAC, ¶¶ 25(e)*]

- Because of NBCU and Maddow's review of the July 29, 2020 Breitbart article [*ECF No. 46-6*], a jury could plausibly find that NBCU knew before publishing the Statements that it was false to claim that Nunes had refused to turn over the package to the FBI [*SAC, ¶ 25(b)*]

- NBCU purposefully avoided the truth when it chose not to interview a known, readily available, highly credible source, Rep. Crawford, who was a Republican member of the House Intelligence Committee and who was on record stating that the package had, in fact, been delivered to the FBI[20] [*SAC, ¶¶ 16, 25(c)*]

- The Statements that the Ranking Member of the House Intelligence Committee and Medal of Freedom recipient would hide the contents of a package he "accepted" from a known "Russian agent" from the Intelligence Community ***and*** "refuse" to turn over the package to the FBI in direct violation of protocol are so inherently improbable that only a reckless person would have put the Statements in circulation [*SAC, ¶ 25(d)*]

    *See, e.g., Stern v. Cosby*, 645 F.Supp.2d 258, 279 (S.D.N.Y. 2009) ("printing a claim that Birkhead and Stern had sex would be a way to make it to the top of the bestseller list, and a reasonable jury could find that Cosby ignored the inherently improbable nature of the Statement in her zeal to write a blockbuster book")

Nunes plausibly alleges sufficient facts to show that NBCU published the Statements with actual malice. *See Bolden v. Morgan Stanley & Co.*, 765 F.Supp. 830, 834 (S.D.N.Y. 1991) (the "aggregate of plaintiff's evidence" showed actual malice).

## CONCLUSION AND REQUEST FOR RELIEF

For the reasons stated above, Plaintiff, Devin G. Nunes, respectfully requests the Court to deny NBCU's motion to dismiss.

---

[20] On July 30, 2020, *Politico* re-reported Crawford's statement that the Derkach package had, in fact, been turned over to the FBI. [*ECF No. 46-7, p. 5 of 6*]. This shows that *Politico* understood that Crawford's statement was credible and important to the story. NBCU and Maddow intentionally ignored Crawford.

DATED:        June 17, 2022

                  Respectfully Submitted,

                  DEVIN G. NUNES


By:    */s/ Steven S. Biss*
             Steven S. Biss (VSB # 32972)
             300 West Main Street, Suite 102
             Charlottesville, Virginia 22903
             Telephone:     (804) 501-8272
             Facsimile:     (202) 318-4098
             Email:         stevenbiss@earthlink.net
             (*Admitted Pro Hac Vice*)

             Anthony C. Carlini, Jr., Esquire
             (New York Bar # 2648374)
             Handel & Carlini, LLP
             1984 Hackensack Road
             Poughkeepsie, NY 12603
             Telephone:  (845) 454-2221
             Facsimile:  (845) 471-1005
             Email: anthony@handelcarlini.com

             *Counsel for the Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 17, 2022 a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will send notice of electronic filing to counsel for the Defendant and all interested parties receiving notices via CM/ECF.

By:___*/s/ Steven S. Biss*_____
   Steven S. Biss (VSB # 32972)
   300 West Main Street, Suite 102
   Charlottesville, Virginia 22903
   Telephone: (804) 501-8272
   Facsimile: (202) 318-4098
   Email:   stevenbiss@earthlink.net
   (*Admitted Pro Hac Vice*)

   Anthony C. Carlini, Jr., Esquire
   (New York Bar # 2648374)
   Handel & Carlini, LLP
   1984 Hackensack Road
   Poughkeepsie, NY 12603
   Telephone:  (845) 454-2221
   Facsimile:  (845) 471-1005
   Email: anthony@handelcarlini.com

   *Counsel for the Plaintiff*