UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

.......................................................................................... x

DEVIN G. NUNES,                                                  :
                                                     :        Case No.: 22-cv-1633-PKC-SN

               Plaintiff,       :
                                                     :        Hon. P. Kevin Castel

         - against -          :        United States District Judge
                                                       :

NBCUNIVERSAL MEDIA, LLC,          :        **ORAL ARGUMENT REQUESTED**
                                                       :

              Defendant.       :

.......................................................................................... x

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT NBCUNIVERSAL MEDIA, LLC'S MOTION FOR SUMMARY JUDGMENT AND SANCTIONS

Elizabeth A. McNamara
Jeremy A. Chase
Alexandra M. Settelmayer
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY  10020-1104
Phone:    (212) 489-8230
Fax:      (212) 489-8340
Email:    lizmcnamara@dwt.com
            jeremychase@dwt.com
            alexandrasettelmayer@dwt.com

*Attorneys for Defendant*
*NBCUniversal Media, LLC*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

SUMMARY JUDGMENT ...................................................................................................... 3

I.    Factual Background In Support Of Summary Judgment ................................................ 3

    A.    The Parties ....................................................................................................... 3

    B.    The Release of the ODNI Report ..................................................................... 4

    C.    Newsgathering for *TRMS* Segment ................................................................ 5

        1.    The July 13, 2020 Letter from Democratic Members of Congress to the FBI ...................................................................................................... 6

        2.    The July 23, 2020 Politico Article ......................................................... 6

        3.    The July 29, 2020 HPSCI Meeting ........................................................ 8

        4.    The July 31, 2020 CNN Article .............................................................. 9

        5.    The September 10, 2020 Sanctions Against Derkach ............................ 10

        6.    The March 17, 2021 Deadline Interview ................................................ 10

    D.    Other Facts Informing the Statement .............................................................. 11

        1.    The Parnas Interview And Related Reporting ......................................... 11

        2.    Nunes' Public Mistrust Of And Hostility Toward The FBI ..................... 12

    E.    The *TRMS* Segment ....................................................................................... 13

    F.    This Litigation ................................................................................................. 14

II.    NBCU is Entitled to Summary Judgment ................................................................... 16

    A.    Legal Standard ................................................................................................. 16

    B.    NBCU Relied On Reporting From A Reliable Publication ............................. 19

    C.    Maddow's Own Prior Reporting And Well-Reported National Events Bolstered NBCU's Confidence In The Truth Of The Statement ......................................... 20

    D.    None of the Evidence Produced In This Action Is Remotely Capable of Establishing Actual Malice by Clear and Convincing Evidence .......................... 23

i

MOTION FOR SPOLIATION SANCTIONS ................................................................... 30

I.      Factual Background In Support of Spoliation Sanctions ..................................... 30

        A.      Plaintiff Made No Effort to Preserve His Own Relevant Documents .................. 30

        B.      Plaintiff Made No Effort to Ensure His Staffers Preserved Relevant Documents 30

        C.      Third-Party Discovery Has Confirmed Plaintiff's Failure to Produce Relevant
                Documents ......................................................................................... 31

        D.      Plaintiff's Spoliation Has Prejudiced NBCU in Establishing Its Defenses In This
                Litigation ......................................................................................... 33

II.     Argument In Support Of Spoliation Sanctions ................................................. 33

        A.      Plaintiff Has Engaged In Spoliation ................................................... 33

        B.      The Court Should Dismiss Plaintiff's Claims As A Sanction For His Spoliation 36

        C.      The Court Should Enter An Adverse Inference Order As A Sanction For His
                Spoliation ......................................................................................... 39

        D.      The Court Should Award NBCU Its Cost and Attorneys' Fees ........................... 39

CONCLUSION .......................................................................................................... 40

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adler v. Conde Nast Publ'ns, Inc.*,
    643 F. Supp. 1558 (S.D.N.Y. 1986)....................................................................................19

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).........................................................................................................17

*Arpaio v. Zucker*,
    414 F. Supp. 3d 84 (D.C.C. 2019) ................................................................................28

*Associated Financial Corp. v. Financial Services Information Co.*,
    1989 U.S. Dist. LEXIS 16263 (C.D. Cal. July 27, 1989) .......................................20

*Baiul v. Disson*,
    607 F. App'x 18 (2d Cir. 2015) ....................................................................................18

*Basulto v. Netflix, Inc.*,
    2023 WL 7129970 (S.D. Fla. Sept. 20, 2023) ..........................................................29

*Beck v. Test Masters Educ. Servs., Inc.*,
    289 F.R.D. 374 (D.D.C. 2013)......................................................................................36

*Biro v. Conde Nast*,
    963 F. Supp. 2d 255 (S.D.N.Y. 2013).....................................................................20, 24

*Blankenship v. NBCUniversal, LLC*,
    60 F.4th 744 (4th Cir. 2023) .........................................................................................26

*Bloom v. A360 Media LLC*,
    2024 WL 2812905 (S.D.N.Y. June 3, 2024) ............................................................27

*Borum v. Brentwood Vill., LLC*,
    332 F.R.D. 38 (D.D.C. 2019)..................................................................................35, 36

*Bose Corp v. Consumers Union of U.S., Inc.*,
    466 U.S. 485 (1984).........................................................................................................17

*Brimelow v. New York Times Co.*,
    2020 WL 7405261 (S.D.N.Y. Dec. 16, 2020),
    *aff'd*, 2021 WL 4901969 (2d Cir. Oct. 21, 2021) ...................................18, 25, 26

*Capricorn Mgmt. Sys. v. Gov't Emps. Ins. Co.*,
    2019 WL 5694256 (E.D.N.Y. July 22, 2019),
    *report & recommendation adopted,* 2020 WL 1242616 (E.D.N.Y. Mar. 16, 2020)..............37

*Chaiken v. VV Publ'g Corp.*,
119 F.3d 1018 (2d Cir. 1997) ........................................................................................19

*Cobb v. Time, Inc.*,
278 F.3d 629 (6th Cir. 2002) .........................................................................................29

*Davis v. Costa-Gavras*,
654 F. Supp. 653 (S.D.N.Y. 1987) ................................................................................20

*Delaney v. Bank of Am. Corp.*,
766 F.3d 163 (2d Cir. 2014)...........................................................................................16

*Dongguk Univ. v. Yale Univ.*,
734 F.3d 113 (2d Cir. 2013)...........................................................................................18

*Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*,
304 F.R.D. 178 (S.D.N.Y. 2014) ...................................................................................39

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985).......................................................................................................17

*Edwards v. National Audubon Soc'y, Inc.*,
556 F.2d 113 (2d Cir. 1977).......................................................................................3, 24

*Elavon, Inc. v. Ne. Advance Techs., Inc.*,
2022 WL 1175039 (S.D.N.Y. Apr. 20, 2022)...............................................................34

*Electra v. 59 Murray Enters., Inc.*,
987 F.3d 233 (2d Cir. 2021)...........................................................................................17

*Fodor v. Berglas*,
1995 WL 505522 (S.D.N.Y. Aug 18, 1995)..................................................................20

*Freeman v. Giuliani*,
691 F. Supp. 3d 32 (D.D.C. 2023) .................................................................................39

*Garrison v. State of La.*,
379 U.S. 64 (1964).........................................................................................................17

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)...................................................................................................16, 17

*Harte-Hanks Comms. v. Connaughton*,
491 U.S. 657 (1989)..................................................................................................26, 27

*Hice v. Lemon*,
2021 WL 6053812 (E.D.N.Y. Nov. 17, 2021)...............................................................36

*Houston Cmty. Coll. Sys. v. Wilson*,
    595 U.S. 468 (2022)........................................................................................................1

*Hughes v. City of N.Y.*,
    2021 WL 4295209 (S.D.N.Y. Sept. 21, 2021)...............................................35, 40

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
    341 F.R.D. 474 (S.D.N.Y. 2022) ...............................................................................34

*Jankovic v. Int'l Crisis Grp.*,
    822 F.3d 576 (D.D.C. 2016) ........................................................................................29

*Jeffreys v. City of New York*,
    426 F. 3d 549 (2d Cir. 2005)......................................................................................17

*Karsch v. Blink Health*,
    2019 WL 2708125 (S.D.N.Y. June 20, 2019) .......................................................40

*Keithley v. Home Store.com, Inc.*,
    2008 WL 3833384 (N.D. Cal. Aug. 12, 2008) ......................................................35

*Leidig v. Buzzfeed, Inc.*,
    2017 WL 6512353 (S.D.N.Y. Dec. 19, 2017) .......................................................35

*Liberty Lobby, Inc. v. Anderson*,
    1991 WL 186998 (D.D.C. May 1, 1991)..................................................................25

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
    2018 WL 1512055 (S.D.N.Y. Mar. 12, 2018) .......................................................38

*McFarlane v. Sheridan Square Press*,
    91 F.3d 1501 (D.C. Cir. 1996) ..........................................................................28, 29

*McMunn v. Mem'l Sloan-Kettering Cancer Ctr.*,
    191 F. Supp. 2d 440 (S.D.N.Y. 2002)......................................................................38

*Montgomery v. Risen*,
    197 F. Supp. 3d 219 (D.D.C. 2016) .........................................................................23

*Moody v. CSX Transp., Inc.*,
    271 F. Supp. 3d 410 (W.D.N.Y. 2017) ....................................................................39

*Moore v. Chertoff*,
    255 F.R.D. 10 (D.D.C. 2008)......................................................................................38

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964)...........................................................................................1, 17, 18

*Nunes v. WP Company LLC d/b/a The Washington Post, et al.*,
    2024 WL 3504066 (D.D.C. June 14, 2024)...................................................35, 36

*Ottoson v. SMBC Leasing & Fin., Inc.*,
    268 F. Supp. 3d 570 (S.D.N.Y. 2017).................................................................36

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019)...................................................................18, 28

*Prince v. Intercept*,
    634 F. Supp. 3d 114 (S.D.N.Y. 2022)...............................................................26

*Prince v. Intercept*,
    2023 WL 4492413 (S.D.N.Y. July 12, 2023) ...................................................27

*Rosanova v. Playboy Enters., Inc.*,
    580 F.2d 859 (5th Cir. 1978) ...........................................................................23

*Rossbach v. Montefiore Med. Ctr.*,
    81 F.4th 124 (2d Cir. 2023) ...............................................................34, 35, 38

*Scientology Int'l v. Time Warner, Inc.*,
    903 F. Supp. 637 (S.D.N.Y. 1995), *on reconsideration*,
    932 F. Supp. 589 (S.D.N.Y. 1996), *and aff'd sub nom.*
    *Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001)......................28

*Speer v. Ottaway Newspapers, Inc.*,
    828 F.2d 475 (8th Cir. 1987) ...........................................................................25

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)...................................................................17, 23, 24

*StoneX Grp., Inc. v. Shipman*,
    2024 WL 1509346 (S.D.N.Y. Feb. 5, 2024), *report and recommendation adopted*,
    2024 WL 3356989 (S.D.N.Y. July 10, 2024) ...................................................37, 38

*Vandenburg v. Newsweek, Inc.*,
    507 F.2d 1024 (5th Cir. 1975) .........................................................................27

*World Boxing Council v. Cosell*,
    715 F. Supp. 1259 (S.D.N.Y. 1989)..................................................................19

*Zubulake v. UBS Warburg LLC*,
    220 F.R.D. 212 (S.D.N.Y. 2003) .....................................................................34

**Other Authorities**

Fed. R. Civ. P. 37 *et seq*.................................................................... *passim*

Fed. R. Civ. P. 56 *et seq*...........................................................................................................1, 16

Defendant NBCUniversal Media, LLC ("NBCU") submits this memorandum of law in support of its Motion for Summary Judgment dismissing the claims of Plaintiff Devin G. Nunes ("Plaintiff" or "Nunes") pursuant to Federal Rule of Civil Procedure 56, and in support of its Motion for Sanctions in response to Plaintiff's spoliation of relevant evidence pursuant to Federal Rule of Civil Procedure 37(e). In support thereof, NBCU states as follows:

## PRELIMINARY STATEMENT

This defamation lawsuit challenges reporting on a recently declassified U.S. intelligence report documenting that Russia tried to interfere in the 2020 election and that members of Congress—including Plaintiff Devin Nunes, a then-sitting Congressman and Ranking Member of the House Permanent Select Committee on Intelligence ("HPSCI")—had been targets of a Russian disinformation campaign. Reporting about a Russian agent seeking to spread disinformation to a sitting Congressman in an effort to interfere with a presidential election is speech that addresses issues of the highest public concern and is precisely the type of action the actual malice standard was designed to weed out. As the Supreme Court held nearly 60 years ago, public officials in this country are assumed to be people "of fortitude, able to thrive in a hardy climate." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 273 (1964); *see also Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022) ("In this country, we expect elected representatives to shoulder a degree of criticism about their public service from their constituents and their peers"). Discovery reveals the Plaintiff's claim is without merit.

Plaintiff Devin Nunes brought this action to challenge several statements from a March 18, 2021 segment of *The Rachel Maddow Show* ("*TRMS* Segment") addressing the newly released intelligence report. In order to contextualize the report's identification of Andrii Derkach as a Russian agent at the center of Russia's disinformation campaign, Rachel Maddow reminded viewers that seven months earlier, it had been reported that Nunes received a package from

Derkach (the "Derkach Package"), failed to disclose it even to his fellow HPSCI members upon direct questioning, and failed to turn the package over to the FBI.  All of this had been previously reported in a highly reliable news report.  And in the intervening months, Nunes never disputed, challenged, or contradicted this prior reporting, including the basis for the one statement that remains in this action: that Nunes "refused to hand [the Derkach Package] over to the FBI, which is what you should do if you get something from somebody that is sanctioned by the U.S. government as a Russian" (the "Statement").

After nearly two years of discovery, Plaintiff has *no* evidence—much less clear and convincing evidence—that anyone responsible for the *TRMS* Segment knew the challenged Statement was false or had serious concerns about its accuracy.  The undisputed record shows that Maddow, who wrote the *TRMS* Segment, and Executive Producer Cory Gnazzo, who reviewed it before it aired, testified unequivocally that they had no doubts as to the accuracy of the Statement and relied on a wealth of information that informed this belief.  This included a credible report from Politico dated July 23, 2020 expressly stating that Nunes did not turn the Derkach Package over to the FBI; Plaintiff's failure to dispute or challenge this reporting for many months (until the filing of this lawsuit); government documents demonstrating that Democratic leadership and Members of Plaintiff's own committee were kept in the dark about the unclassified facts surrounding Plaintiff's receipt and disposition of the Derkach Package; Plaintiff's well-documented and public disputes with the FBI; and his closest aide's reported involvement in gathering disinformation from Russian operatives connected to Derkach.  In short, Maddow and Gnazzo had full confidence in the truth of the Statement.

Plaintiff primarily argues that Maddow and her producers were (or should have been) aware of an ambiguous quote from Rep. Eric A. "Rick" Crawford in a July 29, 2020 Breitbart

article suggesting Plaintiff turned the package over to the FBI.  As an initial matter, the evidence now establishes that both Maddow and Gnazzo were not aware of Rep. Crawford's quote before the Statement aired, and, critically, discovery also revealed that Rep. Crawford's statement to Breitbart was in fact based on pure speculation—he admitted in his deposition that he was not speaking on Plaintiff's behalf and had no knowledge of what Plaintiff did with the Derkach Package.  But even if one assumes for purposes of this motion that Maddow or Gnazzo were aware of Rep. Crawford's quote—and they were not—this vague, second-hand statement hardly supports actual malice when even a direct denial *from the plaintiff* is insufficient to establish actual malice. *See Edwards v. National Audubon Soc'y, Inc*., 556 F.2d 113, 121 (2d Cir. 1977).

Put simply, the record establishes that NBCU had full confidence in the accuracy of the Statement and, after extensive discovery, Plaintiff cannot meet his burden of establishing clear and convincing evidence to support actual malice.  NBCU is entitled to summary judgment.

Separately, and in the alternative, NBCU seeks sanctions pursuant to Federal Rule of Civil Procedure 37(e) for Plaintiff's abject failure to preserve documents relevant to this litigation. Despite his extensive experience as a litigant, Plaintiff took no steps to ensure that relevant Congressional records were preserved when he left the House of Representatives *after* filing this action.  Not surprising, as a result, discovery shows that relevant materials were spoliated and that Plaintiff's utter disregard for his preservation obligations has prejudiced NBCU in its ability to establish substantial truth as a defense.  Sanctions, including dismissal of this action, an adverse inference, and/or an award of attorney's fees against Plaintiff are warranted.

## **SUMMARY JUDGMENT**

## I.    **Factual Background In Support Of Summary Judgment**

### A.    **The Parties**

Plaintiff is a former member of the U.S. House of Representatives, having served in

Congress from January 1, 2003 until January 1, 2022.  Defendant's Rule 56.1 Statement of Undisputed Material Facts ("56.1") ¶ 5.  While in Congress, Plaintiff was a member of HPSCI, which is charged with oversight of the U.S. Intelligence Community.  *Id.* ¶ 6.  Plaintiff served as Chairman of HPSCI for a number of years before serving as HPSCI's Ranking Member from January 2019 until he left Congress on January 1, 2022.  *Id.* ¶¶ 7–8.  Plaintiff is also a serial libel litigant, having filed at least ten defamation actions against various media organizations.  *Id.* ¶ 9.

NBCU owns and operates the cable network MSNBC, which delivers perspective news programming and breaking news to millions of households worldwide.  *Id.* ¶ 1.  In 2021, MSNBC aired *TRMS,* a news commentary program, weekdays at 9:00 pm.  *Id.* ¶ 2.  *TRMS* frequently discusses contemporary issues by addressing them in the context of their relevant historical framework.  *Id.* ¶ 152.  This action stems from a March 18, 2021 episode of *TRMS*.  *Id.* ¶ 10.

### B.     The Release of the ODNI Report

On September 12, 2018, by Executive Order 13848, then-President Trump declared a national emergency to deal with the "extraordinary threat to national security" posed by "persons located, in whole or in substantial part outside the United States to interfere in or undermine public confidence in United States elections."  *Id.* ¶ 21.  This Executive Order required the Director of National Intelligence to investigate "any information indicating that a foreign government, or any person acting as an agent of or on behalf of a foreign government, has acted with the intent or purpose of interfering in" U.S. elections.  *Id.*

In accordance with Section 1(a) of the Executive Order, on January 7, 2021, the National Intelligence Counsel, in coordination with several intelligence agencies, issued a classified report on foreign actors' efforts to interfere with the 2020 U.S. federal election.  *Id.* ¶ 22.  The report was declassified on March 15, 2021 and thereafter publicly released (the "ODNI Report").  *Id.* ¶ 23.

The ODNI Report contained a number of conclusions about foreign interference in the 2020 federal elections. *Id.* ¶¶ 24–27. Relevant here, the ODNI Report concluded that Russia had "conducted influence operations against the 2020 US presidential election aimed at denigrating President Biden and the Democratic Party, supporting former President Trump." *Id.* ¶ 24. The ODNI Report further stated that "[a] key element of Moscow's strategy this election cycle was its use of people linked to Russian intelligence to launder influence narratives—including misleading or unsubstantiated allegations against President Biden—through . . . US officials . . . some of whom were close to former President Trump and his administration." *Id.* ¶ 25.

The ODNI Report specifically explained that "Putin had purview over the activities of Andri[i] Derkach, a Ukrainian legislator who played a prominent role in Russia's election influence activities. Derkach has ties to Russian officials as well as Russia's intelligence services." *Id.* ¶ 26. The Report stated that Derkach and his associates "sought to use prominent US persons and media conduits to launder their narratives to US officials and audiences" and that "[t]hese Russian proxies met with and provided materials to Trump administration-linked US persons to advocate for formal investigations; hired a US firm to petition US officials; and attempted to make contact with several senior US officials." *Id.* ¶ 27.

### C.    Newsgathering for *TRMS* Segment

The ODNI Report's findings were a consequential news story and the catalyst for the reporting at issue in this litigation. *Id.* ¶ 28. Maddow and Gnazzo decided to do a segment of the show reporting on the significance of the ODNI Report's findings and placing them in the greater context of what government officials had previously stated about foreign interference efforts. *Id.* ¶¶ 151, 153. The *TRMS* Segment connected the dots between the ODNI Report's findings about Derkach and one of the "U.S. Officials" targeted in this disinformation campaign: Rep. Devin Nunes, who, the previous summer had been reported to have received a package from Derkach,

refused to comment on his receipt and disposition of the package, and failed to turn the package over to the FBI. *Id.* ¶¶ 136–46.  Maddow and Gnazzo's confidence in the accuracy of the Statement was informed by credible and undisputed reporting, as well as other contextual facts that bolstered the reasonableness and credibility of the Statement:

### 1.     The July 13, 2020 Letter from Democratic Members of Congress to the FBI

On July 13, 2020, Democratic Congressional leadership sent a letter to FBI Director, Christopher Wray (the "July 13, 2020 Letter"), sounding the alarm that Congress appeared to be a "target of a concerted foreign interference campaign, which seeks to launder and amplify disinformation in order to influence congressional activity, public debate, and the presidential election in November." *Id.* ¶¶ 34, 36.  In light of "the seriousness and specificity of these threats," the July 13, 2020 Letter requested a defensive briefing to all Members of Congress in an effort to combat these threats.  *Id.* ¶ 37.  The July 13, 2020 Letter was released to the American public.  *Id.* ¶ 39.  Maddow and Gnazzo reviewed the letter on or about July 20, 2020 and understood that it reflected that the FBI was not fully informed of the disinformation operation targeting Congress. *Id.* ¶¶ 40–42.

### 2.     The July 23, 2020 Politico Article

The specific nature of the disinformation campaign targeting Congress described in the July 13, 2020 Letter came into sharper focus on July 23, 2020 upon Politico's publication of an article titled "Democrats: Packets sent to Trump allies are part of foreign plot to damage Biden" by Natasha Bertrand, Andrew Desiderio, and Kyle Cheney (the "July 23, 2020 Politico Article"). *Id.* ¶ 43.  The July 23, 2020 Politico Article reported that "[t]op congressional Democrats are sounding the alarm about a series of packets mailed to prominent allies of Donald Trump – material

they say is part of a disinformation plot to damage former Vice President Joe Biden, according to new details from a letter the lawmakers delivered to the FBI last week." *Id.* ¶ 44.

The Politico Article stated that "packets . . . were sent late last year to Rep. Devin Nunes (R-Calif.), Sens. Lindsey Graham (R-S.C.) and Chuck Grassley (R-Iowa) and then-White House Chief of Staff Mick Mulvaney" and "were sent by Andrii Derkach, a Ukrainian lawmaker who met with Trump's personal lawyer and former New York City Mayor Rudolph "Rudy" Giuliani in Kyiv last December to discuss investigating the Biden family." *Id.* ¶ 46. Politico included a statement from Derkach in the article confirming that he "had sent these materials to the lawmakers and Mulvaney." *Id.* ¶ 48.

Critically, the July 23, 2020 Politico Article reported that "Graham and Grassley denied having received the material, and Mulvaney and ***Nunes declined repeated requests for comment***. ***One person familiar with the matter said the information was not turned over to the FBI. The FBI declined to comment***." (emphasis added). *Id.* ¶ 47. The Article also included a prior statement from FBI Director Christopher Wray that "if any public official or member of any campaign is contacted by any nation-state, or anybody acting on behalf of a nation-state, about influencing or interfering with an election then that's something the FBI would want to know about." *Id.* ¶ 49.

The same day the Politico article was published, Gnazzo sent it to Maddow and *TRMS* staff via email. *Id.* ¶ 53. Both in the July 23, 2020 Politico Article, and during the intervening seven months since the publication of the article, Plaintiff never disputed Politico's reporting; he never denied that he failed to turn the Derkach Package over the FBI; and he never stated that he in fact turned the Derkach Package over to the FBI. *Id.* ¶¶ 50–51. As later observed at the HPSCI

meeting, his "silence spoke volumes." *Id.* ¶ 65.[1]

### 3.    The July 29, 2020 HPSCI Meeting

In the wake of the news about Plaintiff being a target of a foreign disinformation campaign, on July 29, 2020, HPSCI held a Meeting (the "HPSCI Meeting"), a redacted transcript of which was released publicly.  *Id.* ¶ 58.  During this meeting, Chairman Adam Schiff pronounced that Russia was "trying to interfere in the Presidential election and seeking to divide Americans," that "[o]n July 13, I, along with Speaker Pelosi…wrote a letter to FBI Director Wray requesting a counterintelligence briefing to the entire Congress regarding foreign efforts to interfere in the Presidential election," and that "[t]he letter highlighted our grave concern, and in particular that Congress appears to be the target of a concerted foreign interference campaign which seeks to launder and amplify disinformation in order to influence congressional activity, public debate, and the Presidential election in November."  *Id.* ¶ 59.  During the HPSCI Meeting, Chairman Schiff indicated there would be a vote to make the classified addendum to the July 13, 2020 Letter available to all members of the House of Representatives.  *Id.* ¶ 60.  Plaintiff objected to the limited release of the addendum and described it as a "politicization of intelligence" because it "focuses entirely on Russia while ignoring potential election meddling by any other nations."  *Id.* ¶ 61.

Upon conclusion of the votes during the meeting, Chairman Schiff asked the Members in attendance whether there was "any further business before the committee?"  *Id.* ¶ 62.  Rep. Sean Patrick Maloney spoke up:

---

[1] Discovery has established that Mr. Nunes received one or more packages from Derkach in December 2019.  His receipt of a package was widely reported in July 2020. *See, e.g.*, *Id.* ¶¶ 46, 74–75.  In September 2020, well before *TRMS* Segment, Derkach was publicly identified as a Russian agent and sanctioned by the U.S. Treasury Department for attempting to influence the 2020 Presidential election.  *Id.* ¶¶ 81–85.  On March 15, 2021 the ODNI report was declassified. *Id.* ¶ 23.  Further, Mr. Nunes' receipt of the Derkach Package (and what he did with it) was not classified information, which he acknowledges.  *Id.* ¶¶ 64, 66–67.  Accordingly, there was no logical reason to believe that Mr. Nunes was somehow unable to publicly state whether he did (or did not) provide the FBI with the Derkach Package.  Indeed, even Mr. Crawford testified that Mr. Nunes could reveal this information.  *Id.* ¶ 68.

> Mr. Chairman, there have been public reports that the minority has received materials from Andrii Derkach, and *those materials would not be classified and they would not be prohibited from disclosure*. But at a minimum, I also understand that the majority staff has requested of the minority that they be shared with majority staff so that we might evaluate them independently. And so my question, Mr. Chairman, is of the ranking member, whether he is prepared to disclose to the committee whether he has received materials that have been called into question in the public reports from Andrii Derkach and, if so, whether he is prepared to share them with the rest of the committee.

*Id.* ¶ 62 (emphasis added). In response, Chairman Schiff asked Plaintiff "does the ranking member wish to respond?" and Plaintiff said "no." *Id.* ¶ 63. Rep. Maloney then continued:

> Well, so, Mr. Chairman, for the record, I guess I would request an explanation from the ranking member why he is just not prepared to respond to a simple question whether he has received materials that have been called into question that seem designed to denigrate a former Vice President of the United States, but, at a minimum, to share them with the rest of the committee. I mean, as I understand it, committee staff is in possession of evidence that a package was received. None of this is classified. So is the ranking member prepared to even respond to the question? How about it, Mr. Nunes? Did you receive a package from Andrii Derkach or not? And would you share with the committee or not?

*Id.* ¶ 64. The transcript of the HPSCI Meeting reflects that Plaintiff did not respond to Rep. Maloney, who then stated "[w]ell, I guess this is a case where silence speaks volumes." *Id.* ¶ 65. Maddow's contemporaneous notes for the *TRMS* Segment directly reference the HPSCI Meeting and Plaintiff's refusal to respond to Rep. Maloney's questions. *Id.* ¶ 69.

#### 4. The July 31, 2020 CNN Article

On July 31, 2020, CNN published an article titled "Devin Nunes won't say if he got foreign info meant to damage Biden" (the "CNN Article"). *Id.* ¶ 73. The CNN Article provided a hyperlink to the transcript of the HPSCI Meeting and reported on Plaintiff's refusal to answer Maloney's questions about the Derkach Package. *Id.* ¶ 74. The CNN Article also provided a hyperlink to the July 13, 2020 Letter in which Congressional Democrats alerted the FBI regarding their concern with "2020 foreign interference efforts." *Id.* ¶ 76. Thus, it was not just Politico that saw Mr. Nunes' behavior—and his refusal to address the issues—as being newsworthy. The

headline and excerpts from the CNN Article were later displayed on screen during the *TRMS*
Segment at issue.  *Id.* ¶ 77.

### 5.    The September 10, 2020 Sanctions Against Derkach

On September 10, 2020, the Treasury Department's Office of Foreign Assets Control
("OFAC") imposed sanctions on Derkach for being an active Russian agent who undertook efforts
to influence the 2020 U.S. presidential election.  *Id.* ¶¶ 81–85.  OFAC's press release announcing
the sanctions stated that "From at least late 2019 through mid-2020, Derkach waged a covert
influence campaign centered on cultivating false and unsubstantiated narratives concerning U.S.
officials in the upcoming 2020 Presidential Election, spurring corruption investigations in both
Ukraine and the United States designed to culminate prior to election day."  *Id.* ¶ 84.  It continued
that "Derkach almost certainly targeted the U.S. voting populace, prominent U.S. persons, and
members of the U.S. government."  *Id.* ¶ 85.

### 6.    The March 17, 2021 Deadline Interview

On March 17, 2021, following the release of the ODNI Report, Nicolle Wallace
interviewed Rep. Maloney on MSNBC's *Deadline: White House* (the "March 2021 *Deadline*
Interview").  *Id.* ¶ 87.  During the March 2021 *Deadline* Interview, Rep. Maloney addressed the
release of the ODNI Report:

> Maloney:  Well, I'm so proud that Chairman Adam Schiff, and those of us on the
> Intelligence Committee, you know, wrote into law that the agencies had to issue
> this report and declassify it, because now everyone can see what I was getting
> excited about.  And the fact is, is that *they were so comfortable using people like
> Devin Nunes that Andriy Derkach, a known Russian agent, sent information to
> Devin Nunes at the Intelligence Committee*.  We literally had the package receipt.
>
> And you'll recall that what prompted that appearance on your show, was that I
> questioned him during a hearing, an open hearing about what was in the box. What
> he had received from Andriy Derkach, it was the same information, presumably,
> that Ron Johnson was trying to spread around using his position in the Senate, as
> the Chairman at that time of the Homeland Security Committee.   So, it`s

extraordinary that Russia's strategy was to spread disinformation using American media organizations like Fox and OAN.

But even more alarmingly, senior members of the Senate and the U.S. House like Ron Johnson and Devin Nunes in an effort to launder their disinformation in a way that the media might find credible.

*Id.* ¶¶ 89–90.  Maddow's research notes for the *TRMS* Segment directly reference the March 2021 *Deadline* Interview, which occurred days before the Segment.  *Id.* ¶ 91.

### D.    Other Facts Informing the Statement

In addition to the specific reporting referenced above, numerous other well-reported facts informed *TRMS's* confidence in the accuracy of the July 23, 2020 Politico Article's report that Nunes did not turn the Derkach Package over to the FBI.  This included the following:

### 1.    The Parnas Interview And Related Reporting

On January 15, 2020, Maddow interviewed Lev Parnas, a Ukrainian American business man in connection with reports of Parnas working with President Trump's personal lawyer Rudolph Giuliani and others to acquire and spread information that would be detrimental to President Biden's candidacy in the 2020 U.S. Presidential Election.  *Id.* ¶¶ 93–95, 104.  Parnas and Giuliani were connected to Russian-linked actors in this endeavor (including Derkach).  *Id.* ¶¶ 93–95.  During the interview, Parnas stated that he had met Plaintiff several times, but that most of his interactions were with Plaintiff's aide, Derek Harvey.  *Id.* ¶ 106.  Specifically, Parnas said he set up several Skype interviews for Harvey with different Ukrainian prosecutors, including one who, in January 2021, OFAC sanctioned in connection to his election interference work in collaboration with Derkach.  *Id.* ¶ 107.

Subsequent events established the Plaintiff was not forthcoming concerning his connections with Parnas.  Plaintiff had publicly denied knowing Parnas or communicating with him, but HPSCI later released a report in December 2019 establishing that there had been phone

calls between Parnas and Plaintiff. *Id.* ¶¶ 98–100, 103, 105. Likewise, Maddow reviewed a series of WhatsApp messages released by HPSCI between Harvey and Parnas including messages setting up the meetings with Ukrainian prosecutors—just as Parnas said during the interview. *Id.* ¶¶ 116–17; McNamara Decl. Ex. 2 ¶ 42. Then, on January 18, 2020, the Los Angeles Times published an article titled "Text messages point to Rep. Devin Nunes in Ukraine scheme at heart of Trump impeachment" (the "January 18, 2020 LA Times Article"), which reported on Maddow's interview with Parnas, these WhatsApp messages, and suggested that Plaintiff was connected to the Parnas and Giuliani efforts to obtain negative information about President Biden to harm his presidential campaign. 56.1 ¶¶ 111–14.

In sum, the Parnas Interview and related public reports underscored a pattern of behavior— that Plaintiff appeared to consistently hide his interactions with individuals linked to Russian interference in U.S. elections, a fact that is entirely consistent with Plaintiff both refusing to acknowledge receipt of the Derkach Package and failing to turn it over to the FBI. McNamara Decl. Ex. 2 ¶ 43.

### 2. Nunes' Public Mistrust Of And Hostility Toward The FBI

Following the 2016 election, Representative Nunes publicly touted for years how he led the charge in exposing the "Russia Hoax," engaged in "numerous battles with the FBI and the Department of Justice" (56.1 ¶¶ 128–29), and as Chairman of HPSCI, authored a report in January of 2018 regarding surveillance and other abuses at the FBI which "raise[d] concerns with the legitimacy of certain" FBI actions. *Id.* ¶¶ 130–31. Over time, Nunes' relationship with the FBI deteriorated to the point that he openly called the FBI "dirty," and dishonest in nationally televised interviews. *Id.* ¶¶ 124–25. *TRMS* had reported on Nunes' prior hostilities toward the FBI. *Id.* ¶ 133. Plaintiff's well-documented animosity toward the FBI further informed Gnazzo's confidence

in the accuracy of the Statement concerning his refusal to turn the Derkach Package over to the FBI.[2]  *Id.* ¶¶ 134–35.

### E.    The *TRMS* Segment

The *TRMS* Segment was telecast during the "A-Block" or introductory segment of the March 18, 2021 show.  McNamara Decl. Ex. 2 ¶ 14, Ex. 3 ¶13.  Maddow wrote the A-Block on the day of the show and had full confidence in the accuracy of the Statement.  56.1 ¶¶ 17, 19.  Maddow is a voracious reader and spends much of the day reading the news of the day and other materials relevant to her show that evening.  *Id.* ¶ 147.  Her belief in the accuracy and credibility of the Statement was informed by a wealth of previously published news and government reports described above.  *Id.* ¶¶ 19, 28–29, 41, 54, 71, 78, 86, 91, 110.

Cory Gnazzo is the Executive Producer of the *TRMS*.  *Id.* ¶ 4.  In his role, Gnazzo bears ultimate responsibility for the content on *TRMS*, together with Rachel Maddow.  *Id.* ¶ 14.  Gnazzo reviewed the *TRMS* Segment before it aired and had no question as to the accuracy of the Statement.  *Id.* ¶ 16.  *TRMS* has a "fact-checking" process tied to each segment—primarily to look at spellings, names, and dates—and discovery showed that on March 18, 2021, Sofia Miller, a *TRMS* intern, conducted the fact-check for the *TRMS* Segment and did not identify any errors relevant to the Statement or Derkach Package.  McNamara Decl. Ex. 2 ¶ 12; *Id.* Ex. 3 at ¶¶ 12, 17.

The *TRMS* Segment reported on the just released ODNI Report and put the findings of the Report in the broader context by relying on previous reporting and events documented over the prior year, including reporting from the July 23, 2020 Politico Article that Nunes did not turn the Derkach Package over to the FBI.  *Id.* ¶¶ 151–53.  Maddow began the *TRMS* Segment by

---

[2] Plaintiff confirmed in this action, with regard to the January 2018 HPSCI Memorandum, that he had serious concerns about the trustworthiness of the FBI.  *Id.* ¶ 127.  And he testified that well before the *TRMS* Segment, he publicly stated that members of the FBI were corrupt and that the agency was "dirty." *Id.* ¶¶ 123–24.  When asked whether his distrust of the FBI began around 2018, Plaintiff testified in this action "I still have distrust of the FBI." *Id.* ¶ 127.

highlighting the key findings of the ODNI Report, including that Russia had deployed an influence operation to interfere in the 2020 U.S. Presidential Election in support of former-President Trump and in an effort to impair President Biden's candidacy.  *Id.* ¶ 137.  Maddow contextualized the ODNI Report and its findings, underscoring that the intelligence community under the Trump administration had authored the Report.  *Id.* ¶ 138.

Maddow then discussed how the ODNI Report specifically identified Andrii Derkach—who OFAC sanctioned in September 2020 (*see id.* ¶¶ 140–44)—as a Russian agent working under President Vladmir Putin's purview to further this interference operation.  *Id.* ¶ 144.  Maddow provided examples of Derkach's conduct, explaining that Derkach's efforts to launder Russian intelligence disinformation through Rudy Giuliani were well-documented.  *Id.* ¶ 142; *see also Id.* ¶¶ 48, 75, 95–96.  Maddow then discussed Derkach's efforts to influence Plaintiff.  *Id.* ¶¶ 142–46.  Specifically, Maddow highlighted that "as part of Russia's attack on our election, last summer, Democrats on the Intelligence Committee in the House learned that same guy Derkach, had mailed a stack of unknown materials to a Republican congressman named Devin Nunes, who is the top Republican on the Intelligence Committee to this day."  *Id.* ¶ 142.  After noting Plaintiff's acceptance of the Derkach Package, Maddow asked "what was in it?"  *Id.* ¶ 145.  She explained that Plaintiff "has refused to answer questions about what he has received from Andrii Derkach.  He has refused to show the contents of the package to members of the intelligence community.  He has refused to hand it over to the FBI, which is what you should do if you get something from somebody that is sanctioned by the U.S. government as a Russian agent."  *Id.* ¶ 146.

### F.    This Litigation

On April 5, 2021, counsel for Plaintiff, Steven Biss, sent a demand and retraction letter to NBCU (the "Demand Letter") asserting that the Segment was materially false because "Congressman Nunes did not refuse to hand [the Derkach Package] over to the FBI."  *Id.* ¶¶ 164–

65.  The Demand Letter referred NBCU to a July 29, 2020 Breitbart article titled "Republicans Mull Ethics Charges Against Schiff Ally as Democrats Turn Back to Failed Russia Strategy" (the "Breitbart Article"), which contains a quote from Representative Rick Crawford obliquely suggesting that Plaintiff had turned the Derkach Package over to the FBI.  *Id.* ¶¶ 166, 179.

On April 9, 2021, counsel for NBCU, David N. Sternlicht, sent Mr. Biss, a written response to his Demand Letter ("NBCU Letter").  *Id.* ¶ 187.  In the NBCU Letter, Sternlicht addressed the ambiguities in the Breitbart Article and asked for clarification concerning whether Plaintiff contended he did in fact turn the Derkach Package over to the FBI.  *Id.* ¶ 190.  The NBCU Letter made clear that it "would like to update [its] reporting on this matter as expeditiously as possible in light of Congressman Nunes's responses and the information in [the Demand Letter], which [it] seek[s] to clarify."  *Id.* ¶ 191.  Plaintiff never responded to NBCU's Letter.  *Id.* ¶¶ 193–94.

Instead, four months later on August 3, 2021, Plaintiff filed this lawsuit against NBCU in the Eastern District of Texas alleging that several statements in the *TRMS* Segment were defamatory. Dkt. 1.  NBCU successfully moved to dismiss the case for lack of personal jurisdiction and improper venue on October 28, 2021 (Dkt. 5), and this case was transferred to this Court in February 2022 (Dkt. 22).  Following the transfer, Plaintiff amended his Complaint twice, with the operative Second Amended Complaint ("SAC") filed on May 12, 2022.  Dkt. 40.

Plaintiff's complaint was the first time he specifically alleged that he in fact turned the Derkach Package over to the FBI and attached a December 11, 2019 letter to then Attorney General Barr (the "Barr Letter").  SAC ¶ 13.  The Barr Letter stated, in its entirety, that:

> The House Intelligence Committee today received a package from foreign individuals addressed to me. We have strong reason to believe that the sending of this package is part of a foreign disinformation campaign that included participation by Americans.  As a result, I request a meeting with you to discuss these concerns at your earliest convenience.

*Id.*; 56.1 ¶ 200.  As Plaintiff has acknowledged in this action, the letter was not actual evidence that the Derkach Package was sent to the FBI.  56.1 ¶¶ 199, 201.  And the only evidence produced in this action conflicts with the facts set forth in the Barr Letter.[3]

On May 27, 2022, NBCU moved to dismiss the Second Amended Complaint and on November 28, 2022, this Court granted NBCU's motion to dismiss the SAC with the exception of the Statement.  Dkt. 57.  The Court specifically held that because the July 23, 2020 Politico Article was not cited or referenced in the Complaint, "it was not properly considered on a motion to dismiss" and the Court could not "draw the factual inference that the speaker or others responsible for the segment had knowledge of the . . . article and based the statements on its contents."  *Id.* at 20.  The Court reasoned that "[w]hile it was plausible that the statement was made with knowledge of the [Politico] article . . . [a] court does not weigh competing, plausible theories of actual malice on a motion to dismiss."  *Id.* at 21.  Discovery is now complete, and this motion follows.

## II.    NBCU is Entitled to Summary Judgment

### A.    Legal Standard

Summary judgment is warranted here because, based on the undisputed record, Plaintiff cannot show by clear and convincing evidence that the allegedly defamatory Statement was published with actual malice.  *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 323 (1974).  Under Rule 56(a) of the Federal Rules of Civil Procedure, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Although the Court must "construe the facts in the light most favorable to the non-moving party," *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014), "the mere

---

[3] In response to NBCU's Touhy Request, the Department of Justice produced an FBI 302 drafted on January 8, 2020 (the "FBI 302").  *See* Declaration of Jeremy A. Chase ("Chase Decl."), Ex. 11.  The FBI 302 does not address the package identified in the Barr Letter at all, but rather a second package with a cover letter dated December 17, 2019. Plaintiff could offer no explanation for this discrepancy.

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat summary judgment]; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F. 3d 549, 554 (2d Cir. 2005) (emphasis in original). Moreover, "[t]he question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protections is not merely a question for the trier of fact. Judges, as expositors of the constitution, must independently decide whether the evidence in the record is sufficient." *Bose Corp v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 (1984).

Plaintiff concedes that he was a public official when he filed this lawsuit, and as such, he must show that NBCU acted with actual malice. "Actual malice" does not mean common-law malice in the sense of ill will or spite; it means knowledge of falsity or reckless disregard for the truth. *Sullivan*, 376 U.S. at 279–80. "Reckless disregard" is a purely "subjective test" requiring that a defendant "entertained serious doubts as to truth of [the] publication," *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968), or had a "high degree of awareness of . . . probable falsity." *Garrison v. State of La.*, 379 U.S. 64, 74 (1964). It is "not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant*, 390 U.S. at 731. In essence, reckless disregard means that the defendant believed a statement was likely false but published it anyway.

Importantly, Plaintiff must establish actual malice by "clear and convincing evidence." *Gertz*, 418 U.S. at 329 n.2; *Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 259 (2d Cir. 2021). This standard is "exceedingly difficult to satisfy," *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 768 (1985) (White, J., concurring), and applies at summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56 (1986). Additionally, the U.S. Supreme Court has

held that "the state of mind required for actual malice would have to be brought home to the persons in the [defendant's] organization having responsibility for the publication of the [statement]." *Sullivan*, 376 U.S. at 287. Thus, knowledge of falsity must reside in the minds of those responsible for the reporting at issue. *See Palin v. New York Times Co.*, 940 F.3d 804, 810 (2d Cir. 2019); *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013).

Ultimately, the actual malice standard "imposes on a plaintiff 'a heavy burden of proof, a burden that is designed to assure to the freedoms of speech and press that breathing space essential to their fruitful exercise.'" *Brimelow v. N.Y. Times Co.*, 2021 WL 4901969, at *2 (2d Cir. Oct. 21, 2021) (citing *Contemp. Mission, Inc. v. N.Y. Times Co.*, 842 F.2d 612, 621 (2d Cir. 1988)); *see also Baiul v. Disson*, 607 F. App'x 18, 21 (2d Cir. 2015) (actual malice imposes a "'demanding burden' requiring 'clear and convincing proof.'") (citing *Celle v. Filipino Reporter Enterprises*, 209 F.3d 163, 182–83 (2d Cir. 2000)). This "heavy burden of proof," *Brimelow,* 2021 WL 4901969, at *2, serves our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," even though such debate "may well include vehement, caustic, and sometimes unpleasantly sharp"—and even "erroneous"—commentary about public figures. *Sullivan*, 376 U.S. at 270–71.

Here, Plaintiff has no evidence—let alone clear and convincing evidence—that NBCU had *any* doubts about the truth of the Statement that Plaintiff failed to turn the Derkach Package over to the FBI. Rather, those responsible for the *TRMS* Segment testified that they had no doubts as to the accuracy of the Statement. 56.1 ¶¶ 17–18. This belief was well-grounded in a wealth of information, including previously published news reports from reputable publications, records from Congress and other federal agencies, and *TRMS's* own prior reporting. *Id.* ¶¶ 19–20. As such, summary judgment should be granted and this action should be dismissed with prejudice.

### B.     NBCU Relied On Reporting From A Reliable Publication

Maddow and Gnazzo both testified that they reviewed and relied upon the July 23, 2020 Politico Article in writing and airing the Statement.  *Id.* ¶¶ 54–56.  That article, published seven months earlier, reported that Nunes received a package and that "one person familiar with the matter said the information was not turned over to the FBI," that "Nunes declined repeated requests for comment," and that the "FBI did not return a request for comment."  *Id.* ¶ 47.

NBCU had no doubts about the accuracy of the July 23, 2020 Politico Article.  Maddow and Gnazzo each considered Politico to be a highly reputable publication with comparable reporting standards to NBCU.  *Id.* ¶ 56.  Further, it was their opinion that the journalists responsible for the article were well-respected and particularly well-sourced in reporting on matters related to Congress.  *Id.*  Given Politico's comparable reporting standards to NBCU, the July 23, 2020 Politico Article's characterization of its source for the Statement as a "person familiar with the matter" led Maddow and Gnazzo to believe that this was someone with direct knowledge of the events.  *Id*. ¶ 47; *see also* McNamara Decl. Ex. 3 ¶ 27; *Id.* Ex. 2 ¶ 30.  The law is clear that a publication's reliance on "wholly plausible factual representations of writers whom they have reason to believe are professional [and] reliable" precludes a finding of actual malice.  *See Adler v. Conde Nast Publ'ns, Inc.*, 643 F. Supp. 1558, 1566 (S.D.N.Y. 1986); *Chaiken v. VV Publ'g Corp*., 119 F.3d 1018, 1032 (2d Cir. 1997) (no actual malice where publisher "relies upon the integrity of a reputable author and has no serious reason to question the accuracy of the information provided by that author"); *World Boxing Council v. Cosell*, 715 F. Supp. 1259, 1265 (S.D.N.Y. 1989) (no actual malice where author relied on articles that "appeared in respected publications, and were authored by reputable journalists, whose allegations were not so improbable that a prudent author would have questioned their accuracy").

NBCU's good faith belief in the truth of Politico's reporting was further underscored by the lack of any indicia that it was false. Plaintiff had declined multiple requests for comment for the article, Politico had not made any correction to the article, Plaintiff had never made any public statements refuting the truth of the report, and Plaintiff had never filed suit against Politico over the report. 56.1 ¶¶ 50–52, 57; *see*, *e.g.*, *Davis v. Costa-Gavras*, 654 F. Supp. 653, 656 (S.D.N.Y. 1987) (crediting filmmakers' knowledge that no legal action was taken challenging any claims from book upon which movie was based as evidence of movie producer's lack of actual malice). This gave NBCU particular confidence in the Politico report in light of Plaintiff's extensive track record of filing libel lawsuits. 56.1. ¶¶ 9, 54–55; *see also* McNamara Decl. Ex. 2 ¶ 32; *Id.* Ex. 3 ¶ 20. Indeed, the July 23, 2020 Politico Article remains unchallenged to this day.[4] 56.1 ¶¶ 51–52.

Notwithstanding that the July 23, 2020 Politico Article was far from NBCU's only source for the statement at issue, courts routinely find that reliance on just a single report—like the July 23, 2020 Politico Article—is sufficient by itself to prove the absence of actual malice. *See*, *e.g.*, *Fodor v. Berglas*, 1995 WL 505522, at \*5 (S.D.N.Y. Aug 18, 1995) (no actual malice where book author relied on single *New Yorker* article); *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013) (plaintiff could not plausibly plead actual malice because defendants republished an article from *The New Yorker*, a reputable publication); *Associated Financial Corp. v. Financial Services Information Co.*, 1989 U.S. Dist. LEXIS 16263, at \*20-23 (C.D. Cal. July 27, 1989) (no actual malice where publisher relied on a single, twelve year old article in *Forbes*).

### C.    Maddow's Own Prior Reporting And Well-Reported National Events Bolstered NBCU's Confidence In The Truth Of The Statement

---

[4] Plaintiff's refusal to comment on the July 23, 2020 Politico Article reinforced Maddow and Gnazzo's belief that the Statement was accurate. 56.1 ¶¶ 54–55, 71–72, 155; McNamara Decl. Ex. 2 ¶¶ 31–32; *Id.* Ex. 3 ¶ 20. Maddow believed that this was consistent with his conduct during the HPSCI Meeting where he refused to address the non-classified facts surrounding his receipt of the Derkach Package. *Id.*

Additional facts bolstered NBCU's confidence in the truth of the Statement that Plaintiff refused to turn the Derkach Package over to the FBI.

*First*, the July 13, 2020 Letter from Democratic congressional leadership to the FBI Director conveyed to Maddow and Gnazzo that the FBI was not fully informed of the extent to which Congress was the target of a foreign influence campaign, which was consistent with Politico's reporting that Nunes had not turned the package over to the FBI. *Id.* ¶¶ 41–42; *see also* McNamara Decl. Ex. 2 at ¶ 26.

*Second*, that Plaintiff refused to acknowledge receipt of the Derkach Package and his unwillingness to share it with other members of HPSCI, gave NBCU further confidence in the Statement. 56.1 ¶¶ 71–72; *see also* McNamara Decl. Ex. 2 ¶¶ 31, 35; *Id.* Ex. 3 ¶ 19. Maddow and Gnazzo saw no reason why Plaintiff would refuse. *Id.* As Rep. Maloney stated in the HPSCI Meeting, the receipt of the package was *not* a classified matter, and as Maddow testified, "anyone in that circumstance would have no reason but to come forward and say here's what you do if somebody who's a sanctioned Russian agent sends you disinformation as part of a foreign influence operation" as part of "what you would hope would be a nonpartisan, patriotic instinct." McNamara Decl. Ex. 4 at 93:7–11, 22 –23. Plaintiff's refusal to respond to his fellow Member on HPSCI about the package made it all the more credible that he had not turned it over to the FBI.

*Third*, Maddow and Gnazzo's confidence in the credibility of the Statement was further supported by Rep. Maloney's comments on *Deadline* that he believed Plaintiff was spreading the Russian disinformation being fed by Derkach, that he had the concrete proof of the shipping receipt for the Derkach Package and, nevertheless, Plaintiff refused to provide straight answers concerning what he did with the Derkach Package, even though months had passed. 56.1 ¶¶ 88–90; *see also* McNamara Decl. Ex. 3 ¶¶ 21–22.

21

*Fourth*, the various reports linking Plaintiff and his aide Derek Harvey to Parnas, Giuliani, and their efforts to obtain harmful information on Joe Biden, coupled with Plaintiff's public denials concerning any connection to such efforts further reinforced Maddow and Gnazzo's belief in the truth of the statement that Nunes failed to turn the Derkach Package over to the FBI. 56.1 ¶¶ 110, 121, 122; *see also* McNamara Decl. Ex. 2 ¶¶ 40–42; *Id.* Ex. 3 ¶ 19. Indeed, the December 2019 HPSCI Impeachment Report, Maddow's January 15, 2020 interview with Lev Parnas, and WhatsApp Messages between Harvey and Parnas collectively confirmed that (1) Nunes was in contact with Giuliani and Parnas—men connected to Derkach in the disinformation campaign, (2) Nunes' top aide *was* in fact taking active steps to coordinate with Ukrainian prosecutors with confirmed close ties to Derkach, and (3) Plaintiff publicly denied these facts but was later shown to have been at best wrong or at worst dishonest in his denials. 56.1 ¶¶ 97–120. All of this suggested that Plaintiff was open to receiving information from such sources and less than forthcoming about it, thus giving Maddow full confidence that Plaintiff had not turned over the Derkach Package to the FBI.

*Fifth*, in addition to the source material outlined above, Gnazzo took further confidence in the Statement that Nunes refused to turn the Derkach Package over to the FBI because he was well aware of Nunes' openly contentious relationship with the FBI, which had been reported on by other news outlets and *TRMS*. 56.1 ¶¶ 134–35. To Gnazzo, Plaintiff's attitude toward the FBI made it all the more credible that he would have refused to turn the Derkach Package over to the it. McNamara Decl. Ex 3 ¶ 23.

When taken together, all of this information provided Maddow and Gnazzo with complete confidence that the Statement was true. They relied upon a "plethora of other news articles . . . and government records, pre-dating the [*TRMS* Segment], which align[ed] with and corroborate[d]

the [Statement's] general thrust." *Montgomery v. Risen*, 197 F. Supp. 3d 219, 260 (D.D.C. 2016).

The law is clear that there can be no subjective awareness of probable falsity where, as here, the

publisher's allegations are "supported by a multitude of previous reports upon which the publisher

reasonably relied." *Rosanova v. Playboy Enters., Inc.*, 580 F.2d 859, 862 (5th Cir. 1978).  In short,

the evidence shows that, far from seeking to avoid the truth, Maddow and her producers brought

their significant knowledge, reporting, and editorial judgment to bear, which bolstered their firm

belief in the accuracy of the Statement.

### D.    None of the Evidence Produced In This Action Is Remotely Capable of Establishing Actual Malice by Clear and Convincing Evidence

With this wealth of evidence documenting the basis for Maddow and Gnazzo's firm belief

in the accuracy of the Statement, summary judgment must be granted unless Plaintiff can point to

clear and convincing evidence the Statement was:

> [f]abricated by the defendant, . . . the product of his imagination, or . . . based wholly
> on an unverified anonymous telephone call . . . [or that] the publisher's allegations
> [were] so inherently improbable that only a reckless man would have put them in
> circulation.  Likewise, recklessness may be found where there are obvious reasons
> to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant*, 390 U.S. at 732.  While Plaintiff posits various conclusory theories to support his claim

that NBCU acted with actual malice, the record establishes that Plaintiff has not unearthed *any*

evidence (much less clear and convincing evidence) showing that NBCU aired the Statement with

knowledge of falsity or with reckless disregard for the truth.  After nearly two years of discovery,

all Plaintiff can offer are the unsupported allegations from his Second Amended Complaint, which

are insufficient to establish actual malice as a matter of law.

***First and foremost***, Plaintiff hinges much of his actual malice case on the argument that

Maddow reviewed the Breitbart Article before the *TRMS* Segment aired and was, therefore, on

notice that the Statement was inaccurate due to a vague and speculative quote from Rep. Crawford referenced therein.  Plaintiff is wrong.

Discovery has established that neither Maddow nor Gnazzo were aware of or read the Breitbart Article before the Statement aired. 56.1 ¶¶ 181–82.  Although Rep. Crawford's quotation was later referenced in a Politico article published on July 30, 2020 (the "July 30, 2020 Politico Article"), neither Maddow nor Gnazzo were aware of this article when *TRMS* Segment aired.  *Id.* ¶ 184.[5]  As the actual malice standard focuses on the author's subjective state of mind at the time of publication, neither Maddow nor Gnazzo can be charged with knowledge of Crawford's statement.  Nor may Plaintiff contend that NBCU should have conducted additional research to find this specific reporting.  The law is clear that "failure to investigate is not evidence of actual malice."  *Biro*, 963 F. Supp. 2d at 285; *see also St. Amant*, 390 U.S. at 733.

Critically, Maddow and Gnazzo's lack of knowledge concerning the Crawford statement cannot be a material disputed fact since the law is clear that even if they *had* reviewed the Breitbart Article or Rep. Crawford's quote (they did not), it still would not constitute clear and convincing evidence of actual malice.  The Crawford quote was a second hand, vague contention that the right thing to do if you receive a package from a foreign agent is to turn it over to the FBI and "that's what happened."  56.1 ¶ 169.  But even a definitive denial *by the plaintiff* is not sufficient to establish actual malice in the face of evidence (like here) that credibly supported the challenged statement.  *Edwards*, 556 F.2d at121 (holding that clear and convincing proof of actual malice

---

[5] On March 18, 2021 at 11:17 am EST, Steve Benen, who serves as the editor of the MaddowBlog website, published an article concerning the ODNI Report (the "March 18, 2021 MaddowBlog Post").  *Id.* ¶ 185.  Later that day, Benen circulated this article to *TRMS* staff.  McNamara Decl. Ex. 2 ¶ 55; *Id.* Ex. 3 ¶ 31. The July 30, 2020 Politico Article was hyperlinked in the MaddowBlog Post.  *Id.* Neither Maddow nor Gnazzo accessed this particular hyperlink.  *Id.* And the evidence unequivocally establishes that Benen had no involvement in the production of *TRMS* Segment and was not responsible for the Statement, which was exclusively written by Maddow.  56.1 ¶ 186.

"cannot be predicated on mere denials, however vehement"); *Brimelow*, 2021 WL 4901969 at *3 ("It is well settled that denials without more do not support a plausible claim of actual malice.").

Further, Maddow and Gnazzo both testified that even if they had reviewed the Breitbart Article prior to air, they would not have credited Rep. Crawford's statement as a definitive account of what Plaintiff did with the Derkach Package.  McNamara Decl. Ex. 2 ¶ 53; *Id.* Ex. 3 ¶ 30.  Mere "knowledge of the existence of a contradictory source, without more, does not constitute clear and convincing evidence of actual malice."  *Liberty Lobby, Inc. v. Anderson*, 1991 WL 186998, at *8 (D.D.C. May 1, 1991); *Speer v. Ottaway Newspapers, Inc.*, 828 F.2d 475, 478 (8th Cir. 1987) (publishing editorial crediting account of trusted reporter over another source describing it as a "pack of lies" does not suggest that newspaper published with actual malice).

Here, Rep. Crawford's statement provided no indicia that Rep. Crawford actually knew Plaintiff turned the package over to the FBI or that he had even spoken with Plaintiff.  Plaintiff was interviewed for and quoted extensively in the same Breitbart Article and did not at any point in that article, or any other, say he turned the Derkach Package over to the FBI.[6]  Indeed, the lack of credibility evident on the face of the Crawford's quote proved true:  Rep. Crawford testified in this action that he was in fact speculating, that he was not speaking on Plaintiff's behalf, and had no knowledge concerning what Plaintiff did or did not do with the Derkach package.  *See* 56.1 ¶¶ 170–78.  Further, the July 30, 2020 Politico Article itself downplayed the import of Crawford's statement, noting it "appeared to confirm that Nunes received a package from a foreign source,

---

[6] Plaintiff was not constrained by classified information in addressing whether he turned the Derkach Package over to the FBI with Breitbart. 56.1 ¶¶ 66–68.  Indeed, even Rep. Crawford testified that there was no legal basis for Plaintiff's refusal to answer questions from his colleagues on HPSCI about the Derkach Package.  *Id.*  ¶ 68.  When Plaintiff was asked why he did not clear the air on whether he turned the Package over to the FBI in the Breitbart Article, Plaintiff explained that it was "because it's a made up story."  *Id.* ¶ 167.  Incredibly, Plaintiff testified that he never heard of Derkach, he did not know who Derkach was at the time HPSCI received the Derkach Package, *id.* ¶ 168, and "[n]obody cares about Derkach, nobody ever cared about Derkach."  Put simply, nothing—not a legal obligation, national security concern, or law enforcement purpose—precluded Plaintiff from addressing his receipt of the Derkach Package.

and *suggested* that Nunes turned it over to authorities"—hardly a vote of confidence in the strength

of the quote.  Tellingly, that same July 30, 2020 Politico Article linked back to the July 23, 2020

Article, with no clarification or refutation of the prior statement that Nunes failed to turn the

Derkach Package over to the FBI.  McNamara Decl. Ex. 50.

      *Second*, Plaintiff has suggested that NBCU failed to adhere to its News Group Policies and

Guidelines in an effort to find something to support actual malice.  Plaintiff is wrong on both the

facts and the law.  Maddow and Gnazzo consistently affirmed that they followed the guidelines

and explained precisely why.  McNamara Ex. 2 ¶ 47; *Id.* Ex. 3 ¶ 27.  Plaintiff cannot marshal any

evidence to the contrary.   And Plaintiff's argument has no legal basis because courts have

consistently held that a "deviation from normal journalistic standards does not constitute actual

malice."  *Brimelow v. New York Times Co.,* 2020 WL 7405261, at *8 (S.D.N.Y. Dec. 16, 2020),

*aff'd*, 2021 WL 4901969 (2d Cir. Oct. 21, 2021); *see also Prince v. Intercept*, 634 F. Supp. 3d 114,

140 (S.D.N.Y. 2022) (that reporters "failed to include information regarding their anonymous

sources in violation of The Intercept's policies and procedures" was "unavailing"); *Blankenship v.

NBCUniversal, LLC,* 60 F.4th 744, 763 (4th Cir. 2023) (MSNBC's purported failure to follow its

own News Group Policies and Guidelines insufficient to establish actual malice).  Even proof of

"highly unreasonable conduct constituting an extreme departure from the standards of

investigation and reporting ordinarily adhered to by responsible publishers" will not establish

actual malice.  *Harte-Hanks Comms. v. Connaughton*, 491 U.S. 657, 664–65 & n.5 (1989).  In

short, even if publication of the Statement somehow violated NBCU's News Group Policies and

Guidelines—and it did not—such a violation would *not* support a finding of actual malice.

      *Third*, *TRMS*'s decision not to seek comment from Plaintiff does not establish actual

malice.  Initially, the *TRMS* Segment was not only reporting on the newly released findings of the

ODNI Report, but the commentary concerning Plaintiff's actions back in December 2019 or July 2020 was all based on prior reporting and well-established events about which Plaintiff had repeatedly declined comment. 56.1 ¶¶ 136–46, 151, 153. Further, any outreach to Plaintiff would have been a fruitless exercise since the record establishes that Plaintiff (1) had repeatedly refused to provide comment to *TRMS* over the years and (2) had a well-known practice of not speaking to the media like MSNBC, even going so far as to put it on his own website. *Id.* ¶¶ 156–61. And, indeed, "a defendant's failure to verify statements with the plaintiff . . . does not amount to reckless disregard of the truth." *Prince v. Intercept*, 2023 WL 4492413, at *10 (S.D.N.Y. July 12, 2023) (citation omitted); *Vandenburg v. Newsweek, Inc.*, 507 F.2d 1024, 1027–28 (5th Cir. 1975) (failure to verify story with plaintiff prior to publication insufficient evidence of actual malice.). In sum, Plaintiff cannot establish actual malice based on NBCU's wholly justifiable decision not to reach out to him for comment.

**Fourth**, Plaintiff has alleged that NBCU was motivated by ratings in publishing the Statement. However, other than Plaintiff's rank speculation, there is nothing in the record even suggesting that ratings or a profit motive motivated the telecast of the *TRMS* Segment. Maddow and Gnazzo both affirmed that the Segment was not informed by ratings and that they published the *TRMS* Segment because it was inherently newsworthy. 56.1 ¶ 204. And it is well established that "a desire to turn a profit does not in and of itself indicate a defendant acted with actual malice." *Bloom v. A360 Media LLC*, 2024 WL 2812905, at *5 (S.D.N.Y. June 3, 2024) (citing *Harte-Hanks*, 491 U.S. at 667). As the Supreme Court has aptly observed "if a profit motive could somehow strip communications of the otherwise available constitutional protection, [its] cases . . . would be little more than empty vessels." *Harte-Hanks*, 491 U.S. at 667.

**Fifth**, Plaintiff alleges that NBCU was motivated by bias, spite, or ill-will in publishing the Segment.  Again, the record is devoid of any evidence of bias, spite, or ill-will against Plaintiff. The best Plaintiff can point to is the unremarkable proposition that he is a conservative and Maddow is a liberal.  But Maddow testified that she had "personal empathy with [Plaintiff]," and that "any personal opinion that [she] ha[s] about a political figure or a public figure doesn't influence [her] reporting on their actions."  56.1 ¶ 203; *see also* McNamara Decl. Ex. 4 at 148:9–12;149:9–10.  Further, even had Plaintiff marshalled any evidence of bias on Maddow's part (he has not), it is well-established that bias is not enough to establish actual malice.  *See Scientology Int'l v. Time Warner, Inc.*, 903 F. Supp. 637, 641 (S.D.N.Y. 1995), *on reconsideration*, 932 F. Supp. 589 (S.D.N.Y. 1996), *and aff'd sub nom. Church of Scientology Int'l v. Behar*, 238 F.3d 168 (2d Cir. 2001); *see also Palin*, 940 F.3d at 814 ("political opposition alone does not constitute actual malice"*); Arpaio v. Zucker*, 414 F. Supp. 3d 84, 92 (D.C.C. 2019) (holding that "the motivations behind defendants' communications – inspired by political differences or otherwise – do not impact whether defendants acted with actual malice as a matter of law").

**Finally**, Plaintiff's individual pieces of purported "circumstantial evidence"—which in and of themselves are not probative of actual malice—cannot together create actual malice.  Indeed, "there is persuasive evidence" that NBCU firmly believed the *TRMS* Segment was entirely accurate, "and the cumulative force of the evidence to the contrary is very weak," if not non-existent.  *McFarlane v. Sheridan Square Press*, 91 F.3d 1501, 1514 (D.C. Cir. 1996).  The *McFarlane* decision is particularly instructive. There, plaintiff argued that actual malice was evinced by defendant's decision to publish a book without verifying the information with any of the major figures in it and his reliance on a source who had been known to fabricate facts and whose story was uncorroborated.  *Id.* at 1510.  The court found that although the author "had

reasons to be wary" of the source, "he also had some reason to believe" the information was not fabricated.  The court ultimately concluded that a reasonable jury could not have found by clear and convincing evidence that defendant had published the materials with actual malice.  *Id.* at 1514; *see also Cobb v. Time, Inc.*, 278 F.3d 629, 638 (6th Cir. 2002) (no actual malice where journalist relied on source who was a drug user with "criminal background" and who was "paid" to provide "bizarre" information).

The D.C. Circuit's decision in *Jankovic v. Int'l Crisis Grp.,* is similarly instructive.  822 F.3d 576, 596 (D.D.C. 2016).  There the court rejected various nominal pieces of circumstantial evidence of actual malice, including overreliance on unreliable foreign press reports, misreading the import of other evidence, insufficient investigation, failure to follow its own news guidelines, conclusory statements of inherent improbability, and even the author's alleged extortion attempt of the plaintiff, holding that the plaintiff "failed to establish that 'the defendant actually possessed subjective doubt' about the [challenged] statement."  *Id.* 597.  The court further concluded that "[e]ven taking these flawed evidentiary assertions together, no reasonable jury could find by clear and convincing evidence that [defendant] acted with actual malice."  *Id.*; *see also Basulto v. Netflix, Inc.*, 2023 WL 7129970, at *50 (S.D. Fla. Sept. 20, 2023) ("Plaintiffs have cobbled together a series of circumstances they deem to be suspicious and argue that these factors somehow establish actual malice.  They do not.").

These cases underscore the heavy burden that Nunes faces and reinforces that he cannot come close to establishing that NBCU acted with actual malice.  There must be clear and convincing evidence that the defendant harbored serious doubts as to the truth of their publication; not, as here, a collection of nominal theories unsupported by the record.  Put simply, the record clearly establishes that Plaintiff cannot prove that the *TRMS* Segment and its Statement were

published with actual malice, and summary judgment should be granted for NBCU.

## MOTION FOR SPOLIATION SANCTIONS

NBCU's concern with Plaintiff's failure to preserve documents has been repeatedly raised throughout this litigation.[7]  Now that fact discovery has concluded, the record is clear that Plaintiff spoliated documents relevant to this case.  NBCU is entitled to sanctions against Plaintiff for spoliation of relevant records.

### I.    Factual Background In Support of Spoliation Sanctions

#### A.    Plaintiff Made No Effort to Preserve His Own Relevant Documents

Plaintiff is a serial litigant (56.1 ¶ 9) and purports to be aware of his obligations to preserve documents in the cases that he files (McNamara Decl. Ex. 6 at 287:14–21).  Nevertheless, Plaintiff utterly failed to ensure that relevant materials were preserved.  Plaintiff filed this action when he was a sitting member of Congress on August 3, 2021 and left his position five months later.  When Plaintiff departed Congress, however, he made no effort to retain any relevant documents.  Plaintiff explicitly stated in his interrogatory responses that "[a]ny physical and electronic files from [his] congressional office would have been left with the House of Representatives upon [his] departure from Congress."  Chase Decl. Ex. 1 at 12–13.

#### B.    Plaintiff Made No Effort to Ensure His Staffers Preserved Relevant Documents

Plaintiff identified several staffers under his direct supervision from HPSCI and his personal office as having information relevant to this litigation.  Chase Decl. Ex. 2 at 7, 13.  These individuals communicated by email and through text messages with Plaintiff and other staffers.[8]

---

[7] NBCU initially raised to this issue to the Court on June 2, 2023 (Dkt. 65), but elected to explore the issue further in depositions (Dkt. 74 at 1–2).  NBCU re-raised this issue to Magistrate Judge Netburn on February 13, 2024 (Dkt. 98) after additional discovery, including Plaintiff's deposition.  Magistrate Judge Netburn ultimately deferred to issue sanctions until a full record was established and discovery was completed. Dkt. 113 at 6.

[8] Plaintiff specifically identified Nicholas Ciarlante, Derek Harvey, George Pappas, Jacob ("Jack") Langer, and Jennifer Morrow. McNamara Decl. Ex. 8 at 37:1—22; *Id.* Ex. 9 at 14:17–20, 17:9–12, 57:5–9, 123:1–124:9, 129:5–

Further in Plaintiff's responses to NBCU's interrogatories, he indicated that "each staffer had a House email address and phone" and that "any relevant files would have been stored in those repositories." Chase Decl. Ex. 1 at 12–13.

Discovery has confirmed that Plaintiff failed to issue a preservation or litigation hold in connection with this matter to HPSCI, HPSCI staffers individuals, or to his staffers in his personal office. In response to a subpoena from NBCU (Chase Decl. Ex. 3), HPSCI confirmed that it "did not locate any requests to preserve documents related to this litigation." Chase Decl. Ex. 4. Plaintiff's staffers, likewise, repeatedly testified that they did not receive any instruction to preserve documents in connection with this litigation.[9] Plaintiff's former staffers consistently stated that they did not take any steps to preserve or search for documents related to this litigation.[10]

### C.     Third-Party Discovery Has Confirmed Plaintiff's Failure to Produce Relevant Documents

Third-party discovery has confirmed that Plaintiff failed to produce relevant documents. On April 27, 2023, Plaintiff's former counsel, Steven Biss, accepted service of six third-party subpoenas to Plaintiff's former staffers for relevant documents. Chase Decl. Ex. 7.

In response to these third-party subpoenas, Mr. Biss produced a single set of documents— a handful of text messages from Jack Langer (Plaintiff's communications director)—and he did so only after NBCU raised this issue to the Court. *See* Dkts. 65, 72.[11] Langer's text messages establish Plaintiff's failure to preserve and produce documents. *First*, Langer produced text

---

7; *Id.* Ex. 38 at 157:14–158:6; *Id.* Ex. 53 at 35:15–18, 53:23–54:2; Chase Decl. Ex. 5 at 17:11–17, 28:23–25, 52:16–53:6; *Id* . Ex. 6 at 82:10–16.

[9] McNamara Decl. Ex. 8 at 53:16–19; *Id* . Ex. 9 at 135:13–17; 140:2–6; *Id* . Ex. 53 at 64:10–12, 68:2–9; Chase Decl. Ex. 5 at 71 6–72: 19; *Id* . Ex. 6 at 81:12–82:25.

[10] McNamara Decl. Ex. 9 at 15:5–16:18; 141:16–142:7; *Id* . Ex. 38 at 160:5–14, 162:1–6; *Id*. Ex. 53 at 64:22–24, 67:23–68:1; Chase Decl. Ex. 6 at 65:1–66:9; 69:17–72:2; *Id* . Ex. 7 at 82:17–25.

[11] Plaintiff's collection efforts in response to these third-party subpoenas were suspect. Morrow and Langer testified that, in order to respond to NBCU's subpoena for documents, they identified responsive materials by conducting searches on their personal devices and accounts without the supervision or guidance of counsel. Chase Decl. Ex. 5 at 74:9-75:1; McNamara Decl. Ex. 9 at 58:20-59:9.

messages with Plaintiff, directly contradicting Plaintiff's prior representations to the Court that he did not engage in written communications relevant to the lawsuit. *Second*, these text messages confirm that Langer had failed to preserve relevant communications with the media about the Derkach Package. Chase Decl. Ex 8 at PX965, PX969, PX970–71; McNamara Decl. Ex. 9 at 218:19–219:6. Langer acknowledged that these and other communications with the media directly relevant to this action would have been on his phone issued by the House of Representatives, but he turned in his House phone to Congress *after* this action was commenced and all of his communications on that device were destroyed. *Id.* at 141:9–20. The loss of actual highly relevant evidence is also documented by the fact the Representative Crawford produced an email between his Communications Director and Langer about an interview for the Breitbart Article, but Langer produced no such communications (including the inevitable related communications Langer presumably had). Chase Decl. Ex. 9.

Finally, discovery has revealed that Mr. Biss never even informed Harvey of NBCU's third-party subpoena directed to him, or that Mr. Biss had accepted service of the same on Harvey's behalf. As an initial matter, there is no excuse for Mr. Biss' failure as he had been representing Harvey in a separate matter and was unquestionably capable of contacting his client. McNamara Decl. Ex. 38 at 162:16–163:1. Nevertheless, Harvey testified that "Mr. Biss never informed me that I had a subpoena." And that he never searched for relevant documents related to this action. *Id.* at 134:11–13; 160:5–14. This testimony raises serious concerns, given Mr. Biss's prior representations to Magistrate Judge Netburn, per her order instructing him to confirm with staffers whether they had written communications related to the case, (Dkt. 72), that Harvey "believed he may have had some notes, but, after searching his records, could not find any notes, and no other documents ever existed." Dkt. 73 at 4.

**D.    Plaintiff's Spoliation Has Prejudiced NBCU in Establishing Its Defenses In This Litigation**

NBCU has been prejudiced by Plaintiff's spoliation.  Plaintiff's current counsel made no effort to remedy any of the aforementioned issues.  During the course of this litigation, Plaintiff has only produced a single document in support of his contention that he turned the Derkach Package over to the FBI—the Barr Letter.  McNamara Decl. Ex. 52.  However, as Plaintiff admitted, the Barr Letter did not state, or otherwise reflect, that Plaintiff enclosed the Derkach Package or that it was delivered to the FBI.  McNamara Decl. Ex. 6 at 41:18–42:5.

NBCU obtained one other relevant document through third-party discovery—the FBI 302. Chase Decl. Ex. 11.  This document, however, raises more questions than it answers.  It does not confirm that the Derkach Package was delivered to the FBI on December 11, 2019 as Plaintiff alleges and testified.  Instead, it states that Plaintiff received a *second* package of materials from Derkach on December 17, 2019, which was delivered to the FBI on January 8, 2020. *Id.* at FBI0002.  Plaintiff and his staff members have no explanation for this discrepancy.  *See*, *e.g.*, McNamara Decl. Ex. 6 at 164:18–22; *Id.* Ex. 53 at 111:25–113:25.  And while there is self-serving testimony from Plaintiff's staffers that the Derkach Package was turned over to the FBI, the specific factual details of this incident remain unknown.[12]  Thus, Plaintiff's spoliation has denied NBCU the opportunity to test this testimony.

**II.    Argument In Support Of Spoliation Sanctions**

**A.    Plaintiff Has Engaged In Spoliation**

---

[12] For example, Pappas testified that Ciarlante brought the package to his attention the day it was delivered (Chase Decl. Ex. 10 at 25:25–26:3) and that he had a meeting with Plaintiff, Ciarlante, Harvey, and Staff Director and General Counsel, Allen Souza, in Plaintiff's personal office about what to do with the Derkach Package when it arrived. *Id.* at 22:2–23:1.  Ciarlante testified that he did not have a conversation with Pappas or Souza about the Derkach Package when it arrived.  McNamara Decl. Ex. 53 at 77:23–78:10.

Plaintiff's spoliation in this case is beyond dispute. "A party spoliates evidence if (1) 'the party having control over the evidence had an obligation to preserve it at the time it was destroyed;' (2) 'the records were destroyed with a culpable state of mind;' and (3) 'the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 139 (2d Cir. 2023) (citation omitted). A "'culpable state of mind' for a spoliation claim need not be intentional or willful, and may be found where the spoliation occurred due to negligence." *Id.* at 140 (citation omitted). Here, all three elements of spoliation are plainly met.

Plaintiff was required to maintain any relevant records as soon as he contemplated bringing this lawsuit against NBCU. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 341 F.R.D. 474, 494 (S.D.N.Y. 2022) ("The duty to preserve arises 'when a party should have known that the evidence may be relevant to future litigation.'") (quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). Plaintiff clearly contemplated litigation at least as early as April 5, 2021, when he sent the Demand Letter to NBCU. McNamara Decl. Ex. 46. When a party "reasonably anticipates litigation, [he] must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003). This obligation extends to individuals that are "key players in the case" who are "likely to have discoverable information that the disclosing party may use to support its claims or defenses," including the individuals who are "identified in a party's initial disclosure and any subsequent supplementation thereto." *Elavon, Inc. v. Ne. Advance Techs., Inc.*, 2022 WL 1175039, at *3 (S.D.N.Y. Apr. 20, 2022). Despite being a serial litigant and claiming to understand his obligations, Plaintiff completely disregarded his responsibilities—which is especially egregious since he initiated this lawsuit. Moreover,

documents directly related to the issues involved in this litigation were conclusively destroyed.
*See* Chase Decl. Ex 9 at PX 965, 69, 70–71, *Id.* Ex. 11; McNamara Decl. Ex. 9 at 218:19–219:6.

As to the second prong, Plaintiff had a culpable state of mind when the relevant records
were destroyed. "'Once the duty to preserve attaches, any destruction of documents is, at a
minimum, negligent.'" *Hughes v. City of N.Y.*, 2021 WL 4295209, at *11 (S.D.N.Y. Sept. 21,
2021) (quoting *Charlestown Cap. Advisors, LLC v. Acero Junction, Inc.*, 337 F.R.D. 47, 61
(S.D.N.Y. 2020)). As the Second Circuit explained in *Rossbach*:

> Even if the district court were to have credited [plaintiff]'s testimony about the
> misfortunes that befell her iPhones . . . , the 'culpable state of mind' for a spoliation
> claim need not be intentional or willful, and may be found where the spoliation
> occurred due to negligence. . . . At the least, [plaintiff]'s failure to preserve her
> iPhones and their data, and [her attorney]'s failure to ensure that his client did so,
> demonstrated a disregard of their discovery obligations. Thus, the district court's
> spoliation finding was not clearly erroneous.

81 F.4th at 140 (internal citation omitted). At a minimum, Plaintiff's abject failure to ensure that
relevant documents were preserved amounts to negligence. Although Plaintiff suggested that he
issued an oral litigation hold pertaining to all of his various litigations, his staffers have not
corroborated this. Indeed, Plaintiff has made material misrepresentations to this Court about his
preservation efforts, raising serious questions about his credibility. *See Supra* I.C.

But setting this aside, it is "well recognized that an oral litigation hold is insufficient to
reasonably protect against the spoliation of evidence." *Borum v. Brentwood Vill., LLC*, 332 F.R.D.
38, 46 (D.D.C. 2019). Courts find a failure to issue a formal written litigation hold to reflect a
"lackadaisical attitude" toward discovery. *Keithley v. Home Store.com, Inc.*, 2008 WL 3833384,
at *6 (N.D. Cal. Aug. 12, 2008). As the plaintiff, Nunes's failure to do so is "particularly
unreasonable." *Leidig v. Buzzfeed, Inc.*, 2017 WL 6512353, at *12 (S.D.N.Y. Dec. 19, 2017).
Moreover, this is not the first time that Plaintiff has faced charges of spoliation. In *Nunes v. WP*

*Company LLC d/b/a The Washington Post, et al.*, 21-cv-506-CJN, Plaintiff faced a nearly identical sanctions motion for his failure to preserve relevant documents before leaving Congress.[13]  *Id.* at Dkt. 78.  Plaintiff's conduct suggests that this is a systematic and intentional pattern of conduct to deprive the defendants he hails into court of their ability to defend themselves.

Finally, because of Plaintiff's conduct, records have been "irremediably lost"—including documentary evidence regarding whether the Derkach Package was, in fact, turned over to the FBI.  *Borum*, 332 F.R.D. at 46.  The destruction of relevant documents has hamstrung NBCU in concretely establishing the truth or falsity of the Statement.

### B.    The Court Should Dismiss Plaintiff's Claims As A Sanction For His Spoliation

Severe sanctions for Plaintiff's discovery conduct are warranted under Rule 37(e)(2) because the evidence reflects that Plaintiff destroyed evidence with the intent to deprive NBCU of relevant communications in this litigation.  Upon a finding that a party acted with such intent, courts may "dismiss the action or enter a default judgment."  Fed. R. Civ. P. 37(e)(2)(C).  This intent can be shown by a party's "conscious disregard" of preservation obligations by failing "to make any serious effort" to preserve or recover ESI.  *Beck v. Test Masters Educ. Servs., Inc.*, 289 F.R.D. 374, 378 (D.D.C. 2013) (citation omitted); *see also Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 582–83 (S.D.N.Y. 2017) (noting conscious failure "to take any reasonable steps to preserve" relevant records can satisfy intent requirement of Rule 37(e)(2)).  A "'party's conscious dereliction of a known duty to preserve electronic data'—whether passive or active— 'is both necessary and sufficient to find that the party acted with the intent to deprive another party of the information's use' under Rule 37(e)(2)."  *Hice v. Lemon*, 2021 WL 6053812, at *7 (E.D.N.Y.

---

[13] The court, however, did not rule on the this motion because it granted the Washington Post's Summary Judgment motion and dismissed the case.  2024 WL 3504066, at *9 (D.D.C. June 14, 2024).

Nov. 17, 2021) (citation omitted).  Additionally, "[c]ourts in this Circuit have held that where a party has significantly failed in its obligation to preserve and collect documents, it is appropriate to infer intent to deprive."  *StoneX Grp., Inc. v. Shipman*, 2024 WL 1509346, at *11 (S.D.N.Y. Feb. 5, 2024) (collecting cases), *report and recommendation adopted,* 2024 WL 3356989 (S.D.N.Y. July 10, 2024).  Here, Plaintiff's status as a repeat litigant and his conduct in this particular lawsuit establishes that he consciously disregarded his preservation obligations.

In determining whether sanctions are appropriate under Fed. R. Civ. P. 37(e)(2), courts in this Circuit consider: "(i) whether ESI that should have been preserved has been lost; (ii) whether [the spoliating party] took 'reasonable steps' to preserve the ESI; and (iii) whether the ESI can be [entirely] restored or replaced through additional discovery."  *Capricorn Mgmt. Sys. v. Gov't Emps. Ins. Co.*, 2019 WL 5694256, at *8 (E.D.N.Y. July 22, 2019), *report & recommendation adopted,* 2020 WL 1242616 (E.D.N.Y. Mar. 16, 2020).  As previously discussed in Section I.4, *supra*, discovery has established that relevant ESI has been lost and that Plaintiff took no concrete steps to preserve these materials.  As to the third prong, it is clear that the ESI cannot be replaced through additional discovery.  For example, the FBI 302 reflects that there was email correspondence between HPSCI staffer, Nicholas Ciarlante, and the agency about the Derkach Package.  Chase Decl. Ex. 11.  Ciarlante confirmed that these emails were permanently deleted when he left HPSCI in May of 2020.[14]  Ciarlante could not confirm, however, whether any other HPSCI staffer was copied on this email correspondence.  McNamara Decl. Ex. 53 at 112:9–17. Since all of the individuals that Plaintiff identified as having relevant information no longer work for Congress, any copy of these emails, for example, are lost.[15]  Moreover, it is clear that

---

[14] NBCU does not contend that Ciarlante's emails were spoliated, as he left HPSCI before this lawsuit was initiated. Ciarlante's testimony, however, underscores that relevant records were almost certainly permanently deleted, as none of the HPSCI staffers Plaintiff identified as having relevant knowledge to this litigation work for Congress anymore.
[15] NBCU also sought this information from the FBI via Touhy Request, but was not able to obtain copies of this email.

documents cannot be restored or replaced through additional discovery, as NBCU has exhausted

any alternative sources for this information. *See Lokai Holdings LLC v. Twin Tiger USA LLC*,

2018 WL 1512055, at *12 (S.D.N.Y. Mar. 12, 2018) (third party discovery was "insufficient to

show that all of the missing emails can be replaced").

Although prejudice is not required where intent to deprive is shown, Plaintiff's destruction

of this critical evidence directly prejudices NBCU's defenses in establishing the truth or falsity of

the challenged Statement. *See Rossbach*, 81 F.4th at 140–142 (affirming "case-terminating and

monetary sanction against [plaintiff]" where plaintiff failed "to take sufficient steps to ensure that

her iPhones and their data were preserved"); *see also StoneX Grp.*, 2024 WL 1509346, at *8-10

(dismissing party's claims under Fed. Civ. P. 37(e) for spoliating relevant ESI); *McMunn v.

Mem'l Sloan-Kettering Cancer Ctr.*, 191 F. Supp. 2d 440, 454 (S.D.N.Y. 2002) (same).   In

determining whether to dismiss this action as a sanction, the Court should also consider Plaintiff's

pattern of duplicitous conduct throughout this litigation and habitual efforts to obfuscate the truth.

*See Stonex Grp.*, 2024 WL 3356989, at *4 ("[A] lesser sanction such as a jury instruction may be

ineffective as a sanction for pervasive dishonest behaviors when the scope of the spoliation is

extensive.") (citing *McMunn*, 191 F. Supp. 2d at 462 (dismissing case as sanction for plaintiff's

"dishonest behavior")).

Ultimately, Plaintiff's spoliation of evidence, combined with his repeated

misrepresentations to the Court (*see* Supra, I.C.) warrant severe sanctions.   Courts find such

patterns of misrepresentations and "substantial and prejudicial obduracy" to "constitute bad faith"

in the context of Rule 37. *Moore v. Chertoff*, 255 F.R.D. 10, 35 (D.D.C. 2008) (citation omitted)

(noting that sanctioned party had "effectively rewritten both Rule 34 and this court's orders to

justify his production of only those documents he was inclined to produce").   This is especially

true where the litigant is "sophisticated" like Plaintiff, who has filed suit frequently in state and federal courts and who has held process-oriented positions as a member of Congress and as chief executive of a social media company. *Freeman v. Giuliani*, 691 F. Supp. 3d 32, 61 (D.D.C. 2023) (concluding that the "only reasonable explanation" for a sophisticated litigant's "blatant disregard for satisfying his preservation obligations—despite fully understanding them—is that he intentionally and willfully ignored them"), subsequent history omitted.  Dismissal is warranted.

### C.    The Court Should Enter An Adverse Inference Order As A Sanction For His Spoliation

In the alternative, NBCU is entitled to adverse inference instructions at trial (should this case proceed), due to Plaintiff's chronic, unabated failure to preserve relevant evidence.  If the Court declines to dismiss this action, the Court should instead "presume that the lost information was unfavorable" to Plaintiff's defamation claim.  Fed. R. Civ. P. 37(e)(2)(A); *see also Dorchester Fin. Holdings Corp. v. Banco BRJ S.A.*, 304 F.R.D. 178, 181–183 (S.D.N.Y. 2014) (ordering adverse inference against plaintiff's breach of contract claim where plaintiff failed to "make reasonable efforts to recover [ESI] data" and failed "to mention the loss of documents" until "more than two years later, in response to [defendant]'s request for discovery"); *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 431 (W.D.N.Y. 2017) (inferring intent to deprive from party's failure to ensure relevant data was not overwritten, and granting motion for adverse inference instruction). NBCU, therefore, respectfully requests that the Court specifically instruct the jury that Plaintiff failed to produce records within his control, and that the jury may infer that those records would have contained evidence unfavorable to Plaintiff's assertion that the Statement at issue was false.

### D.    The Court Should Award NBCU Its Cost and Attorneys' Fees

NBCU should be awarded the attorneys' fees it has incurred by its exhaustive efforts to

obtain Plaintiff's spoliated evidence[16] and in connection with making this motion. It is well-established that "'misconduct that causes a party to incur additional expenses is a form of prejudice that supports an award of sanctions pursuant to Rule 37(e).'" *Hughes*, 2021 WL 4295209, at *14 (quoting *Fashion Exch. LLC v. Hybrid Promotions, LLC*, 2021 WL 1172265, at *5 (S.D.N.Y. Mar. 29, 2021)); *see also Karsch v. Blink Health*, 2019 WL 2708125, at *25 (S.D.N.Y. June 20, 2019). Among other things, such an award will serve to deter such misconduct in the future, as well as to compensate for the expenses NBCU were forced to incur by Plaintiff's "willful disregard in ensuring that [evidence preservation] obligations were being met." *Hughes*, 2021 WL 4295209, at *14 (alteration in original) (citations omitted). Accordingly, NBCU respectfully requests that the Court enter an order awarding to them their costs and reasonable attorneys' fees.

## CONCLUSION

For the foregoing reasons, NBCU respectfully requests this Court grant summary judgment in its favor and dismiss the remaining claim against it. Should the Court decline to grant summary judgment, NBCU respectfully requests that the Court enter an order pursuant to Rule 37(e) of the Federal Rules of Civil Procedure (i) dismissing Plaintiff's claims as a sanction for his spoliation; or, in the alternative, (ii) entering an adverse inference order presuming the spoliated information was unfavorable to Plaintiff; and (iii) award NBCU its costs and reasonable attorneys' fees incurred in their efforts to obtain Plaintiff's spoliated evidence and in connection with this motion.

---

[16] *See* Dkt. 65 at 4, Dkt. 87 at 2, Dkt. 98.

Dated:  November 21, 2024
      New York, New York

                                  Respectfully submitted,

                                  By: _____
                                  Elizabeth A. McNamara
                                  Jeremy A. Chase
                                  Alexandra M. Settelmayer
                                  DAVIS WRIGHT TREMAINE LLP
                                  1251 Avenue of the Americas 21st Floor
                                  New York, NY  10020-1104
                                  Phone: (212) 489-8230
                                  Fax:    (212) 489-8340
                                  Email: lizmcnamara@dwt.com
                                        jeremychase@dwt.com
                                        alexandrasettelmayer@dwt.com

                                  *Attorneys for Defendant NBCUniversal Media, LLC*