McNamara Declaration

Exhibit 22

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
DEVIN G. NUNES,

                              PLAINTIFF,

         -against-            Case No.:
                              22-cv-1633
                                (PKC)
NBCUNIVERSAL MEDIA, LLC,

                              DEFENDANT.
------------------------------------------X
```

DATE: September 19, 2024

TIME: 8:15 a.m. EST


- CONFIDENTIAL ATTORNEYS' EYES ONLY -


REMOTE DEPOSITION of ERIC ALAN "RICK" CRAWFORD, taken by the Defendant, pursuant to a Subpoena and to the Federal Rules of Civil Procedure, held remotely via Zoom Videoconference, before Suzanne Pastor, a Notary Public of the State of New York.

```
 1   possibly establishing a press hit, if you
 2   will.  Possibly an interview or something
 3   like that, if I recall.  But I don't
 4   remember the full context of it.
 5        Q.    Mm-hmm.  When you say "press
 6   hit," what do you mean by that?
 7        A.    So like an interview with a
 8   media outlet.
 9        Q.    And the communications with
10   Mr. Langer, did you communicate with him
11   directly or was that through a staffer?
12        A.    I think that was through my
13   press secretary.  There was I think some
14   e-mails exchanged between my press
15   secretary and Jack Langer.
16        Q.    Do you know if Mr. Langer
17   communicated -- strike that.
18              Was your press secretary
19   Ms. Sara Robertson?
20        A.    That's correct.
21        Q.    Do you know if Mr. Langer
22   communicated any details about his receipt
23   of the package to Ms. Robertson?
24        A.    I don't know.  I wasn't -- I
25   didn't see any of the e-mail exchanges or
```

1  anything of that nature.  So all I know is
2  that I do believe that there was an
3  exchange between the two of them.
4      Q.   Did Mrs. Robertson brief you on
5  the circumstances surrounding Mr. Nunes's
6  receipt of the package?
7      A.   No.  Typically, because of the
8  nature of the committee, typically I don't
9  discuss things topically with my staff
10 because this space that I'm in now is not
11 cleared.  So we typically don't have those
12 conversations.
13           So if there was an exchange
14 between myself and my press secretary on
15 this topic, it was mostly to deal with
16 scheduling.  It wasn't -- it would not have
17 been discussing the topic at hand or any of
18 the specifics of any of that.  So I think
19 more than likely, in this case it would
20 mostly have been a scheduling
21 communication.
22      Q.   Understood.  So sitting here
23 today, do you know any of the circumstances
24 surrounding Mr. Nunes's receipt of this
25 package?

 1     A.   I don't.  I don't -- I mean,
 2   the first I heard of it was in that meeting
 3   for which you have the transcript.  And
 4   that was -- I remember the meeting.  That
 5   exchange was confrontational and it was
 6   fairly terse, if you will.  But I don't --
 7   that was the first I'd heard of it and
 8   really never had another conversation about
 9   it with anyone that I can recall.
10          And I certainly didn't know --
11   I didn't know the name of the person in
12   question until you showed the transcript.
13   I just didn't recall it.
14     Q.   Understood.  Do you know if
15   Mr. Nunes ever discussed his receipt of the
16   package during a Republican caucus meeting
17   of HPSCI?
18     A.   Not that I can recall.
19     Q.   Do you know sitting here today
20   whether Mr. Nunes -- what Mr. Nunes did
21   with the package upon its receipt?
22     A.   I have no idea.  I'm assuming,
23   but I don't know, I'm assuming that it was
24   given the appropriate attention from the
25   standpoint of any time a member receives a

```
 1   package.  I get packages from time to time
 2   at my official office and it has to go
 3   through I think as long as a two-week
 4   security screening before it comes --
 5   actually comes to my office.
 6             So I'm assuming that's the way
 7   it was treated, but I don't know.  I was
 8   not read into the disposition of a package.
 9        Q.   And sitting here today, you
10   have no reason to believe that at one point
11   you were aware of it.
12        A.   I'm not sure I understand what
13   you're asking me.
14        Q.   Meaning is it possible that
15   you're just forgetting a conversation but
16   you just --
17        A.   It's certainly possible.
18        Q.   Sitting here today you have no
19   specific recollection of any conversation
20   outside of the committee meeting concerning
21   the package.
22        A.   That's correct.
23             MR. CHASE:  Ali, can you pull
24        up the Breitbart article.  Actually,
25        before we show that, Ali, let's just
```

Eric Alan Crawford   Attorneys Eyes Only
September 19, 2024

```
 1           ask Mr. Crawford a couple of
 2           questions.
 3        Q.    Mr. Crawford, the press hit
 4   that you ultimately did was with Breitbart,
 5   am I correct?
 6        A.    I'm not sure that was a
 7   scheduled press hit.  If I recall, the
 8   interaction I had with Breitbart was as I
 9   was walking down the Capitol steps after a
10   vote series.  So I don't know that that
11   was -- if I remember correctly, I'm not
12   sure that that was a scheduled interview.
13   It was one of those -- you have reporters
14   outside of the Capitol all the time,
15   outside of the House chamber.  And if I
16   recall, that was the nature of that
17   encounter with that particular reporter.  I
18   don't believe that was a scheduled press
19   hit.
20        Q.    Interesting.  Were any other
21   press present during that press -- during
22   that encounter in the hallway?
23        A.    I'm certain that there were,
24   but I'm not sure that they were paying
25   attention to our conversation because it
```

 1   was kind of a walk-and-talk dynamic.  It
 2   wasn't as though I was standing there
 3   around a press gaggle.  So there's always
 4   media present when you walk out of the
 5   chamber and down the Capitol steps.
 6              But if I recall correctly, and
 7   I think this is the case, this was as I was
 8   walking down the steps headed back to my
 9   office where I encountered this reporter,
10   and there was an exchange.
11       Q.    I see.
12             MR. CHASE:  Ali, let's pull up
13        the e-mail exchange that was
14         previously marked as Exhibit 16.
15       Q.    Mr. Crawford, I'm going to
16   represent to you that this has been
17   previously marked in this case as Exhibit
18   16.  This is a July 29, 2020 e-mail
19   exchange between Jack Langer and
20   Ms. Robertson.  This is the same date as
21   the hearing, am I correct?  July 29, 2020.
22       A.    It appears to be.
23             MR. CHASE:  Ali, if you could
24         scroll down.
25       Q.    So the first e-mail in the

 1   committee, Crawford told Breitbart News.
 2   So obviously Devin Nunes didn't comment on
 3   that.  Here's the thing.  It's standard
 4   practice that if you get a package from
 5   unknown source in a foreign country, it's
 6   probably a good idea to call the FBI and
 7   let them handle it and not handle those
 8   packages and don't open them and go hey, I
 9   wonder what this is.  I guess it's
10   Christmas came early this year.  No, you
11   follow the protocol, which is you turn that
12   over to the FBI.  That's what happened."
13            Did I read that correctly, sir?
14       A.   It appears that you have.
15       Q.   So I'm going to ask you a few
16   questions about that.  When you say --
17   well, first of all, do you recall making
18   this statement to Breitbart?
19       A.   I don't recall making the
20   statement, but that appears to be accurate.
21       Q.   When you say "Devin Nunes
22   didn't" -- "so obviously Devin Nunes didn't
23   comment on that," sitting here today, why
24   do you think it was obvious that he didn't
25   comment on that?

 1      A.    Because as I recall, and I
 2   think the transcript would probably reflect
 3   this, Mr. Maloney was trying to engage in
 4   some form of -- I don't want to say taunt,
 5   but almost goad the ranking member into
 6   engaging in a conversation or some
 7   discourse that I felt was inappropriate
 8   given that that item was not on the agenda
 9   for the business meeting, number 1.
10              And number 2, it's typically
11   not what members do in a business meeting,
12   is to call out, if you will, a colleagues
13   on the committee and suggest that they've
14   done something that they shouldn't have
15   done.  If there was a problem, and there's
16   probably a better way to go about it than
17   to interject that into a business meeting
18   with that having been placed on the agenda.
19      Q.    Aside from decorum issues -- is
20   that a fair way of describing what you just
21   said?  Decorum and civility?
22      A.    I would agree with that.
23      Q.    Is there a bases in the law for
24   not responding to Mr. Maloney's entreaty
25   there?

1        A.    I don't think there's
2    necessarily a basis in the law for not
3    responding.  I think more than anything,
4    it's probably common sense that you don't
5    take the bait, if you will.  And that is to
6    say, not get drawn into some discourse that
7    was irrelevant to the topic of the business
8    meeting.
9              Clearly Mr. Maloney was hostile
10   to the ranking member in that exchange.
11   And that was -- as I recall, that's what
12   stuck out to me the most, was the nature of
13   his tone, and particularly as it applies to
14   the fact that the chairman and ranking
15   members of committees are typically given a
16   high degree of deference due to their
17   positions on the committee.  So I thought
18   it was unseemly for him to act the way he
19   did in the committee.  That's just my
20   opinion.
21       Q.    How did this topic come up
22   outside of the business meeting -- strike
23   that.
24             Do you know if this topic came
25   up outside of the business meeting?

 1        A.    Not that I recall.  I mean,
 2   nothing that I was privy to that I can
 3   recall.
 4        Q.    And in that circumstance, had
 5   it come up outside of the business meeting,
 6   do you think it would have been appropriate
 7   for Mr. Nunes to respond to the question in
 8   that environment?
 9        A.    I'm not sure that I understand
10   the question.  Can you restate that for me
11   so I can get a better understanding --
12        Q.    Of course.  I could have
13   phrased that better.
14              If Mr. Maloney had come to
15   Mr. Nunes's office and asked him about the
16   receipt of the package, in that
17   circumstance would it have been appropriate
18   for Mr. Nunes to respond?
19        A.    You know, I don't know.  I
20   think that's a question that would be
21   better directed to Mr. Nunes.  I mean, now
22   you're talking about member-to-member
23   communications.  Direct member-to-member
24   communications.
25              So not really knowing the

 1  nature of the package in question or who it
 2  was from, that's not -- I'm not prepared to
 3  render any kind of judgment on what the
 4  appropriate response would be between
 5  members engaging in some question about a
 6  package.  That's something I think that
 7  Mr. Nunes would have to answer.
 8        Q.    Fair enough.
 9              So in the last sentence of your
10  quote you say, "No, you follow the
11  protocol, which is you turn that over to
12  the FBI.  That's what happened."
13              What did you mean by that?
14        A.    Well, I think, if I recall,
15  probably that's just -- as I would do if I
16  received a package from a foreign source, I
17  would turn that over to the FBI.  And I
18  assume that's what happened.  I just didn't
19  think that there was anything more to it
20  than that.
21              So based on the context of what
22  I'm reading there and the best of my
23  recollection, I think I was trying to
24  communicate that if there had been a
25  package received from a foreign source, the

```
 1   proper protocol would have been to turn it

 2   over to the FBI.  And to my knowledge,

 3   that's what happened.

 4        Q.    But you have -- you never had a

 5   communication with Mr. Nunes about that,

 6   correct?

 7        A.    Correct.

 8        Q.    And you never spoke with any of

 9   his staffers about that, correct?

10        A.    Nothing that I can recall.  I

11   don't recall this being a topic of

12   conversation outside of the SCIF, with the

13   exception of that encounter with the

14   Breitbart reporter.

15        Q.    And you never spoke with the

16   FBI about that, correct?

17        A.    I never did, no.

18        Q.    So other than your assumption,

19   you had no independent basis for the

20   statement that Mr. Nunes -- that that's

21   what happened in this circumstance, is that

22   correct?

23        A.    That's correct.

24        Q.    Let's take a quick break,

25   Mr. Crawford.  It's going to be a very
```

```
 1              C E R T I F I C A T E

 2
    STATE OF NEW YORK    )
 3                :    SS.:
    COUNTY OF DELAWARE    )
 4

 5         I, SUZANNE PASTOR, a Notary Public

 6   for and within the State of New York, do

 7   hereby certify:

 8         That the witness whose examination is

 9   hereinbefore set forth was duly sworn and

10   that such examination is a true record of

11   the testimony given by that witness.

12         I further certify that I am not

13   related to any of the parties to this

14   action by blood or by marriage and that I

15   am in no way interested in the outcome of

16   this matter.

17         IN WITNESS WHEREOF, I have hereunto

18   set my hand this day, September 25, 2024.

19
                    [signature: Suzanne Pastor]
20
         _____
21              SUZANNE PASTOR

22

23

24

25
```