McNamara Declaration

Exhibit 53

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
DEVIN G. NUNES,

                            PLAINTIFF,

          -against-          Case No.:
                             22-cv-1633
                               (PKC)
NBCUNIVERSAL MEDIA, LLC,

                            DEFENDANT.
----------------------------------------X
                  DATE: July 26, 2024

                  TIME: 10:00 a.m. EST


     - CONFIDENTIAL ATTORNEYS' EYES ONLY -


          REMOTE DEPOSITION of NICHOLAS

CIARLANTE, taken by the Defendant, pursuant

to a Subpoena and to the Federal Rules of

Civil Procedure, held remotely via Zoom

Videoconference, before Suzanne Pastor, a

Notary Public of the State of New York.

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    during that time period?

2         A.    Almost daily.

3         Q.    What would you communicate with

4    him about, broadly speaking?  Without going

5    into committee business.  I'm more talking

6    about the general topics and types of

7    communications.

8         A.    Sure.  So some of it would be

9    about the committee schedule; if there was

10   a conflict with, say, a larger GOP member

11   meeting or a democratic member meeting, if

12   we had to reschedule something.  So it

13   would be about the committee schedule.

14   Topics for briefings and events, just so he

15   was aware of what was coming down the

16   agenda.

17              Once I assumed the

18   responsibility of having oversight over the

19   ODNI, I would be talking to him about

20   issues that I saw at the ODNI; legislative

21   reforms that we could possibly do.  And I

22   was staffing him so he would ask for advice

23   and counsel based on my expertise of either

24   the House policies and procedures, or if I

25   was staffing him regarding an issue within

Nicholas Ciarlante   Attorneys Eyes Only
July 26, 2024

1    the intelligence community.

2         Q.    I see, and so when you would

3    communicate with Mr. Nunes, how typically

4    would you communicate with him?  What was

5    the means of communication?

6         A.    Sure.  So if it was a

7    classified discussion, it would have

8    happened in the committee space, which is

9    the SCIF, the sensitive compartmented

10   information facility.

11            If it was nonclassified

12   information that we were discussing, we

13   would discuss over the phone or in person

14   in his office.

15        Q.    Would you ever e-mail or text

16   with Representative Nunes?

17        A.    Occasionally text, but no

18   e-mail.

19        Q.    No e-mail, okay.  Would any of

20   your advice that you just described to

21   Mr. Nunes, would that ever be written down

22   or memorialized anywhere?

23        A.    No.

24        Q.    It was all verbal?

25        A.    Yes.

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1        Q.    And you didn't have a practice

2   of keeping notes of your meetings with

3   Representative Nunes?

4        A.    Not with Mr. Nunes.

5        Q.    With other people?

6        A.    If I had attended a briefing

7   with an external agency, certainly I would

8   have notes of items that we had discussed.

9   But I generally did not memorialize any

10  internal staff conversations or

11  conversations with members.

12       Q.    Understood.  So when you

13  departed the House Intelligence Committee,

14  you then went to the office of the Director

15  of National Intelligence, correct?

16       A.    Yes, that is correct.

17       Q.    And what did you do at the

18  Office of National Intelligence?  Or office

19  of the Director of National Intelligence.

20       A.    Sure, I was the deputy chief

21  operating officer.

22       Q.    And what were your

23  responsibilities there?

24       A.    Sure, so I was responsible for

25  providing support to the, then it was the

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    the FBI, what was the means of

2    communication that you'd use?

3         A.    Sure, so it would have been

4    either e-mail or phone call.

5         Q.    And did you have a practice of

6    copying other individuals when you would

7    e-mail them?

8         A.    I think it would depend on --

9    depend on the circumstance.  If it was a

10   member letter that I was sending, sometimes

11   copy the staff director on the letter.  If

12   it was just a request for information, I

13   would just likely copy myself so I had a

14   copy for my FBI oversight folder.

15        Q.    Got it, okay.  When you say

16   copy yourself, you just mean you would add

17   yourself as a cc on your own e-mail?

18        A.    Yes, that is correct.

19        Q.    And it would be at the same

20   e-mail address.

21        A.    Yes.

22        Q.    When you would communicate with

23   members who served on the committee, how

24   would you go about communicating with them?

25        A.    Sure, so every member is

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    different.  Some you could e-mail directly,

2    so there are times where I e-mailed a

3    member directly.  Some members I

4    communicated through their staff.  There

5    would be times where I communicated with a

6    member in person or via the phone.

7         Q.    Did you have much interaction

8    with Representative Rick Crawford?

9         A.    Yes.  He was a member of the

10   committee.

11        Q.    And what was his practice,

12   generally, in that respect with respect to

13   communicating?

14        A.    He was a member that allowed

15   direct contact.  So there's certainly times

16   where I would have called him directly or

17   e-mailed him directly.

18        Q.    When you would communicate with

19   staffers for a particular congressman, how

20   would you typically go about doing that?

21        A.    Sure, again, so e-mail or phone

22   or in person.

23        Q.    And with respect to

24   communications with other HPSCI staffers,

25   what were the means of communication that

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    you would use?

2         A.    Sure, so again, e-mail.  At the

3    committee we had an internal high side, so

4    if we were dealing with classified

5    materials, there would be a way for us to

6    correspond on a classified network as well

7    as the same means to communicate

8    unclassified e-mail, or mostly in person

9    since we were within the same office space.

10         Q.    And during your time at HPSCI,

11    either stint, did you have any

12    communications with the press?

13         A.    I did, yes.

14         Q.    So during which time -- was

15    that during both time periods or one or the

16    other?

17         A.    No, it would -- I'm sorry.  It

18    would have been during the first period

19    when we were in the majority.

20         Q.    And so what types of

21    communications with the press would you

22    have?

23         A.    Sure, there were a couple

24    instances where Mr. Langer, the

25    communications director for the committee,

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    authorized me to go on background to

2    provide information to the press.  And he

3    would been on those calls with me.

4        Q.    When you say "on background

5    with the press," what types of -- what is

6    your understanding of "on background"?

7        A.    Sure, so it was primarily -- it

8    was during the Russian investigation.  So I

9    was providing process and context

10   information to them, especially how many

11   witnesses had been interviewed or if they

12   had a procedural question about the

13   committee's rules or the process of

14   notifying a hearing or briefing.  That's

15   the information I would provide.  And "on

16   background" means I was not attributed to

17   the information that they would be

18   reporting.

19       Q.    Was there a reason why

20   Mr. Langer asked you to go on background

21   when speaking with the press?

22       A.    I was not the communications

23   director, so my understanding is that from

24   the direction only he could be actually

25   quoted in any type of press.

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1   been -- that they were gone.

2        Q.    Do you know how long records

3   are preserved once a staff member leaves

4   the House?

5        A.    I do not, no.

6        Q.    Am I correct that you would

7   have access to e-mails from this account

8   from January 2021 onward?  Is that an

9   accurate statement?

10       A.    So the e-mails that I have

11  access to currently are only from my time

12  with the Sergeant at Arms.  So even when I

13  left HPSCI the second time, while I have

14  the same e-mail address, the in box itself

15  did not follow me.  Because those are

16  committee records, they stay at the

17  committee.  So I started with a fresh in

18  box, fresh set of contacts.  The only thing

19  that was the same was the

20  Nick.Ciarlante@mail.house.gov.

21       Q.    Remind me, what date was it

22  that you left HPSCI?  For the most recent

23  time I should say.

24       A.    Sure.  April 1, 2023 was my

25  first day of employment with the Sergeant

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    at Arms.  So the last day of March would

2    have been my final day on HPSCI's payroll.

3         Q.    When was it that you first

4    learned about this lawsuit filed by

5    Mr. Nunes?

6         A.    When there was media reporting.

7    I believe when it was first filed.  I don't

8    know when that actually occurred, but I did

9    see the media reporting.

10        Q.    Did you ever receive a document

11   retention notice about this lawsuit?

12        A.    I did not.  Just the subpoena.

13        Q.    So the first time counsel for

14   Mr. Nunes contacted you about this lawsuit

15   was in July of 2023?

16        A.    Yes, to tell me that I had been

17   subpoenaed.  That is correct.

18        Q.    And that was four months after

19   you had left the House Intelligence

20   Committee, just to be clear.  Roughly.

21        A.    Yes.

22        Q.    So did you at any point prior

23   to leaving HPSCI search for records that

24   were relevant to this lawsuit?

25        A.    I did not.

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1        Q.    Are you aware of whether the

2   House Intelligence Committee received a

3   document retention notice for your e-mails?

4        A.    I am not aware of that.

5        Q.    Did you have a computer that

6   was issued to you from the House of

7   Representatives?

8        A.    I had a, yeah, a desktop that I

9   used on a daily basis, yes.

10        Q.    And did you save any documents

11   on this computer while you worked at the

12   House of Representatives?

13        A.    Everything was primarily saved

14   on the -- not the Google Drive.  The 365,

15   the iCloud drive.  Or whatever -- it's not

16   iCloud.  One Drive.  The House moved to

17   Office 365.  So when I was doing classified

18   work, everything was saved on that drive.

19        Q.    So any records that you -- let

20   me put it this way.  Any documents that you

21   worked on while at HPSCI would have been

22   preserved on their system at large.

23   Putting aside communications.

24        A.    Yes.

25        Q.    Did you have a cellphone that

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1   was issued to you as part of your job

2   working for HPSCI?

3        A.    I did, yes.

4        Q.    And what happened to that

5   cellphone each time you left HPSCI?  Did

6   you have to turn it back in?

7        A.    Yes.

8        Q.    And do you know what happened

9   to the communications that resided on that

10  cellphone?

11       A.    When I turned it back in, the

12  instruction was to wipe it and then give it

13  back.  And that --

14       Q.    So all text -- sorry.  I didn't

15  mean to --

16       A.    I'm sorry.  And that was

17  consistent both times, to wipe the devices

18  when they're turned in.

19       Q.    So that would be inclusive of

20  any text messages that may have existed on

21  that phone at that time.

22       A.    Yeah, they would have been

23  wiped.

24       Q.    You had previously testified

25  though that you did text with Mr. Nunes on

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    occasion.

2        A.    Mm-hmm.

3        Q.    And did you do so on that

4    phone?

5        A.    Yes, I did.

6        Q.    Did you have a personal

7    cellphone also during that time period?

8        A.    I do, yes, and I did.

9        Q.    And did you communicate with

10   Representative Nunes or other staff members

11   using your personal phone ever?

12       A.    I think maybe once or twice for

13   Mr. Nunes, if it was something campaign or

14   political related.  But anything official

15   would have been on the official device.

16       Q.    And the same goes for staffers

17   of HPSCI?

18       A.    Yeah, I don't think I -- other

19   than the HPSCI staffers who I was friends

20   with outside the office, I would not have

21   conducted any official business on my

22   personal device.

23       Q.    So it's fair to say that you

24   haven't preserved any records related to

25   this lawsuit prior to leaving HPSCI.

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1        A.    That is correct.

2        Q.    Just to close the loop on an

3    earlier line of questioning, I asked you if

4    you had received a document retention

5    notice in relation to this lawsuit.  Did

6    you receive any oral instructions to

7    preserve documents in connection with

8    this --

9        A.    I did not.

10        Q.    Are you aware of other

11    defamation lawsuits that Mr. Nunes filed

12    while you were working through HPSCI?

13        A.    I am, through public reporting.

14        Q.    Which ones are you aware of,

15    sitting here today?

16        A.    Yeah, so there's obviously this

17    one, and I believe there was one against

18    the Washington Post.

19        Q.    And were you ever instructed to

20    preserve documents in connection with those

21    lawsuits?

22        A.    I was not.

23        Q.    I think I know the answer to

24    this, but do you know if Mr. Nunes

25    preserved his own documents or

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    communications relevant to this lawsuit?

2        A.    I do not know that.

3        Q.    Mr. Ciarlante, are you aware

4    that Mr. Nunes received a package of

5    materials from Andrii Derkach when he was

6    the ranking member of the House

7    Intelligence Committee?

8        A.    I am.

9        Q.    To your knowledge, when did

10   Mr. Nunes receive this package from

11   Mr. Derkach?

12       A.    I believe it was in the late

13   November/early December time frame of 2019.

14       Q.    And are you aware that

15   Mr. Nunes's complaint in this action

16   alleges that he received the package on

17   December 11, 2019?

18       A.    I would have read that in the

19   complaint, but.

20       Q.    Do you understand that to be an

21   accurate statement, as far as you know?

22       A.    I'm sorry, can you repeat that,

23   please?

24       Q.    Do you understand that to be an

25   accurate statement of when he received the

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    the scanning seal that it had been

2    delivered in.

3         Q.    I see, that makes sense.

4              Okay, so once it was inspected

5    by the Capitol police, what happened next?

6    What did you do with the package?

7         A.    Sure, so once it was cleared by

8    the Capitol police and brought back to the

9    office, I was directed to put it in a lock

10   bag and to lock it in my safe.

11        Q.    And how long did it remain in

12   your safe?

13        A.    Probably not more than two

14   days.

15        Q.    And so who gave you that

16   direction?

17        A.    That came from Mr. Langer on

18   behalf of Mr. Nunes.

19        Q.    Were there any meetings with

20   respect to the package?

21        A.    None that I was a part of.

22        Q.    How did Mr. Langer provide

23   these instructions to you --

24        A.    On the phone.

25        Q.    -- what method?  On the phone?

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1        A.    Yes.

2        Q.    Was anyone else in the SCIF

3   when you brought the package in?  If you

4   recall.

5        A.    Yeah, I mean, there would have

6   been majority and minority staff sitting at

7   their desks.

8        Q.    Was anyone else aware that

9   there was a package sent from Andrii

10  Derkach?

11       A.    On --

12       Q.    Who was in the SCIF at that

13  moment.

14       A.    No.

15       Q.    Did you tell any other

16  Republican staff about the receipt of the

17  package?

18       A.    I did not.

19       Q.    Did you tell anyone about the

20  receipt of the package other than

21  Mr. Langer?

22       A.    I did not.

23       Q.    Did you have a conversation

24  with George Pappas about the package?

25       A.    I did not have a conversation

Nicholas Ciarlante   Attorneys Eyes Only
July 26, 2024

1    with him, but it's possible he might have

2    been aware since he was a senior advisor to

3    Devin that there was something coming.

4    Excuse me, Mr. Nunes.

5        Q.    At that point in time Alan

6    Souza was the staff director, correct?

7        A.    Yes.

8        Q.    Did you have any conversations

9    with him about the receipt of the package?

10       A.    I did not.

11       Q.    Would it have been -- would

12   that have been something that you would

13   have done normally if there was a package

14   that came in for a particular congressman?

15       A.    No.

16       Q.    Did the receipt of the package

17   raise any suspicions for you?

18       A.    It did, because Mr. Langer had

19   called asking if there was a package.  And

20   then I was instructed to put it in a lock

21   bag and lock it in the safe.

22       Q.    But beyond that it didn't cause

23   any concern?

24       A.    Unh-unh.

25       Q.    At the time the package was

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    received, did you know who Andrii Derkach

2    was?

3        A.    I did not.

4        Q.    When did you first learn who

5    Andrii Derkach was?

6        A.    It was probably in a later

7    conversation with Mr. Langer that he

8    mentioned that he was a Ukrainian

9    parliamentarian.

10        Q.    Were you aware that he was a

11    Russian agent at the time?

12        A.    I was not.

13        Q.    Did you come to learn that

14    later?

15        A.    I did not know that.

16        Q.    Are you aware that on

17    March 15th, 2021 the office of the Director

18    of National Intelligence declassified a

19    report entitled "Foreign threats to the

20    2020 U.S. federal elections"?

21        A.    I am aware of that report.

22        Q.    That report was issued while

23    you were still at the Office of the

24    Director of National Intelligence, correct?

25        A.    If it was dated March 2021, I

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1        A.    My answer is going to be the

2   same.  I still don't think there was any

3   obligation.  From this letter, he sent a

4   letter to the Attorney General expressing

5   his concern, requesting a meeting.  Again,

6   I still don't think there was an obligation

7   that he had to tell anybody about it.

8        Q.    Are you aware of whether there

9   was a log of incoming and outgoing official

10  letters at HPSCI?

11       A.    During which period?

12       Q.    The time at issue.

13       A.    Sending a letter to an agency

14  was routine -- a routine part of business.

15  Sending an oversight letter, especially if

16  a staff requested it to have been

17  fulfilled, sending something with a

18  member's signature on it has more force

19  than a staff e-mail.

20       Q.    Right, but outgoing letters to

21  other agencies, were they recorded in some

22  fashion?

23       A.    Yes.  All letters that were

24  sent out of the committee were -- during my

25  time were maintained in the committee's

1    records.

2         Q.    Are you aware if there's any

3    sort of similar log maintained out of a

4    congressman's personal office?

5         A.    So from my time in the member

6    office, there is a database where you track

7    correspondence, especially if it's from a

8    constituent, you input into the database so

9    you can keep track of the running

10   interactions that you have with your

11   constituency.

12        Q.    Does anyone outside of a

13   congressman's office have access to that

14   database?

15        A.    Not that I'm aware of.

16        Q.    So it's fair to say that this

17   letter that came from his personal

18   letterhead, his personal office was not

19   logged by HPSCI, is that correct?

20        A.    It would not have been -- yes,

21   that's correct.  It would not have been

22   logged by HPSCI.

23        Q.    And no other representatives

24   would have had access or been aware that

25   this letter was sent, is that correct?

Nicholas Ciarlante   Attorneys Eyes Only
July 26, 2024

1        A.    Unless it was disclosed

2    publicly.

3        Q.    And that would include the

4    Democratic members as well, correct?

5        A.    Correct.  Unless it was

6    disclosed publicly.

7        Q.    Do you know if a meeting ever

8    occurred between Mr. Nunes and Attorney

9    General Barr in response to this letter?

10       A.    I'm not aware.  I don't believe

11   one did, but I'm not certain.

12       Q.    Do you know if Mr. Nunes ever

13   spoke with any of Mr. Barr's staff

14   regarding this letter?

15       A.    So as part of my turning the

16   package over to the FBI, a briefing with

17   the Washington field office of the FBI was

18   set up.  FBI does fall under Justice.

19       Q.    Where did that briefing occur?

20       A.    It was in Mr. Nunes's office in

21   Longworth.

22       Q.    Were you in attendance at that

23   meeting?

24       A.    I was not.

25       Q.    Were you ever briefed about

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    what happened at that meeting?

2         A.    I was not.

3              MR. CHASE:  Ali, if you could

4          go to paragraph 13 of this.

5         Q.    You could see at the top of the

6    page, Mr. Ciarlante, this is in paragraph

7    13 of the amended complaint, it says, "The

8    same day, the designated staff member in

9    plaintiff's office, following protocol and

10   without the package ever being opened,

11   sealed the package in an envelope and

12   delivered it to the FBI.  Additionally, in

13   early January 2020, plaintiff and top

14   Republican staff on the House Intelligence

15   Committee briefed the FBI on their concerns

16   about the package."

17              Is that an accurate statement?

18        A.    I don't recall if it was the

19   same day I turned the package over to the

20   FBI.  I called the FBI probably that day,

21   and it might have been the next day when

22   they actually came to pick it up.  But it

23   could have been the same day.  I don't have

24   those -- access to their calendar or the

25   e-mails that I would have sent arranging

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    of an interview that they conduct during an

2    investigation.

3              MR. CHASE:  Ali, can you put up

4         Exhibit 30.

5         Q.    Mr. Ciarlante, this is a FBI

6    302 that was produced to us by the FBI in

7    response to a TUI request for

8    communications with Representative Nunes's

9    office concerning the Derkach package.

10             MR. CHASE:  Ali, if you could

11        scroll down.

12        Q.    So this reads, "On January 8,

13   2020, Nicholas Ciarlante, Republican budget

14   director and investigations coordinator,

15   U.S. House of Representatives Permanent

16   Select Committee on Intelligence (HPSCI),

17   contacted the undersigned, SSA," then

18   redaction, "Jay Bratt, DOJ," I believe

19   that's National Security Division, but I'm

20   not positive.

21        A.    It is.

22        Q.    "And another redacted personnel

23   from the DOJ Office of Legislative Affairs,

24   via e-mail advising representative Devin

25   Nunes received additional records via mail

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    (see FD-302 of meeting with FBI/DOJ on

2    December 19, 2019).  The records were

3    picked up from Ciarlante by SSA," redacted,

4    "and delivered to the undersigned."  Did I

5    read that correctly?

6         A.    You did, yes.

7         Q.    It continues, "The records

8    include a cover letter dated December 17,

9    2019 from Andrii Derkach, member of the

10   parliament of the Ukraine, to Nunes.

11   Included are five categories of documents

12   listed as," and then a large redaction.

13             And then it says, "The records

14   were included in a DHL shipment envelope

15   and internal envelope, and were opened,

16   inspected, and resealed by the House mail

17   clearing service.  The cover letter and

18   attachments are attached hereto in PDF and

19   all original records maintain in the 1A

20   envelope.  E-mail correspondence from

21   Ciarlante is included therein."

22             So I just want to ask you a few

23   questions about this.

24        A.    Mm-hmm.

25        Q.    So you see this FBI document

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1   shows that you contacted the FBI on

2   January 8th, 2020 about the Derkach

3   package.  Does that sound right to you?

4   Does that refresh your recollection?

5        A.   I just don't know the date.

6   You know, if the package was received in

7   December, I would not have waited until

8   January to contact the FBI.

9        Q.   It also says that you contacted

10   the FBI via e-mail.  I believe you said

11   that earlier.

12             Do you see the reference that

13   it's "additional records" that were

14   received via e-mail?  Do you know what

15   that's a reference to?

16        A.   I do not.  This is the first

17   time I've seen this FBI document.

18        Q.   Do you have an understanding

19   that Mr. Nunes received another package

20   from Mr. -- excuse me, I'll strike that.

21             Do you have an understanding of

22   whether Mr. Nunes received other records

23   from Mr. Derkach at some other point in

24   time?

25        A.   To the best of my recollection,

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1    there was only that one package.

2         Q.    So you don't know what this is

3    a reference to?

4         A.    I do not.  Like I said, this is

5    the first time I've seen this FBI document.

6         Q.    And it says the records include

7    a cover letter dated December 17, 2019 from

8    Andrii Derkach.  Does that sound right to

9    you?

10        A.    I did not see the material, so

11   I don't even know if there's a cover

12   letter, if there was a cover letter

13   included in the package.

14        Q.    If you'll recall earlier the

15   letter that Mr. Nunes sent to Attorney

16   General Barr was dated December 11, 2019.

17   Does that sound right to you?

18        A.    It does, yes.

19        Q.    Do you have any understanding

20   as to why this summary from the FBI would

21   conflict with what's been pled in the

22   complaint?

23        A.    I do not.  I'm not sure of the

24   FBI's policies and procedures in drafting

25   such a document.

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1          Q.    Do you recall a meeting with
2    the FBI -- strike that.
3                Earlier you testified that you
4    would have turned the package over to the
5    FBI --
6          A.    Mm-hmm.
7          Q.    -- a day or two after it was
8    received, is that correct?
9          A.    Yes.
10         Q.    So does the reference here
11   where it says "see FD-302 of meeting with
12   FBI/DOJ on December 19, 2019," does that
13   suggest to you that that was the day that
14   you turned over the package to the FBI?
15   Does that sound like that could be correct?
16         A.    So looking at this document,
17   where they say "see FD-302 of meeting with
18   FBI/DOJ on 12/19," that indicates that
19   would have been likely the meeting with
20   Mr. Nunes and the Washington field office,
21   and the package was turned over in advance
22   of that meeting.
23         Q.    So you have no idea what this
24   reference to your receipt of "additional
25   records via e-mail" was.

Nicholas Ciarlante  Attorneys Eyes Only
July 26, 2024

1          C E R T I F I C A T E

2

STATE OF NEW YORK        )
3                  :    SS.:
COUNTY OF DELAWARE       )

4

5          I, SUZANNE PASTOR, a Notary Public

6     for and within the State of New York, do

7     hereby certify:

8          That the witness whose examination is

9     hereinbefore set forth was duly sworn and

10    that such examination is a true record of

11    the testimony given by that witness.

12          I further certify that I am not

13    related to any of the parties to this

14    action by blood or by marriage and that I

15    am in no way interested in the outcome of

16    this matter.

17          IN WITNESS WHEREOF, I have hereunto

18    set my hand this day, August 9, 2024.

19

20          _Suzanne Pastor_

21          _____
            SUZANNE PASTOR

22

23

24

25