**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

DEVIN G. NUNES,

                 Plaintiff,

        - against -

NBCUNIVERSAL MEDIA, LLC,

               Defendant.

-------------------------------------------------------- x

Case No.: 22-cv-1633-PKC-SN

**ORAL ARGUMENT REQUESTED**

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND SANCTIONS

Jason Greaves, *pro hac vice*
Jesse R. Binnall*, pro hac vice*
Shawn Flynn, *pro hac vice*
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
jason@binnall.com
jesse@binnall.com
shawn@binnall.com

*Attorneys for Plaintiff Devin G. Nunes*

**TABLE OF CONTENTS**

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

BACKGROUND.......................................................................................................... 2

STANDARD OF REVIEW ............................................................................................ 7

ARGUMENT ........................................................................................................... 7

    I.      Defendant is not Entitled to Summary Judgment. .................................................. 7

        a.     Defendant acted with actual malice................................................................. 8

    II.     Defendant is not Entitled to Sanctions. ............................................................ 23

        a.     Defendant cannot meet the threshold requirements for sanctions. .................... 24
        b.     Defendant is not entitled to its requested sanctions. ....................................... 30

CONCLUSION............................................................................................................ 36

CERTIFICATE OF SERVICE............................................................................................ 38

## TABLE OF AUTHORITIES

**Cases**

*Basulto v. Netflix, Inc.*,

  No. 1:22-cv-21796, 2023 WL 7129970 (S.D. Fla. Sept. 20, 2023) ...................................... 22

*Beck v. Test Masters Educ. Servs., Inc*.,

  289 F.R.D. 374, 378 (D.D.C. 2013) .................................................................................. 32

*Bose Corp. v. Consumers Union of United States, Inc.*,

  692 F.2d 189, 196 (1st Cir. 1982) ............................................................................ 8, 9, 23

*Brady v. Town of Colchester*,

  863 F.2d 205, 210 (2d Cir. 1988)........................................................................................ 7

*Celle v. Filipino Reporter Enterprises Inc.*,

  209 F.3d 163, 182-83 (2d Cir. 2000)................................................................. 8, 9, 17, 23

*Chambers v. TRM Copy Centers Corp.*,

  43 F.3d 29, 37 (2d Cir. 1994) ............................................................................................. 7

*Church of Scientology Intern. v. Behar*,

  238 F.3d 168, 174 (2d Cir. 2001)................................................................................ 18, 19

*Curtis Pub. Co. v. Butts*,

  388 U.S. 130 (1967) ....................................................................................... 10, 14, 23

*Dalbec v. Gentleman's Companion, Inc.*,

  828 F.2d 921, 927 (2d Cir. 1987)........................................................................................ 8

*Dilworth v. Goldberg*,

  3 F. Supp. 3d 198, 200 (S.D.N.Y. 2014)........................................................................... 24

*Freeman v. Giuliani*,

   691 F. Supp. 3d 32, 61 (D.D.C. 2023) ................................................................................ 33

*GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.*,

   282 F.R.D. 346, 357 (S.D.N.Y. 2012) ............................................................................... 32

*Gertz v. Robert Welch, Inc.*,

   418 U.S. 323, 341 (1974) ................................................................................................... 9

*Goldfarb v. Channel One Russia*,

   663 F. Supp. 3d 280, 309 (S.D.N.Y. 2023) ...................................................................... 18

*Goldwater v. Ginzburg*,

   414 F.2d 324, 339-40 (2d Cir. 1969) .................................................................. 10, 11, 14

*Harte-Hanks Communications, Inc. v. Connaughton*,

   491 U.S. 657, 688 (1989) ..................................................................................... 9, 10, 14

*Hice v. Lemon,*

   No. 19-cv-4666 (JMA)(SIL), 2021 WL 6053812, at *7 (E.D.N.Y. Nov. 17, 2021) .............. 33

*Howard v. Schoberle*,

   907 F. Supp. 671, 676 (S.D.N.Y. 1995) .............................................................................. 7

*Int'l Bus. Machines Corp. v. Naganayagam*,

   No. 15-cv-7991, 2017 WL 5633165, at *6 (S.D.N.Y. Nov. 21, 2017) ................................ 31

*Jankovic v. Int'l Crisis Grp.,*

   822 F.3d 576, 583 (D.D.C. 2016) ..................................................................................... 22

*Knowles v. New York City Dept. of Corrections*,

   904 F. Supp. 217, 220 (S.D.N.Y. 1995) .............................................................................. 7

*Leidig v. Buzzfeed, Inc.*,

    No. 16-cv-542, 2017 WL 6512353, at *11 (S.D.N.Y. Dec. 19, 2017) .................................. 31

*Liberty Lobby, Inc. v. Dow Jones & Co*.,

    838 F.2d 1287, 1293 (D.C. Cir. 1988) .................................................................................. 9

*Lokai Holdings LLC v. Twin Tiger USA LLC*,

    No. 15-cv-9363, 2018 WL 1512055, at *16 (S.D.N.Y. Mar. 12, 2018) ............................... 31

*McFarlane v. Sheridan Square Press, Inc.*,

    91 F.3d 1501, 1510 (D.C. Cir. 1996) ................................................................................. 13

*Montgomery v. Risen*,

    197 F. Supp. 3d 219, 260 (D.D.C. 2016) ........................................................................... 21

*New York Times Co. v. Sullivan*,

    376 U.S. 254, 280 (1964) ..................................................................................................... 8

*Ottoson v. SMBC Leasing and Finance, Inc.*,

    268 F. Supp. 3d 570, 579 (S.D.N.Y. 2017) ................................................................. 24, 33

*Palin v. New York Times Co.*,

    482 F. Supp. 3d 208, 218 (S.D.N.Y. 2020) ........................................................... 8, 18, 23

*Popat v. Levy*,

    No. 15-cv-1052, 2022 WL 4562095, at *6 (W.D.N.Y. Sept. 29, 2022) ............................... 31

*Pugh-Ozua v. Springhill Suites*,

    No. 18-cv-1755, 2020 WL 6562376, at *4 (S.D.N.Y. Nov. 9, 2020) .................................. 34

*Rosanova v. Playboy Enters., Inc.*,

    580 F.2d 859, 862 (5th Cir. 1978) ...................................................................................... 21

*Rosario v. City of New York*,

    No. 18-cv-4023, 2022 WL 2965953, at *3 (S.D.N.Y. Jul. 27, 2022) .......... 30, 31, 32, 34, 35

*Rossbach v. Montefiore Med. Ctr.*,

    81 F.4th 124, 139 (2d Cir. 2023) ...................................................................................... 24

*Simon v. City of New York*,

    No. 14-cv-8391, 2017 WL 57860, at *7 (S.D.N.Y. Jan. 5, 2017) ........................................ 34

*St. Amant v. Thompson*,

    390 U.S. 727, 732 (1968).......................................................................... 8, 10, 15, 20, 23

*Stern v. Cosby*,

    645 F. Supp. 2d 258, 278 (S.D.N.Y. 2009) ................................................................... 9, 21

*StoneX Grp., Inc. v. Shipman*,

    No. 1:23-cv-00613, 2024 WL 1509346, at *11 (S.D.N.Y. Feb. 5, 2024)............................. 33

*Tavoulareas v. Piro*,

    817 F.2d 762, 794 n.43 (D.C. Cir. 1987) (*en banc*)................................................. 9, 17, 21

*Tchatat v. O'Hara*,

    249 F. Supp. 3d 701, 711 (S.D.N.Y. 2017), *objection overruled*, 2017 WL 3172715, at *9–11

    (S.D.N.Y. July 25, 2017), *aff'd*, 795 F. App'x 34, 36–37 (2d Cir. 2019)............................. 24

*Treppel v. Biovail Corp.*,

    249 F.R.D. 111 (S.D.N.Y. 2008) ...................................................................................... 27

*Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)..................................................................... 7

*Zubulake v. UBS Warburg LLC*,

    220 F.R.D. 212, 221 (S.D.N.Y. 2003) .............................................................................. 27

**Other Authorities**

Final Order of Dismissal and Order Denying All Pending Motions as Moot, *Basulto v. Netflix,*

*Inc.*, No. 1:22-cv-21796 (S.D. Fla. Jan. 31, 2024)..................................................................... 22

*Refused,* Merriam-Webster, https://www.merriam-webster.com/dictionary/refused, accessed on

Jan. 13, 2025 ........................................................................................................................... 14

**Rules**

Fed. R. Civ. P. 37 (advisory committee note to the 2015 amendment).................................. 32, 34

Fed. R. Civ. P 37(e) .................................................................................................................... 34

Fed. R. Civ. P. 37(e)(1)............................................................................................................... 30

Fed. R. Civ. P. 37(e)(2)............................................................................................................... 30

Rachel Maddow made a false statement about Devin Nunes on live television to millions of viewers that was a reckless fabrication at best, and a deliberate smear at worst. She accused Mr. Nunes of refusing to turn over information to the FBI—a serious crime. Defendant's attempt to obfuscate and muddy the waters of this simple case with irrelevant details—reflected in the incorrect assertion in the first line of its Motion that this case is about "reporting on a recently declassified U.S. Intelligence report"—demonstrates the fatal flaw at the heart of its Motion: none of the sources upon which Defendant claims to have relied provide any credible shelter for them to hide behind simple ignorance or negligence.

Defendant's only defense at summary judgment is that it did not act with actual malice. Its argument essentially boils down to: Ms. Maddow and Mr. Gnazzo testified they were confident in the truth of the statements when aired because they relied upon sources that were critical of Mr. Nunes—but none of which reported or showed that he refused to turn over information to the FBI. Therefore, Defendant's claim that it cannot have acted with actual malice is incorrect.

Defendant incredibly claims Ms. Maddow's statement was "previously reported in a highly reliable news report" which is not only a blatant mischaracterization of the Politico Article it refers to, but violates Defendant's own policies against relying upon single, anonymous sources from other media outlets. Ms. Maddow purports to be shocked at Mr. Nunes' declining to comment on Politico's reporting—incredibly arguing that this somehow "informed" her belief that Mr. Nunes must have been hiding something—while simultaneously testifying that she was well aware of Mr. Nunes' long-standing policy and reputation of not speaking to the press. Ms. Maddow, in a catty, mean-girl fashion, made a scandalously false accusation against Mr. Nunes, and then acts like it is his obligation to disprove it, rather than her obligation to retract and take responsibility for her lie.

A reasonable juror could conclude, based on Ms. Maddow's incredible testimony, her history of criticizing and smearing Mr. Nunes, and the utter lack of evidentiary support, that Ms. Maddow's accusation was a reckless fabrication at best, and a deliberate smear at worst. This Court is not required to accept Defendant's self-serving claims of good faith in the face of the litany of disputed material facts as to their motivations, their knowledge, and their repeated misrepresentations and mischaracterizations of evidence. Therefore, as there is a material dispute of fact regarding whether actual malice exists and there is clear and convincing evidence supporting a finding of actual malice, this Court should find that a jury must make the necessary credibility determinations in this case and render a judgment. Accordingly, this Court should deny Defendant's Motion for Summary Judgment in its entirety rather than short-circuiting this litigation.

## BACKGROUND

While Defendant spills much ink on the background it alleges is relevant to this case, the truth is substantially simpler. In late 2019, a package arrived to the House Permanent Subcommittee on Intelligence ("HPSCI") addressed to Mr. Nunes, purportedly from a Ukranian named Andrii Derkach (the "Derkach Package"). Declaration of Jason C. Greaves ("Greaves") Ex. A at 69:9–13. The package was picked up from the mail by Nicholas Ciarlante, a staffer working for HPSCI. *Id.* at 73:24–74:23. Mr. Ciarlante did not open the package. *Id.* He explained that the package was likely opened as part of the screening process and then resealed in that same process, and, therefore, the package was delivered to HPSCI sealed and was not opened again. *Id.* at 75:6–76:3.

2

Mr. Ciarlante had the package inspected by the Capitol Police and then locked the package in a lockbag and put it in his safe. *Id.* at 74:14–76:10. After approximately two days, the package was turned over to the FBI. *Id.* at 83:11–14. This first-hand account, is supported by multiple other witnesses with knowledge of the package and its handling. Greaves Ex. B at 61:24-62:4; Greaves Ex. C at 303:4-14; Greaves Ex. D at 130:20-25; Greaves Ex. E at 50:14-21.

On March 18, 2021, Rachel Maddow made the following assertion on *The Rachel Maddow Show:* "[Mr. Nunes] has refused to hand [the Derkach Package] over to the FBI which is what you should do if you get something from somebody who is sanctioned by the U.S. as a Russian agent." Dkt. No. 40 at 2. Ms. Maddow falsely accused Mr. Nunes not only failing to turn over the package to the FBI but that he *refused a request or even order to do so.*

This litigation shortly followed. In discovery, Defendant and its agents have pointed to a number of sources which allegedly support the false statement that Mr. Nunes refused to turn the package over to the FBI. None of these sources contain any support for this assertion, rendering the statement false, defamatory, and made with actual malice.  Ms. Maddow's affidavit points to a number of sources or pieces of information that she claims support the statement she made and Mr. Gnazzo approved on March 18, 2021: (1) March 16, 2021 ODNI Report, (2) July 13, 2020 Letter, (3) July 23, 2020 Politico Article, (4) July 29, 2020 HPSCI Meeting, (5) July 31, 2020 CNN Article, (6) Mr. Nunes's Dealings with Lev Parnas. *See generally* McNamara Decl., Dkt. No. 144 ("McNamara") Ex. 2. None of these provide any support for the statement.

The ODNI Report, which is not a report but an Intelligence Committee Assessment, only mentions the packages in passing and provides no support for the notion that a package was sent to Mr. Nunes or that Mr. Nunes either refused or failed to provide the package to the FBI. *See* McNamara Ex. 12 at NBCU0000111. Other than this mention, the ODNI Report sheds no light on

the specific issue and provides no greater context as the core message is simply that certain "Russian proxies met with and provided materials to Trump administration-linked US Persons to advocate for formal investigations; hired a US firm to petition US officials; and attempted to make contact with several senior US officials. *Id*.

Likewise, the July 13, 2021, Letter provides no support for the statement at issue and provides no relevant additional context *See* McNamara Ex. 18. The letter could not provide additional context or support for Ms. Maddow's false accusation as it is a request for information about packages that were allegedly sent, with nothing to indicate that Mr. Nunes failed or refused to hand over any package to the FBI. *Id*.

The July 23, 2020 Politico article reports that Derkach sent packages to four individuals, including Mr. Nunes. In pertinent part, it states:

> The packets were sent amid a Democratic push to impeach Trump over his effort to pressure Ukraine 's president to investigate Biden and his son Hunter the sources said. Graham and Grassley denied having received the material, and Mulvaney and Nunes declined repeated requests for comment. One person familiar with the matter said the information was not turned over to the FBI. The FBI declined to comment.

McNamara Ex. 10 at NBCU0001375. There are two issues with Defendant's reliance on this source. First, it is simply inaccurate to claim—as Defendant repeatedly and self-servingly does— that this article singles out Mr. Nunes as not having turned over anything to the FBI. Four different individuals were identified in the article as having supposedly received packages from Derkach. However, the article does not specify the relation of its single, anonymous source "familiar with the matter" to any of these individuals. It is not clear who, or whose office this person is claiming did not turn over information. Second, there is a material difference between a claim that something was "not turned over" and what Defendant accused, which is that Mr. Nunes *refused* to turn over the Derkach Package. In addition, the source for Politico was a single, anonymous source,

which Defendant did not seek to verify in any way. *Id*; Greaves Ex. F at 93:25–95:8 (admitting that she does not know who Politico's source is); Greaves Ex. G at 101:22–102:20 (admitting that Mr. Gnazzo *assumed* that the source was vetted by Politico but had not firsthand or even any other kind of knowledge to confirm that belief).

During a public portion of the July 29, 2020 HPSCI Meeting, Representative Sean Maloney (D-NY18) asked the Chairman a question directed at Mr. Nunes regarding the packages and whether he had received such materials. *See* McNamara Ex. 21 at NBCU0001743–44. Specifically, Mr. Maloney stated:

> And so my question, Mr. Chairman, is of the ranking member, whether he is prepared to disclose to the committee whether he has received materials that have been called into question in the public reports from Andrii Derkach and, if so, whether he is prepared to share them with the rest of the committee.
> THE CHAIRMAN: Does the ranking member wish to respond?
> MR. NUNES: No

*Id.* In full, this exchange provides no support for the notion that Mr. Nunes refused to turn over the package to the FBI, failed to turn it over, or even that he possessed it. Only a reckless or malicious reading of this exchange could find support for such a notion in Mr. Nunes' declining to respond, particularly considering Mr. Nunes' responsibility for highly sensitive information and investigations, and the obviously goading, partisan tenor of the question.

The July 31, 2020 CNN Article reports on the exchange at the July 29, 2020 HPSCI Business Meeting. *See* McNamara Ex. 24. Since that meeting contained no plausible information supporting the notion that Mr. Nunes refused to turn the package over to the FBI or even that he possessed the package, and CNN's reporting added no such information, it does not provide any credible support for Defendant's claim to have made the accusation in good faith.

Finally, turning to the last basis for support offered by Ms. Maddow: her interview with Lev Parnas and review of documents relating to Mr. Parnas' claimed interactions with Mr. Nunes.

*See* McNamara Ex. 36. Ms. Maddow claims that this interview bolsters her reporting because it is *another* instance of Mr. Nunes obtaining foreign information and that it reduces Mr. Nunes' credibility because he was purportedly not honest about his interactions with Mr. Parnas. *See* McNamara Ex. 2 at ¶¶ 40–43. This is a blatant mischaracterization and once again, the cited materials do not support Defendant's positions. McNamara Exhibit 35 provides no support for the notion that Mr. Nunes was obtaining information from Parnas but rather only confirms that Mr. Harvey connected with Mr. Parnas. *See* McNamara Ex. 35 at NBCU0001455, NBCU0001465. On their face, and as testified to by Mr. Harvey, Harvey's text messages with Parnas were utterly mundane and typical of what a HPSCI staffer would do with a potential source or whistleblower. Greaves Ex. D at 113:5-114:24. Mr. Harvey—at all times wary of Parnas' credibility and intentions—listened to what he had to say, asked questions, and after a brief period of due diligence, cut off communications because he evaluated Parnas to be a "grifter." Greaves Ex. D at 85:21-86:24. Moreover, Mr. Nunes was open and honest about his brief interaction with Mr. Parnas (contrary to Ms. Maddow's mischaracterizations), in an interview covered by an article she claims to have reviewed. *See* McNamara Ex. 32 at NBCU0000174. Ms. Maddow falsely claimed that Mr. Nunes initially denied knowing Mr. Parnas, when his actual statement was that it was possible he had spoken with him but he didn't recall it, and that he would check his records. *Id.* Upon checking his records, Mr. Nunes publicly stated to Fox News that he now recalled a brief conversation. *Id*. Again, contrary to Ms. Maddow's suggestion that phone records somehow contradicted Mr. Nunes, they are entirely consistent. *See* Pl. Statement of Material Facts in Dispute at Response 98.

## STANDARD OF REVIEW

A motion for summary judgment "may not be granted unless the court determines that there is no genuine issue of material fact and that the undisputed facts warrant judgment for the moving party as a matter of law." *Howard v. Schoberle*, 907 F. Supp. 671, 676 (S.D.N.Y. 1995). "In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." *Knowles v. New York City Dept. of Corrections*, 904 F. Supp. 217, 220 (S.D.N.Y. 1995) (citations omitted). "If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper." *Howard*, 907 F. Supp. at 677 (citing *Chambers v. TRM Copy Centers Corp*., 43 F.3d 29, 37 (2d Cir. 1994)). In deciding a summary judgment motion, "the district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). "[A]ll doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir. 1988).

## ARGUMENT

### I.    Defendant is not Entitled to Summary Judgment.

Mr. Nunes alleges a single count of defamation. The only outstanding defamatory statement is Defendant's false accusation that "[Mr. Nunes] has *refused* to hand [the Derkach Package] over to the FBI which is what you should do if you get something from somebody who is sanctioned by the U.S. as a Russian agent." Dkt. No. 40 at ¶ 2 (emphasis added); Dkt. No. 57

7

at 16 ("NBCU's motion to dismiss will therefore be granted as to the first and second sentences of Statement Two but denied as to the third sentence."). The statement is categorically false, as supported by numerous witnesses, and it was made either knowingly false, or with reckless disregard for truth. While actual malice is a high burden for a public figure, Mr. Nunes meets that burden here.

> **a.    Defendant acted with actual malice.**

In cases where the plaintiff is a public figure, as here, the plaintiff cannot recover for defamation unless they can show, by clear and convincing evidence, that the defendant made the statement with actual malice. *Celle v. Filipino Reporter Enterprises Inc.*, 209 F.3d 163, 182-83 (2d Cir. 2000). Actual malice requires showing the defendant "had a subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard of the its truth or falsity." *Id*. at 182 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). While actual malice is subjective, a "court typically will infer actual malice from objective facts." *Id*. (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189, 196 (1st Cir. 1982)). This is because actual malice "revolves around facts usually within the defendant's knowledge and control, and rarely is admitted." *Id.* (quoting *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987)). Therefore, "a defendant cannot 'automatically insure a favorable verdict by testifying that he published with a belief that the statements were true.'" *Palin v. New York Times Co.*, 482 F. Supp. 3d 208, 218 (S.D.N.Y. 2020) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)). This determination that a profession of good faith is not conclusive to actual malice is of particular importance here, where Defendant attempts to avoid liability through the proclaimed good faith and lack of doubt in self-serving statements by its agents.

When proving actual malice, the facts "should provide evidence of 'negligence, motive and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice.'" *Celle*, 209 F.3d at 183 (quoting *Bose Corp.*, 692 F.2d at 196). Indeed, "[a]ctual malice can be established '[t]hrough the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story [among] other circumstantial evidence[.]'" *Id*. at 183 (quoting *Liberty Lobby, Inc. v. Dow Jones & Co*., 838 F.2d 1287, 1293 (D.C. Cir. 1988)). All of the evidence is considered in the aggregate. *Stern v. Cosby*, 645 F. Supp. 2d 258, 278 (S.D.N.Y. 2009) (citing *Tavoulareas v. Piro*, 817 F.2d 762, 794 n.43 (D.C. Cir. 1987) (*en banc*) ("We recognize that each individual piece of evidence cannot fairly be judged individually against the standard of clear and convincing evidence. Plaintiffs are entitled to an aggregate consideration of all their evidence to determine if their burden has been met.")).

While actual malice is a heightened standard, it does not afford the press "absolute immunity in its coverage of public figures." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989). As recognized by the Supreme Court in *Gertz*:

> The need to avoid self-censorship by the news media is, however, not the only societal value at issue. If it were, this Court would have embraced long ago the view that publishers and broadcasters enjoy an unconditional and indefeasible immunity from liability for defamation.

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341 (1974).

### 1. Defendant recklessly disregarded the truth by relying upon utterly irrelevant "sources" to support a narrative that "hit" Mr. Nunes.

While "failure to investigate will not alone support a finding of actual malice," "purposeful avoidance of the truth is in a different category." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (citing *St. Amant v. Thompson*, 390 U.S. 727, 731–33

(1968)). Here, the evidence establishes that in entirely fabricating its claim that Mr. Nunes *refused*

to hand over the Derkach package to the FBI, Defendant purposefully avoided the truth.

The Supreme Court appears to have first addressed the issue of purposeful avoidance in

1967. *See Curtis Pub. Co. v. Butts*, 388 U.S. 130 (1967). In *Butts*, the defendant accused the

plaintiff "of conspiring to 'fix' a football game." *Id.* at 135. The defendant argued it could not have

acted with actual malice because it relied on a source for its assertion. *Id.* at 156. The Supreme

Court disagreed upholding the jury's finding of actual malice for four reasons: (1) the Court found

the news story was not "hot news," therefore the defendant had time to investigate; (2) the source

was problematic, and the defendant did not seek independent support for its statement despite there

being witnesses who had access to the same facts; (3) the writer was not knowledgeable about

football and did not seek help from someone who was; and (4) the defendant was eager to "produce

a successful expose." *Id.* at 156–58.

> Two years later, the Second Circuit relied on *Butts* in finding actual malice wherein:

> The Goldwater article did not contain 'hot news'; the appellants were very much
> aware of the possible resulting harm; the seriousness of the charges called for a
> thorough investigation but the evidence reveals only the careless utilization of
> slipshod and sketchy investigative techniques; appellants were not psychiatric
> experts nor did they have any expert review 'Goldwater: The Man and the Menace'
> or evaluate its conclusions; they persisted in their polling project despite warnings
> by reputable professional organizations that their techniques lacked validity; and,
> obviously there was evidence as to whether there was a possible preconceived plan
> to attack Senator Goldwater regardless of the facts.

*Goldwater v. Ginzburg*, 414 F.2d 324, 339-40 (2d Cir. 1969). The Second Circuit found this

conduct—avoiding the truth—to be sufficient for finding actual malice. *Id.* at 340. And in 1989,

the Supreme Court reaffirmed *Butts*, confirming that such "evidence of an intent to avoid the truth"

would support a finding of actual malice. *Connaughton*, 491 U.S. at 692–93.

Likewise, here, the evidence indicates Defendant's intent to avoid the truth. As an initial matter, Defendant's statement did not involve "hot news." Defendant purports to have chiefly relied on a Politico article from July 23, 2020, for its false statement. Defendant made the statement, however, nearly nine months later on March 18, 2021. Thus, Defendant had ample time to investigate its statement before publishing. Indeed, "the seriousness of the charges called for a thorough investigation." *Ginzburg*, 414 F.2d at 339–40. Similarly, Defendant's accusation that Mr. Nunes had obstructed justice by refusing to turn over information to the FBI is quite serious. Yet, as discussed below, Defendant did not engage in any serious investigation.

After identifying four individuals who supposedly received the Derkach Package,[1] the above-mentioned Politico article stated, "one person familiar with the matter says the information was not turned over to the FBI." McNamara Ex. 10 at NBCU0001375. There are two issues with this supposed reliance. First, Defendant repeatedly mischaracterizes the Politico article to falsely and self-servingly claim that Politico previously reported that Mr. Nunes had not turned over the Derkach Package. Politico does not single out Mr. Nunes, and does not identify or associate its anonymous source with any particular person or office. It is therefore completely unclear who or whose office supposedly failed to turn anything over. Ms. Maddow confirmed that she did not know who this unnamed source was when she made her accusation. Greaves Ex. F at 93:25–94:6. And Mr. Gnazzo acknowledged that this section of the Politico article did not even mention Mr.

---

[1] It is noteworthy that this part of the Politico article is based on two other anonymous sources, who purportedly had reviewed a classified letter written by Democrat lawmakers. This very fact indicates the partisan nature of this story, as these anonymous leakers were presumably staff members of the Democrat lawmakers, or even the Democrat lawmakers themselves. Therefore, a reasonable juror could conclude that the initial media frensy over the Derkach Package, the overwrought reaction of Democrat leadership, and the subsequent accusation of Ms. Maddow, were all part of a partisan disinformation scheme.

Nunes, it merely indicated that *someone* did not turn the package over to the FBI. Greaves Ex. G at 107:20–108:13.

Despite this, and evidencing its lack of investigation, Ms. Maddow, could not recall ever discussing whether Defendant's statement was actually accurate. Greaves Ex. F at 23:11–24:21. The only evidence of fact-checking that Defendant produced was an email from an intern, correcting the assertion that Defendant received two reports on the same day when the reports were released on different days. Greaves Ex. H. The Rachel Maddow Show employed a single intern to fact check its scripts, which it delivered to the intern about an hour before the show. Greaves Ex. G at 21:6–11; Greaves Ex. N at 16:5–17. This fact-checking intern did not consider whether the package received by HPSCI for Mr. Nunes was actually turned over to the FBI, or whether Mr. Nunes *refused* to turn over the package, as Defendant stated. Presumably, the fact-checking intern did not even read the Politico article to see that Ms. Maddow's statement was utterly unsupported. Defendant did not attempt to contact Mr. Nunes. Greaves Ex. F at 128:12-22. Defendant does not even know if Politico explicitly asked Mr. Nunes if he handed over the package. Greaves Ex. G at 100:21-102:20.

Thus, Defendant took a statement, from a single, unnamed source, from another media outlet—which is itself against NBCU's journalistic policies, *see* Greaves Ex. O at NBCU0000006—without even knowing if it was even about Mr. Nunes, and twisted it into an accusation that Mr. Nunes had refused to turn over information to the FBI. Despite these glaring issues, and under no time crunch, Defendant undertook no meaningful steps to investigate the accuracy of its statement. The only new information upon which Defendant claims to rely was the ODNI Report, which was released on March 16, 2021. Yet, the ODNI report contains no allegation that Mr. Nunes refused to turn over any information to the FBI. Moreover, Defendant took two

days before reporting on this story and still utterly failed to investigation of the facts. Such purposeful avoidance of the truth is exactly what the Supreme Court and Second Circuit has found to be sufficient for a finding of actual malice. As is illustrative here, when "a defendant has reason to doubt the veracity of its source, then its utter failure to examine evidence within easy reach or to make obvious contacts in an effort to confirm a story would be evidence of its reckless disregard." *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1510 (D.C. Cir. 1996).

This is especially true considering just one week after the July 23, 2020, article, Politico published a follow up on article on July 30, 2020, wherein Rep. Crawford said, "that's what happened," when referring to whether Mr. Nunes handed the package over to the FBI. McNamara Ex. 48 at NBCU0001317. Mr. Benen, who works with Ms. Maddow's show, even included this July 30 article in a blog post he wrote, indicating he clearly knew of the article's existence. *See* McNamara Ex. 49. While Defendant now claims Mr. Benen played no role in preparing for the March 18, 2021 show that is the subject of this suit, the evidence tells a different story. Dkt. No. 142 at 24 n.5. Ms. Maddow testified that she read Mr. Benen's emails daily, that they were "very helpful" to her, and that his blog posts influenced the contents of the show based upon the reactions they got online. Greaves Ex. F at 140:1–144:21. Indeed, Mr. Gnazzo admitted that Mr. Benen's ideas are pitched to the group, and he sends around his blog. Greaves Ex. G at 37:9–38:10. Mr. Gnazzo further admitted that Mr. Benen played a "part" in the segment discussing Mr. Nunes on March 18, 2021. Greaves Ex. G at 38:11–42:18. Even if Mr. Benen did not prepare the script for March 18, 2021, Mr. Gnazzo had "the final say" over the script and admitted to reviewing Mr. Benen's blog, which contained the July 30, 2020, Politico article. Greaves Ex. G at 37:17–24; McNamara Ex. 49. Thus, Defendant's employees were aware of contradicting evidence was in the public realm, yet purposefully avoided it.

13

Still, despite this knowledge, Defendant did not contact or interview Rep. Crawford (or any other HPSCI minority member or staff). Such decision was a conscious evasion or avoidance of the truth. *See Connaughton*, 491 U.S. 657, 682, 692 (holding that failure to interview a contradicting witness, who was easily accessible, represented a clear evasion from the truth, supporting a finding of actual malice) (citing *Butts*, 388 U.S. 130, 157 ("Although there was reason to question the informant's veracity, just as there was reason to doubt Thompson's story, the editors did not interview a witness who had the same access to the facts as the informant and did not look at films that revealed what actually happened at the game in question.")). While Defendant was aware of Mr. Nunes's policy of not commenting on stories, this does not absolve them of their requirement to investigate and seek the truth.

Second, the Politico article merely said, "the information was not turned over to the FBI." Even ignoring that the statement has no relation to Mr. Nunes or his office, Defendant fabricated the claim that Mr. Nunes *refused* to hand the package over to the FBI. A refusal to turn over the package is substantially different than simply not turning it over. Merriam-Webster defines refuse as "to express oneself as unwilling to accept" or "to show or express unwillingness to do or comply with". *See Refused,* Merriam-Webster,  https://www.merriam-webster.com/dictionary/refused, accessed on Jan. 13, 2025. Refusing to turn over the package implies a duty or obligation to do so that is being deliberately violated by a sitting Member of Congress, suggesting a potential violation of law, in addition to a serious violation of public trust. This is different than simply not having turned over the package, which is what the Politico article vaguely suggests. This negates any sort of reliance Defendant now claims. *See Ginzburg*, 414 F.2d at 337 ("One cannot fairly argue his good faith or avoid liability by claiming that he is relying on the reports of another if the latter's statements or observations are altered or taken out of context."); *St. Amant v. Thompson*, 390 U.S.

at 732 ("Professions of good faith will be unlikely to prove persuasive . . . where a story is fabricated by the defendant, is the product of his [or her] imagination, or is based wholly on an unverified anonymous telephone call."). Therefore, Defendant fabricated the "refusal" by Mr. Nunes, and altered the statements from its sources impermissibly.

The same applies the other sources Defendant purports to have relied on. Dkt. No. 142 at 20–23. First, the Defendant says Ms. Maddow and Mr. Gnazzo relied on a July 13, 2020, congressional letter. On its face, that letter makes no claim that Mr. Nunes failed or refused to hand the package over to the FBI, as acknowledged by Mr. Gnazzo. Gnazzo at 83:19–85:7.

Second, Defendant says it relied on a July 29, 2020, HPSCI transcript. There, Mr. Nunes was asked whether he wished to respond to the question posed by another member of HPSCI as to whether he had *received* the package, and he declined to do so. *See* McNamara Ex. 21 at NBCU0001743-44. He was never specifically asked about turning it over to the FBI, and he expressly stated "no" only to the question of whether he wished to respond to the question. *Id.* Ms. Maddow and Mr. Gnazzo both acknowledged this distinction. Greaves Ex. F at 117:23–119:5; Greaves Ex. G at 76:15–77:8.

Third, Defendant claims it relied on Rep. Maloney's interview with Deadline. As with the transcript, however, on its face, this interview had nothing to do with the FBI or any allegation that Mr. Nunes had failed or refused to turn over the Derkach package. McNamara Ex. 25.

Fourth, Defendant says it relied on the fact that people close to Mr. Nunes were attempting to dig up dirt on President Biden. Again absent, however, is any mention of the FBI or any claim that Mr. Nunes had failed or refused to turn over the Derkach package.

Fifth, Defendant says it relied on Mr. Nunes having a contentious relationship with the FBI. It simply incredible, however, to make the leap from Mr. Nunes being critical of and even

investigating the FBI for wrongdoing, to an unfounded accusation that he refused to turn over the Derkach package to the FBI. Being critical of law enforcement is simply not a basis to accuse Mr. Nunes of a crime or of breaching his duties as the ranking member of HPSCI.

Defendant has attempted to create all of the *post hoc* rationalizations it could think of for making a false statement about Mr. Nunes. None of these sources support the notion that Mr. Nunes *refused* or even failed to turn over the package to the FBI. It is also clear that Ms. Maddow did not merely misspeak, this lie was fully scripted. Greaves Ex. I. This is the precise altering of and taking statements out of context that the Second Circuit held cannot be protected in *Ginzburg*. In addition, this is precisely the type of reckless disregard that the Supreme Court has found actionable. It is difficult to imagine a clearer picture of individuals creating a *post hoc* rationalization for their "hit" on Mr. Nunes when facing litigation for their false and defamatory statements. Greaves Ex. O (referring to their work as an easier "hit" against Mr. Nunes than other Republicans).

As was the case in *Butts* and *Ginzburg*, Defendant published a story that was not "hot news" and had questionable sources (the Politico article, which did not disclose the name of its source and did not actually say Mr. Nunes did the thing Defendant said he did), but still did not conduct any investigation, despite the seriousness of the charge. This was due to, as discussed below, ill will and a motivation for ratings. The conduct here is even arguably worse than that in *Butts*, where the defendant was at least simply reporting what its source told it. Here, Defendant made up a story that did not appear in any source and was openly contradicted elsewhere. This indicates that Defendant deliberately fabricated an event, or, minimally, acted with reckless disregard for the truth.

16

2.    *Other circumstantial evidence likewise indicates Defendant's actual malice.*

Defendant's reckless disregard is bolstered by numerous pieces of circumstantial evidence outlining Defendant's actual malice. As a starting point, actual malice may be proven by evidence of ill will, when combined with other circumstantial evidence. *Celle*, 209 F.3d at 183 (citing *Tavoulareas*, 817 F.2d at 795). Ms. Maddow admitted that her politics differ from Mr. Nunes', and even criticized Mr. Nunes, implying that he is hypocritical for bringing a defamation lawsuit. Greaves Ex. F at 148:20-150:20. In one email, Ms. Maddow appeared to refer to Senator McConnell as "Moscow Mitch." Greaves Ex. J. And in another email Defendant referred to Mr. Nunes as an "easier hit." Greaves Ex. K. Mr. Gnazzo also made it a point that he does not "prefer" Mr. Nunes's attitude toward the press. Greaves Ex. G at 157:20-158:4. In multiple episodes of The Rachel Maddow Show, Ms. Maddow derides and criticizes Mr. Nunes in a manner that a reasonable juror could conclude is evidence of her ill will and even malice toward Mr. Nunes. In discovery Defendant produced 36 different transcripts from February 2017 to January 2020 in which Ms. Maddow discussed Mr. Nunes on her show. A sampling of these transcripts evidences her malice toward Mr. Nunes. *See* Plaintiff's Rule 56.1 Statement, Response 203.

In addition, Ms. Maddow's counsel inappropriately shut down questioning about her political beliefs at her deposition. *See* Dkt. No. 137 at 4 (finding that the instruction not to answer questions was improper but may have been upheld on relevance grounds). Therefore, it can be expected that the full questioning at trial would adduce additional information about Ms. Maddow's well-known left-wing political beliefs and how the piece was meant to be an "easier hit" against Mr. Nunes than other Republicans, which was shut down improperly. *See* Dkt. No. 137 at 4 ("I'm a liberal and he's a conservative, so we probably disagree on most things, but you never know.") (citing Maddow Tr. at 150:15-17); *see also* Greaves Ex. K (discussing the "easier

17

hit" against Mr. Nunes undermining Ms. Maddow claimed impartiality and creating an inference of political motivation). As the Second Circuit has made clear, evidence of political bias, when combined with other factors, "give rise to a plausible inference that [the defendant] was recklessly disregarding the truth." *Palin v. New York Times, Co.*, 940 F.3d 804, 814 (2d Cir. 2019). And as the Second Circuit previously agreed, "alleged bias would be relevant to show a purposeful avoidance of the truth if it were coupled with evidence of an extreme departure from standard investigative techniques." *Church of Scientology Intern. v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001).

The evidence also indicates Defendant was motivated by television ratings. *See Goldfarb v. Channel One Russia*, 663 F. Supp. 3d 280, 309 (S.D.N.Y. 2023) ("a defendant's motive for defaming the plaintiff can constitute circumstantial evidence of actual malice.") (internal citations omitted). Ms. Maddow's show was in the primetime slot. Greaves Ex. G at 14:11–17. Ms. Maddow admitted ratings are important. Greaves Ex. F at 151:13–22. And as Mr. Gnazzo discussed, they were always looking for ways to tell better stories. Greaves Ex. G at 170:9–171:3. And as noted, they were looking for the "easier hit" that would drive ratings for their show, which was well known as a left-wing show. Greaves Ex. K. Thus, Mr. Nunes, a prominent Republican, became Defendant's target for achieving the ratings Defendant desired.

Next, the evidence indicates a departure from journalist professional standards. Under Defendant's guidelines, when reporting from another news organization, *e.g.*, the Politico article, the guidelines note to consider whether the other organization's source is anonymous. Greaves Ex. O at NBCU0000008. Here, Politico's source was anonymous, however, Mr. Gnazzo did not appreciate that, testifying that he simply relied on Politico without questioning their unnamed source. Greaves Ex. G at 130:22–132:6. Additionally, Defendant's guidelines require at least two

independent sources, and that single-source reporting should only be used after careful consideration of multiple factors (including whether the source had first-hand, direct knowledge, whether they are a previously used and reliable source, whether there are corroborating documents, whether they are corroborated by other sources, and what motivations or biases the source might have). Greaves Ex. O at NBCU0000006. Additionally, any single source who is neither authoritative or a spokesperson, must be approved by an authorized member of senior management. *Id.* Defendant did not take these considerations into account, claiming to be reporting allegations previously made by Politico, and purporting to rely upon the reputation of Politico in vetting its single, anonymous source. Greaves Ex. G at 65:2–71:25. The next consideration in the guidelines is whether Defendant took any action to independently verify the source. Greaves Ex. O at NBCU0000008. Here, Mr. Gnazzo admitted that, prior to publishing, he never reached out to Mr. Nunes for comment, or certain others who might have had knowledge. Greaves Ex. G at 132:21–133:23. Finally, the guidelines say that when reporting information from another news organization, it should be disclosed. Greaves Ex. O at NBCU0000008. Here, as Mr. Gnazzo admitted, Ms. Maddow did no such thing. Greaves Ex. G at 134:4–20.

As the Second Circuit previously agreed, "alleged bias would be relevant to show a purposeful avoidance of the truth if it were coupled with evidence of an extreme departure from standard investigative techniques." *Church of Scientology Intern. v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001). Here, Defendant's purposeful avoidance of the truth and fabrication of Mr. Nunes's refusal, coupled with its extreme departure from standard investigative techniques, including its own standards, makes its bias all the more relevant. The combination of these factors is clear and convincing evidence for a jury to make a finding of actual malice.

19

Finally, Defendant's statement is so inherently improbable that only a reckless individual would publish it. *See St. Amant*, 390 U.S. at 732 (holding that a publisher will be unlikely to prevail on an actual malice defense where the "publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation."). Mr. Nunes was a sitting United States Congressman. He also had served with distinction on HPSCI, including serving as both the Chairman and Ranking Member. The allegation that he would deviate from ethics requirements and even obstruct justice while sitting in this position is inherently improbable. This is bolstered by the fact that the July 23, 2020, Politico article had a quote from FBI Director Wray a month prior stating, "if any public official or member of any campaign is contacted by any nation-state, or anybody acting on behalf of a nation-state, about influencing or interfering with an election then that's something the FBI would want to know about." McNamara Ex. 10 at NBCU0001378. Therefore, Defendant knew it was accusing Mr. Nunes of not just violating his duties as a congressman, particularly one on HPSCI, but potentially a crime, and recklessly did so without any thorough or proper investigation of its allegations. Defendant's arguments are unavailing.

None of Defendant's arguments change the overwhelming evidence of its actual malice. Defendant tries to salvage its reliance on the Politico article by arguing Mr. Nunes did not provide a comment to Politico. Dkt. No. 142 at 20 n.4. This reliance fails because Politico never said Mr. Nunes refused to hand over the package, and the article does not even specifically say it was Mr. Nunes who failed to turn over the package. Further, Ms. Maddow and Mr. Gnazzo were well aware of Mr. Nunes' policy against talking to the media. Greaves Ex. F at 98:22–99:5; Greaves Ex. G at 106:14–107:4. Mr. Gnazzo also acknowledged that not commenting did not necessarily mean Mr. Nunes did not hand the package over to the FBI. Greaves Ex. G at 103:9–105:21. Thus, Mr. Nunes' utterly characteristic declining to comment to Politico is not a credible source of reliance for

Defendant's fabrication and failure to investigate its claim by seeking a comment or investigating in other ways.

As discussed above, Defendant's purported reliance on other sources is also unavailing. Dkt. No. 142 at 20–23. This case is inapposite to *Montgomery v. Risen*. There, the D.C. District found the defendant's reliance on other sources sufficient because in the "Chapter" containing the subject statements, the defendant "expressly acknowledged" their sources, and the sources made "substantially similar claims." *Montgomery v. Risen*, 197 F. Supp. 3d 219, 260 (D.D.C. 2016). Here, Ms. Maddow's segment made no reference to any sources Defendant now self-servingly claims to have relied on. Further, none of these sources made any claims that even came close to suggesting Mr. Nunes refused to turn over the package.

Likewise, this case is easily distinguished from *Rosanova v. Playboy Enters., Inc*. There, the Fifth Circuit held "defamation defendants will not be forced to defend . . . the truthfulness of previous reports made by independent publishers." *Rosanova v. Playboy Enters., Inc*., 580 F.2d 859, 862 (5th Cir. 1978). Here, as discussed, Defendant did not directly report anything from an independent publisher. Instead, Defendant made up its claim out of whole cloth and substantively altered the reporting of another publisher. This is unsupported by *Rosanova*.

Next, Defendant's attempt to view each piece of circumstantial evidence in isolation is contrary to the law. Dkt. No. 142 at 23–29. On summary judgment, all of the evidence is considered in the aggregate. *Stern*, 645 F. Supp. 2d at 278 (citing *Tavoulareas*, 817 F.2d at 794 n.43 ("Plaintiffs are entitled to an aggregate consideration of all their evidence to determine if their burden has been met.")). In considering the evidence in the aggregate, as required, Mr. Nunes has met his burden to establish clear and convincing evidence of a material factual dispute over actual malice.

Defendant concludes its argument by attempting to compare this case to *Jankovic v. Int'l Crisis Grp.* There, the defendant's statements indicated that the plaintiff was affiliated with a Serbian president responsible for "a pattern of ethnic violence," and that the plaintiff "benefited from [the regime] directly." 822 F.3d 576, 583 (D.D.C. 2016). The court discussed the various steps the defendant took before publishing, including reviewing numerous government reports and conducting "many interviews" with confidential government sources familiar with the facts. *Id.* at 591. These sources directly told the defendant that the plaintiff "profited handsomely" under the regime, and that the plaintiff couldn't have accumulated his wealth without the assistance of the regime. *Id.* at 592. Ultimately, the court found that because the plaintiff had not pointed to any reasons to doubt the confidential sources, or any other reasons for the defendant to doubt the reporting, the plaintiff could not meet his burden. *Id.* at 597. Here, unlike *Jankovic,* Defendant had many reasons to doubt its purported "sources," particularly that none of them actually stated support for the statement aired by Defendant. Further underscoring its inapplicability, in *Jankovic,* the defendant took his claims directly from sources but here, Defendant made merely fabricated allegations that did not appear in any of its sources.[2]

Accordingly, each of Defendant's arguments fail. Mr. Nunes provided clear and convincing evidence to show, in the aggregate, that Defendant acted with actual malice. Defendant's self-serving and incredible claim to have believed in the accusation does not entitle it

---

[2] Defendant cites to an out-of-district magistrate judge's report and recommendation, as if it serves as an authority. Dkt. No. 142 at 129 (citing *Basulto v. Netflix, Inc.*, No. 1:22-cv-21796, 2023 WL 7129970 (S.D. Fla. Sept. 20, 2023)). Upon further review, it does not appear the court adopted this report and recommendation. Instead, the parties to the case settled, and the court dismissed the case with prejudice, denying all pending motions as moot, seemingly including the pending motion for summary judgment. Final Order of Dismissal and Order Denying All Pending Motions as Moot, *Basulto v. Netflix, Inc.*, No. 1:22-cv-21796 (S.D. Fla. Jan. 31, 2024). Thus, this Court should not consider this report and recommendation.

to summary judgment. *Palin*, 482 F. Supp. 3d at 218; *see also St. Amant v. Thompson,* 390 U.S. at 732 ("Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call."). Mr. Nunes has shown "negligence, motive and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice." *Celle*, 209 F.3d at 183 (quoting *Bose Corp.*, 692 F.2d at 196).

Defendant essentially suggests this Court cannot find liability where they acted recklessly because it was a mistake and they really believed the statement when they aired it. Accepting such an argument would turn decades of Supreme Court precedence on its head, eliminate the reckless disregard standard entirely. The purpose of the actual malice standard is not to give prominent journalists a free pass to say what they like about public figures, so long as they claim to have honestly believed their own reckless fabrications. As Chief Justice Warren observed, "[f]reedom of the press under the First Amendment does not include absolute license to destroy lives or careers." *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 170 (1967) (Warren, C.J., concurring). Defendant is not protected from its knowing or reckless lies about Mr. Nunes. Therefore, Mr. Nunes respectfully requests that this Court deny Defendant's Motion for Summary Judgment.

## II.    Defendant is not Entitled to Sanctions.

"A party spoliates evidence if (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 139 (2d Cir. 2023). "A party seeking spoliation sanctions has the burden of establishing the elements of a spoliation claim by a preponderance of the evidence."

23

*Dilworth v. Goldberg*, 3 F. Supp. 3d 198, 200 (S.D.N.Y. 2014); *accord Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 711 (S.D.N.Y. 2017), *objection overruled*, 2017 WL 3172715, at *9–11 (S.D.N.Y. July 25, 2017), *aff'd*, 795 F. App'x 34, 36–37 (2d Cir. 2019).

### a.    Defendant cannot meet the threshold requirements for sanctions.

#### 1.    *Plaintiff did not have an obligation to preserve irrelevant documents.*

"The obligation to preserve evidence applies to all *relevant* documents in existence and arises when a party 'reasonably anticipates litigation.'" *Ottoson v. SMBC Leasing and Finance, Inc.*, 268 F. Supp. 3d 570, 579 (S.D.N.Y. 2017) (emphasis added). Importantly, this does not include an obligation to preserve every possible document that anyone with any relation to the case might possess.

This is a narrow case involving only a handful of individuals. At its broadest interpretation, on the Plaintiff's side, it involved Plaintiff and a couple of members of his staff from whom ESI was preserved or from whom the additional documents have been recovered. Defendant now makes allegations that this evinces there *might* be other relevant documents that were not preserved. In discovery, Plaintiff produced roughly 1,005 documents. Defendant had the burden of establishing these elements, yet as discussed further below, has not provided any concrete examples of Plaintiff failing to preserve and produce documents relevant to this case.

Further, while Mr. Nunes previously oversaw many of the witnesses in this case as part of his staff, he resigned from office effective January 1, 2022, prior to discovery commencing in this case. Accordingly, Mr. Nunes lost the ability to supervise these individuals, to direct searches for specific terminology, or to compel any witness to produce records of any kind.

Defendants seems to conflate its displeasure with the dearth of relevant records in Plaintiff's possession with a spoliation and sanctions issue. Defendants have not pointed to a single

record that Plaintiff deleted or withheld that is relevant, non-privileged, actually existed, and is irretrievably lost. Therefore, Plaintiff complied with his duties to preserve relevant ESI from or including key players in this case. This Court should deny Defendants' motion since the ESI has not been irretrievably lost.

### 2.    *Plaintiff did not destroy any records with a culpable mind.*

When Mr. Nunes left Congress, there were no outstanding discovery or subpoenas from Defendant or anyone else relating to this action. Mr. Nunes properly instructed his staff to retain all relevant information. Greaves Ex. C at 133:21–134:14. Mr. Langer, who had been Mr. Nunes's communications director and served in both his personal office and on HPSCI, testified that Mr. Nunes repeatedly told him to preserve emails related to the lawsuit. *Id*. While Mr. Langer testified that he was not sure if Mr. Nunes had asked him to specifically preserve documents related to this particular case, it was unnecessary as there was a standing instruction for all outstanding litigation. *Id*.

While Defendant attacks Mr. Nunes for Mr. Langer's failure to produce an email with Rep. Crawford, as previously explained to this Court, this was inadvertent. Dkt. No. 116. It is not at all surprising that the email was not found before Mr. Langer left Congress and lost access to his email. The email does not mention Derkach or the package. It is an exchange with another communications staffer for another member of congress, to set up an interview about a HPSCI business meeting. On its face and in its contents, the email does not appear relevant to this lawsuit, as HPSCI regularly conducted business meetings, and Mr. Langer regularly engaged with the communications offices of other members of Congress. The only contextual hints in the email that it could be relevant to this lawsuit are a mention of "Maloney's accusations against Devin," and a link to a Breitbart story about Republicans considering ethics charges against Congressman

Maloney. Even so, it is entirely reasonable that this was not identified as relevant before any discovery was issued. Congressman Maloney is not even mentioned in the original or the first amended complaint in this case. Further, one would need to follow the Breitbart link and carefully read the article to know that it referenced anything about the alleged "package" sent to various members of congress.

As understood by Mr. Langer, at the time he conducted searches for relevant documents, this case was about the false accusation made by Rachel Maddow on March 18, 2021, that Mr. Nunes "accepted" the "Derkach package" and then refused to turn it over to the FBI. He preserved documents as best he could, consistent with his understanding of the issues relevant to that case. Therefore, the fact that Mr. Langer overlooked this particular exchange with Sara Robertson, prior to leaving Congress and losing access to his emails, was understandably inadvertent. Further, as Defendant makes clear, it did, in fact, receive this email in discovery, nonetheless.

Defendant has not identified any further specific documents that are relevant to its defenses that were not preserved. Not even after deposition of both Mr. Langer and Mr. Nunes, who testified that there was very little written communications in general, and none that they know of with regard to the Derkach package, can Defendant demonstrate a likelihood that there are relevant documents that were within the possession of personal office staff that would have been destroyed. Greaves Ex. E at 38:14-39:6, 189:2-9, 279:12-24, 283:6-284:18; Greaves Ex. C at 297:14-298:22, 303:15-21. Defendant, therefore, cannot establish a culpable state of mind.

### 3. *The alleged destroyed records are not relevant.*

While some records are likely gone, as discussed above, Defendant has received all relevant records in this case. To the extent Mr. Nunes was at all culpable for those destroyed records—and he was not—he was, at worst, negligent. This is evidenced by the fact that he took

26

steps to ensure the preservation of records by talking with his staff. When the "destruction of evidence appears to have been negligent but not willful," the moving party "must demonstrate that a reasonable trier of fact could find that the missing [evidence] would support [his] claims." *Treppel v. Biovail Corp.*, 249 F.R.D. 111 (S.D.N.Y. 2008) (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 221 (S.D.N.Y. 2003)). Here, Defendant has not done so.

In *Treppel*, the defendant made a showing that certain records were destroyed. *Id.* at 120-22. Still, the court found this insufficient for sanctions because the defendant did not show how the destroyed records were relevant. As the court discussed, the defendant's "generalized assertions" that "it is highly improbable that relevant documents regarding Treppel were not created between December 2002 and December 2003" and the failure to prevent overwriting of emails "almost certainly resulted in spoliation of significant relevant evidence," was insufficient. *Id.* at 122. Therefore, the court denied the defendant's motion for an adverse inference. *Id.* at 123.

In this case, Defendant relies on similar generalized assertions that the *Treppel* court rejected. Defendant first argues, "[w]hen Plaintiff departed Congress, however, he made no effort to retain any relevant documents." Dkt. No. 142 at 30. As discussed, there was very little written communications in general, and none that they know of with regard to the Derkach package. And Mr. Nunes testified that he did, in fact, turn the package over to the FBI. Greaves Ex. E at 50:14–51:5.

Turning to the personal office, Defendant generally argues that Mr. Nunes' personal staffers *may* have had relevant documents on their House email addresses and cell phones. Dkt. No. 142 at 30-31. Only two of the individuals identified, however, Ms. Morrow and Ms. Souza, were solely personal office staffers for Mr. Nunes's congressional office. Ms. Morrow testified that she maintained Mr. Nunes's calendars, the only relevant document to this matter other than

27

Ms. Morrow's personal knowledge. Greaves Ex. M at 71:20–24 ("Q: So the only thing that you were instructed to do was preserve Mr. Nunes's calendar when you left office -- or when he left office I should say. A. Yes. That's right."). Beyond the calendars, Ms. Morrow testified that she had no knowledge of who Andrii Derkach is and was unaware of the package. Greaves Ex. M at 128:20–23 ("Q. Do you know who Andrii Derkach is? A. No. I never heard that name until I got the subpoena."); id. at 129:12–21. Ms. Souza likewise possessed no information, nor have Defendant's suggested that she did.

The picture painted by Defendant, that Mr. Nunes destroyed relevant documents, is incorrect. Mr. Nunes's personal staff did not maintain documents beyond the calendars maintained by Ms. Morrow and the texts produced by Mr. Langer because they did not possess other relevant documents or communications. The bulk of the personal office did not even have the clearance to discuss the package issues, and the staff that did were not involved in its handling or disposition. These witnesses were identified for their access to the calendars and their ability to testify to other issues in this case, such as damages and credibility.

Defendant then points to two specific instances to purportedly show that documents and communications were not preserved: (1) an email produced by Representative Crawford's office about an interview with Breitbart, and (2) text messages between Mr. Nunes and Mr. Langer. See Dkt. No. 142 at 31–32. Defendant does not suggest, nor does Mr. Langer's testimony show, that there were any other exchanges such as the email with Representative Crawford's office. In addition, Defendants are in possession of this communication, making it an inapposite ground for a spoliation instruction, particularly as it does not even suggest that there may be additional documents that were not preserved.

The second instance outlined by Defendant fares little better. These text messages were produced. Defendant seeks to characterize these messages as indicating that there are further communications that were not produced, yet the texts themselves contain all of the information that would likely be contained in the referenced emails, which are not even relevant to the single remaining issue before this Court. The texts from Mr. Langer include references to three requests for comments from the media about receipt of the Derkach package. Each of these requests is described with sufficient detail in the texts and in Mr. Langer's testimony to provide Defendant with the relevant information and demonstrate that these messages do not bear on the single narrow issue before this Court. Therefore, Defendant cannot establish that any purportedly missing documents are relevant or that they could support their defense. And Defendant's generalized assertions to the contrary are not entitled to any weight.[3]

At this point, this case solely involves whether Mr. Nunes handed the package over to the FBI. Defendant argues they are unable to test the falsity in this statement. Dkt. No. 142 at 36. This ignores the fact that Defendant *did* test the falsity in this statement. Every single person of Mr. Nunes' team that Defendant deposed, who had knowledge of the event, all said the same thing, under oath: the Derkach Package was promptly turned over to the FBI. Greaves Ex. E at 50:14–51:5; Greaves Ex. B at 61:24-62:4; Greaves Ex. C at 303:4-14; Greaves Ex. A at 83:3-14; Greaves Ex. D at 130:20-25.

Defendant seeks to muddy the waters because discovery has made it clear that the package was indeed handed over to the FBI, and their agent, Ms. Maddow, fabricated her accusation that

---

[3] Defendant also points to Mr. Nunes's former counsel's actions in the document collection of Mr. Harvey. As Defendant admits, however, Mr. Harvey did search his devices and had no responsive records. Dkt. No. 142 at 32. Accordingly, this can hardly be a ground for sanctions.

Mr. Nunes refused to turn it over. This motion is a transparent attempt to evade responsibility for Ms. Maddow's defamatory lies about Mr. Nunes. Defendant has not established that any personal office documents were relevant to their defense such that a reasonable trier of fact could find that it would support that defense, nor has it established that Mr. Nunes had a culpable state of mind for the alleged failure to produce any documents or records before the House of Representatives destroyed them in its normal course of business. Simply put, Defendant has failed to meet its burden. Accordingly, Mr. Nunes respectfully requests this Court deny Defendant's request for sanctions.

### b.    Defendant is not entitled to its requested sanctions.

Even if Defendant could succeed in meeting each of the above elements—and it *cannot*—Defendant is not entitled to its requested sanctions. Rule 37(e) illustrates two prongs of sanctions. Under Rule 37(e)(1), "upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). *Or*, in the alternative, "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may" award the sanctions Defendant seeks here. Fed. R. Civ. P. 37(e)(2). Notably, Rule 37(e)(2) imposes a much higher burden than Rule 37(e)(1).

### 1.    Mr. Nunes did not act with intent to deprive Defendant of information.

To obtain relief under Rule 37(e)(2), Defendant must prove, by clear and convincing evidence, that Mr. Nunes acted with "intent to deprive." *Rosario v. City of New York*, No. 18-cv-4023, 2022 WL 2965953, at *3 (S.D.N.Y. Jul. 27, 2022). This is not simply intent to destroy the ESI; it must be intent to actually deprive another party of evidence. *Id*. (quoting *Leidig v. Buzzfeed, Inc.*, No. 16-cv-542, 2017 WL 6512353, at *11 (S.D.N.Y. Dec. 19, 2017)). "[I]f there is no

30

evidence of selective deletion, or if the evidence is capable of more than one interpretation, that would not support a finding of 'intent to deprive.'" *Id*. (citing *Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15-cv-9363, 2018 WL 1512055, at *16 (S.D.N.Y. Mar. 12, 2018)). "[T]he failure to take reasonable steps to preserve ESI, without more, is insufficient to warrant sanctions under Rule 37(e)(2)." *Popat v. Levy*, No. 15-cv-1052, 2022 WL 4562095, at *6 (W.D.N.Y. Sept. 29, 2022). The requirement is "is both stringent and specific." *Id*.

In *Rosario*, the court found there was no intent to deprive the defendant of text messages because the plaintiff regularly deleted his text messages, and not all the text messages would even be relevant. *Rosario*, 2022 WL 2965953, at *3. The plaintiff did not selectively delete messages, he merely deleted them all. *Id*. Based on this evidence, the defendant could not meet the 'clear and convincing' threshold. *Id*.

Here, Mr. Nunes brought this case on August 3, 2021. He then left Congress on January 1, 2022. And Defendant first served discovery on January 5, 2023, after Mr. Nunes had already left Congress. As discussed above, Mr. Nunes did preserve and produce his own personal *relevant* documents. Defendant's speculation to the contrary is not entitled any deference. And as Mr. Langer and Ms. Morrow testified, Mr. Nunes ordered his staff to preserve relevant information. Greaves Ex. C at 133:21–134:14; Graves Ex. M at 71:20–24. For the sake of argument, even assuming Mr. Nunes was negligent in doing so, it certainly does not show an intent to deprive Defendant of evidence. *See Int'l Bus. Machines Corp. v. Naganayagam*, No. 15-cv-7991, 2017 WL 5633165, at *6 (S.D.N.Y. Nov. 21, 2017) (failure to place a litigation hold on emails alleges negligence, rather than intentionality). Any documents that are missing in discovery is a result of Mr. Nunes and his staff leaving Congress, not any "selective deletion." In fact, Mr. Nunes attempted to preserve relevant documents through his instruction to his staff. Thus, no matter how

Defendant attempts to twist the facts, given this other interpretation, Defendant cannot meet its burden. *See Rosario*, 2022 WL 2965953, at *3.

Defendant argues that an oral litigation hold is insufficient and grounds for a spoliation instruction, yet the cases they rely upon belay this notion. In *Borum*, the D.D.C. determined that while an oral litigation hold may not be sufficient, it is not a dispositive issue for issuing the severe sanctions requested by Defendants. *Borum,* 332 F.R.D. at 46 (citing *GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 357 (S.D.N.Y. 2012)). Indeed, relying upon out-of-district precedent, the D.D.C. found that an oral litigation hold is insufficient in a case involving complex litigation, but the court declined to impose anything more than monetary sanctions. *Id.* at 49–50. Here, the litigation is narrow and focused. It was not necessary to issue a litigation hold to the entirety of Plaintiff's staff because the vast majority of them had no relevant information about the specifics of this case and, therefore, had no evidence that must have been preserved in accordance with Plaintiff's duties. Moreover, in this case, Defendant has not shown the same prejudice that was shown in *Borum.*

Defendant also argues sufficient intent may be found in Mr. Nunes's alleged "conscious disregard" for his discovery obligations. In support, Defendant cites four cases. Dkt. No. 142 at 36–37. First, in *Beck v. Test Masters Educ. Servs., Inc*., this case was based on D.C. law, and prior to the 2015 amendment to Rule 37. 289 F.R.D. 374, 378 (D.D.C. 2013). There, the court found severe sanctions under a "preponderance of the evidence" standard. *Id.* This is clearly contrary to the law of this Circuit, which interprets Rule 37(e)(2) to require *clear and convincing* evidence.

Second, in *Ottoson v. SMBC Leasing & Fin., Inc.*, the court awarded severe sanctions because the plaintiff did not take *any* steps to preserve documents. 268 F. Supp. 3d 570, 582–83 (S.D.N.Y. 2017). The plaintiff "deleted emails during times when she had a duty to preserve them,

and that she could not recall making any attempt to preserve emails that she sent to or received." *Id.* Here, the evidence illustrates Mr. Nunes did not consciously delete any evidence, and he told his staff to preserve relevant information.

Third, Defendant cites *Hice v. Lemon*, where the court found the plaintiff's conduct "egregious, but declined to dismiss the case as the defendant requested. No. 19-cv-4666 (JMA)(SIL), 2021 WL 6053812, at *7 (E.D.N.Y. Nov. 17, 2021). The conduct was egregious because the plaintiff consciously deleted relevant messages under the guise of not wanting to be reminded of the mockery, but some of the deleted messages appearing elsewhere showed that the plaintiff was actually trying to hide favorable evidence. *Id.* at *6. Again, here, Mr. Nunes did not actively delete anything, or try to hide anything. He left Congress, after telling his staff to retain relevant information, and some records, which weren't even relevant, were lost in the normal course of congressional operations.

Fourth, in *StoneX Grp., Inc. v. Shipman*, the court emphasized the need to find an "affirmative act" demonstrating bad faith. No. 1:23-cv-00613, 2024 WL 1509346, at *11 (S.D.N.Y. Feb. 5, 2024). As discussed, Defendant can point to no such affirmative act.

Finally, Defendant attempts to paint Mr. Nunes as a sophisticated litigant who should have known better by citing to *Freeman v. Giuliani*. There, however, Mr. Giuliani admitted he knew the rules of preservation, and was a practicing attorney for over fifty years. 691 F. Supp. 3d 32, 61 (D.D.C. 2023). To the contrary, Mr. Nunes is not an attorney. Plaintiff is not even in the same universe as Mr. Giuliani when it comes to litigation experience. Moreover, the 2015 advisory committee notes to Federal Rule of Civil Procedure 37 indicates that courts "should be sensitive to [a] party's sophistication with regard to litigation in evaluating preservation efforts; some litigants, *particularly individual litigants,* may be less familiar with preservation obligations than

others who have considerable experience in litigation." *See* Fed. R. Civ. P. 37 (advisory committee note to the 2015 amendment) (emphasis added). That Mr. Nunes has been involved in other cases does not change anything or establish the required intent.[4]

The burden was on Defendant to show, with clear and convincing evidence, that Mr. Nunes acted intentionally to deprive Defendant of evidence. Defendant has not even come close to that burden. Accordingly, Defendant is not entitled to its requested sanctions.

### 2.    *Defendant is not entitled to any other sanctions.*

Again, Defendant did not meet the threshold requirements for Rule 37(e) and, therefore, this Rule does not apply. "[E]ven assuming Defendant[] could establish that relevant evidence was actually lost (which they cannot), the Court would next have to 'find[] prejudice to [Defendant] from loss of the information' before it could 'order measures no greater than necessary to cure the prejudice.'" *Rosario*, 2022 WL 2965953 at *2 (citing Fed. R. Civ. P 37(e)). Even if deleted materials were relevant, this alone does not establish prejudice. *Id*. (quoting *Pugh-Ozua v. Springhill Suites*, No. 18-cv-1755, 2020 WL 6562376, at *4 (S.D.N.Y. Nov. 9, 2020)). "Rather there must be some evidence—beyond pure speculation—that the lost materials would be helpful to Defendants' case." *Id*. (citing *Simon v. City of New York*, No. 14-cv-8391, 2017 WL 57860, at *7 (S.D.N.Y. Jan. 5, 2017)).

In *Rosario*, the court found there to be no prejudice because the defendant's obtained the messages at issue elsewhere, and they "are at best tangentially relevant to the issues to be tried."

---

[4] As to the supposed deletion of HPSCI emails that Defendant references, Dkt. No. 142 at 37–38, Defendant has not established that Mr. Nunes had an obligation to request that HPSCI maintain documents relating to the handling of the Derkach package. Defendant certainly does not have evidence that Mr. Nunes directed HPSCI to delete the emails.

*Id.* The court found that any additional sanction beyond a limited impeachment "would put Defendants in a better position than they would otherwise have been, even though they have not lost access to any evidence." *Id.*

The same would apply in this case. Defendant asserts it was prejudiced because it does not have enough documents to test whether Mr. Nunes gave the package to the FBI. Dkt. No. 142 at 33. Defendant, however, admits it received some of the evidence at issue, mainly the Rep. Crawford email and there is no indication as to what other documents would even exist. Mr. Nunes and four others testified independently of one another and under oath that Mr. Nunes' office promptly turned the package over to the FBI which was done by physically handing it to an FBI agent. Greaves Ex. B at 61:24–62:4; Greaves Ex. C 303:4–14; Greaves Ex. A 83:3–14; Greaves Ex. D at 130:20–25; Greaves Ex. E at 50:14–21. And as thoroughly briefed now, any documents that were deleted were simply not relevant. Accordingly, Defendant has not been prejudiced because it has obtained the information it seeks elsewhere, and it does not point to spoliation of any relevant documents beyond pure speculation. Therefore, because Defendant has not been prejudiced, it is not entitled to any relief.

### 3.    *Defendant is not entitled to costs or fees.*

Defendant claims it has expended monies to bring this motion, which is, of course, true. This motion, however, should not have been brought, or, at the very least, should have been drastically shorter and simpler, given that much of the ESI complained of is within Defendant's possession as of the time it drafted and submitted this brief. And, as discussed, Defendant's motion is utterly devoid of merit.

As for Defendant's other referenced filings, they include (1) a June 2, 2023, letter motion for a conference, which, as Dkt. No. 77 indicates, was resolved upon cooperation between the

parties; (2) a January 16, 2024, joint status report, which the Court itself ordered; and (3) a February 13, 2024, letter, which was again ordered by the Court. Defendant should not be entitled to fees for one filing that was resolved by the Parties, and two others that the Court itself ordered.

Accordingly, Defendant is not entitled to any fees. This Court should reject Defendant's attempts to create a discovery dispute where none exists.[5]

## CONCLUSION

Defendant cannot avoid responsibility for Ms. Maddow's false statement about Mr. Nunes. A reasonable juror could conclude, based on the clear and convincing evidence that Ms. Maddow mischaracterized and misconstrued her purported sources—none of which support the allegation that Mr. Nunes refused to turn over material to the FBI—and her documented ill will toward Mr. Nunes, that her statement was a reckless fabrication at best, and a deliberate smear at worst. The veracity and the credibility of Defendant's self-serving protestations of good faith are disputed issues of fact that must be decided by a jury. Wherefore, this Court should deny Defendant's motion for summary judgment, as well as its meritless motion for discovery sanctions.

Dated: January 13, 2025

Respectfully submitted,

/s/        *Jason Greaves*
Jason Greaves, *pro hac vice*
Jesse R. Binnall*, pro hac vice*

---

[5] As the saying goes, "those who live in glass houses shouldn't throw stones." Mr. Nunes was required to bring his own letter motion for a conference on October 16, 2024, because of Defendant's own shortcomings in discovery. *See* Dkt. No. 129. This letter was the result of Defendant informing undersigned counsel that it had searched Ms. Maddow's personal cell phone, despite Ms. Maddow later testifying that her personal cell phone was *never* searched. *Id*. This Court then reopened discovery for purposes of examining Ms. Maddow's personal cell phone. *See* Dkt. No. 37.

Shawn Flynn, *pro hac vice*
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
jason@binnall.com
jesse@binnall.com
shawn@binnall.com

*Attorneys for Plaintiff Devin G. Nunes*

**CERTIFICATE OF SERVICE**

I certify that on January 13, 2025, a copy of the foregoing was filed with the Clerk of the

Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

Respectfully submitted,

*/s/        Jason Greaves*
Jason Greaves, *pro hac vice*

*Attorney for Plaintiff Devin G. Nunes*