Greaves Declaration
Exhibit E

Devin G. Nunes    Attorneys Eyes Only
February 08, 2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------
DEVIN G. NUNES,

                          PLAINTIFF,

        -against-         Case No.:
                          22-cv-1633
                            (PKC)
NBCUNIVERSAL MEDIA, LLC,

                          DEFENDANT.
----------------------------------------
            DATE:  February 8, 2024

            TIME:  9:35 a.m.



    - CONFIDENTIAL ATTORNEYS' EYES ONLY -



     VIDEOTAPED DEPOSITION of DEVIN G.

NUNES, taken by counsel for the Defendant,

pursuant to the Federal Rules of Civil

Procedure, held at the offices of Davis

Wright Tremaine LLP, 1251 Avenue of the

Americas, New York, New York 10020, before

Roberta Caiola, a Shorthand Reporter and

Notary Public of the State of New York.

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

```
  1                   Devin G. Nunes

  2        A.    I didn't know who Derkach was

  3    then.  I still don't know who it is now.

  4        Q.    So is the answer no?

  5        A.    Yes, sorry.  That's what I

  6    meant, no.

  7        Q.    Okay.  Had you received any

  8    other communications from Mr. Derkach

  9    before December 11, 2019?

 10        A.    Like I said -- well, I'll just

 11    answer no.

 12        Q.    Okay.  That moves us along, I

 13    appreciate that.

 14              Did you receive any packages or

 15    communications from Mr. Derkach after

 16    December 11, 2019?

 17        A.    Not that I'm aware of.

 18        Q.    So this is the only

 19    communication you ever received from

 20    Mr. Derkach, to your knowledge; is that

 21    right?

 22        A.    As far as I know, that's

 23    correct.

 24        Q.    And when you were asked to

 25    produce documents in this litigation, did
```

Devin G. Nunes   Attorneys Eyes Only
February 08, 2024

1                    Devin G. Nunes

2      you review your phone to see whether you

3      had any communications from Mr. Derkach or

4      one of his proxies?

5           A.    I mean, yes, I did.  There were

6      none.

7           Q.    Just to clarify.  You were

8      never contacted by Mr. Derkach after you

9      received the package on December 11th; is

10     that right?

11          A.    That's correct.

12          Q.    Now your letter also says to

13     Mr. Barr that "I request a meeting with you

14     to discuss these concerns."

15               Do you see that?

16          A.    Yes.

17          Q.    Did you receive a response from

18     Mr. Barr concerning the letter?

19          A.    As I recall, the -- we ended up

20     having a meeting sometime after -- after

21     this.  I can't remember if it was --

22     probably within 60 days with

23     representatives from the FBI.

24          Q.    And did someone from Mr. Barr's

25     office contact you to coordinate that

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

```
1                 Devin G. Nunes

2        Q.    Yes.  Would you be aware if

3   there was any documentation at HPSCI

4   concerning the receipt and transmittal of a

5   package to the FBI?

6        A.    Actually, I wouldn't be aware

7   that there would be any documentation at

8   HPSCI because I don't know how that -- but

9   there would be -- but there would for sure

10  be documentation of the FBI meeting with

11  us, plus I think we provided that on my

12  schedule so you know that that meeting

13  occurred.

14       Q.    Do you know whether there's any

15  evidence to substantiate that the Derkach

16  package was actually delivered to the FBI

17  on December 11, 2019?

18       A.    Well, sure there's evidence.

19       Q.    What?

20       A.    Because it was handed off to

21  the FBI.

22       Q.    But what is the evidence that

23  substantiates that?

24       A.    The evidence is that I sent a

25  letter requesting a meeting in regards to
```

Devin G. Nunes   Attorneys Eyes Only
February 08, 2024

1                    Devin G. Nunes

2    the package.  The evidence of, you know, my

3    testimony, I think numerous other people's

4    testimony that it was turned over to the

5    FBI.  I don't know what more you need.

6        Q.    We don't have anybody else's

7    testimony that it was turned over to the

8    FBI.

9        A.    Okay.

10       Q.    So that's why I'm asking you.

11       A.    Okay.

12       Q.    You're the last man standing on

13   this point.

14       A.    Okay.  I don't think that's

15   ever been in question, but...

16       Q.    Okay.

17       A.    I mean, I think that there's --

18   so what is it?  The staff cannot -- the

19   staff that handed off the package to the

20   FBI?

21       Q.    We haven't deposed -- in

22   fairness, we haven't deposed Mr. Ciarlante

23   yet and he seems to be the critical player.

24   There have been objections from the counsel

25   for the Committee and the counsel has not

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

1                    Devin G. Nunes

2    the time for the FBI.

3         Q.    So you have no recollection of

4    who from the FBI was at the meeting?

5         A.    No.

6         Q.    Did you discuss the meeting --

7    the fact that the meeting was going to

8    occur with anyone before it occurred?

9         A.    Look, it's been a -- it's been

10   a long time ago, but I am sure that at some

11   point I discussed with -- with the members

12   on my Committee and probably other

13   Republicans that, you know, that this was

14   being handled, this, you know,

15   disinformation operation was being handled

16   appropriately.  So I'm sure I told them

17   that we, you know, got it to the FBI and

18   that we were following up on it.

19        Q.    You have produced your calendar

20   for the year 2020 to us, and I can show you

21   what appears to be a reference, there could

22   be a reference, to a meeting with the FBI.

23              This has been previously marked

24   as Exhibit 7 at Ms. Morrow's deposition.

25              Mr. Nunes, this has been

Devin G. Nunes    Attorneys Eyes Only
February 08, 2024

1                    Devin G. Nunes

2     represented to be your calendar for the

3     year 2020.  Does that appear to be correct?

4          A.    I have no reason to believe

5     it's not.

6          Q.    If you direct your attention to

7     the page that is marked on the bottom PX

8     804, it's the third page in the document.

9     There is an entry on January 10th at

10    9:00 a.m. that says:  "Meeting/HPSCI:  FBI

11    WHO (AS/DH/GP) -- ofc."

12                Do you see that?

13         A.    Um-hum.

14         Q.    Is that the meeting you're

15    referring to with regard to the FBI in

16    early January in your complaint?

17         A.    I'm assuming that's -- that

18    would be a good assumption, but I can't

19    tell you for sure.

20         Q.    And --

21         A.    But --

22         Q.    I'm sorry.

23         A.    No, that's -- I just don't know

24    if that's the actual event.  It appears to

25    be like it, but I don't know.

Devin G. Nunes   Attorneys Eyes Only
February 08, 2024

```
 1                 Devin G. Nunes

 2        Q.    And do you have any reason to

 3   believe that there was a different or

 4   another meeting with the FBI concerning the

 5   Derkach package that was received on

 6   December 11, 2019?

 7        A.    It's possible, but I don't -- I

 8   don't think so.

 9        Q.    It appears that this meeting

10   occurred in your congressional office, is

11   that correct?

12        A.    Well, I remember that meeting

13   being in my -- in my office.

14        Q.    In your congressional office?

15        A.    Yes.

16        Q.    That's what Ms. Souza

17   testified.  She wasn't at the meeting I

18   think, but she testified that OFC meant it

19   was in your office?

20        A.    Oh, okay.

21        Q.    Is that correct, to your

22   knowledge?

23        A.    Well, it's not -- that would be

24   correct, but also I remember the meeting

25   being in my office.
```

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

```
 1                    Devin G. Nunes

 2          Q.    Okay.

 3          A.    Because sometimes you would

 4    take meetings, you know, it could be in

 5    your office, it could be -- but sometimes

 6    it could say office, so you might -- it

 7    might be off the floor, but I remember that

 8    specific meeting being in my office.

 9          Q.    If the meeting was going to

10    concern classified information, would it be

11    held in your office?

12          A.    No.  Well, to -- I'm not going

13    to get into that, yeah, because I don't

14    want to.

15          Q.    Well --

16          A.    You can go up to -- and Todd

17    can stop me if I'm saying anything that's

18    inappropriate -- but you can go up to

19    certain levels depending on the topic,

20    which sometimes it's easier to do those,

21    that's why you would do meetings on the

22    outside.

23          Q.    If you wanted to have a meeting

24    that was discussing classified information

25    at a certain level, you would have it in a
```

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

1                   Devin G. Nunes

2    SCIF?

3         A.    Correct.

4         Q.    Did you have an understanding

5    as to whether the Derkach package was

6    considered to be classified?

7         A.    I wouldn't, I don't know.

8         Q.    So you can't say one way or the

9    other?

10        A.    No.  Well, it wouldn't be

11   class -- I mean -- I don't know what -- I

12   don't know if there's an investigation

13   going, I don't know if they dropped it, I

14   don't know, you know, I have no idea.

15   There could be -- it could be classified if

16   there's some investigation going, or maybe

17   there's not, maybe they didn't do anything

18   about it.  I don't know, I never heard.

19        Q.    But you didn't understand that

20   the fact that you received the Derkach

21   package was classified information?

22        A.    Well, it was publicly

23   transmitted out there, so I think --

24   whether or not the package ever arrived is,

25   you know, I mean that was out there before

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

```
 1                  Devin G. Nunes

 2   it arrived.  And then it arrived, but like

 3   all other packages, it would have been sent

 4   to the appropriate authorities.

 5        Q.    And wouldn't you want to know

 6   whether it was classified or the level of

 7   classification, if it was classified,

 8   before you held a meeting in your office?

 9        A.    No.  Well, I don't want to --

10   we can go on and on talking.  I have to put

11   my old hat on here if you want to go --

12   really get into that.

13        Q.    I'm trying to understand --

14             MR. GREAVES:  I'm going to

15          object to the relevance, but go ahead

16          and ask your question.

17             MS. McNAMARA:  It goes to kind

18          of what could be testified to and

19          what can't be, that's why we're

20          trying to nail it down.

21        A.    Well, something would not be

22   classified if -- it's packages that are

23   being sent from wherever they're being sent

24   from, would not be classified.

25        Q.    Do you know who the initial --
```

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

1                    Devin G. Nunes

2    I'm sorry?

3         A.    Because I don't know if this

4    guy is Russian or Ukrainian, I don't even

5    know.  He doesn't get the ability to decide

6    if something's classified or not under the

7    U.S. standards.

8         Q.    And do you know who the

9    initials AS stands for?

10        A.    Maybe it's Alan Souza.  That's

11   the only AS I can think of.

12        Q.    Who's Alan Souza?

13        A.    He was -- no, it can't be Alan

14   Souza because he wasn't working for me at

15   that time.

16        Q.    He became married to

17   Ms. Morrow; is that right?

18        A.    No, to Jillian.

19        Q.    To Jillian Plank?

20        A.    Yeah, but he wasn't working for

21   me at that time.  So I don't know who it

22   would be.  And just because initials are on

23   there doesn't mean he would be in the

24   meeting.

25        Q.    Why would that be?

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

```
 1                Devin G. Nunes

 2        A.    Because you might -- well, a

 3    number of reasons, but it could have been

 4    just somebody who's coordinating, you know,

 5    like who's making sure that they're there

 6    to know that, you know, give people coffee

 7    or whatever.

 8        Q.    Who creates this calendar for

 9    you at that time?

10        A.    There was a process in place,

11    everything would get fed into Jennifer, but

12    it could just be -- like typically for

13    intelligence stuff, because not a lot of

14    intelligence stuff would be on the

15    calendar, just the basics.

16            So I think that -- I think the

17    way we handled it was Mr. -- whoever the

18    staff director was would, if there was

19    something they needed to be on or a time

20    slot, they would have a phone call.  I

21    don't know if it was once a week or a

22    couple of times a week.

23        Q.    So someone must have told

24    whoever was creating this calendar, you

25    know, when the meeting was going to occur
```

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

1                    Devin G. Nunes

2    and presumably who was attending; is that

3    fair to say?

4         A.    I mean the -- the person in

5    attendance that matters is me.  I don't --

6    I just don't know.  I'm not trying to be

7    offensive or not answer your question, I

8    don't remember other -- it seems to me like

9    Mr. Pappas was in the meeting.

10        Q.    Anybody else?  You believe

11   Mr. Pappas.  Do you know who DH was?

12        A.    I think it's Derek Harvey.

13        Q.    Okay.  And what about GP?

14        A.    Well, GP is George Pappas.

15        Q.    Okay.  Then AS we just don't

16   know?

17        A.    Right.

18        Q.    I see.

19        A.    Well, I think that's Alan

20   Souza.  I'm trying to think, I don't know.

21   What's the date on this?

22        Q.    It's January 10, 2020.

23        A.    No, she was gone already, so I

24   don't know who that would be.

25        Q.    And --

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

```
 1                    Devin G. Nunes

 2        A.    Did you get -- did Jennifer

 3    Morrow tell you who it was?

 4        Q.    I don't believe so.

 5        A.    Okay.

 6              MS. McNAMARA:  Did she?

 7              MR. CHASE:  I believe Ms. Plank

 8         testified that it was her husband,

 9         Alan Souza.

10              THE WITNESS:  Okay.  The

11         initials.

12              MR. CHASE:  The initials,

13         correct.

14              THE WITNESS:  Yeah.

15        Q.    So again I'm confused about if

16    this meeting is set up and you're going to

17    discuss the Derkach package, it's set up in

18    your office, but you have no knowledge

19    about what the contents of the package was

20    or what you were going to be discussing?

21        A.    I was -- I think I was -- we

22    can -- I would be glad to go into it again.

23              We didn't care what was in the

24    package or not in the package because it

25    was a -- it was a disinformation operation
```

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

1              Devin G. Nunes

2      A.    I wouldn't know if it's a

3   Russian operative, and I wouldn't engage

4   with them with anything with Russia.

5      Q.    You understood or people

6   working for you understood the package was

7   suspicious and that's why it was turned

8   over to the FBI; is that right?

9      A.    It was turned over to the FBI.

10  Well, first of all, all packages would get

11  turned over to the FBI, but this one in

12  particular was of interest for reasons I've

13  already told you, because it was a smear

14  operation.

15     Q.    First of all, are you telling

16  me on the record here that all packages

17  received by HPSCI are automatically turned

18  over to the FBI?

19     A.    Well, I'm not going to get

20  into -- all packages go through a

21  procedure.

22     Q.    But do all packages get turned

23  over to the FBI?

24     A.    No.

25     Q.    So again, going back to why was

Devin G. Nunes   Attorneys Eyes Only
February 08, 2024

1                    Devin G. Nunes

2         Q.    You don't know?

3         A.    I have no idea.  I don't know

4    what that meeting is referring to.

5         Q.    Well, you only alleged in your

6    complaint, your claim, that we're here

7    today concerning, concerned a package that

8    you received on December 11, 2019, and a

9    meeting that occurred in early January of

10   2020.

11             This 302 doesn't reflect either

12   fact; do you agree with me?

13             MR. GREAVES:  Objection to

14        form.

15        A.    No.

16        Q.    You can answer the question.

17        A.    No, I don't agree with you.

18        Q.    Where in this document does it

19   reflect that you received a package on

20   December 11, 2019?

21        A.    Well, I don't know that that's

22   what this document's about.

23             What this document is about is

24   about we are trying to work with the FBI,

25   and I think you have proof of that here, to

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

```
 1                    Devin G. Nunes

 2     hand over anything and everything that we

 3     have as it relates to Derkach.

 4          Q.    If you continue down,

 5     Mr. Nunes, in the last paragraph of this

 6     email that begins with:  "The records were

 7     included in a DHL shipment envelope and

 8     internal envelope, and were opened,

 9     inspected, and resealed by the House mail

10     clearing service."

11               Do you see that?

12          A.    Um-hum.

13          Q.    That conflicts with your

14     complaint and your testimony today that any

15     package received from Mr. Derkach was not

16     opened, does it not?

17          A.    No.

18          Q.    It doesn't conflict with that?

19          A.    No.  I don't know what this --

20     I don't know what packages they're

21     referring to.

22          Q.    So this would not be the --

23     because you've indicated that the package

24     received on December 11th wasn't opened and

25     was turned over to the FBI on that day.
```

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

```
 1                  Devin G. Nunes

 2        Q.    How did you generally

 3   communicate with Mr. Langer during this

 4   time?

 5        A.    If it involved intelligence,

 6   most of the time just via phone.

 7        Q.    Most of the time by phone, but

 8   he would also text you?

 9        A.    Not very often, but...

10        Q.    Obviously like this is an

11   example where he did text you; isn't that

12   right?

13        A.    But I think this was when --

14   when was this sent?

15        Q.    Well, based upon the

16   contextual, I think Mr. Langer's testimony

17   it was early January sometime or in

18   January.  It was after January 14th, if you

19   look at the content.

20             MR. GREAVES:  Is there a time

21        stamp on the original production?

22             MS. McNAMARA:  No.  It was a

23        little disorganized on how it was

24        produced, I apologize, I wish it was

25        more.
```

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

```
1                    Devin G. Nunes

2    sure, reached out to see if he could -- if

3    he could get his -- I think we provided

4    this to you guys in the discovery

5    questions -- to try to get his emails,

6    because he had left for a while, I forget

7    where he went, but he had left and he came

8    back.

9         Q.    And so his emails were

10   destroyed?

11        A.    Yeah.

12        Q.    But that was reaching out well

13   into this litigation, you were more after

14   this litigation started.  I'm focused on

15   what, if any, communications you had with

16   Mr. Ciarlante commensurate with the claim

17   and filing of this litigation instructing

18   Mr. Ciarlante to retain all records related

19   to the issues before this action.

20        A.    I don't think we would have had

21   anything with Ciarlante.  He was not a, you

22   know, not involved, you know, directly in

23   this.  I mean later he became, but not at

24   the time.

25        Q.    He was involved in the sense
```

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

```
 1                 Devin G. Nunes
 2   but there's nothing in there that would be,
 3   you know, that are all hard, you know, what
 4   do you call it, you know, they're like
 5   reams of binders of papers, documents.
 6        Q.    The communications that you say
 7   that you had with Mr. Langer or
 8   Mr. Ciarlante, did you document those
 9   communications in any way?  And these are
10   communications about retention of
11   documents.
12        A.    I don't know how I would even
13   document them.
14        Q.    Well, you could, you know, put
15   them in a text message, put them in an
16   email, put them down on a piece of paper.
17        A.    Yeah, well I wouldn't be
18   putting them likely in a text message, but
19   it was -- like I said, it was clearly
20   always to keep all communications, and I
21   think they did a nice job of it, very
22   complete.
23        Q.    So it seems that you didn't
24   maintain your text messages, because we
25   haven't received any text messages from
```

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

```
 1                Devin G. Nunes

 2    you.

 3        A.    Because there's none that are

 4    relevant.

 5        Q.    Well, you said that you

 6    searched for text messages; isn't that

 7    right?

 8        A.    That's correct.

 9        Q.    How did you search for them?

10        A.    Through the -- through the

11    cloud, however you do that.

12        Q.    Did you have search terms?

13        A.    The lawyers -- the lawyers did

14    it, so I don't know how they -- how they

15    did that.

16        Q.    And by the lawyers, are you

17    talking about Mr. Biss?

18        A.    Yes.

19        Q.    He was kind of a one-man shop,

20    there aren't multiple; is that right?

21        A.    Yes.  Well, now I guess you

22    guys haven't searched now, well.

23        Q.    When you did that search, you

24    did that when you were asked for

25    documents -- strike that.
```

Devin G. Nunes  Attorneys Eyes Only
February 08, 2024

```
 1              Devin G. Nunes

 2          C E R T I F I C A T E

 3

 4   STATE OF NEW YORK  )

 5        : ss

 6   COUNTY OF BRONX    )

 7

 8         I, ROBERTA CAIOLA, a Certified

 9   Shorthand Reporter, do hereby certify:

10         That DEVIN G. NUNES, the witness

11   whose deposition is hereinbefore set forth,

12   was duly sworn by me and that such

13   deposition is a true record of the

14   testimony given by the witness.

15         I further certify that I am not

16   related to any of the parties to this

17   action by blood or marriage, and that I am

18   in no way interested in the outcome of this

19   matter.

20         IN WITNESS WHEREOF, I have hereunto

21   set my hand on February 19, 2024

22

23         _Roberta Caiola_

24              ROBERTA CAIOLA

25
```