**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------- x

DEVIN G. NUNES,                                       :
                                                      :
                        Plaintiff,                    :
                                                      :        Case No.: 22-cv-1633-PKC-SN
            - against -                               :
                                                      :        **ORAL ARGUMENT REQUESTED**
NBCUNIVERSAL MEDIA, LLC,                              :
                                                      :
                        Defendant.                    :
                                                      :
----------------------------------------------------------- x

<u>**PLAINTIFF'S RULE 56.1 STATEMENT OF MATERIAL FACTS IN DISPUTE**</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules for the United States District Court for the Southern District of New York, Defendant NBCUniversal Media, LLC ("NBCU") filed this statement of material facts to which it contends there does not exist a genuine issue to be tried in support of their Motion for Summary Judgment.[1]

Plaintiff Devin Nunes responds accordingly, along with the Declaration of Jason C. Greaves, filed concurrently with this memorandum, and the exhibits annexed thereto:

### THE PARTIES

1.      Defendant NBCU owns and operates MSNBC.  McNamara Decl. Ex. 2 ("Maddow Decl.") ¶ 3; *Id.* Ex. 3 ("Gnazzo Decl.") ¶ 3.

**Response 1**. No dispute.

2.      *The Rachel Maddow Show* ("*TRMS*") is a news and commentary television program hosted by Rachel Maddow, that in 2021, aired weekdays at 9:00 pm on MSNBC.  McNamara Decl.

---

[1] As in NBCU's filing, references to the Second Amended Complaint in this action will be to the "SAC" (Dkt. 40) and references to the declarations of counsel and the exhibits attached thereto for either party will be denoted by reference to the counsel's surname i.e. Declaration of Elizabeth A. McNamara ("McNamara Decl.") and any specific exhibits.

Ex. 4 ("Maddow Tr.") 44:9–17, 49:15–17, 50:4–5; *Id.* Ex. 5 ("Gnazzo Tr.") 15:9–14; Maddow

Decl. ¶ 2; Gnazzo Decl. ¶ 6.

 **Response 2**. No dispute.

 3. Rachel Maddow is the host of *TRMS*.  Maddow Tr. 49:15–17; Gnazzo Tr. 17:2–6;

Maddow Decl. ¶ 2; Gnazzo Decl. ¶ 7.

 **Response 3**. No dispute.

 4. Cory Gnazzo was the Executive Producer of *TRMS* on March 18, 2021.  Gnazzo

Tr. 20:18–22; Gnazzo Decl. ¶ 5.  As Executive Producer of *TRMS*, Gnazzo was a member of senior

management at MSNBC.  Gnazzo Tr. 124:14–16; Gnazzo Decl. ¶ 5.

 **Response 4**. No dispute.

 5. Plaintiff Devin G. Nunes ("Plaintiff" or "Nunes") served as a Member of the U.S.

House of Representatives from January 1, 2003 to January 1, 2022.  SAC ¶ 1; McNamara Decl.

Ex. 6 ("Nunes Tr.") 260:3–5.

 **Response 5**. No dispute.

 6. While in Congress, Plaintiff served on the House Permanent Select Committee on

Intelligence ("HPSCI"), which is charged with oversight of the United States Intelligence

Community and its agencies.  Nunes Tr. 289:3–6; McNamara Decl. Ex. 7; Id. Ex. 8 at 29:19–21.

 **Response 6**. No dispute.

 7. Plaintiff served as the Chairman of HPSCI from January 2015 until January 2019,

when Democrats gained the majority in the U.S. House of Representatives.  Nunes Tr. 290:11–15;

McNamara Decl. Ex. 9 at 29:14–30:15, 239:13–14.

 **Response 7**. No dispute.

8.      Starting in January 2019, Plaintiff served as the Ranking Member of HPSCI until he left Congress in 2022.  McNamara Decl. Ex. 8 at 31:25–32:4; Id. Ex. 9 at 29:14–30:15.

**Response 8**. No dispute.

9.      Including this action, Plaintiff has filed at least ten separate defamation lawsuits.[2]

**Response 9**. Mr. Nunes disputes this statement to the extent it includes *Nunes v. Meredith*, 21-cv-78-JLT-BAM (E.D. Ca.). Defamation was not a listed cause of action in that case.

### THIS ACTION

10.      This defamation action challenges certain statements from a segment of the March 18, 2021 episode of *TRMS* (the "*TRMS* Segment").  SAC ¶ 13; McNamara Decl. Ex. 1.

**Response 10**. No dispute.

11.      The challenged statements pertain to a package of materials that was reportedly sent to and received by HPSCI in December 2019 from Andrii Derkach that was addressed to Plaintiff (the "Derkach Package").  SAC ¶ 13; McNamara Decl. Ex. 1; *Id.* Ex. 10.

**Response 11**. No dispute.

12.      U.S. government agencies have described Derkach as a Russian agent and linked him to Russian efforts to influence the 2020 U.S. Presidential Election.  McNamara Decl. Ex. 11; *Id.* Ex. 12 at NBCU000110; *Id.* Ex. 13 at NBCU0001858–59.

**Response 12**. No dispute.

---

[2] *See Nunes v. Twitter, et al.*, CL19-1715 (Va. Circuit Ct., Henrico Cty.) (dismissed, 105 Va. Cir. 230 (Va. Cir. Ct. 2020)); *Nunes v. The McClatchy, et al.*, CL19-629 (Va. Cir. Ct., Albemarle Cty.); *Nunes v. Meredith*, 21-cv-78-JLT-BAM (E.D. Ca.); *Nunes v. Lizza*, 19-cv-4064-CJW-MAR (N.D. Iowa) (dismissed, 2023 WL 3079996, at *45 (N.D. Iowa Apr. 25, 2023)) (appeal pending, No. 23-2322 (8th Cir.)); *Nunes v. Cable News Network, Inc.*, 20-cv-3976-LTS-OTW (S.D.N.Y.) (dismissed, 520 F. Supp. 3d 549, 562 (S.D.N.Y. 2021), *aff'd*, 31 F.4th 135 (2d Cir. 2022)); *Nunes v. WP Company, LLC*, 20-cv-1405-LO-IDD (E.D. Va.) (transferred to D.D.C., 21-cv-506-CJN) (dismissed, 2024 WL 3504066, *9 (D.D.C. June 14, 2024)); *Nunes v. WP Company*, LLC, 20-cv-1403 (dismissed, 513 F.Supp.3d 1, 10 (D.D.C. 2020)); *Nunes v. Cable News Networks, et al.*, 22-cv-2659- SCB-AEP (M.D. Fla.) (dismissed, 2023 WL 2468646, at *6 (M.D. Fla. Mar. 1, 2023)), (appeal dismissed, No. 23-11038-D, 2023 WL 4248936 (11th Cir. May 22, 2023)); *Nunes v. Guardian News & Media, Ltd.*, 2023CA003668NC (Fla. Cir. Ct., Sarasota Cty.).

13.     The only challenged statement from the *TRMS* Segment that remains at issue in this action is the statement that Plaintiff "refused to hand [the Derkach Package] over to the FBI, which is what you should do if you get something from somebody who is sanctioned by the U.S. as a Russian agent." (the "Statement").  *See* Dkt. 57 at 21, 22; McNamara Decl. Ex. 1 at 24:32–24:40.

**Response 13**. No dispute.

14.     Maddow and Gnazzo are together ultimately responsible for the editorial content of *TRMS*.  Maddow Decl. ¶¶ 7–8; Gnazzo Decl. ¶ 7.

**Response 14**. Mr. Nunes disputes this factual assertion as it conflicts with the testimony of Mr. Gnazzo, who stated that he has final approval over the entire content of the show. *See* Declaration of Jason C. Greaves ("Greaves") Ex. G at 37:12-16. Specifically, he stated "I can say this now, I have the ultimate approval of what goes on air. It comes out of Rachel's mouth, obviously, but I have the approval, the script approval." *Id*. It also does not comport with Mr. Gnazzo and Ms. Maddow's cited affidavits, which admit Mr. Gnazzo has final approval authority over the editorial content aired on TRMS. *See* Maddow Decl. ¶ 8; Gnazzo Decl. ¶ 10. Therefore, the claim that Ms. Maddow and Mr. Gnazzo "are together ultimately responsible for the editorial content of TRMPS" is incorrect.

15.     Maddow wrote the *TRMS* Segment and the Statement.  Maddow Tr. 126:20–23; Gnazzo Tr. 37:19–20, 49:10–13, 58:22 –25; Maddow Decl. ¶ 18; Gnazzo Decl. ¶ 14.

**Response 15**. No dispute.

16.     Gnazzo oversaw the production of the *TRMS* Report and reviewed it before it aired, together with Maddow.  McNamara Decl. Ex. 14; Gnazzo Tr. 37:19–24, 48:15–18, 49:7–9, 53:11–19, 59:1–3, 61:18–62:1, 150:6–13; Maddow Decl. ¶ 20; Gnazzo Decl. ¶¶ 14, 17.

**Response 16**. No dispute.

17.    Maddow testified that when she wrote the script for the *TRMS* Segment on March 18, 2021 she had no doubts about its accuracy. Maddow Tr. 126:20–23; Maddow Decl. ¶¶ 18, 21.

**Response 17**. Mr. Nunes disputes the credibility of any testimony that Ms. Maddow had "no doubts" about the accuracy of the TRMS Statement at issue, given that none of her cited sources included any such allegation. A reasonable juror could conclude that Ms. Maddow either knew or didn't care that the Statement was unsupported by evidence, and that she wrote and made the Statement as a reckless speculation at best or a deliberate smear at worst. This is a material issue of disputed fact.

18.    Gnazzo testified that when the *TRMS* Segment aired, he had no doubts about the accuracy of the Statement.  Gnazzo Tr. 53:4–6, 131:19–132:20; Gnazzo Decl. ¶¶ 18–19.

**Response 18**. Mr. Nunes denies that this is an accurate description of Mr. Gnazzo's cited testimony.

- Greaves Ex. G at 51:14–6, Mr. Gnazzo is responding to a question that Defendants do not include in their excerpt. The question was whether he had sent the script for the show back for research as to the statement that Mr. Nunes had refused to hand over the Derkach package to the FBI, and in response, he says that he does not recall whether that happened, but says that he doesn't think he did because they were "working off several data points that made us feel very comfortable about proceeding with this."

- Gnazzo Tr. at 131:19–132:20, Mr. Gnazzo, in response to a question about what he relied upon to "verify [Politico's] sourcing was meeting your standards," he lists (1) the purportedly truthful reputation of Politico's reporting—which notably does *not* report that Mr. Nunes refused or even failed to turn the Derkach Package over to the FBI; (2) the transcript of a HPSCI business meeting—which notably does *not* include

any statement that Mr. Nunes refused or failed to turn the Derkach Package over to the FBI; (3) the fact that Mr. Nunes had not denied receiving the package and had not publicly stated that he turned it over to the FBI—which notably does *not* evidence any refusal or failure by Mr. Nunes to turn such a package over to the FBI; and (4) an intel report that indicated Derkach had purportedly sent materials to members of congress— which notably does *not* evidence any refusal or failure by Mr. Nunes to turn any package over to the FBI. *Id*. at 130:22–132:20. Mr. Gnazzo then says that these four data points "came together in making me comfortable with going forward with our report." *Id.* at 132:18–20. These are not statements that he had "no doubts" about the accuracy of the Statement, and a reasonable juror could conclude that these were justifications for being "comfortable" with publishing the Statement without fact-checking and without regard for NBC's journalistic policy against relying on anonymous, single sources from other news organizations. *See* Greaves Ex. O.

- Moreover, Mr. Nunes disputes the credibility of any testimony that Mr. Gnazzo had "no doubts" about the accuracy of the TRMS Statement at issue, given that none of their cited sources included any such allegation. A reasonable juror could conclude that Mr. Gnazzo either knew or didn't care that the Statement was unsupported by evidence, and that he approved the script as a reckless speculation at best or a deliberate smear at worst. This is a material issue of disputed fact.

19.    Maddow testified that multiple data points informed her belief that the *TRMS* Segment and its Statement were accurate when she wrote the script and when the Segment aired. Maddow Tr. 125:4–126:23, 128:23–129:15; Maddow Decl. ¶¶ 22, 23, 27, 33, 37, 40, 43.

**Response 19**. Mr. Nunes disputes that this is an accurate description of the cited testimony.

- Maddow Tr. at 125:4–126:23, Ms. Maddow is responding to a question about whether she had "any information of a direct allegation that Mr. Nunes did not turn the material at question over to the FBI?" *Id.* at 124:23–125:3. Ms. Maddow first responds by inaccurately describing the Politico article as "reporting that Mr. Nunes did not turn the information over to the FBI, and then there is his refusal to comment on that reporting when confronted with it." *Id.* at 125:6–8. Notably, Politico did *not* single out Mr. Nunes or accuse him of refusing or even failing to turn over materials to the FBI. *See* Declaration of Elizabeth A. McNamara ("McNamara") Ex. 10. First, Politico identified four Republicans, including Mr. Nunes, who were supposedly sent packages by Derkach—based on leaks from a classified letter written by Democrat lawmakers to the FBI, from two anonymous sources who read the letter, presumably members of the Democrat HPSCI staff or even the Democrat lawmakers themselves. *See id*. Then, Politico cited to another anonymous source "familiar with the matter," who claimed that "the information was not turned over to the FBI," without any indication of who or what office that source was "familiar" with, or who supposedly failed to turn over information. *Id.* Given the ambiguities of the Politico article, it is also inaccurate for Ms. Maddow to claim that Mr. Nunes "refused" to comment on an allegation that the article doesn't make. Politico simply states that "Mulvaney and Nunes declined repeated requests for comment." *Id.* Ms. Maddow continues along this same fallacy, asserting that other circumstances "would seem to bolster *that claim* from Politico's reporting." Maddow Tr. 125:11–14 (emphasis added). Once again, Ms. Maddow is referring to the supposed "claim" that Mr. Nunes "did not turn the information over to the FBI" which was *not* made in the Politico article. She cites the existence of the

Democrat letter to the FBI, which she tellingly describes as being written by "the congressional leadership," without mentioning party affiliation. *See id* at 125:14–22. Of course, that letter does not accuse Mr. Nunes of refusing or failing to turn over anything to the FBI, but Ms. Maddow makes a facially ridiculous leap to conclude that, rather than the letter evidencing partisanship, it somehow means that Mr. Nunes was withholding information from the FBI. *See id*. She cites to intel reports identifying Derkach as being a sanctioned Russian agent, which of course does not have any bearing on whether Mr. Nunes handed over the Derkach package to the FBI. *See id*. at 125:23–126:8. She cites to a shipping receipt to allege that Mr. Nunes or his office received the package, which of course has no bearing on what he did with that package. *See id.* at 126:9–13. She cites once again to Mr. Nunes's "refusal to comment" and the "age of his refusal" as being "an important data point." *Id.* at 126:16–19. Ms. Maddow, however, has unambiguously testified that she was aware of Mr. Nunes' reputation for declining to comment to media outlets like TRMS, and she even cites that reputation as justification for not seeking comment on the TRMS report *at issue*. *See* Greaves Ex. F at 98:17–99:5; Maddow Decl. ¶ 46. So, when Ms. Maddow says, at Maddow Tr. 126:20–23, that she has "no doubts as to the accuracy of this information," she is referring to the data points she just listed in support of an allegation she claims was made in the Politico article. It does not mean that she had "no doubts" about *her* accusation—different from what was in the Politico article—that Mr. Nunes had refused to turn over the Derkach package to the FBI. And even if that is what she meant to say, it is simply not credible, given the lack of any evidence that Mr. Nunes refused to hand anything over to the FBI, and it is certainly not credible for her to claim his

refusal to comment was an important, much less relevant data point, when she knew it was Mr. Nunes' practice not to speak to the media. A reasonable juror could conclude that Ms. Maddow deliberately mischaracterized Mr. Nunes' refusal to comment in a manner to discredit and attack him, and to support her deliberately or recklessly false accusation that he refused to turn over information to the FBI.

- At Maddow Tr. 128:23–129:15, Ms. Maddow is responding to a question about whether she sought comment from the FBI before making her accusation. *Id.* at 128:17–22. Once again, she points the finger at Politico, claiming falsely that she was only repeating their previous reporting, and then cites to the same data points that supposedly bolstered that reporting, as justification for why she did not seek comment from the FBI. *See id.* at 128:23–129:15.

- In her Declaration, Ms. Maddow cites to the same data points that "informed [her] confidence in the accuracy of the Statement that Mr. Nunes refused to turn over the Derkach Package to the FBI." Maddow Decl. ¶¶ 22, 23, 27, 33, 37, 40, 43. While Mr. Nunes does not dispute that Ms. Maddow has made these declarations, he disputes the veracity or the relevance of any of these data points, and he disputes Ms. Maddow's credibility in claiming that she believed in an accusation from Politico that was not actually made. A reasonable juror could conclude that Ms. Maddow is an experienced, partisan commentator, skilled at manipulating language and context, who either knew or didn't care that her Statement was unsupported by evidence, and that she deliberately or recklessly lied about Mr. Nunes to damage him as a Republican party leader. This is a disputed issue of material fact.

20.     Gnazzo testified that he relied on multiple sources to confirm that the *TRMS* Segment and its Statement was accurate.  Gnazzo Tr. 61:18–62:22, 74:1–75:1; Gnazzo Decl. ¶¶ 18–24.

**Response 20**. Mr. Nunes disputes that this is an accurate description of the cited testimony.

- At Gnazzo Tr. 61:18–62:22, Mr. Gnazzo was responding to the question, "did you have to yourself do any reading about the Derkach package to make yourself comfortable with approving [the Statement] in the script?". Gnazzo Tr. 61:18–25. In response, he says he read the Politico story, discussed above in Response 19, a blog post about the Derkach package by a TRMS employee—which also does not report that Nunes refused to hand over any materials to the FBI—the transcript of the HPSCI business meeting, discussed above in Response 18, the Democrat lawmaker letter, discussed above in Response 19, and a CNN story—which also does not report that Nunes refused to hand over any materials to the FBI. *Id.* at 62:1–22.

- At Gnazzo Tr. 74:1–75:1, Mr. Gnazzo was responding to a question about whether the single, anonymous source from the Politico article was TRMS's source for reporting that Mr. Nunes "refused to hand over the package to the FBI?" Greaves Ex. G at 73:9– 74:3. He responds by confirming it was one of his sources, and then refers to the transcript of the HPSCI business meeting, discussed above in Response 18, the CNN story—which also does not report that Nunes refused to hand over any materials to the FBI—and the intel report about Derkach being a Russian agent, discussed above in Response 18. *Id.* at 75:9–76:1.

- In Mr. Gnazzo's declaration, he cites to these sources that supposedly "informed [his] confidence in the accuracy and credibility of the Statement," none of which contain

any allegation that Mr. Nunes refused to turn over the Derkach package to the FBI. Gnazzo Decl. ¶¶18–24. While Mr. Nunes does not dispute that Mr. Gnazzo has made these declarations, it does not concede to the veracity or the relevance of any of these sources or his credibility in claiming to have relied on them in supporting the purported accuracy of the TRMS Statement at issue. Of particular note, in his Declaration, Mr. Gnazzo repeats the same falsehood as Ms. Maddow: that "Politico had previously reported in a July 23, 2020 article, that Mr. Nunes did not turn the Derkach Package over to the FBI." *Id.* at ¶ 20. That is not what Politico reported, as previously discussed in Response 19. Similarly, Mr. Gnazzo claims that he relied on Mr. Nunes purportedly not disputing "the fact, as reported by Politico, that he failed to turn the Derkach Package over to the FBI" as supposed evidence that he refused to turn the package over to the FBI. *Id.* As previously discussed in Response 19, Politico does not report that Mr. Nunes was confronted with this "fact" because it does not even report this as a "fact" in their article. This calls into question Mr. Gnazzo's credibility on his actual belief in the accuracy of the Statement because he testified unambiguously that he was aware of Mr. Nunes' reputation for not giving comment to the press. *See* Greaves Ex. G at 104:17–105:10; Gnazzo Decl. ¶ 26. Mr. Gnazzo continues to misrepresent the Politico article, claiming as evidence in support of their belief in the TRMS Statement that Mr. Nunes had not sued Politico "over its reporting that he failed to turn the Derkach Package over to the FBI." Once again, that is not what Politico reported, which is obviously why Mr. Nunes did not sue them, and it is not credible to claim this as a basis for their supposed belief in the accuracy of the TRMS Statement.

Mr. Nunes disputes the credibility of Mr. Gnazzo's claim to have relied on evidence to support the purported accuracy of the TRMS Statement, because none of his cited evidence contains such an allegation. A reasonable juror could conclude that Mr. Gnazzo either knew or didn't care the that Statement was unsupported by evidence and it was reckless speculation at best, and a deliberate smear at worst. Therefore, Mr. Gnazzo's testimony, claiming to have believed in the accuracy of the Statement based on these sources is a material issue of disputed fact.

### RELEASE OF THE ODNI REPORT

21.    On September 12, 2018, by Executive Order 13848, then President Trump declared a national emergency to deal with the "unusual and extraordinary threat to the national security and foreign policy of the United States" posed by "persons located, in whole or in substantial part, outside the United States to interfere in or undermine public confidence in United States elections." *See* McNamara Decl. Ex. 15.  This Executive Order required the Director of National Intelligence to investigate "any information indicating that a foreign government, or any person acting as an agent of or on behalf of a foreign government, has acted with the intent or purpose of interfering in" U.S. elections.  *Id.*

**Response 21**. Mr. Nunes admits that Executive Order 13848 was issued on September 12, 2018. He further admits that the quoted language appears in the Executive Order. Mr. Nunes disputes the characterization of the Executive Order, which speaks for itself. Specifically, the report does not use the term "investigate" at all and orders an "assessment."

22.    In accordance with Section 1(a) of the Executive Order on foreign interference in U.S. elections, on January 7, 2021, the National Intelligence Council, in coordination with other intelligence agencies, issued a classified report on foreign actors' intentions and efforts to interfere

with the 2020 U.S. federal elections titled "Foreign Threats to the 2020 US Federal Elections" (the "ODNI Report").  McNamara Decl. Ex. 12 at NBCU0000106.

**Response 22**. Mr. Nunes disputes this statement to the extent it classifies the ODNI Intelligence Community Assessment ("ICA") as a "report". Plaintiff admits that ODNI issued an ICA on January 7, 2021, pursuant to Section 1(a) of Executive Order 13848 with the title "Foreign Threats to the 2020 US Federal Elections".

23.    The ODNI Report reflects that it was declassified on March 15, 2021.  *Id.*  at NBCU0000104.

**Response 23**. Mr. Nunes disputes this statement to the extent it classifies the ODNI Intelligence Community Assessment ("ICA") as a "report,"[3] but he admits that it reflects it was declassified on March 15, 2021.

24.    The ODNI Report stated in part that "[w]e assess that President Putin and the Russian state authorized and conducted influence operations against the 2020 US presidential election aimed at denigrating President Biden and the Democratic Party, supporting former President Trump, undermining public confidence in the electoral process, and exacerbating sociopolitical divisions in the US."  *Id.* at NBCU0000110.

**Response 24**. No dispute.

25.    The ODNI Report stated in part that "[a] key element of Moscow's strategy this election cycle was its use of people linked to Russian intelligence to launder influence narratives— including misleading or unsubstantiated allegations against President Biden—through US media organizations, US officials, and prominent US individuals, some of whom were close to former President Trump and his administration."  *Id.*

---

[3] To avoid duplication of this dispute, Mr. Nunes disputes each characterization of the ODNI ICA as a "report."

**Response 25**. No dispute.

26.     The ODNI Report stated in part that "[w]e assess that President Putin and other senior Russian officials were aware of and probably directed Russia's influence operations against the 2020 US Presidential election.  For example, we assess that Putin had purview over the activities of Andri[i] Derkach, a Ukrainian legislator who played a prominent role in Russia's election influence activities.  Derkach has ties to Russian officials as well as Russia's intelligence services." *Id.*

**Response 26**. No dispute.

27.     The ODNI Report stated in part that "Derkach, Kilimnik, and their associates sought to use prominent US persons and media conduits to launder their narratives to US officials and audiences.  These Russian proxies met with and provided materials to Trump administration-linked US persons to advocate for formal investigations; hired a US firm to petition US officials; and attempted to make contact with several senior US officials." *Id.* at NBCU0000111.

**Response 27**. No dispute.

28.     Maddow and Gnazzo testified that the ODNI Report was the one of the impetuses for the *TRMS* Segment.  Gnazzo Tr. 74:18–75:1; Maddow Decl. ¶ 16; Gnazzo Decl. ¶¶ 15.

**Response 28**. No dispute.

29.     Maddow testified that she relied on the ODNI Report in writing the *TRMS* Segment. Maddow Tr. 92:19–23, 125:4–126:23.

**Response 29**. Mr. Nunes disputes the credibility of Ms. Maddow's testimony that she could possibly have relied upon the ODNI Report to write the TRMS Statement at issue, as the report contained no allegation that Mr. Nunes refused to turn over material to the FBI.

14

30.    Maddow quoted from the ODNI Report during the *TRMS* Segment.  McNamara Decl. Ex. 1 at 16:30–17:20, 23:01–23:13.

**Response 30**. No dispute.

31.    Gnazzo relied on the ODNI Report in reviewing the *TRMS* Segment for accuracy before it aired.  Gnazzo Tr. 74:17–75:1; Gnazzo Decl. ¶ 19.

**Response 31**. Mr. Nunes disputes this statement as unsupported by the cited testimony. Mr. Gnazzo did not state that he reviewed the ODNI Report. Gnazzo Decl. ¶ 19. Instead, he listed materials that were supposed sources for the TRMS Statement that "influenced what we were thinking." Gnazzo Tr. 74:17–75:1. Mr. Nunes also disputes the credibility of any testimony that Mr. Gnazzo could have relied upon the ODNI report to support the purported accuracy of the TRMS Statement at issue. Defendant's vague language of "relied on . . . in reviewing the TRMS *Segment* for accuracy" is a tacit admission that it had no bearing on the Statement at issue, and a reasonable person could find that the TRMS Statement was a reckless speculation at best, and a deliberate smear at worst. This is a material dispute of fact for the jury to determine.

## NEWSGATHERING FOR THE *TRMS* SEGMENT

32.    Prior to the 2020 U.S. Presidential Election, there was public reporting and press releases from U.S. government agencies and members of Congress regarding Russian efforts to influence and interfere with the election.  McNamara Decl. Exs. 11, 16, 17; *Id.* Ex. 13 at NBCU0001858.

Response 32. Mr. Nunes disputes this statement to the extent that Exhibit 13 does not include any marking for NBCU0001858. Mr. Nunes concedes the general proposition that many reports had been made about supposed Russian efforts to influence and interfere with the election, which would speak for themselves and are subject to differing interpretations.

33.     Democratic leadership in U.S. House of Representatives and the Senate publicly expressed concern that Congress was a target in Russia's efforts to influence and interfere with the 2020 U.S. Presidential Election.  McNamara Decl. Ex. 18.

Response 33. No dispute.

**A.     The July 13, 2020 Letter**

34.     On July 13, 2020, then-Speaker of the U.S. House of Representatives, Rep. Nancy Pelosi, Chairman of HPSCI, Rep. Adam B. Schiff, Democratic Leader of the U.S. Senate, Senator Charles E. Schumer, and Vice Chairman of the U.S. Senate Select Committee on Intelligence, Senator Mark R. Warner sent a letter to the Director of the FBI Christopher Wray (the "July 13, 2020 Letter").  McNamara Decl. Exs. 18, 19.

Response 34. No dispute.

35.     The July 13, 2020 Letter stated in part that "[w]e write to request that the Federal Bureau of Investigation provide a defensive counterintelligence briefing to all Members of the House of Representatives and the Senate regarding foreign efforts to interfere in the 2020 U.S. presidential election."  McNamara Decl. Ex.18.

Response 35. No dispute.

36.     The July 13, 2020 Letter further stated in part that "[w]e are gravely concerned, in particular, that Congress appears to be the target of a concerted foreign interference campaign, which seeks to launder and amplify disinformation in order to influence congressional activity, public debate, and the presidential election in November."  *Id.*

Response 36. No dispute.

37.     The July 13, 2020 Letter stated in part that "[g]iven the seriousness and specificity of these threats, as members of congressional leadership and the congressional intelligence committees we believe it is imperative that the FBI provide a classified defensive briefing to all

Members of Congress and that the briefing draw on all-source intelligence information and analysis, consistent with due regard for the protection of sensitive intelligence sources and methods." *Id.*

Response 37. No dispute.

38.    The July 13, 2020 Letter concluded "[d]ue to the ongoing nature of these threats, we ask that the FBI provide this briefing prior to the August recess at the earliest opportunity, and that your office outline a plan for the briefing by Monday, July 20." *Id.*

Response 38. No dispute.

39.    The July 13, 2020 Letter was released publicly, but contained a classified addendum. *Id.*

Response 39. No dispute.

40.    Maddow first became aware of the July 13, 2020 Letter on July 20, 2020, when it was sent to her by email. Maddow Decl. ¶ 24; McNamara Decl. Ex. 19. This email was sent by Kelsey Desiderio, a Producer on *TRMS*, to Maddow and the entire staff of *TRMS*, including to Executive Producer, Cory Gnazzo. McNamara Decl. Ex. 19; Maddow Decl. ¶ 24.

Response 40. No dispute.

41.    Maddow testified that she relied on the July 13, 2020 Letter in writing the Statement. Maddow Tr. 91:2–92:18, 125:11–22; Maddow Decl. ¶¶ 22–25.

Response 41. Mr. Nunes disputes the credibility of Ms. Maddow's testimony that she could possibly have relied upon the July 13, 2020 Letter to write the TRMS Statement at issue, as the letter contained no allegation that Mr. Nunes refused to turn over material to the FBI.

42.    Gnazzo testified that he relied on the July 13, 2020 Letter in reviewing the *TRMS* Segment for accuracy before it aired. Gnazzo Tr. 62:9–12, 83:19–24; Gnazzo Decl. ¶¶ 19, 27–28.

Response 42. Mr. Nunes disputes the credibility of Mr. Gnazzo's testimony that he could possibly have relied on the July 13, 2020 Letter to support the purported accuracy of the TRMS Statement at issue. As previously discussed, the letter does not make or imply any allegation that Mr. Nunes withheld information from the FBI. Defendant's vague language of "relied on . . . in reviewing the TRMS *Segment* for accuracy" is a tacit admission that it had no bearing on the Statement at issue, and a reasonable person could find that the TRMS Statement was a reckless speculation at best, and a deliberate smear at worst. This is a material dispute of fact for the jury to determine.

### B.    The July 23, 2020 Politico Article

43.    On July 23, 2020, Politico published an article by Natasha Bertrand, Andrew Desiderio, and Kyle Cheney titled "Democrats: Packets sent to Trump allies are part of foreign plot to damage Biden" (the "July 23, 2020 Politico Article").  McNamara Decl. Ex.10.

Response 43. No dispute.

44.    The July 23, 2020 Politico Article reported in part that "[t]op congressional Democrats are sounding the alarm about a series of packets mailed to prominent allies of Donald Trump – material they say is part of a disinformation plot to damage former vice president Joe Biden, according to new details from a letter the lawmakers delivered to the FBI last week."  *Id*. at NBCU0001375.

Response 44. No dispute.

45.    The July 23, 2020 Politico Article further reported in part that "[t]he [July 13] letter to FBI Director Christopher Wray – authored by House Speaker Nancy Pelosi, Senate Minority Leader Chuck Schumer and the top Democrats on the House and Senate intelligence committees – also included a public request that the bureau brief all lawmakers."  *Id.* at NBCU0001376.

Response 45. No dispute.

46.    The July 23, 2020 Politico Article further reported in part that these "packets . . . were sent late last year to Rep. Devin Nunes (R-Calif.), Sens. Lindsey Graham (R-S.C.) and Chuck Grassley (R-Iowa), and then-White House Chief of Staff Mick Mulvaney." *Id.* at NBCU0001375.

Response 46. Mr. Nunes disputes this characterization of the Politico Article as omitting relevant information. The full quotation of the Politico article is as follows:

> The packets, described to POLITICO by two people who have seen the classified portion of the Democrats' letter, were sent late last year to Rep. Devin Nunes (R-Calif.), Sens. Lindsey Graham (R-S.C.) and Chuck Grassley (R-Iowa), and then-White House chief of staff Mick Mulvaney.

47.    The July 23, 2020 Politico Article further stated in part that "Graham and Grassley denied having received the material, and Mulvaney and Nunes declined repeated requests for comment. One person familiar with the matter said the information was not turned over to the FBI. The FBI declined to comment." *Id.* (emphasis added).

Response 47. No dispute.

48.    The July 23 Politico Article further stated in part that the packets "were sent by Andrii Derkach, a Ukrainian lawmaker who met with Trump's personal lawyer Rudy Giuliani in Kyiv last December to discuss investigating the Biden family" and included a statement to Politico from Derkach that confirmed that he had "sent these materials to the lawmakers and Mulvaney." *Id.* at NBCU0001376.

Response 48. No dispute.

49.    The July 23, 2020 Politico Article included a June 12, 2019 statement from FBI Director Christopher Wray that "if any public official or member of any campaign is contacted by any nation-state, or anybody acting on behalf of a nation-state, about influencing or interfering with an election then that's something the FBI would want to know about." *Id.* at NBCU0001378.

Response 49. No dispute.

50.    Plaintiff testified that he did not provide any comment to Politico in connection with the July 23, 2020 Politico Article. Nunes Tr. 205:24–206:22, 207:22–208:3; McNamara Decl. Ex. 9 at 201:15–202:9, 202:18–22.

Response 50. No dispute.

51.    Plaintiff testified that he did not request a correction from Politico in connection with the July 23, 2020 Article, including its reporting that he did not turn over the Derkach package to the FBI.  Nunes Tr. 209:6–210:21.

Response 51. Mr. Nunes disputes Defendant's blatant mischaracterization of the Politico Article, as it does not report that Mr. Nunes did not turn over the Derkach package to the FBI. This repeated mischaracterization is a disputed issue of material fact that is fatal to their motion for summary judgment. There is no dispute that Mr. Nunes' office did not request any correction from Politico.

52.    Plaintiff testified that he did not sue Politico over its July 23, 2020 Article reporting that he did not turn over the Derkach package to the FBI.  Nunes Tr. 217:4–7; McNamara Decl. Ex. 9 at 179:9–14.

Response 52. Mr. Nunes disputes Defendant's blatant mischaracterization of the Politico Article, as it does not report that Mr. Nunes did not turn over the Derkach package to the FBI. This repeated mischaracterization is a disputed issue of material fact that is fatal to their motion for summary judgment. There is no dispute that Mr. Nunes did not sue Politico.

53.    On July 23, 2020, Gnazzo circulated the July 23, 2020 Politico Article to Maddow and the *TRMS* Staff.  McNamara Decl. Ex. 20; Maddow Decl. ¶ 28.

Response 53. No dispute.

54.     Maddow testified that she relied on the July 23, 2020 Politico Article in writing the Statement.  Maddow Tr. 91:2–93:16, 94:3–6, 94:16–21, 125:4–126:23; Maddow Decl. ¶¶ 27–32.

Response 54. Mr. Nunes disputes the credibility of Ms. Maddow's testimony that she could possibly have relied upon the Politico Article to write the TRMS Statement at issue, as the article contained no allegation that Mr. Nunes refused to turn over material to the FBI.

55.     Gnazzo testified that he relied on the July 23, 2020 Politico Article in reviewing the *TRMS* Segment for accuracy before it aired.  Gnazzo Tr. 62:2-3, 64:14–18, 72:21–74:12, 98:25–99:11; Gnazzo Decl. ¶ 19, 20, 27.

Response 55. Mr. Nunes disputes the credibility of Mr. Gnazzo's testimony that he could possibly have relied upon the Politico Article to support the purported accuracy of the TRMS Statement at issue, as the article contained no allegation that Mr. Nunes refused to turn over material to the FBI.

56.     Maddow and Gnazzo testified that he believed that Politico was a reputable publication and that the authors of the July 23, 2020 Politico Article were well-respected.  Maddow Tr. 91:7–8; Gnazzo Tr. 72:21–74:10, 100:23–101:10, 102:2–16; Maddow Decl. ¶ 29.

Response 56. No dispute.

57.     Maddow and Gnazzo testified that they understood at the time the *TRMS* Segment aired that Plaintiff did not sue Politico over the reporting in the July 23, 2020 Politico Article, or make any public statement disputing its reporting.  Gnazzo Tr. 161:2–4; Maddow Decl. ¶¶ 31–32; Gnazzo Decl. ¶¶ 20, 25.

Response 57. No dispute.

**C.     The July 29, 2020 HPSCI Transcript**

58.     On July 29, 2020, HPSCI held a closed-door business meeting (the "HPSCI Business Meeting").  A redacted transcript of the HPSCI Business Meeting was released publicly

(the "July 29, 2020 HPSCI Transcript").  McNamara Decl. Ex. 21.

Response 58. No dispute.

59.    According to the July 29, 2020 HPSCI Transcript, Chairman Adam Schiff (D-CA) stated that Russia was "trying to interfere in the Presidential election and seeking to divide Americans," that "[o]n July 13, I, along with Speaker Pelosi, Leader Schumer, and Vice Chair Warner, wrote a letter to FBI Director Wray requesting a defensive counterintelligence briefing to the entire Congress regarding foreign efforts to interfere in the 2020 Presidential election," and that "[t]he letter highlighted our grave concern, and in particular that Congress appears to be the target of a concerted foreign interference campaign which seeks to launder and amplify disinformation in order to influence congressional activity, public debate, and the Presidential election in November."  *Id.* at NBCU0001733.

Response 59. No dispute.

60.    The July 29, 2020 HPSCI Transcript reflects that Chairman Schiff then stated that "today the committee will vote, pursuant to committee rule 14(f), to make available to any member of the full House, upon request, an in-camera review of the classified addendum to the July 13, 2020, letter that the Speaker, Democratic Leader, Vice Chair, and I sent to the FBI Director as part of our request for a defensive briefing to the Congress related to foreign interference."  *Id.* at NBCU0001734.

Response 60. No dispute.

61.    The July 29, 2020 HPSCI Transcript reflects that Plaintiff opposed the release of the addendum to the July 13, 2020 Letter to other House members, calling it a "politicization of intelligence" designed to "provide classified material to support the Democrats' agenda" as it "focuses entirely on Russia while ignoring potential election meddling by any other nations."  *Id.*

at NBCU0001736.

Response 61. Mr. Nunes disputes Defendant's characterization of the transcript, which the Court may review in full. The full context provides that Plaintiff was concerned with the potential for leaks of incredibly sensitive national security information and the motion requested by Chairman Schiff did not adequately address this risk and why it was warranted by nonpartisan supporting facts. *See* NBCU00001736.

62.     The July 29, 2020 HPSCI Transcript reflects that Chairman Schiff asked if there was "any further business before this committee," to which Rep. Maloney responded: "Mr. Chairman, there have been public reports that the minority has received materials from Andrii Derkach, and those materials would not be classified and they would not be prohibited from disclosure.  But, at a minimum, I also understand that majority staff has requested of the minority that they be shared with majority staff so that we might evaluate them independently.  And so my question, Mr. Chairman, is of the ranking member, whether he is prepared to disclose to the committee whether he has received materials that have been called into question in the public reports from Andrii Derkach and, if so, whether he is prepared to share them with the rest of the committee."  *Id.* at NBCU0001743.

Response 62. No dispute that this is an accurate quotation of Mr. Maloney's statement from the transcript, but Mr. Nunes does not concede the characterizations contained therein.

63.     The July 29, 2020 HPSCI Transcript reflects that, in response to Rep. Maloney's question, Chairman Adam Schiff asked "[d]oes the ranking member wish to respond?" and Plaintiff responded "[n]o."  *Id.*

Response 63. No dispute.

64.     The July 29, 2020 HPSCI Transcript reflects that Rep. Maloney then stated "[w]ell,

so, Mr. Chairman, for the record, I guess I would request an explanation from the ranking member why he is just not prepared to respond to a simple question whether he has received materials that have been called into question that seem designed to denigrate a former Vice President of the United States, but, at a minimum, to share them with the rest of the committee. I mean, as I understand it, committee staff is in possession of evidence that a package was received. None of this is classified. So is the ranking member prepared to even respond to the question? How about it, Mr. Nunes? Did you receive a package from Andrii Derkach or not? And would you share with the committee or not?" *Id.* at NBCU0001743–44.

Response 64. No dispute that this is an accurate quotation of Mr. Maloney's statement from the transcript, but Mr. Nunes does not concede the characterizations contained therein.

65.     The July 29, 2020 HPSCI Transcript reflects that Plaintiff did not respond to Rep. Maloney's questions and that Rep. Maloney responded "Well, I guess this is a case where silence speaks volumes." *Id.* at NBCU0001744.

Response 65. No dispute that this is an accurate quotation of Mr. Maloney's statement from the transcript, but Mr. Nunes does not concede the characterizations contained therein.

66.     Plaintiff testified that the sending and receipt of the Derkach Package was not classified information. Nunes Tr. 69:19–70:4.

Response 66. Mr. Nunes disputes the characterization of the cited testimony, which speaks for itself. The relevant portion of the transcript is Greaves Ex. E at 69:4–71:7, and the exchange is as follows:

> Q. Did you have an understanding as to whether the Derkach package was considered to be classified?
>
> A. I wouldn't, I don't know.
>
> Q. So you can't say one way or the other?

A. No. Well, it wouldn't be class—I mean—I don't know what—I don't know if there's an investigation going, I don't know if they dropped it, I don't know, you know, I have no idea. There could be—it could be classified if there's some investigation going, or maybe there's not, maybe they didn't do anything about it. I don't know, I never heard.

Q. But you don't understand that the fact that you received the Derkach package was classified information?

A. Well, it was publicly transmitted out there, so I think—whether or not the package ever arrived is, you know, I mean that was out there before it arrived. And then it arrived, but like all other packages, it would have been sent to the appropriate authorities.

Q. And wouldn't you want to know whether it was classified or the level of classification, if it was classified, before you held a meeting in your office?

A. No. Well, I don't want to—we can go on and on talking. I have to put my old hat on here if you want to go—really get into that.

Q. I'm trying to understand—

[Objection to relevance]

A. Well, something would not be classified if—it's packages that are being sent from wherever they're being sent from, would not be classified.

Q. Do you know the initial—I'm sorry?

A. Because I don't know if this guy is Russian or Ukrainian, I don't even know. He doesn't get the ability to decide if something's classified or not under the U.S. standards.

67.    Plaintiff and the former Staff Director on HPSCI, George Pappas, testified that the Derkach Package itself was not classified.  Nunes Tr. 70:21–71:7; McNamara Decl. Ex. 8 at 74:18–75:11, 76:9–24, 126:11–21.

Response 67. Mr. Nunes disputes the characterization of the cited testimony, which speaks for itself. The relevant portion of Mr. Nunes' testimony is at Greaves Ex. E at 69:4–71:7, and is reproduced above in Response 66. While it is not disputed that Mr. Pappas testified that the package was not classified under HPSCI's standards and procedures, he specifies that "we didn't know that at the time because we did not see the document." McNamara Ex. 8 at 74:18–75:11. Mr.

Pappas, additionally, did not testify as to any potential classification that could have arisen as a result of investigation by other government agencies, as noted to be a possibility by Mr. Nunes in his cited testimony.

68.    Rep. Eric A. "Rick" Crawford testified that he did not think there was a bases [sic] in the law for Plaintiff's refusal to respond to Rep. Maloney's questions about the Derkach Package during the HPSCI Business Meeting.  McNamara Decl. Ex. 22 at 27:23–28:8.

Response 68. Mr. Nunes disputes this blatant mischaracterization of Mr. Crawford's testimony, which speaks for itself. *See* McNamara Ex. 22 at 26:21–28:20. Defendant's characterization suggests that Mr. Crawford was critical of Mr. Nunes' "refusal to respond" to Maloney's questions about the Derkach package, and even that Mr. Nunes was legally required to respond. The term "legal bases [sic]" was suggested by the question asked by defense counsel, and it was a follow-up question to Mr. Crawford's detailed explanation that Mr. Nunes *rightfully* declined to comment in response to inappropriate, goading questions from Maloney, on a topic that was not part of the meeting agenda. In other words, Mr. Crawford's response to the "legal bases" question was his understanding that Mr. Nunes was not "necessarily" legally *prohibited* from answering the question, not that he was required or expected to answer. The full context shows that Mr. Crawford was being critical not of Mr. Nunes, but of Mr. Maloney for his "unseemly" violation of protocol. Therefore, the actual meaning of Mr. Crawford's testimony is quite different the meaning suggested by Defendant's characterization. The full exchange is as follows:

> Q. When you say "Devin Nunes didn't"—"so obviously Devin Nunes didn't comment on that [referring to Rep. Maloney's attempts to press the issue of alleged items being sent to HPSCI, *see* Ex. 47 at 8]. Here's the thing. It's standard practice that if you get a package from unknown source in a foreign country, it's probably a good idea to call the FBI and let them handle it and not handle those packages and don't open them and go hey, I wonder what this is. I guess it's Christmas came

early this year. No, you follow protocol, which is you turn that over to the FBI. That's what happened."

Did I read that correctly, sir?

A. It appears that you have.

Q. So I'm going to ask you a few questions about that. When you say—well, first of all, do you recall making this statement to Breitbart?

A. I don't recall making the statement, but that appears to be accurate.

Q. When you say "Devin Nunes didn't" —"so obviously Devin Nunes didn't comment on that," sitting here today, why do you think it was obvious that he didn't comment on that?

A. Because as I recall, and I think the transcript would probably reflect this, Mr. Maloney was trying to engage in some form of—I don't want to say taunt, but almost goad the ranking member into engaging in a conversation or some discourse that I felt was inappropriate given that that item was not on the agenda for the business meeting, number1.

And number 2, it's typically not what members do in a business meeting, is to call out, if you will, a colleagues on the committee and suggest that they've done something that they shouldn't have done. If there was a problem, and there's probably a better way to go about it than to interject that into a business meeting with that having been placed on the agenda.

Q. Aside from decorum issues—is that a fair way of describing what you just said? Decorum and civility?

A. I would agree with that.

Q. Is there a bases [sic] in the law for not responding to Mr. Maloney's entreaty there?

A. I don't think there's necessarily a basis in the law for not responding. I think more than anything, it's probably common sense that you don't take the bait, if you will. And that is to say, not get drawn into some discourse that was irrelevant to the topic of the business meeting.

Clearly Mr. Maloney was hostile to the ranking member in that exchange. And that was—as I recall, that's what stuck out to me the most, was the nature of his tone, and particularly as it applies to the fact that the chairman and ranking members of committees are typically given a high degree of deference due to their positions on the committee. So I thought it was unseemly for [Maloney] to act the way he did in the committee. That's just my opinion.

69.    Maddow's research notes for the *TRMS* Segment (the "Research Notes") refer to the July 29, 2020 HPSCI Business Meeting and includes a quotation from the transcript. McNamara Decl. Ex. 23.

Response 69. No dispute.

70.    Maddow's Research Notes were circulated to the entire *TRMS* staff, including to Gnazzo.  McNamara Decl. Ex. 23; Maddow Decl. ¶ 11, 14; Gnazzo Decl. ¶ 14.

Response 70. No dispute.

71.    Maddow testified that she relied on the transcript of the July 29, 2020 HPSCI Business Meeting in writing the Statement.  Maddow Tr. 91:20–24, 118:18–120:7, 125:4–126:23; Maddow Decl. ¶ 36; McNamara Decl. Ex. 23.

Response 71. Mr. Nunes disputes the credibility of Ms. Maddow's testimony that she could possibly have relied upon the HPSCI transcript in writing the Statement because the transcript contains no allegation or implication that Mr. Nunes had failed or refused to turn over any materials to the FBI.

72.    Gnazzo testified that he relied on the transcript of the July 29, 2020 HPSCI Business Meeting in reviewing the *TRMS* Segment for accuracy before it aired.  Gnazzo Tr. 66:12–19, 74:1–11, 136:21–23; Gnazzo Decl. ¶¶ 19, 20, 27.

Response 72. Mr. Nunes disputes the credibility of Mr. Gnazzo's testimony that he could possibly have relied upon the HPSCI transcript to support the accuracy of the TRMS Statement at issue, as the transcript contains no allegation or implication that Mr. Nunes had failed or refused to turn over any materials to the FBI. Defendant's weasel words of "relied on . . . in reviewing the TRMS *Segment* for accuracy" is a tacit admission that the allegedly "relied" upon material has no bearing on the specific *Statement* at issue, and therefore a reasonable person could find that

Defendant's Statement was a reckless speculation at best, and a deliberate smear at worst. This is a material dispute of fact for the jury to determine.

> **D.    The July 31, 2020 CNN Article**

73.    On July 31, 2020, CNN published an article authored by Manu Raju and Caroline Kelly titled "Devin Nunes won't say if he got foreign info meant to damage Biden" (the "July 31, 2020 CNN Article").  McNamara Decl. Ex. 24.

Response 73. No dispute.

74.    The July 31, 2020 CNN Article, linked to the July 29, 2020 HPSCI Transcript, and reported in part that "Rep. Devin Nunes, the ranking Republican on the House Intelligence Committee, declined to say at a closed-door meeting this week whether he had received foreign information meant to damage former Vice President Joe Biden, according to a transcript released by the committee on Thursday." *Id*.

Response 74. No dispute that this is an accurate quotation of the CNN Article, but Mr. Nunes does not concede the characterizations contained therein.

75.    The July 31, 2020 CNN Article reported in part that "[t]he information in question pertained to packets reportedly sent to GOP members of Congress, including Nunes, by Ukrainian lawmaker Andrii Derkach – who has worked closely with President Donald Trump's lawyer Rudy Giuliani.  Giuliani played a key role in the effort to pressure the Ukrainian government to publicly announce an investigation into the former vice president, an effort that led to the President's impeachment and subsequent acquittal." *Id*.

Response 75. No dispute that this is an accurate quotation of the CNN Article, but Mr. Nunes does not concede the characterizations contained therein.

76.    The July 31, 2020 CNN Article, linking to the July 13, 2020 Letter, reported in part that "Congressional Democrats have expressed interest of late in potential disinformation going

after Biden.  Last week, Democratic congressional leaders sent FBI Director Chris Wray a letter urging an FBI briefing to all lawmakers about 2020 foreign interference efforts."  Id. at NBCU0000182.

Response 76. No dispute.

77.    The headline and excerpts of the July 31, 2020 CNN Article were displayed on-screen during the *TRMS* Segment.  McNamara Decl. Ex. 1 at 23:39–24:01.

Response 77. No dispute.

78.    Maddow testified that she "must have looked at" the July 31, 2020 CNN Article in writing the Statement.  Maddow Tr. 114:5–116:17; Maddow Decl. ¶¶ 37–39.

Response 78. No dispute.

79.    Gnazzo testified that he relied on the July 31, 2020 CNN Article in reviewing the *TRMS* Segment for accuracy before it aired.  Gnazzo Tr 74:11–12, 80:9–15; Gnazzo Decl. ¶¶ 19, 28.

Response 79. Mr. Nunes disputes the credibility of Mr. Gnazzo's testimony that he can possibly have "relied" upon the CNN Article to support the purported accuracy of the TRMS Statement at issue, because the CNN Article contains no allegation that Mr. Nunes failed or refused to turn over any information to the FBI. Defendant's weasel words of "relied on . . . in reviewing the TRMS *Segment* for accuracy" is a tacit admission that the allegedly "relied" upon material has no bearing on the specific *Statement* at issue, and therefore a reasonable person could find that Defendant's Statement was a reckless speculation at best, and a deliberate smear at worst. This is a material dispute of fact for the jury to determine.

80.     Maddow and Gnazzo testified that they believed that CNN was a reputable publication and that the authors of the July 31, 2020 Article were well-respected.  Maddow Decl. ¶ 38; Gnazzo Decl. ¶¶ 19, 28.

Response 80. No dispute that this was their testimony about their beliefs. Mr. Nunes does not accept their characterizations.

**E.     The September 10, 2020 Treasury Press Release**

81.     On September 10, 2020, the U.S. Department of the Treasury issued a press release titled "Treasury Sanctions Russia-Linked Election Interference Actors." (the "September 10, 2020 Treasury Press Release").  McNamara Decl. Ex. 11.

Response 81. No dispute.

82.     The September 10, 2020 Treasury Press Release announced that the Treasury's Office of Foreign Asset Control was designating four "Russia-linked individuals for attempting to influence the U.S. electoral process," including Derkach.  *Id.*

Response 82. No dispute.

83.     The September 10, 2020 Treasury Press Release identified Derkach as "an active Russian agent for over a decade, maintaining close connections with the Russian Intelligence Services."  *Id.*

Response 83. No dispute.

84.     The September 10, 2020 Treasury Press Release stated in part that "[f]rom at least late 2019 through mid-2020, Derkach waged a covert influence campaign centered on cultivating false and unsubstantiated narratives concerning U.S. officials in the upcoming 2020 Presidential Election, spurring corruption investigations in both Ukraine and the United States designed to culminate prior to election day."  *Id.*

Response 84. No dispute.

85.     The September 10, 2020 Treasury Press Release further stated that "Derkach almost certainly targeted the U.S. voting populace, prominent U.S. persons, and members of the U.S. government, based on his reliance on U.S. platforms, English-language documents and videos, and pro-Russian lobbyists in the United States used to propagate his claims." *Id.* at NBCU0001828.

Response 85. No dispute.

86.     Maddow and Gnazzo were all aware at the time the *TRMS* Segment aired that Derkach had been sanctioned by the U.S. Treasury Department for acting as a Russian agent and for the activities referenced in the September 10, 2020 Treasury Press Release.  McNamara Decl. Ex. 1 at 24:02–24:17; Maddow Tr. 74:21–75:7.

Response 86. No dispute.

**F.     The March 17, 2021 Deadline Interview**

87.     On March 17, 2021, Rep. Maloney was interviewed by Nicolle Wallace on MSNBC's *Deadline: White House* about the release of the ODNI Report (the "March 17, 2021 Deadline Interview")*.*  McNamara Decl. Exs. 25, 26.

Response 87. No dispute.

88.     In the March 17, 2021 Deadline Interview, Wallace asked Rep. Maloney "[d]id we appreciate the extent to which Donald Trump's most intimate political advisors like Rudy Giuliani, and even people in the Senate, like Ron Johnson, are laundering and trafficking Russian disinformation designed to harm Joe Biden?"  McNamara Decl. Ex. 26 at 0:00–0:15.

Response 88. No dispute that this is an accurate quotation of Ms. Wallace's statement, but Mr. Nunes does not concede the characterizations contained therein.

89.     In the March 17, 2021 Deadline Interview, Rep. Maloney responded to Wallace's question: "well, I'm so proud that Chairman Adam Schiff, and those of us on the Intelligence Committee, you know, wrote into law that the agencies had to issue this report and declassify it,

because now everyone can see what I was getting excited about.  And the fact is, is that they were so comfortable using people like Devin Nunes that Andrii Derkach, a known Russian asset, sent information to Devin Nunes at the Intelligence Committee.  We literally had the package receipt." *Id.* at 0:15–0:46.

Response 89. No dispute that this is an accurate quotation of Mr. Maloney's statement, but Mr. Nunes does not concede to the characterizations contained therein.

90.    In the March 17, 2021 Deadline Interview, Rep. Maloney stated in part "And you'll recall that what prompted that appearance on your show was that I questioned him during a hearing, an open hearing about what was in the box.  What he had received from Andrii Derkach. It was the same information, presumably, that Ron Johnson was trying to spread around using his position in the Senate as the Chairman at that time of the Homeland Security Committee.  So it's extraordinary that Russia's strategy was to spread disinformation using American media organizations like Fox and OAN.  But even more alarmingly, senior members of the Senate and the U.S. House like Ron Johnson and Devin Nunes, in an effort to launder their disinformation in a way that the media might find credible."  *Id.* at 0:47–1:31.

Response 90. No dispute that this is an accurate quotation of Mr. Maloney's statement, but Mr. Nunes does not concede to the characterizations contained therein.

91.    Maddow's Research Notes refers to the March 17, 2021 Deadline Interview and includes a quotation from this interview.  McNamara Decl. Ex. 23.

Response 91. No dispute that Ms. Maddow's Research Notes refer to the March 17, 2021 Deadline Interview and that it includes a paraphrase of a portion of that interview.

92.    Gnazzo testified that he relied on the March 17 Deadline Interview in reviewing the *TRMS* Segment for accuracy before it aired.  Gnazzo Tr. 95:22–96:9; Gnazzo Decl. ¶¶ 21–22.

Response 92. Mr. Nunes disputes that this is an accurate description of the cited testimony, as it does not include any testimony that Mr. Gnazzo reviewed the interview prior to airing of the TRMS Segment. Gnazzo Tr. at 95:22–96:9, Mr. Gnazzo, in response to a question about whether he had watched the interview, stated that he did not recall whether he watched it, but that he recalled discussing it. In his Declaration, he states that he became aware of the interview based on the reference to it in Ms. Maddow's Research Notes, and that it "reinforced [his] confidence in the accuracy of the Statement."  Mr. Nunes also disputes the credibility of Mr. Gnazzo's statement that he could possibly rely on the statements of Mr. Maloney in the Deadline Interview to support the purported accuracy of the TRMS Statement at issue, as they did not include any allegation that Mr. Nunes had failed or refused to turn over any information to the FBI. Defendant's weasel words of "relied on . . . in reviewing the TRMS *Segment* for accuracy" is a tacit admission that the allegedly "relied" upon material has no bearing on the specific *Statement* at issue, and therefore a reasonable person could find that Defendant's Statement was a reckless speculation at best, and a deliberate smear at worst. This is a material dispute of fact for the jury to determine.

### PRIOR PUBLIC REPORTING ON RUSSIAN INTERFERENCE IN THE 2020 ELECTION THAT INFORMED THE *TRMS* SEGMENT

93.     Ahead of the 2020 U.S. Presidential Election, there was public reporting that President Trump's personal attorney, Rudolph W. Giuliani, and Lev Parnas, a Ukrainian American businessman, were seeking to uncover damaging information about Joe Biden and to encourage Ukraine to announce an investigation into Joe Biden ahead of the 2020 election.  McNamara Decl. Exs. 27, 28, 29.

Response 93. Mr. Nunes disputes the characterization of the cited media reports which speak for themselves. Mr. Nunes, of course, does not concede the veracity or relevance of these reports, but does not dispute that the subject of Joe Biden and Ukraine and President Trump was

widely reported on in the media in 2020. Mr. Nunes specifically denies Defendant's characterization of the cited articles, that they purport to demonstrate reporting that President Trump, through his attorney Rudolph Giuliani, was working with Lev Parnas to obtain damaging information about Joe Biden and to encourage Ukraine to announce an investigation into Joe Biden. The articles and the purported facts contained therein are subject to numerous interpretations.

94.    Public reporting reflected that, through their efforts to obtain harmful information about President Biden before the 2020 election, Giuliani and Parnas became conduits for Russian misinformation.  McNamara Decl. Exs. 27, 28; *Id.* Ex. 29 at NBCU0001815–16.

Response 94. Mr. Nunes denies Defendant's characterization of public reporting and the cited articles which speak for themselves and are subject to differing interpretations. While Mr. Nunes concedes that the thrust of these articles was clearly to portray President Trump and anyone in his sphere in a negative light, and to cast doubt on contemporaneous reports of corruption involving Joe Biden and his son's business interests in Ukraine, it is specifically denied that any of these articles "reflected" that "Giuliani and Parnas became conduits for Russian misinformation." Indeed, a reasonable reader could draw a different conclusion, for example, that foreign agents were tasked with making contacts with prominent Republicans and then claiming to work with them so as to discredit the work or investigations being done by those Republicans, and that it was the mainstream press—e.g. Washington Post—that was involved in the laundering of such misinformation.

95.    Public reporting linked Derkach to Giuliani's efforts to obtain information that would be detrimental to President Biden's candidacy in the 2020 U.S. Presidential Election. *Id.*

Response 95. Mr. Nunes denies Defendant's characterization of public reporting and the cited articles which speak for themselves and are subject to differing interpretations, as discussed in Response 94.

96.     There were press reports in December of 2019 confirming that Giuliani had met with Derkach in Kyiv.  McNamara Decl. Exs. 30, 31.

Response 96. No dispute.

97.     Public reporting linked Plaintiff to Giuliani and Parnas's efforts to obtain information that would be detrimental to President Biden's candidacy in the 2020 U.S. Presidential Election.  McNamara Decl. Ex. 32.

Response 97. Mr. Nunes denies Defendant's characterization of public reporting and the cited article which speaks for itself and is subject to differing interpretations. Mr. Nunes concedes that the thrust of the article is to cast him in a negative light, but Mr. Nunes specifically denies that the article "linked" him to any efforts by Giuliani and Lev Parnas to do anything.

98.     Public reporting stated that Plaintiff initially publicly denied knowing Parnas. McNamara Decl. Ex. 33.

Response 98. Mr. Nunes denies Defendant's mischaracterization of "public reporting" which speaks for itself and is subject to multiple interpretations. For example, in the "public reporting" by Los Angeles Times, previously cited by Defendant as Exhibit 32, the relevant portion of the article reads:

> [Mr. Nunes] said he had no recollection of speaking to Parnas, and while he needed to check his records, it "seems very unlikely I will be taking calls from random people."
>
> "You know, it's possible," Nunes told Fox News. "I haven't gone through my phone records. I don't really recall that name."

> But last week, shortly before Parnas told MSNBC that he and Nunes had spoken on the phone and met in person but don't "have too much of a relationship," Nunes said he did recall a phone call with Parnas.
>
> "I checked it with my records, and it was very clear—I remember that call, which was very odd, random, talking about random things, and I said, 'Great,' you know, 'Talk to my staff,' and boom, boom, boom," Nunes told Fox News on Wednesday. "That's just normal operating procedure."

As is clear from the face of this article, Mr. Nunes initially stated that he did not recall a phone call with Parnas, noting that he had not checked his records. In a later interview, Mr. Nunes stated that after reviewing his records, he recalled having a conversation with Parnas. Therefore, Mr. Nunes disputes Defendant's characterization that he initially denied knowing Mr. Parnas, as though this was somehow inconsistent with his later statements, which simply admitted to recalling a single conversation with the man. These are not inconsistent, because having an eight-minute conversation with someone does not mean that you know them. Moreover, Mr. Nunes did not deny ever having spoken to Mr. Parnas, only that he initially did not recall speaking with him.

99.     Plaintiff testified in this action that he did not know Parnas.  Nunes Tr. 324:3–4.

Response 99. No dispute.

100.     The Washington Post reported in part that in a December 2019 interview with Sean Hannity, Plaintiff stated that "although it was 'possible' that he spoke with Parnas, he did not 'recall' his name" and that he said "I will go back and check my records, but it seems very unlikely I will be taking calls from random people."  McNamara Decl. Ex. 34 at NBCU0000168.

Response 100. No dispute.

101.     In December of 2019, HPSCI published "The Trump-Ukraine Impeachment Inquiry Report" (the "HPSCI Impeachment Report").  McNamara Decl. Ex. 35.

Response 101. No dispute.

102.    The HPSCI Impeachment Report reflected that on April 10, 2019, phone records showed three short phone calls took place between Giuliani and Plaintiff "in rapid succession, followed by a text message, and ending with a three minute call." *Id.* at NBCU0001455.

Response 102. No dispute.

103.    The HPSCI Impeachment Report reflected that there were four calls between Parnas and Nunes on April 12, 2019, including one that lasted 8 minutes and 43 seconds. *Id.* at NBCU0001566–67.

Response 103. Mr. Nunes disputes Defendant's characterization of the Impeachment Report that he had "four calls" with Mr. Parnas on April 12, 2019, which deliberately omits key information to suggest multiple conversations as a way to discredit Mr. Nunes' recollection of having a single conversation with Mr. Parnas. *See* NBCU0001566–67. What the record reflects is a call from Mr. Parnas to Mr. Nunes at 4:12 p.m., with a total time of one minute, likely a voicemail. *See id.* at 4:54 p.m., the record reflects two failed attempts by Mr. Nunes to return Mr. Parnas's phone call, with one lasting zero seconds, and the second lasting two seconds. *Id.* at 5:30 p.m. Mr. Parnas calls Mr. Nunes again, this time apparently connecting as the call lasts for 8 minutes and 34 seconds. *Id.*

104.    On the January 15, 2020 episode of *TRMS*, Maddow interviewed Parnas (the "January 15, 2020 Parnas Interview").  McNamara Decl. Ex. 36.

Response 104. No dispute.

105.    In the January 15, 2020 episode of *TRMS* containing the Parnas Interview, Maddow stated that "[b]ecause Congressman Nunes has been publicly very vague and defensive about whether he remembers any of his own communications with Lev Parnas . . . I asked Mr. Parnas today if he remembers any interactions with Congressman Nunes." *Id.* at NBCU0000792.

Response 105. No dispute that this is what Ms. Maddow said on her program. Mr. Nunes disputes her characterization of his public statements regarding Parnas as being vague or defensive.

106.    In the January 15, 2020 Parnas Interview, Parnas stated that "[Plaintiff] knows who I am" (*Id.* at NBCU0000793) and explained "[w]e don't have too much of a relationship.  We met several times at the Trump hotel, but our relationship started getting basically where it expanded was when I was introduced to his aide, Derek Harvey, and the reason why Derek Harvey was more -- I understood, I was told at the time because Devin Nunes had an ethics, something to do with an ethics committee, and he couldn't be in the spotlight" (*Id.* at NBCU0000792).

Response 106. No dispute that this is what Mr. Parnas said during his interview. Mr. Nunes disputes the veracity of Mr. Parnas' statements, including as outlined in response 98 and 103.

107.    In the January 15, 2020 Parnas Interview, Parnas stated that he set up several Skype interviews for Derek Harvey with different prosecutors, including Kostiantyn Kulyk who Parnas described as "one of the major guys that's had this whole Biden stuff."  *Id.* at NBCU0000793.

Response 107. No dispute that this is what Mr. Parnas said during his interview. Mr. Nunes disputes the veracity of any of Mr. Parnas' statements.

108.    In the January 15, 2020 episode of *TRMS* containing the Parnas Interview, Maddow stated "[w]e contacted Congressman Nunes's office for comment tonight.  We did not receive any reply before air time.  We'll let you know if that changes before we're off the air."  *Id.*

Response 108. No dispute that this is what Ms. Maddow said during the broadcast. Mr. Nunes disputes the attempted characterization by Ms. Maddow that Mr. Nunes' failure to comment has any bearing on the veracity of Parnas' statements. As is well known by Ms. Maddow, it is Mr. Nunes' practice not to provide comment to media outlets like TRMS, and her failure to note that policy is part of her deliberate attempt to portray Mr. Nunes in a negative light.

109.    Maddow attested that, to her knowledge, TRMS never received comment from Nunes concerning the January 15, 2020 Parnas Interview.  Maddow Decl. ¶ 46.

Response 109. No dispute that Mr. Nunes did not provide comment to TRMS concerning the January 15, 2020 Parnas Interview. Mr. Nunes does dispute the characterization that Defendant attempts to make here—just as Ms. Maddow did on her broadcast—that Mr. Nunes' failure to comment has any bearing on the veracity of Parnas' statements or on Mr. Nunes' truthfulness, given Defendant's knowledge of Mr. Nunes' policy against providing comment to media outlets like TRMS. Such characterization is a disputed issue of material fact.

110.    Maddow testified that she relied on the January 15, 2020 Parnas Interview in writing the Statement.  Maddow Tr. 133:9–136:11; Maddow Decl. ¶¶ 40–43.

Response 110. Mr. Nunes disputes Defendant's statement as not being an accurate description of Ms. Maddow's testimony. The Statement at issue was the accusation that Mr. Nunes had refused to turn over materials allegedly from Derkach to the FBI. Ms. Maddow admits in the cited testimony that Parnas had made no allegation about Mr. Nunes receiving or failing to turn over a Derkach package. Maddow Tr. 134:3–5. She claims that the Parnas interview is relevant to her Statement because Parnas claimed to have been in contact with Mr. Nunes, while Mr. Nunes had supposedly denied ever having contact with Parnas. This is a mischaracterization on two levels. First, Mr. Nunes had not denied ever having contact with Parnas, and had stated that it was possible but he did not recall speaking with him. *See* McNamara Ex. 32. Second, as of the air date of Ms. Maddow's Parnas interview, Mr. Nunes had publicly stated to Fox News that upon reviewing his records, he now recalled having a brief phone call with Parnas, as reported in the Los Angeles Times and discussed in Response 98. *See id*. It is simply not credible for Ms. Maddow to claim she relied on the Parnas Interview to write the Statement, because Parnas said nothing

about Mr. Nunes' receipt of the Derkach package or what he did with it, and therefore, this is a disputed issue of material fact.

111.    On January 18, 2020, the Los Angeles Times published an article titled "Text messages point to Rep. Devin Nunes in Ukraine scheme at heart of Trump impeachment" (the "January 18, 2020 LA Times Article").  McNamara Decl. Ex. 32.

Response 111. No dispute.

112.    The January 18, 2020 LA Times Article reported in part that "[a]s the top Republican on the House Intelligence Committee, Rep. Devin Nunes (R-Tulare) presented a fiery defense of President Trump during impeachment hearings last month, angrily accusing Democrats of ginning up a false narrative about the president's efforts to get Ukraine to dig up dirt on a political rival.  But newly released text messages suggest Nunes' staff was aware of and involved in portions of the scheme, casting new light on his combative defense."  *Id.* at NBCU0000172.

Response 112. Mr. Nunes does not dispute that this is an accurate quotation from the LA Times Article, while not conceding the characterizations contained therein.

113.    The January 18, 2020 LA Times Article further reported in part that "[d]ocuments released by the House committee show repeated contact between Lev Parnas, who worked with Trump's personal attorney Rudolph W. Giuliani, and Derek Harvey, an aide to Nunes on the committee, about meetings with Ukrainian prosecutors to get damaging information about Democrat Joe Biden, who is running for president, and about a debunked theory about Ukrainian involvement in the 2016 U.S. election."  *Id*.

Response 113. Mr. Nunes does not dispute that this is an accurate quotation from the LA Times Article, while not conceding the characterizations contained therein.

114.    The January 18, 2020 LA Times Article reported that "[a] spokesman for Nunes did not return an email seeking comment Saturday." *Id.*

Response 114. No dispute.

115.    Plaintiff did not bring a libel action arising out of the January 18, 2020 LA Times Article.

Response 115. No dispute.

116.    Members of the House publicly released WhatsApp messages exchanged between Parnas and Harvey from February to May of 2019.  McNamara Decl. Ex. 37; *Id.* Ex. 38 at 89:25–90:25.

Response 116. No dispute.

117.    The messages reflect that Parnas facilitated or attempted to facilitate Skype meetings between Harvey and Ukrainian prosecutors, including Kulyk and Shokin.  McNamara Decl. Ex. 37; *Id.* Ex. 38 at 104:11–107:24.

Response 117. Mr. Nunes disputes the characterization of what the messages "reflect" and are subject to multiple interpretations as to what Mr. Parnas was attempting to do, including an attempt to gain access to Mr. Nunes and for self-promotion. As shown in the relevant testimony of Mr. Harvey, which Defendant omits from its exhibit, Mr. Harvey initially communicated with Mr. Parnas as a potential whistleblower, he was suspicious of Mr. Parnas' credibility and was wary of potential forgeries and misinformation, and after a brief period of due diligence, he cut off communications because he evaluated Parnas to be a "grifter." Greaves Ex. D at 77:7–118:6.

118.    On January 11, 2021, the U.S. Department of Treasury issued a press release titled "Treasury Takes Further Action Against Russian-linked Actors" (the "January 11, 2021 Treasury Department Press Release") which announced that "the U.S. Department of the Treasury's Office

of Foreign Assets Control (OFAC) took additional action against seven individuals and four entities that are part of a Russia-linked foreign influence network associated with Andrii Derkach." McNamara Decl. Ex. 39.

Response 118. No dispute.

119.    The January 11, 2021 Treasury Department Press Release stated in part that "Former Ukrainian Government officials Konstantin Kulyk, Oleksandr Onyshchenko, Andriy Telizhenko, and current Ukraine Member of Parliament Oleksandr Dubinsky have publicly appeared or affiliated themselves with Derkach through the coordinated dissemination and promotion of fraudulent and unsubstantiated allegations involving a U.S. political candidate." *Id*.

Response 119. No dispute.

120.    The January 11, 2021 Treasury Department Press Release stated in part that "Kulyk, a former prosecutor for the Prosecutor General's Office of Ukraine, formed an alliance with Derkach to spread false accusations of international corruption." *Id*.

Response 120. No dispute.

121.    Maddow testified that she ultimately found Mr. Parnas' statements in the January 15, 2020 Interview to be credible based on the HPSCI Impeachment Report, the WhatsApp messages between Harvey and Parnas, and the January 18, 2020 LA Times Article. Maddow Decl. ¶¶ 42–43.

Response 121. No dispute that this is Ms. Maddow's testimony. Mr. Nunes disputes the credibility of Ms. Maddow in her purported belief that Parnas, who was under indictment and was purportedly a conduit for misinformation, was a truthful or reliable source. Moreover, Mr. Nunes disputes Ms. Maddow's purported belief that Parnas's purported interactions with Mr. Nunes or his staff had any bearing whatsoever over her accusation that Mr. Nunes had refused to turn over

information to the FBI.

122.     Gnazzo testified that he was aware of the January 15, 2020 Parnas Interview and background information about Russian interference efforts in the 2020 Presidential election and that this informed their belief that the Statement was accurate.  Gnazzo Decl. ¶ 19.

Response 122. Mr. Nunes disputes the credibility of Mr. Gnazzo's testimony that the Parnas Interview could possibly inform his belief in the purported accuracy of the TRMS Statement at issue. As discussed in Response 121, Mr. Gnazzo was also aware of Mr. Parnas being under indictment and the accusations that he was a Russia-linked disinformation agent, and he was also aware that Parnas' statements in the Parnas Interview had nothing to do with the Derkach package or what Mr. Nunes did with that package. Defendant's weasel words of "*informed* their belief that the Statement was accurate" is a tacit admission that there was no evidence for the Statement, and a reasonable person could find that Defendant made a reckless speculation at best, and a deliberate smear at worst. This is a material dispute of fact for the jury to determine.

**PLAINTIFF'S PUBLICLY-STATED VIEWS REGARDING THE FBI**

123.     Plaintiff testified in this action that he had publicly stated that at least some members of the FBI were corrupt.  Nunes Tr. 307:14–18.

Response 123. No dispute.

124.     Plaintiff testified in this action that he had publicly stated that the FBI was "dirty." Nunes Tr. 307:19–21.

Response 124. No dispute.

125.     In a December 9, 2017 interview with Catherine Herridge of FOX News, Plaintiff, in reference to the FBI, stated "I hate to use the word 'corrupt,' but they've become at least so dirty, that who is watching the watchmen?  Who is investigating these people?  There is no one." McNamara Decl. Ex. 40 at 1:32–1:42.

Response 125. No dispute.

126.    In a November 1, 2017 interview with Laura Ingraham of FOX News, Plaintiff stated "if people really believe that the FBI did not know who paid for that dossier, I have a bridge to sell you.  There is no possible way that the FBI did not know who paid for that dossier.  And yet month after month.  Ingraham: So who's lying at the FBI?"  McNamara Decl. Ex. 41.

Response 126. No dispute.

127.    When asked whether he had a serious distrust of the FBI beginning around 2018, Plaintiff testified in this action "I still have distrust of the FBI."  Nunes Tr. 308:4–9.

Response 127. No dispute.

128.    Plaintiff's website states in part that "[d]uring the Russia collusion hoax, Nunes engaged in numerous battles with the FBI."  McNamara Decl. Ex. 42 at 18.

Response 128. No dispute.

129.    Plaintiff's website also states in part that "Nunes' conservative record in Congress, and particularly his work to expose the Russia collusion hoax and associated abuses within the Intelligence Community, have garnered praise from conservative commentators and activists."  *Id.* at 4.  Plaintiff's website continues to list several political commentators who praised his work in connection with exposing the "Russia collusion hoax" and corruption within the FBI.  *Id.* at 4–7.

Response 129. No dispute.

130.    On January 18, 2018, the HPSCI Republican majority, under Plaintiff's leadership, authored a memorandum regarding "Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation" (the "January 2018 HPSCI Memorandum").  McNamara Decl. Ex. 43.

Response 130. No dispute.

131.    The January 2018 HPSCI Memorandum stated that its findings, among other things "raise concerns with the legitimacy and legality of certain DOJ and FBI interactions with the Foreign Intelligence Surveillance Court (FISC)."  *Id.* at NBCU0001894.

Response 131. No dispute.

132.    Plaintiff confirmed in this action, with regard to the January 2018 HPSCI Memorandum, that he had serious concerns about the trustworthiness of the DOJ and FBI, testifying "well, yes, we were investigating them."  Nunes Tr. 307:8–13.

Response 132. No dispute.

133.    *TRMS* has reported previously on Plaintiff's contentious interactions with the FBI. McNamara Decl. Ex. 44 at NBCU0000431; McNamara Decl. Ex. 45 at NBCU0000453.

Response 133. No dispute.

134.    Gnazzo testified that he was aware of prior reporting on Plaintiff's interactions with the FBI and that this informed their belief that the Statement was accurate.  Gnazzo Tr. 110:23–111:7, 136:20–21; Gnazzo Decl. ¶ 23.

Response 134. Mr. Nunes disputes the credibility of Mr. Gnazzo's testimony that Mr. Nunes' investigation and criticisms of the FBI could possibly inform his belief in the purported accuracy of the TRMS Statement at issue. The fact that a person is critical of a law enforcement agency—particularly one as large as the FBI—is not evidence that that person withheld information or refused to turn over information to that agency on any particular occasion, or would even be more or less likely to do so. Defendant's weasel words of "*informed* their belief that the Statement was accurate" is a tacit admission that there was no evidence for the Statement, and it was a reckless speculation at best, and a deliberate smear at worst. Either way, this is a material dispute of fact for the jury to determine.

135.    Gnazzo testified that was also aware of prior reporting on *TRMS* specifically about Plaintiff and his interactions with the FBI and that this informed their belief that the Statement was accurate.  Gnazzo Tr. 110:23–111:7, 136:20–21; Gnazzo Decl. ¶ 23.

Response 135. Mr. Nunes disputes the credibility of Mr. Gnazzo's testimony that Mr. Nunes' investigation and criticisms of the FBI could possibly inform his belief in the purported accuracy of the TRMS Statement at issue. The fact that a person is critical of a law enforcement agency—particularly one as large as the FBI—is not evidence that that person withheld information or refused to turn over information to that agency on any particular occasion, or would even be more or less likely to do so. Defendant's weasel words of "*informed* their belief that the Statement was accurate" is a tacit admission that there was no evidence for the Statement, and it was a reckless speculation at best, and a deliberate smear at worst. Either way, this is a material dispute of fact for the jury to determine.

### THE MARCH 18, 2021 *TRMS* SEGMENT

136.    The *TRMS* Segment opens by identifying the recently declassified ODNI Report. McNamara Decl. Ex. 1 at 12:09.

Response 136. No dispute.

137.    In the *TRMS* Segment, Maddow identifies a "Key Judgment" of the ODNI Report that stated "we assess that Russian President Putin authorized, and a range of Russian government organizations conducted, influence operations aimed at denigrating President Biden's candidacy and the Democratic Party, supporting former president Trump, undermining public confidence in the electoral process." *Id.* 16:30–17:00.

Response 137. No dispute.

138.    In the *TRMS* Segment, Maddow states that the findings of the ODNI Report are "the conclusion of the U.S. intelligence community, and not the U.S. intelligence community under

President Biden—interestingly the report was actually concluded while Trump was still the president before the inauguration." *Id.* at 17:40–17:54.

Response 138. No dispute.

139.    In the *TRMS* Segment, Maddow reports that one of the named agents in the ODNI report "described by the director of national intelligence as having carried out the Kremlin's attack on our election this year is a guy named Andrii Derkach." *Id.* at 22:46–23:00.

Response 139. No dispute.

140.    In the *TRMS* Segment, Maddow states that "the report names [Derkach], says he was, quote, under the purview of Russian President Vladmir Putin for the purpose of this operation targeting the election to try to hurt Biden and help Trump." *Id.* at 23:01–23:13.

Response 140. No dispute.

141.    In the *TRMS* Segment, Maddow states that "and that guy Derkach didn't just shovel Russian intelligence disinformation to Rudy Giuliani, which is something that has been well documented and raises all sorts of interesting questions about what's reported to be an ongoing criminal investigation of Mr. Giuliani, which was kyboshed in part by Bill Barr's Justice Department when they blocked prosecutors at the local level from pursuing a search warrant for Giuliani's electronic devices." *Id.* at 23:13–23:38.

Response 141. No dispute that this is an accurate quotation of Ms. Maddow's statement, but does not concede the characterizations therein.

142.    In the *TRMS* Segment, Maddow states "beyond Derkach feeding all of this stuff to the President's lawyer, Rudy Giuliani, as part of Russia's attack on our election, last summer, Democrats on the Intelligence Committee in the House learned that same guy Derkach, had mailed

a stack of unknown materials to a Republican congressman named Devin Nunes, who is the top Republican on the Intelligence Committee to this day." *Id.* at 23:39–24:01.

Response 142. No dispute.

143.    In the *TRMS* Segment, when reporting, in part, that "Derkach had mailed" unknown materials to Devin Nunes, the headline and excerpts from the July 31, 2020 CNN Article are displayed. *Id.* at 23:51–24:26.

Response 143. No dispute.

144.    In the *TRMS* Segment, Maddow states "Andrii Derkach is sanctioned by the U.S. Government as a Russian Agent.  He is singled out by name by the director of national intelligence as someone under Vladmir Putin's direct purview who helped run this organization targeting our election last year." *Id.* at 24:02–24:17.

Response 144. No dispute.

145.    In the *TRMS* Segment, Maddow states "Congressman Nunes accepted a package from him" and asks "what was in it?" *Id.* at 24:18–24:22.

Response 145. No dispute that this is an accurate quotation of Ms. Maddow's statement, but disputes the characterizations therein. Indeed, a reasonable juror could find that this statement is evidence of Ms. Maddow's deliberate attempt to smear Mr. Nunes, as she, being an intelligent and skilled communicator, would be fully aware that just because something is mailed to a congressman's office does not mean they have personally "accepted" it.

146.    In the *TRMS* Segment, Maddow then states "Congressman Nunes has refused to answer questions about what he has received from Andrii Derkach.  He has refused to show the contents of the package to members of the intelligence community.  He has refused to hand it over

to the FBI, which is what you should do if you get something from somebody that is sanctioned by the U.S. government as a Russian agent." *Id.* at 24:23–24:40.

Response 146. No dispute that this is an accurate quotation of Ms. Maddow's statement, but obviously disputes the characterizations and outright falsehoods therein.

## THE PRODUCTION OF THE *TRMS* SEGMENT

147.    In developing the content for *TRMS*, Maddow testified that she would spend the first part of the day reading and reviewing the news of the day and other materials that might inform the reporting for the show.  Maddow Tr. 45:4–25; Maddow Decl. ¶ 10.

Response 147. No dispute.

148.    Maddow testified that she would typically circulate her Research Notes to the entire staff of *TRMS* before a daily news meeting.  Maddow Tr. 45:25–46:13; Gnazzo Tr. 143:16–23; Maddow Decl. ¶ 11; Gnazzo Decl. ¶ 11.

Response 148. No dispute.

149.    Maddow and Gnazzo testified that during the daily news meeting the content for the show would be discussed and finalized, and members of *TRMS* would be assigned to each segment of the show.   Maddow Tr. 46:18–23; Gnazzo Tr. 22:8–12, 24:17–25:3, 45:5–46:13; Maddow Decl. ¶¶ 11–12; Gnazzo Decl. ¶¶ 11–12.

Response 149. No dispute.

150.    Maddow and Gnazzo testified that they did not consider the information concerning Plaintiff in the *TRMS* Segment, including the Statement, to be original reporting.  Maddow Tr. 88:11–13; Gnazzo Tr. 66:4–11, 68:21–69:9, 128:23–129:1; Maddow Decl. ¶ 46; Gnazzo Decl. ¶ 25.

Response 150. Mr. Nunes disputes the credibility of Ms. Maddow and Mr. Gnazzo's testimony in their belief that the Statement at issue was not original reporting. They repeatedly

mischaracterize the Politico article—their sole alleged source for the supposed prior reporting of the Statement—to suggest that it says something that it does not say, as previously discussed in Response 19. A reasonable juror could conclude that Ms. Maddow and Mr. Gnazzo knew or didn't care that the Statement was unsupported by evidence, and that it was a reckless speculation at best, or a deliberate smear at worst. This is a material issue of disputed fact.

151.    Maddow testified that the *TRMS* Segment was not "developing and presenting newly-reported information.  We were taking a number of data points that were in the public record and lining them up and presenting them."  Maddow Tr. 128:23–129:1.

Response 151. Mr. Nunes disputes the credibility of Ms. Maddow's testimony in her belief that the Statement at issue was previously reported. She repeatedly mischaracterizes the Politico article—her sole alleged source for the supposed prior reporting of the Statement—to suggest that it says something that it does not say, as previously discussed in Response 19. As discussed in numerous Responses herein, none of Ms. Maddow's other cited sources contained any allegation or implication that Mr. Nunes refused to turn over the Derkach package to the FBI. A reasonable juror could conclude that Ms. Maddow and Mr. Gnazzo knew or didn't care that the Statement was unsupported by evidence, and that it was a reckless speculation at best, or a deliberate smear at worst. This is a material issue of disputed fact.

152.    Maddow and Gnazzo testified that *TRMS* often takes current events and addresses them in the context of their relevant historical framework.  Gnazzo Tr. 23:7–15; Maddow Decl. ¶ 9.

Response 152. No dispute.

153.    Maddow identified certain data points in her testimony—including the reporting in the July 23, 2020 Politico Article, the July 13, 2020 Letter to the FBI, the transcript of the HPSCI

Business Meeting, and the ODNI Report—were "all in the public record" and stated that "we were not advancing any of those stories at all, but rather, combining them into an explanatory narrative that hopefully made sense of this issue for our audience." Maddow Tr. 128:23–129:15; Maddow Decl. ¶¶ 9, 15–16, 23–36; McNamara Decl. Exs. 10, 18, 21.

Response 153. Mr. Nunes disputes the credibility of Ms. Maddow's testimony as an attempt to white-wash her false statement, hiding behind weasel words like "an explanatory narrative" and ignoring her bald accusation that Mr. Nunes refused to turn over material to the FBI. As previously discussed in multiple Responses, none of Ms. Maddow's cited sources contained an allegation that Mr. Nunes refused to turn over the Derkach package to the FBI, and a reasonable juror could conclude that Ms. Maddow knew or didn't care that she had no evidence for her Statement and that it was reckless speculation at best or a deliberate smear at worst.

154.    Maddow testified that she believed that it would have been a normal and appropriate response for Plaintiff to publicly state that he had turned over the Derkach Package to the FBI. Maddow Tr. 92:24–93:24, 94:22–95:8, 95:24–97:22.

Response 154. Mr. Nunes disputes the credibility of Ms. Maddow's purported reliance on his declining to comment as evidence that he refused to turn over materials to the FBI. As discussed in previous Responses, Ms. Maddow was well aware of Mr. Nunes' reputation for not speaking to the press.

155.    Maddow testified that Plaintiff's behavior concerning his receipt of the Derkach Package was remarkable to her and that she took note of his refusal to publicly address what he did with the Derkach Package. Maddow Tr. 93:12–94:6, 125:4–126:23; Maddow Decl. ¶¶ 16, 31, 34–35, 37, 39, 44.

Response 155. Mr. Nunes disputes the credibility of Ms. Maddow's purported shock at Mr. Nunes' declining to comment on the Derkach Package. As discussed, Ms. Maddow was well aware of Mr. Nunes' reputation for not speaking with the press. Given Ms. Maddow's knowledge of public reporting that Mr. Derkach was a foreign disinformation agent, and the fact that Mr. Nunes was the ranking member of HPSCI, entrusted with highly sensitive and classified information and investigations, a reasonable juror could conclude that Ms. Maddow—an intelligent and experienced journalist, who has covered countless political and national security scandals—would not be naive to the valid reasons someone in Mr. Nunes' position could have for declining to publicly address the disposition of the Derkach Package. A reasonable juror could conclude that Ms. Maddow knew or didn't care that she had no evidence of Mr. Nunes refusing to turn over the Derkach package, and that her Statement was a reckless speculation at best, or a deliberate smear at worst. This is a material issue of disputed fact.

156. Maddow and Gnazzo testified that *TRMS* had previously reached out to Plaintiff for comment on unrelated reporting and that he had failed to respond. Maddow Tr. 128:14–16; Maddow Decl. ¶ 46; Gnazzo Decl. ¶ 26.

Response 156. No dispute.

157. During prior episodes of *TRMS*, Maddow stated that *TRMS* had reached out to Plaintiff for comment and had not received a response. McNamara Decl. Ex. 45 at NBCU0000454; *Id.* Ex. 36 at NBCU0000793.

Response 157. No dispute.

158. Plaintiff testified that "I don't speak to any of the fake news" (Nunes Tr. 202:16–17) and that he "for sure" considers Rachel Maddow to be part of the fake news (Nunes Tr. 202:21–25).

Response 158. No dispute.

159.    Plaintiff's former Communications Director, Jack Langer, testified that starting in "late 2016, early 2017," it became his practice not to respond to requests for comment from "mainstream media."  McNamara Decl. Ex. 9 at 77:1–3, 111:17–22.  Langer testified that he considered MSNBC to be part of the mainstream media.  *Id.* at 75:10–13.

Response 159. No dispute.

160.    Plaintiff's website states "Nunes stopped speaking to the mainstream media altogether and urged other Republicans in Congress to do the same" and that Plaintiff "cut off the mainstream media."  McNamara Decl. Ex. 42 at NBCU0001886.  Langer testified that he and Plaintiff wrote this portion of the website together.  McNamara Decl. Ex. 9 at 77:18–21.

Response 160. No dispute.

161.    Maddow and Gnazzo testified that they were aware of Plaintiff's general practice of refusing to provide comment to media outlets.  Maddow Tr. 91:17–19, 98:17–99:5; Gnazzo Tr. 104:17–105:10; Maddow Decl. ¶ 46; Gnazzo Decl. ¶ 26.

Response 161. No dispute.

162.    Maddow and Gnazzo testified that because the *TRMS* Segment was re-reporting information, including from the July 23, 2020 Politico Article, and because they understood that Plaintiff had already declined to provide comment on that article, they did not reach out to Plaintiff for comment.  Maddow Tr. 94:3–6, 106:13–19; Gnazzo Tr. 99:23–100:4, 101:7–21; Maddow Decl. ¶ 46; Gnazzo Decl. ¶ 25.

Response 162. Mr. Nunes disputes Ms. Maddow and Mr. Gnazzo's mischaracterization of the Politico Article, as discussed in Responses 18 and 19, and disputes their credibility in any belief that the Politico Article accuses Mr. Nunes of refusing or even failing to turn over the

Derkach package to the FBI. Therefore, their claim to have not reached out to Mr. Nunes for comment based on such justification is a disputed issue of material fact, especially considering their knowledge of Mr. Nunes' practice of not giving comment to the media.

163.     Maddow and Gnazzo testified that they also did not reach out to Plaintiff because they were aware of his general practice of declining to provide comment to mainstream media organizations.  Maddow Tr. 98:17–99:5; Gnazzo Tr. 133:2–8, 136:23–25; Maddow Decl. ¶ 46; Gnazzo Decl. ¶ 26.

Response 163. No dispute.

## PLAINTIFF'S ALLEGATIONS IN THIS LITIGATION

164.     On April 5, 2021, Counsel for Plaintiff, Steven Biss, sent a demand and retraction letter to NBCU (the "April 5, 2021 Demand Letter").  McNamara Decl. Ex. 46.

Response 164. No dispute.

165.     In the April 5, 2021 Demand Letter, Mr. Biss asserted that the *TRMS* Segment was materially false because, among other reasons, "Congressman Nunes did not refuse to hand [the Derkach Package] over to the FBI."  *Id.* at PX 645.

Response 165. No dispute.

166.     In the April 5, 2021 Demand Letter, Mr. Biss pointed NBCU to a July 29, 2020 Breitbart article titled "Republicans Mull Ethics Charges Against Schiff Ally as Democrats Turn Back to Failed Russia Strategy" (the "July 29, 2020 Breitbart Article").  *Id.*; McNamara Decl. Ex. 47.

Response 166. No dispute.

167.     In the July 29, 2020 Breitbart Article, Plaintiff is interviewed, but does not provide any statement about what happened to the Derkach Package.  McNamara Decl. Ex. 47 at 639, 642. When asked about why he did not clear the air on whether he turned the Derkach Package over to

the FBI in the Breitbart Article, Plaintiff testified that it was because "it's a made up story."  Nunes Tr. 232:16–17.

Response 167. No dispute.

168.    Plaintiff testified that he never heard of Derkach, that he did not know who Derkach was at the time HPSCI received the Derkach Package and "[n]obody cares about Derkach, nobody ever cared about Derkach."  Nunes Tr. 26:15–24, 38:2-3.

Response 168. No dispute.

169.    Rep. Eric A. "Rick" Crawford stated in an interview for the July 29, 2020 Breitbart Article that "it's standard practice that if you get a package from unknown source in a foreign country, it's probably a good idea to call the FBI and let them handle it and not handle those packages and don't open them and go, 'Hey I wonder what this is?  I guess it's Christmas came early this year.' No, you follow the protocol, which is you turn that over to the FBI.  That's what happened."  McNamara Decl. Ex. 47 at 641.

Response 169. No dispute.

170.    Rep. Crawford testified in this action that his statement in the July 29, 2020 Breitbart Article was strictly based on an assumption that Plaintiff had followed proper protocol. McNamara Decl. Ex. 22 at 30:14–20 ("Well, I think, if I recall, probably that's just -- as I would do if I received a package from a foreign source, I would turn that over to the FBI.  And I assume that's what happened.  I just didn't think there was anything more to it than that."); *see also id.* 30:21–31:23.

Response 170. Mr. Nunes disputes the characterization of Mr. Crawford's testimony as being "strictly based on an assumption" as Mr. Crawford never used the words "strictly based." Mr. Crawford's full statement is found at McNamara Ex. 22 at 30:14–31:23, which speaks for

itself and his testimony is based on his recollection as of the date of the deposition. Defendant's characterization suggests that Mr. Crawford could not have had any other basis for that statement, which is not what Mr. Crawford testified, only that he does not recall any conversations about the Derkach package five years after the fact.

171.    Rep. Crawford testified that he never communicated with Plaintiff about whether he turned the Derkach Package over to the FBI. *Id.* at 31:4–7.

Response 171. No dispute.

172.    Rep. Crawford testified that he had no recollection of communicating with Plaintiff's former staffers about whether Plaintiff turned the package to the FBI. *Id.* at 31:8–14.

Response 172. No dispute.

173.    Rep. Crawford testified that he never spoke to the FBI about whether Plaintiff turned over the Derkach Package. *Id.* at 31:15–17.

Response 173. No dispute.

174.    Rep. Crawford testified that his press secretary, Sara Robertson, did not inform him concerning the circumstances surrounding Plaintiff's receipt of the Derkach package in preparation for speaking with Breitbart's reporter for the Breitbart Article. *Id.* at 15:4–12.

Response 174. No dispute.

175.    Rep. Crawford also testified that he did not believe that his conversation with Breitbart was a planned conversation, but rather occurred as an impromptu conversation as he was exiting the U.S. Capitol. *Id.* at 18:6–19.

Response 175. No dispute.

176.    Rep. Crawford also testified that he did not know what Plaintiff did with the Derkach Package. *Id.* at 15:22–17:8.

Response 176. Mr. Nunes disputes the characterization of Mr. Crawford's testimony as it omits a portion that suggests that he could have known at some point from a prior conversation, but that he did not currently recall such a conversation. The full exchange is found at McNamara Ex. 22 at 15:22–17:22.

177.    Rep. Crawford testified that he was not speaking on behalf of Plaintiff when he made his statement to Breitbart.  *Id.* at 31:4–14.

Response 177. No dispute.

178.    Rep. Crawford testified that other than his assumption that Plaintiff followed proper protocol, he had no independent basis for his statement in the July 29, 2020 Breitbart Article that Plaintiff turned over the package to the FBI.  *Id.* at Tr. 31:18–23 ("Q. So other than your assumption, you had no independent basis for the statement that Mr. Nunes -- that that's what happened in this circumstance, is that correct?  A. That's correct.").

Response 178. Mr. Nunes disputes Defendant's characterization of Mr. Crawford's testimony. As discussed in Responses 170 and 176, Mr. Crawford specifies that he could have had knowledge at some point from conversations with other HPSCI staff members, but could not recall them at this point.

179.    In the April 5 Demand Letter, Mr. Biss relied on Representative Crawford's interview in the July 29, 2020 Breitbart Article to support his assertion that the Segment was false. McNamara Decl. Ex. 46 at PX 646.

Response 179. Mr. Nunes disputes Defendant's characterization of the Demand Letter as relying on the Crawford interview to support the assertion that the TRMS Segment was false. The Demand Letter certainly cites to the Crawford interview to show that there was public reporting on the fact that the Derkach Package was turned over to the FBI. The Demand Letter "relied" upon

the truth from his own client, which is that Mr. Nunes in fact turned the package over to the FBI, as supported by the sworn testimony of Mr. Nunes, Mr. Ciarlante, Mr. Harvey, Mr. Langer, Mr. Souza, and undisputed by any other source. *See* Greaves Ex. E at 150:5–14; Greaves Ex. A at 83:11–14, 91:24–92:8; Greaves Ex. D at 130:20–131:10; Greaves Ex. C at 298:23–299:9; Greaves Ex. B at 78:4–7, 81:6–13.

180.    Plaintiff references the July 29, 2020 Breitbart Article in the SAC in support of his allegation that Maddow knew that the Derkach Package had been turned over to the FBI.  SAC ¶ 16.

Response 180. No dispute.

181.    Maddow and Gnazzo testified that they were not aware of the July 29, 2020 Breitbart Article at the time the Segment was published.  Gnazzo Tr. 138:25–139:8; Maddow Decl. ¶¶ 52; Gnazzo Decl. ¶ 29.

Response 181. No dispute.

182.    Maddow testified that she and her team generally do not read Breitbart.  Maddow Tr. 110:12–14.

Response 182. No dispute.

183.    Rep. Crawford's quotation from the July 29, 2020 Breitbart Article was included in a July 30, 2020 Politico article titled "Intel Dems press Nunes for details on anti-Biden package from Ukrainian official" (the "July 30, 2020 Politico Article").  McNamara Decl. Ex. 48.

Response 183. No dispute.

184.    Maddow and Gnazzo testified that they did not recall reading the July 30, 2020 Politico Article before the Segment was published.  Maddow Tr. 102:7–14; Gnazzo Tr. 79:11–17, 138:17–24; Maddow Decl. ¶ 54, 55; Gnazzo Decl. ¶ 29, 31.

Response 184. No dispute.

185.    On March 18, 2021 at 11 am EST, Steve Benen, who serves as the editor of the MaddowBlog website, published an article titled "Intel revelations raise difficult questions for several Republicans" (the "March 18, 2021 MaddowBlog Post").  McNamara Decl. Ex. 49; *Id.* Ex. 50.

Response 185. No dispute.

186.    Maddow and Gnazzo testified that Mr. Benen is not involved in the writing or production of *TRMS* and was not involved in writing or producing the *TRMS* Segment.  Maddow Tr. 140:1–9; Gnazzo Tr. 169:2–3; Maddow Decl. ¶ 56.

Response 186. Mr. Nunes disputes Defendant's characterization of Ms. Maddow and Mr. Gnazzo's testimony and disputes their credibility in any claim that Mr. Benen was "not involved" in the production of TRMS generally or the TRMS Segment at issue. Ms. Maddow testified that she did not recall if Mr. Benen's pitch e-mail or blog post influenced the TRMS Segment on that particular occasion, but that she reviews his emails of what he thinks might be of interest each day, and that his emails are "very helpful." Greaves Ex. F at 140:1–142:12. Given the detailed pitch on Mr. Nunes from Mr. Benen that day, and TRMS running with several ideas from his writing, a reasonable juror could conclude that he was involved in the production of the TRMS Segment. *Id.*

187.    On April 9, 2021, counsel for NBCU, David N. Sternlicht, sent Mr. Biss, a written response to Plaintiff's April 5, 2021 Demand Letter ("NBCU's April 9, 2021 Letter").  McNamara Decl. Ex. 51.

Response 187. No dispute.

188.    In addressing the Statement, NBCU's April 9, 2021 Letter stated that Plaintiff "refused to answer questions about the package" at the July 29, 2020 HPSCI Business Meeting

and states that NBCU was "not aware of any statements by [Plaintiff] since that hearing in which he stated that he provided the package to the FBI." *Id.*

Response 188. No dispute.

189.    NBCU's April 9, 2021 Letter stated in part that the July 29, 2020 Breitbart Article "includes a statement from another congressman, but that individual was not speaking on Congressman [sic] Nunes's behalf, nor has Congressman Nunes or anyone speaking on his behalf made such a statement until your letter now." *Id.*

Response 189. No dispute.

190.    NBCU's April 9, 2021 Letter asked "Is it Congressman Nunes's position that he submitted the package to the FBI or another intelligence agency?  If so, to which agency did Congressman Nunes submit the package and on what date?  Was it in response to a request of the agency?" *Id.* at NBCU0001746.

Response 190. No dispute.

191.    NBCU's April 9, 2021 Letter stated in part that NBCU "would like to update [its] reporting on this matter as expeditiously as possible in light of Congressman Nunes's responses and the information in [the April 5, 2021 Demand Letter], which [NBCU] seek[s] to clarify." *Id.*

Response 191. No dispute.

192.    NBCU's April 9, 2021 Letter asked Plaintiff to "provide [his] reply to Executive Producer of *TRMS*, Cory Gnazzo" and included Gnazzo's email address. *Id.*

Response 192. No dispute.

193.    Gnazzo testified that he never received a response to NBCU's April 9, 2021 Letter from Plaintiff, Mr. Biss, or any other representative of Plaintiff.  Gnazzo Tr. 61:7–17, 137:1–12; Gnazzo Decl. ¶ 35.

Response 193. No dispute.

194.    Maddow testified that, to her knowledge, NBCU never received a response to NBCU's April 9, 2021 Letter from Plaintiff, Mr. Biss, or any other representative of Plaintiff. Maddow Tr. 132:3–11; Maddow Decl. ¶ 51.

Response 194. No dispute.

195.    Maddow testified that "if Plaintiff had an issue with the accuracy of [the Statement] specifically, once we were talking offline about it and he was raising that issue and wanted to contest it, that was . . . yet another great opportunity for him to tell me whether or not he handed this over to the FBI and he didn't."  Maddow Tr. 127:25–128:7.

Response 195. No dispute that this is an accurate quotation of Ms. Maddow's testimony, but Mr. Nunes disputes the mischaracterization by Ms. Maddow, who had already been informed by the Demand Letter that Mr. Nunes had turned the Derkach package over to the FBI. Ms. Maddow was the one who fabricated the accusation that Mr. Nunes refused to turn over the Derkach package to the FBI, without any basis, and her statement suggests that it was somehow Mr. Nunes' obligation to disprove or disavow her lie. Mr. Nunes had already unambiguously notified Ms. Maddow that her statement was false.

196.    Maddow and Gnazzo testified that Plaintiff's actions, particularly his failure to respond to NBCU's April 9, 2021 Letter, further bolstered her view that the Statement was accurate.  Maddow Tr. 128:8–11; Gnazzo Tr. 61:7–17, 137:1–12; Maddow Decl. ¶ 50; Gnazzo Decl. ¶ 35.

Response 196. Mr. Nunes disputes the characterization of Ms. Maddow and Mr. Gnazzo's testimony and the credibility of their testimony that "failure to respond" to NBCU's April 9, 2021 letter could possibly bolster any purported view that the TRMS Statement at issue was accurate.

Ms. Maddow was the one who fabricated the accusation that Mr. Nunes refused to turn over the Derkach package to the FBI, without any basis, and this testimony suggests that it was somehow Mr. Nunes' obligation to respond to NBCU's letter, rather than their obligation to remove and retract false and defamatory material. Mr. Nunes had already unambiguously denied the false accusation that he refused to turn over the Derkach package to the FBI by his Demand Letter.

197.    Gnazzo testified that "the first time [Plaintiff] ever went on the record about this entire story, to my knowledge, is when we were sued." Gnazzo Tr. at 137:9–12.

Response 197. No dispute.

198.    In this action, Plaintiff has produced a letter, dated December 11, 2019, to former Attorney General William P. Barr, with a cc to Brian A. Benczkowski, Assistant Attorney General of the Criminal Division of the Department of Justice (the "December 11, 2019 Barr Letter"). McNamara Decl. Ex. 52. This letter is cited by Plaintiff in his complaint. SAC ¶ 13; McNamara Decl. Ex. 52; Nunes Tr. 21:23–22:8.

Response 198. No dispute.

199.    During Plaintiff's deposition, the December 11, 2019 Barr Letter was the only specific piece of documentary evidence that Nunes pointed to in support of his contention that he turned over the Derkach Package to the FBI. Nunes Tr. 50:14–51:5, 173:22–174:19.

Response 199. Mr. Nunes disputes this altogether. Aside from the letter, Mr. Nunes referred to an FBI 302 as documenting efforts by his office to turn Derkach materials over to the FBI. Greaves Ex. E at 168:18–169:3. Additionally, he referred to calendar records of a meeting with the FBI to discuss the Derkach Package. *Id.* at 65:19–74:20.

200.    The December 11, 2019 Barr Letter stated "[t]he House Intelligence Committee today received a package from foreign individuals addressed to me. We have strong reason to

believe that the sending of this package is part of a foreign disinformation campaign that included participation by Americans.  As a result, I request a meeting with you to discuss these concerns at your earliest convenience."  SAC ¶ 13; McNamara Decl. Ex. 52.

Response 200. No dispute.

201.    The December 11, 2019 Barr Letter did not state, or otherwise reflect, that Plaintiff enclosed the Derkach Package.  McNamara Decl. Ex. 52; Nunes Tr. 41:18–21; McNamara Decl. Ex. 8 at 64:25–65:6.

Response 201. No dispute.

202.    The December 11 Letter was first made public when Plaintiff filed this defamation action on August 3, 2021.  SAC ¶ 13; McNamara Decl. Ex. 53 at 97:16–98:6.

Response 202. No dispute.

203.    Maddow and Gnazzo testified that they did not publish the *TRMS* Segment or its Statement because they harbor any bias, spite, or ill-will towards Plaintiff.  Maddow Tr. 148:8–17, 148:20–150:8; Gnazzo Tr. 141:8–13; Maddow Decl. ¶ 58; Gnazzo Decl. ¶ 37.

Response 203. Mr. Nunes does not dispute that this is their testimony, but he disputes their credibility given their incredible descriptions of the supposed information that they "relied" on or that "informed" their belief in the purported accuracy of the TRMS Statement, none of which included any allegation or implication that Mr. Nunes had refused to turn over material to the FBI, as discussed in multiple Responses above. Moreover, Ms. Maddow and Mr. Gnazzo's disregard for NBCU policy against relying on single, anonymous sources from other media outlets, could be viewed by a reasonable juror as evidence of recklessness and avoidance of truth by Defendant. As demonstrated by multiple transcripts of TRMS, Ms. Maddow repeatedly discusses Mr. Nunes on her program, discussing him in derisive and condescending language, which a reasonable juror

could conclude was evidence of her ongoing malice toward Mr. Nunes. *See* Greaves Exs. P–X. A reasonable juror could also view Ms. Maddow's Interview of Mr. Parnas and her repetition of his claims about Mr. Nunes, and her false accusation regarding the Derkach package to be evidence of her malice toward Mr. Nunes, because—as a reasonable juror could conclude—she does exactly what she accuses Mr. Nunes of doing, that is, to be a conduit for Russian disinformation, as previously discussed in Responses 94 and 155. *See also* Greaves Exs. Y, Z. Given her pattern of covering Mr. Nunes in such a negative light, her admitted political affiliation with Democrats, and her embrace of the Russia-collusion narrative in criticizing President Trump and his allies, like Mr. Nunes, a reasonable juror could conclude that Defendant knew or didn't care that it had no evidence to support the Statement, and that the accusation was either a reckless speculation, or a deliberate smear.

204.    Maddow and Gnazzo testified that they did not publish the *TRMS* Segment or its Statement because of ratings.  Maddow Tr. 151:23–153:4; Maddow Decl. ¶ 57, 59; Gnazzo Decl. ¶ 36.

Response 204: Mr. Nunes disputes the credibility of the statements cited because they are in conflict with other evidence in the record. Ms. Maddow's show was in the primetime slot. Greaves Ex. G at 14:11-17. Ms. Maddow also admitted ratings are important. Greaves Ex. F at 151:13-22. And as Mr. Gnazzo discussed, they were always looking for ways to tell a better story. Greaves Ex. G at 170:9-171:3. And as noted, they were looking for the "easier hit" that would drive ratings for their show, which was well known as a left-wing show. Greaves Ex. K. Thus, drawing all inferences in favor of the Plaintiff, Mr. Nunes, a prominent Republican, became Defendant's target for achieving the ratings Defendant desired.

65

205.    Maddow and Gnazzo testified that they did not publish the *TRMS* Segment or its Statement for political reasons.  Maddow Tr. 150:12–19; Maddow Decl. ¶¶ 58–59; Gnazzo Decl. ¶ 37.

Response 205: Mr. Nunes admits that Maddow and Gnazzo testified as such, but he disputes the credibility of such statements in light of other evidence. During deposition, Ms. Maddow's counsel improperly prevented testimony about Ms. Maddow's political beliefs with an instruction not to answer. *See* Dkt. No. 137 at 4 (finding that the instruction not to answer questions was improper but may have been upheld on relevance grounds). Therefore, it can be expected that full questioning at trial would adduce additional information about Ms. Maddow's well-known left-wing political beliefs and how the piece was meant to be an "easier hit" against Mr. Nunes than other Republicans, which was shut down improperly. *See* Dkt. No. 137 at 4 ("I'm a liberal and he's a conservative, so we probably disagree on most things, but you never know.") (citing Maddow Tr. at 150:15-17); *see also* Greaves Ex K (discussing the "easier hit" against Mr. Nunes undermining Ms. Maddow's claimed impartiality and creating an inference of political motivation). In addition, as the Second Circuit previously agreed, "alleged bias would be relevant to show a purposeful avoidance of the truth if it were coupled with evidence of an extreme departure from standard investigative techniques." *Church of Scientology Intern. v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001).

Dated: January 13, 2025                          Respectfully submitted,

                                                 /s/ *Jason C. Greaves*
                                                 Jason Greaves, *pro hac vice*
                                                 Jesse R. Binnall, *pro hac vice*
                                                 Shawn Flynn, *pro hac vice*
                                                 BINNALL LAW GROUP
                                                 717 King Street, Suite 200
                                                 Alexandria, Virginia 22314
                                                 Phone: (703) 888-1943

jason@binnall.com
jesse@binnall.com
shawn@binnall.com

*Attorneys for Plaintiff Devin G. Nunes*