UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DEVIN NUNES,

                Plaintiff,

    -against-

NBCUNIVERSAL MEDIA, LLC,

                Defendant.

-------------------------------------------------------------x

                       22-cv-1633 (PKC)

                      <u>OPINION AND ORDER</u>

CASTEL, U.S.D.J.

        Plaintiff Devin Nunes brought this defamation action based upon allegedly false statements made during a March 18, 2021, episode of *The Rachel Maddow Show* ("TRMS"). Defendant NBCUniversal Media, LLC ("NBCU") moved to dismiss certain challenged statements from the March 18 episode and the Court granted the motion in part. (ECF 57.) Only one challenged statement remains at issue in this action. (<u>Id.</u>)

        The segment reported that Nunes had received a package addressed to him from Andrii Derkach,[1] a Ukrainian legislator with ties to Russian officials and intelligence services, while he was the ranking member of the House Permanent Select Committee on Intelligence (the "Intelligence Committee" or the "Committee"). The single challenged statement was that Nunes had "refused to hand [the package] over to the" Federal Bureau of Intelligence ("FBI"). This, Nunes contends, was false and defamatory because, as he testified, on the day the package was received, it was turned over to the FBI.

---

[1] The Court's prior opinion and order adopted the Amended Complaint's spelling of Derkach's first name, spelled, "Andriy." (Amend. Compl't, ECF 40.) The parties now spell Derkach's first name as "Andrii" in their summary judgment filings, which the Court adopts.

With discovery closed, NBCU now moves for summary judgment, pursuant to Rule 56, Fed. R. Civ. P., on the grounds that Nunes is a public figure and it lacked actual malice in publishing the statements about him. NBCU also moves for sanctions against Nunes for spoliation of evidence.

Defendant contends that it did not act with actual malice because it relied upon an article appearing on the website Politico eight months before the allegedly defamatory statement. The Politico article referenced Nunes having received materials from Derkach and added that "One person familiar with the matter said that the information was not turned over to the FBI." (ECF 144-10.) The TRMS segment did not reference to or quote from the Politico article. On the summary judgment motion, defendant has come forward with testimony supporting its claim that it did not entertain any serious doubts about the statement. In response, Nunes has failed to put forward affirmative evidence that defendant had the requisite state of mind sufficient for actual malice. Nunes is unable to show, through clear and convincing evidence, that defendant either had actual knowledge of the falsity of the statement or recklessly disregarded the truth of the statement.

For reasons discussed below, the Court concludes that no reasonable jury could find that NBCU made the statement with constitutionally-defined actual malice. The Court will grant summary judgment in favor of NBCU.

BACKGROUND

The Court relies on the undisputed facts of the record. It draws all reasonable inferences in favor of the non-movant, Nunes.[2] The Court assumes familiarity with the allegations of the Second Amended Complaint as discussed in the Court's previous decision. <u>See generally</u> <u>Nunes v. NBCUniversal Media, LLC</u>, 643 F. Supp. 3d 403 (S.D.N.Y. 2022).

Defendant NBCU owns and operates MSNBC, a cable news channel that airs TRMS, a news and commentary television program hosted by Rachel Maddow. (Pl. 56.1 (ECF 159) ¶¶ 1-2; Def. 56.1 (ECF 143) ¶¶ 1-2.)

Nunes served as a member of the Unites States House of Representatives from January 1, 2003, to January 1, 2022. (Pl. 56.1 ¶ 5; Def. 56.1 ¶ 5.) In December 2019, while Nunes was ranking member of the Intelligence Committee, Nunes received a package from Andrii Derkach ("the Derkach package"). (Pl. 56.1 ¶ 11; Def. 56.1 ¶ 11.) Derkach has been described by government agencies as a Russian agent. (Pl. 56.1 ¶ 12; Def. 56.1 ¶ 12.) He has been linked to Russian efforts to influence the 2020 U.S. Presidential election. (<u>Id.</u>) The package was addressed to Nunes and was handled solely by Nunes' staff. (Pl. 56.1 ¶ 11; Def. 56.1 ¶ 11.) Nunes and his staff members testified that on the same day the package was received, they delivered the package to the FBI. (ECF 158, Nunes Tr. at 50-51; Souza Tr. at 61-62; Langer Tr. at 303; Ciarlante Tr. at 83; Harvey Tr. at 130.) Also on that day, Nunes wrote a letter to then-Attorney General William P. Barr advising him of receipt of the package. (Pl. 56.1 ¶ 200; Def. 56.1 ¶ 200.)

---

[2] References to a party's Rule 56.1 Statement is intended to refer to the evidence cited in the Statement. The mere assertion by a party that a fact is disputed is not binding on the Court if the facts of the record reveal otherwise. Citation to evidence does not imply that it is the only evidence in support of the point.

During a July 29, 2020, Intelligence Committee meeting, Representative Sean Maloney asked Nunes questions about the Derkach package.  (Pl. 56.1 ¶ 62; Def. 56.1 ¶ 62.) Maloney questioned whether Nunes received materials from Derkach and whether Nunes was prepared to share them with the Committee.  (Id.)  Nunes declined to respond.  (Pl. 56.1 ¶ 63; Def. 56.1 ¶ 63.)

In March 2021, the Office of the Director of National Intelligence declassified a report entitled, "Foreign Threats to the 2020 US Federal Elections" ("the ODNI Report").  (Pl. 56.1 ¶ 23; Def. 56.1 ¶ 23.)  The ODNI report stated, "that Putin had purview over the activities of Andri[i] Derkach, a Ukrainian legislator who played a prominent role in Russia's election influence activities . . . [with] ties to Russian officials as well as Russia's intelligence services." (Pl. 56.1 ¶ 26; Def. 56.1 ¶ 26.)  The report also discussed Derkach's activities in the United States, finding that:

> "Derkach . . . sought to use prominent US persons and media conduits to launder their narratives to US officials and audiences. These Russian proxies met with and provided materials to Trump administration-linked US persons to advocate for formal investigations; hired a US firm to petition US officials; and attempted to make contact with several senior US officials."

(Pl. 56.1 ¶ 27; Def. 56.1 ¶ 27.)

On March 17, 2021, Maloney was interviewed on MSNBC's *Deadline: White House*, about the release of the ODNI Report.  (Pl. 56.1 ¶ 87; Def. 56.1 ¶ 87.)  In the interview, Maloney referenced his questioning of Nunes at the July 2020 Intelligence Committee meeting. (Pl. 56.1 ¶ 89; Def. 56.1 ¶ 89.)  Maloney said, "And the fact is that [the Russians] were so comfortable using people like Devin Nunes that Andrii Derkach, a known Russian asset, sent information to Devin Nunes at the Intelligence Committee. We literally had the package receipt." (Id.)

The following day, March 18, 2021, TRMS host Rachel Maddow wrote a TRMS segment discussing the release of the ODNI report and Nunes' conduct with the Derkach package.  (Pl. 56.1 ¶ 15; Def. 56.1 ¶ 15.)  Maddow along with Cory Gnazzo, the executive producer of TRMS, were ultimately responsible for the editorial content of TRMS.  (Pl. 56.1 ¶¶ 14-15; Def. 56.1 ¶¶ 14-15.)  According to Maddow and Gnazzo, they did not consider the segment to be original reporting but, rather, believed it addressed public information within the context of various news events.  (Pl. 56.1 ¶¶ 150-152; Def. 56.1 ¶ 150.)  In writing and reviewing the segment, Maddow and Gnazzo testified that they relied upon multiple pieces of information within the public record, including a transcript of the Intelligence Committee meeting (Pl. 56.1 ¶¶ 71-72; Def. 56.1 ¶¶ 71-72); the ODNI Report (Pl. 56.1 ¶¶ 28-31; Def. 56.1 ¶¶ 28-31); and the *Deadline* interview with Maloney (Pl. 56.1 ¶¶ 91-92; Def. 56.1 ¶¶ 91-92).

In particular, Maddow and Gnazzo relied upon a July 23, 2020, Politico article with the headline, "Democrats: Packets sent to Trump allies are part of foreign plot to damage Biden" (the "July 23 Politico article").  (Pl. 56.1 ¶¶ 43, 54-55; Def. 56.1 ¶¶ 43, 54-55.)  The article discussed how Derkach had sent materials to various lawmakers, including Nunes.  (Pl. 56.1 ¶ 48; Def. 56.1 ¶ 48.)  It stated that, "Graham and Grassley denied having received the material, and Mulvaney and Nunes declined repeated requests for comment.  One person familiar with the matter said the information was not turned over to the FBI.  The FBI declined to comment."  (Pl. 56.1 ¶ 47; Def. 56.1 ¶ 47.)  At the time the TRMS Segment aired, Maddow and Gnazzo understood that Nunes had not sued Politico over the July 23 Politico article or made any public statement disputing its reporting.  (Pl. 56.1 ¶ 57; Def. 56.1 ¶ 57.)

In the TRMS segment that aired on March 18, 2021, Maddow discussed the DNI report as part of a longer segment about Derkach and Russian disinformation.[3]  (Pl. 56.1 ¶¶ 137-42; Def. 56.1 ¶¶ 127-42.)  During the segment, Maddow stated that Nunes "has refused to hand it over to the FBI, which is what you should do if you get something from somebody who is sanctioned by the U.S. as a Russian agent."  (Pl. 56.1 ¶ 13; Def. 56.1 ¶ 13.)  Maddow and Gnazzo testified that they did not have doubts about the accuracy of the statement at the time the TRMS segment aired.  (Pl. 56.1 ¶¶ 17-18; Def. 56.1 ¶¶ 17-18.)

On April 5, 2021, counsel for Nunes sent a demand and retraction letter to NBCU. (Pl. 56.1 ¶ 164; Def. 56.1 ¶ 164.)  The demand letter asserted that the TRMS segment was materially false because Nunes did not refuse to hand the Derkach package over to the FBI.  (Pl. 56.1 ¶ 165; Def. 56.1 ¶ 165.)  Nunes also alleges that NBCU should have known the information was false because Representative Eric "Rick" Crawford gave a statement about the Derkach package to Breitbart, another news organization, that said, " . . . you follow the protocol, which is you turn that over to the FBI.  That's what happened."  (Pl. 56.1 ¶ 169; Def. 56.1 ¶ 169.) Crawford's quote from the Breitbart article was included in a July 30, 2020, Politico article titled "Intel Dems press Nunes for details on anti-Biden package from Ukrainian official" (the "July 30 Politico article").  (Pl. 56.1 ¶ 183; Def. 56.1 ¶ 183.)  Maddow and Gnazzo testified that they were not aware of the Breitbart article or the July 30 Politico article before the TRMS segment aired.  (Pl. 56.1 ¶¶ 181, 184; Def. 56.1 ¶¶ 181, 184.)

---

[3] <u>Available at</u>: https://www.youtube.com/watch?v=kQZqqkNiAsA

SUMMARY JUDGMENT STANDARD

Rule 56(c), Fed. R. Civ. P., provides that a court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The mere existence of an alleged factual dispute "will not defeat an otherwise properly supported motion for summary judgment . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The non-moving party cannot "escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture."  Western World Insurance Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990).

"Summary judgment is appropriate in a defamation action, as in other actions, where there are no unresolved factual disputes as to issues material to the outcome of the litigation."  Contemporary Mission, Inc. v. New York Times, 842 F.2d 612, 622 (2d Cir. 1988).  A public figure suing for defamation must prove, as one of the essential elements of the claim, that the defendant published the material with "actual malice."  New York Times Co. v. Sullivan, 376 U.S. 254, 279 (1964).  "[W]here the factual dispute concerns whether a [defendant] acted with actual malice, 'the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not.'"  Contemporary Mission, 842 F.2d at 621 (quoting Liberty Lobby, 477 U.S. at 255-56.)

DISCUSSION

The parties agree that Nunes was a public figure at the time the statement aired on TRMS. As a public figure, under New York law,[4] Nunes must establish "that 'the statements . . . complain[ed] of were (1) of and concerning [the plaintiff], (2) likely to be understood as defamatory by the ordinary person, (3) false, and (4) published with actual malice" in order to succeed on his claims. Karedes v. Ackerley Group, Inc., 423 F.3d 107, 113 (2d Cir. 2005) (quoting Church of Scientology International v. Behar, 238 F.3d 168, 173 (2d Cir. 2001)). Nunes also "must show the falsity of the statement[ ] at issue in order to prevail in a suit for defamation." Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 775 (1986). Evidence sufficient to establish actual malice "will generally encompass evidence of falsity." Contemporary Mission, 842 F.2d at 621. Public figures carry a heavy burden of proof "to assure to the freedoms of speech and press that 'breathing space' essential to their fruitful exercise." Gertz v. Robert Welch, Inc., 418 U.S. 323, 342 (1974). But although actual malice is a heightened standard, it does not afford the press "absolute immunity in its coverage of public figures." Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 688 (1989).

To prove "actual malice" plaintiff must demonstrate by clear and convincing evidence that defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." Sullivan, 376 U.S. at 280; see also St. Amant v. Thompson, 390 U.S. 727, 731 (1968). In this context, "actual malice 'is not measured by whether a reasonably prudent man would have published or would have investigated before publishing,' but by whether there is sufficient evidence 'to permit the conclusion that the

---

[4] The parties' do not dispute that New York law governs Nunes' claim. The parties' agreement that a particular jurisdiction's law governs a claim is generally a sufficient basis for that jurisdiction's law to apply. See, e.g., Photopaint Techs., LLC v. Smartlens Corp., 335 F.3d 152, 160 n.8 (2d Cir. 2003).

defendant in fact entertained serious doubts as to the truth of his publication.'" Behar, 238 F.3d at 174 (quoting St. Amant, 390 U.S. at 731); see also Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 511 (1984) ([T]here is a significant difference between proof of actual malice and mere proof of falsity.").

"Liability requires clear and convincing evidence of a knowing falsehood or 'subjective awareness of probable falsity.'" Contemporary Mission, 842 F.2d at 621 (quoting Gertz, 418 U.S. at 335 n.6). While the test is a matter of the defendant's subjective mental state, "a court typically will infer actual malice from objective facts." Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 176 (2d Cir. 2000). Courts may consider in determining whether a defendant acted with actual malice "(1) whether a story is fabricated or based on an unverified, anonymous source; (2) whether the allegations at issue 'are so inherently improbable that only a reckless person would have put them in circulation'; and (3) whether there are any obvious reasons to doubt that truthfulness of the defendant's source or the accuracy of the source's report." Stern v. Cosby, 645 F. Supp. 2d 258, 278 (S.D.N.Y. 2009) (Chin, J.) (citing Behar, 238 F.3d at 174); see also Celle, 209 F.3d at 183 (finding that actual malice may be established "[t]hrough the defendant's own actions or statements, the dubious nature of his sources, [and] the inherent improbability of the story [among] other circumstantial evidence").

Nunes alleges that the following statement during the March 18, 2021, broadcast of TRMS is false and was made with actual malice:

> [Nunes] has refused to hand [the Derkach package] over to the FBI which is what you should do if you get something from somebody who is sanctioned by the U.S. as a Russian agent.

(ECF 144, McNamara Dec. Ex. 1 at 24:32-24:40.) Nunes argues that this statement was false because the Derkach Package was promptly turned over to the FBI. In deposition testimony,

Nunes and his Congressional staff members said that the package was delivered to the FBI the same day that it was received.  (ECF 158, Nunes Tr. at 50-51; Souza Tr. at 61-62; Langer Tr. at 303; Ciarlante Tr. at 83; Harvey Tr. at 130.)  As noted, Nunes asserts that he advised Attorney General Barr in writing of the receipt of the package on the day of its receipt.  (Nunes Tr. at 21-22; McNamara Dec. Ex. 2.)

Defendant argues that Nunes has failed to prove by clear and convincing evidence that Maddow and Gnazzo made the statement with actual malice.  "When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice."  Dongguk University v. Yale University, 734 F.3d 113, 123-24 (2d Cir. 2013).  Here, Nunes identified Maddow, as the writer of the statement and host of TRMS, and Gnazzo, as the executive producer of TRMS, as responsible for the statement.[5]  Therefore, the Court will consider evidence of both Gnazzo's and Maddow's state of mind in determining whether there is sufficient evidence of actual malice.

Maddow and Gnazzo claim that they relied on information shared by other publications in creating the TRMS segment.  (ECF 144-3, Gnazzo Dec. ¶ 25: "The Statement was not original reporting concerning Mr. Nunes.")  Maddow and Gnazzo point to multiple sources that they say informed their reporting on Nunes' conduct with the Derkach package, which the Court considers in the aggregate.  See Stern, 645 F. Supp. 2d at 278.  But neither

---

[5] Nunes also alleges that Steve Benen, who serves as the editor of the MaddowBlog website, played "a part" in the segment discussing Nunes.  (ECF 157 at 13.)  However, Nunes does not dispute that Maddow was the sole writer of the TRMS Segment and that Gnazzo, as the executive producer, had final approval over the content of the entire show.  (Def. 56.1 ¶¶ 14-15; Pl. 56.1 ¶¶ 14-15.)  Nunes makes no allegations that Benen was ultimately responsible for the content of the March 18 TRMS segment.  As "the state of mind required for actual malice would have to be brought home to the person in [the defendant's] organization having responsibility for the publication of the [defamatory statement]," the Court will not consider Benen's state of mind as he did not have responsibility over the publication of the TRMS segment.  New York Times, 376 U.S. at 187.

Maddow nor Gnazzo points to any source other than the July 23 Politico article that informed

TRMS's reporting that Nunes "refused" to turn over the package to the FBI.[6]

Nunes argues that Maddow and Gnazzo acted with constitutional malice in basing

the TRMS segment on a singular source.  He also alleges that they distorted the July 23 Politico

article to suggest that Nunes had potentially violated the law because the article does not state

that he had "refused" to turn over the package to the FBI.  The relevant portion of the article

states:

> The packets, described to POLITICO by two people who have
> seen the classified portion of the Democrats' letter, were sent late
> last year to Rep. Devin Nunes (R-Calif.), Sens. Lindsey Graham
> (R-S.C.) and Chuck Grassley (R-Iowa), and then-White House
> Chief of Staff Mick Mulvaney.
>
> The packets were sent amid a Democratic push to impeach Trump
> over his effort to pressure Ukraine's president to investigate Biden
> and his son Hunter the sources said.  Graham and Grassley denied
> having received the material, and Mulvaney and Nunes declined
> repeated requests for comment.  One person familiar with the
> matter said the information was not turned over to the FBI.  The
> FBI declined to comment.
>
> . . . Wray has previously said that Americans should share with the
> FBI any information from foreign governments, or their emissaries
> intended to influence the election.
>
> "If any public official or member of any campaign is contacted by
> any nation-state, or anybody acting on behalf of a nation-state,
> about influencing or interfering with an election then that's
> something the FBI would want to know about," Wray said . . . .

(ECF 144-10) (emphasis added.)

Generally, "reliance on a single source does not itself indicate actual malice."

Fodor v. Berglas, 95 Civ. 1153 (SAS), 1995 WL 505522, at *5 (S.D.N.Y. Aug. 24, 1995).  Courts

---

[6] Available at https://www.politico.com/news/2020/07/23/democrats-letters-to-trump-allies-are-foreign-plot-to-damage-biden-380217

in this district have consistently dismissed claims for defamation when defendants have relied on reputable publications as their source of the alleged defamation.  See id. (finding no actual malice when the defendant relied on a reputable source publication and, therefore, would have no reason to believe the statement was inaccurate); Biro v. Conde Nast, 963 F. Supp. 2d 255, 280-81 (S.D.N.Y. 2013) (Oetken, J.) (finding no actual malice when the defendant relied on a source publication that had a reputation "for being an assiduous and thorough fact-checker").  Maddow and Gnazzo both testified that they believed Politico was a reputable publication and that the authors of the article were well respected.  (ECF 144-5, Gnazzo Tr. at 102: "Politico has an excellent reputation and these three reporters have excellent reputations"; ECF 144-4, Maddow Tr. at 91: "[T]here were three or four different reporters on the – bylined on that piece, respected reporters in a respected news organization.")

Nunes alleges that defendant cannot have relied on the Politico article in making the statement because the article does not state that he "refused" to turn over the package, but rather that "the information was not turned over to the FBI."  The dictionary definition of "refuse" is "to express oneself as unwilling to accept" and "to show or express unwillingness to do or comply with."[7]

The July 23 Politico article noted that the information within the Derkach packages, one of which Nunes received, had not been turned over to the FBI.  (ECF 144-10.) The article continues with a quote from FBI Director Wray asking public officials to give such information to the FBI.  (Id.) ("[T]hat's something the FBI would want to know about.")  The Court concludes within this context, the statement that information had not been turned over to the FBI is tantamount to a "refusal."  NBCU's choice of phrasing does not negate its reliance on

---

[7] https://www.merriam-webster.com/dictionary/refuse (last accessed July 29, 2025).

the Politico article and does not rise to actual malice.  See Contemporary Mission, 842 F.2d at

623 (concluding that although the defendant did not report the exact terms of a cease and desist

order, the alleged defamatory statement represented "the sort of inaccuracy that is commonplace

in the forum of robust debate to which the New York Times rule applies") (citation omitted);

Bose Corp., 466 U.S. at 513 (finding that although the defendant's choice of words amounted to

a misconception, "the choice of such language . . . does not place the speech beyond the outer

limits of the First Amendment's broad protective umbrella").

       Further, the language of the source publication and the alleged defamation do not

need to be an exact match "where the journalist believes, reasonably and in good faith, that his

report accurately conveys the charges made."  Edwards v. National Audubon Society, Inc., 556

F.2d 113, 120 (2d Cir. 1977).  NBCU has come forward with the testimony of Maddow and

Gnazzo that they believed that the statement ("refused") accurately represented Politico's

reporting ("was not turned over to the FBI").  (ECF 144-2, Maddow Dec. ¶ 30: "The July 23,

2020 Article directly supported the statement that Mr. Nunes had refused to turn over the

Derkach Package to the FBI . . . Politico's description indicated to me that the individual being

described had direct knowledge that Mr. Nunes had failed to turn over the Derkach package to

the FBI"; Gnazzo Dec. ¶¶ 19-20: "I had full confidence in the accuracy of the statement. . . . In

particular, I was aware that Politico had previously reported in a July 23, 2020 article that Nunes

did not turn the Derkach Package over to the FBI.").  Maddow and Gnazzo also believed the

statement was true because Nunes had not sued Politico over the July 23 Politico article or made

any public statement disputing its reporting.  (Gnazzo Tr. at 161; Gnazzo Dec. ¶¶ 20, 25;

Maddow Dec. ¶¶ 31-32.)  Maddow and Gnazzo's belief in the statement's accuracy, even if the

statement exaggerated the allegations in the article, "enhances, rather than diminishes the

likelihood that [the statements] are protected from libel attack by the First Amendment." Church of Scientology Intern. v. Time Warner, Inc., 903 F. Supp. 637, 641 (S.D.N.Y. 1995) (citing St. Amant, 390 U.S. at 731).

Nunes also puts forward several threads of circumstantial evidence that he asserts show that Maddow and Gnazzo acted with reckless disregard for the truth. As previously noted, in order to establish reckless disregard, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant, 390 U.S. at 731. "Courts have cited various types of circumstantial evidence to justify a factual finding that a defamation defendant acted with actual malice." Goldfarb v. Channel One Russia, 663 F. Supp. 3d 280, 309 (S.D.N.Y. 2023) (Cronan, J.); see also Biro, 963 F. Supp. 2d at 277-278 (collecting cases). However, Nunes has failed to identify circumstantial evidence that could constitute clear and convincing proof that Maddow and Gnazzo acted with reckless disregard for the truth.

Nunes alleges that Maddow and Gnazzo acted with reckless disregard for the truth when they failed to investigate the statement that Nunes "refused" to turn over the package to the FBI. "Generally, 'mere proof of failure to investigate, without more, cannot establish reckless disregard for the truth.'" Dongguk, 734 F.3d at 124 (quoting Gertz, 418 U.S. at 332). Here, Maddow and Gnazzo relied on the Politico article and, typically, "a defendant's reliance on a responsible source negates a finding of 'the recklessness that is required for actual malice.'" Id. (quoting New York Times, 376 U.S. at 287-88). However, "evidence of an intent to avoid the truth" may be sufficient to satisfy the actual malice standard. Harte-Hanks, 491 U.S. at 693.

Nunes alleges that Maddow and Gnazzo entertained serious doubts about the statement because of an article Politico published on July 30, 2020.[8] The July 30 Politico article had the headline, "Intel Dems press Nunes for details on Anti-Biden package from Ukrainian official." (McNamara Dec. Ex. 48.) The article described Republican members of the Intelligence Committee's reaction to Maloney's questioning of Nunes about the Derkach package during the Committee meeting. (Id.) The article included a quote that Representative Rick Crawford had given to Breitbart, another news organization:

> In his interview with Breitbart, Crawford appeared to confirm that Nunes received a package from a foreign source, and suggested that Nunes turned it over to the authorities.
>
> "[I]t's standard practice that if you get a package from an unknown source in a foreign country, it's probably a good idea to call the FBI and let them handle it and not handle those packages and don't open them up and go, 'Hey I wonder what this is? I guess it's Christmas came early this year'," Crawford said. "No, you follow the protocol, which is you turn that over to the FBI. That's what happened."

(Id.) Nunes argues that because defendant did not contact or interview Representative Crawford, or any other member of the House Intelligence Committee minority staff, Maddow and Gnazzo intended to avoid the truth.

Maddow and Gnazzo deny that they were aware of the July 30 Politico article. (Maddow Dec. ¶ 54; Gnazzo Dec. ¶ 29.) Maddow and Gnazzo had no duty to make an independent investigation into the July 23 Politico article, unless they entertained serious doubts as to the truth of the statement. See Fodor, 1995 WL 505522, at *5.

---

[8] Available at https://www.politico.com/news/2020/07/30/devin-nunes-joe-biden-ukraine-388843. For the avoidance of doubt, the Court also concludes that the July 30 Politico article that Maddow and Gnazzo swear they did not read does not provide evidence of their knowledge of falsity of the March 18 segment.

Nunes asserts that they were aware of the July 30 article because TRMS published a blog, called the MaddowBlog, on March 18, 2021, titled, "Intel revelations raise difficult questions for several Republicans."[9]  (McNamara Dec. Ex. 49.)  The blog post included a hyperlink to the July 30 Politico article.  (Id.)  Steve Benen, the author of the blog, was responsible for drafting the blog and sending a daily pitch email to TRMS staff where he shares stories that he wrote for the blog that may be of interest.  (Maddow Dec. ¶ 55.)  Typically, Benen exclusively writes the blog.  (Maddow Dec. ¶ 56.)  Benen was not involved with the TRMS segment and did not have responsibility for its content.  (Id.)

On March 18, 2021, Benen emailed his daily pitch email at 1:22 PM, which included a hyperlink to the blog post.  (McNamara Dec. Ex. 50.)  The email said, "This week's ODNI report left Trump and Guiliani in a difficult position, but thanks to the Derkach references, it also raised some questions for Ron Johnson and Devin Nunes."  (Id.)  The blog itself discussed the July 29, 2020, Intelligence Committee meeting where Maloney questioned Nunes about his handling of the Derkach package.  (McNamara Dec. Ex. 49.)  The hyperlink to the July 30 Politico article appeared in a sentence that stated, "According to a transcript from the closed-door discussion, Nunes didn't want to answer."  (Id.)  The hyperlink was linked to the words "didn't want to answer."  (Id.)

A hyperlink in a blog written by someone who did not have responsibility for the defamatory statement, is insufficient to show that Maddow and Gnazzo had knowledge of the July 30 Politico article or acted with reckless regard for the truth.  Cf. Palin v. New York Times, 113 F.4th 245, 265 (2d Cir. 2024) (finding that a jury could reasonably believe that the defendant read a hyperlinked article when defendant was responsible for editing the article that contained

---

[9] Available at: https://www.msnbc.com/rachel-maddow-show/maddowblog/intel-revelations-raise-difficult-questions-several-republicans-n1261400

the hyperlink).  Neither Maddow nor Gnazzo clicked the hyperlink in the article and believed

that it referenced the transcript of the House Intelligence Committee meeting.  (Maddow Dec. ¶

55; Gnazzo Dec. ¶ 31.)  The blog and the pitch email do not quote or reference Crawford's

statement.  Nothing in the body of the article would have prompted Maddow and Gnazzo to

entertain serious doubts as to the veracity of the statement.  Nunes has failed to come forward

with evidence which, if believed, would allow a reasonably jury to conclude that they were

aware of the July 30 Politico article.

      Nunes cites to <u>Harte-Hanks</u> for support that Gnazzo and Maddow consciously

avoided the truth when they did not contact Crawford or a staff member.  491 U.S. 657.

However, the defendant in <u>Harte-Hanks</u> published original reporting unlike Maddow and Gnazzo

who relied on another publication.  <u>Id.</u> at 682.  There, the defendant newspaper conducted a

taped interview with the plaintiff prior to publishing the article that directly contradicted the

defendant's main source.  <u>Id.</u>  at 691.  The plaintiff had also provided the defendant with a taped

interview of another source that contradicted the defendant's story, but no reporters listened to

the tape.  <u>Id.</u> at 692.  Crawford himself did not have personal knowledge that directly

contradicted the July 23 Politico article.  Crawford said that when he made the statement to

Politico, he was only assuming that the package had been given to the FBI.  (ECF 144-22,

Crawford Tr. at 31.)  Crawford never communicated with Nunes, Nunes' staffers, or the FBI

regarding Nunes' conduct with the Derkach package.  (<u>Id.</u>)  Nunes had already declined to

comment to Politico on the July 23 Politico article which was the principal source of the

allegedly defamatory statement by defendant.

      Nunes also contends that NBCU's reliance on the Politico article itself was

evidence of a reckless disregard for the truth as reliance on a single source is a violation of

NBCU's own newsroom policies.  (ECF 149 at 12.)  However, the policy that Nunes cites does not ban reliance on a single source.  (Greaves Dec. Ex. O at 6: "Any instance of original reporting using only a single source (who is neither authoritative nor a spokesperson) must be approved by an authorized member of senior management.").  Nonetheless, generally, purported deviations from normal operating procedures do not amount to purposeful or reckless avoidance of the truth.  See Prince v. Intercept, 634 F. Supp. 3d 114, 140 (S.D.N.Y. 2022) (Preska, J.).

Although Nunes argues that Gnazzo and Maddow took no meaningful steps to investigate the statement and that the fact-checking that was undertaken was inadequate, the standard is not "whether a reasonably prudent man . . . would have investigated before publishing."  St. Amant, 390 U.S. at 731.  But on the summary judgment record, no reasonable fact finder could find by clear and convincing evidence that Maddow and Gnazzo made the statement with a "high degree of awareness of . . . probable falsity."  Garrison v. State of Louisiana, 379 U.S. 64, 74 (1964); see also Curtis Publishing v. Butts, 388 U.S. 130, 153 (1967) (holding that proof that the statement was "published recklessly despite the publisher's awareness of probable falsity" is essential to recovery in a public figure defamation action).

Nunes also argues that Maddow and Gnazzo were biased against him and that the allegations were inherently implausible.  These are considerations that potentially bear on whether conduct is reckless.  Alone, potential bias or inherent implausibility does not satisfy a finding of recklessness.  See Palin, 940 F.3d at 814 (finding that "sheer political bias" on its own is insufficient to support and inference of actual malice); Stern, 645 F, Supp. 2d at 285 n.19 ("[T]he inherently improbable nature of the Statements, without more, is insufficient evidence of actual malice to reach a jury.").  There is no evidence of recklessness and thus, the Court need

not consider bias and inherent implausibility.  However, if the Court were to consider them, they

would not alter the Court's conclusion.

Nunes claims that Maddow and Gnazzo were biased against him, and that

purported bias combined with their failure to investigate support a finding of actual malice.[10]

See Behar, 238 F.3d at 174 ("[A]lleged bias would be relevant to show a purposeful avoidance of

the truth if it were coupled with evidence of an extreme departure from standard investigative

techniques.").  To support his claim that Maddow and Gnazzo were biased, Nunes points to his

differing political beliefs with Maddow.  Maddow admits that she has differing political beliefs

from Nunes.  (Maddow Tr. at 150: "I think that I'm a liberal and he's a conservative, so we

probably disagree on most things, but you never know.").

Nunes also points to Maddow's criticism of him on thirty-six different episodes of

TRMS between February 2017 to January 2020.  But despite this allegation, Nunes only

provided a "sampling" of ten transcripts in support without identifying an example of bias.  (ECF

157 at 17.)  "Bare assertions of bias are insufficient."  Satanic Temple, Inc. v. Newsweek

Magazine, LLC, 774 F. Supp. 3d 688, 704 (S.D.N.Y. 2025) (Vyskocil, J.) (citing Contemporary

Mission, 842 F.2d at 622-23).  During the time period between 2017 and 2020, Nunes was the

Chairman and then, ranking member of the House Intelligence Committee and, as such, was a

prominent politician subject to public discussion.  See Harte-Hanks, 491 U.S. at 687 ("When a

candidate enters the political arena, he or she 'must expect that the debate will sometimes be

rough and personal'") (citation omitted).  Political bias is a matter of degree ranging from polite

---

[10] Nunes argues that questioning about Maddow's political beliefs was inappropriately shut down by defendant's
counsel.  In response to one question during Maddow's deposition, defendant's counsel objected to relevance and
instructed the witness not to answer.  However, as the Magistrate Judge ruled, this was an isolated instance and there
was abundant other testimony on the subject.  (ECF 137.)

and seasonal disagreement to personal animus.  But there is no evidence that defendant's admitted political bias caused defendant to act with a reckless disregard of the truth.

Nunes also points to an email chain where Maddow refers to Nunes as an "easier hit" and alleges that the email shows that defendant made the statement to increase ratings. (Greaves Dec. Ex. K.)  The email chain discussed content for the March 18 TRMS segment.  The full quote from Maddow's email reads:

> I feel like the Grassley and Johnson thing… it is the denial.
> Whereas with Nunes, Maloney has the receipt. With Nunes it is an
> easier hit… I don't believe the denial from Grassley and Johnson
> but its there.

(Id.)  In the email, Maddow referenced the March 17 *Deadline* interview with Maloney, where he discussed Nunes' handling of the Derkach package.  In the interview, Maloney stated, "And the fact is that they were so comfortable using people like Devin Nunes, that Andrii Derkach, a known Russian asset, sent information to Devin Nunes at the Intelligence Committee.  We literally had the package receipt."  (McNamara Dec. Ex. 26 at 0:15-0:46.)

In context, Maddow's reference to Nunes as an "easier hit" refers to Maloney's information that there was a package receipt for the delivery to Nunes from Derkach which provided ready support for part of the claim.  The use of the word "hit," in this context, i.e. to land a plausible criticism at a person,[11] does not imply "actual malice" or support an inference of recklessness.  Contemporary Mission, 842 F.2d at 622-23 (holding that plaintiffs must come forward with sufficient facts to enable a jury to find by clear and convincing evidence that the defendant "acted with malice in the constitutional sense, i.e., with knowledge that the statements made were false or with reckless disregard for the truth").  Nunes' evidence of Maddow's bias

---

[11] See https://www.merriam-webster.com/dictionary/hit ("[N]oun . . . 3: a telling or critical remark." (last accessed: July 31, 2025)).

against him, without clear and convincing evidence of an inadequate investigation into the statement, does not rise to actual malice.  See Time Warner, Inc., 903 F. Supp. at 641 ("Without a showing of inadequate investigation, bias merely confirms the publisher's firmly-held belief in the alleged defamatory statements.")  Additionally, whether Maddow and Gnazzo were motivated by ratings is not probative of actual malice.  See Harte-Hanks, 491 U.S. at 667 (concluding that the fact that the defendant published defamatory material to increase its profits was not sufficient proof of actual malice).

Nunes further argues that due to his position as the ranking member of the House Intelligence Committee, the claim that he would refuse to turn over the Derkach package to the FBI is so inherently implausible that only a reckless person would have published them.  Nunes' background and position alone do not make the defendant's statement inherently improbable. See Prince v. Intercept, 21-cv-10075 (LAP), 2023 WL 4492413, at *10 (S.D.N.Y. Jul. 12, 2023) (finding defendant's allegations that a former Navy Seal met with a top official of a Russian military force was not inherently improbable because of his background).  In his deposition testimony, Nunes said he still has a "distrust of the FBI" and that he has publicly stated that its members are "corrupt" and "dirty."  (Nunes Tr. at 307-308.)  The Court concludes that the statement that he "refused" to turn over the package to the FBI is not so inherently improbable that only a "reckless" person would publish it.  See Biro, 907 F.3d at 545; World Boxing Council v. Cosell, 715 F. Supp. 1259, 1265 (S.D.N.Y. 1989) ("[T]he articles appeared in respected publications, and were authored by reputable journalists, whose allegations were not so improbable that a prudent author would have questioned their accuracy").

Taking the entirety of the evidence before the Court on the summary judgment record and considering it as a whole, the Court concludes that no reasonable jury could find that

Maddow and Gnazzo acted with actual malice, i.e. knowledge of falsity or reckless disregard of the truth, nor could it permit a reasonable jury to find that they disregarded or had any doubts as to the truth of the statement.[12]  Accordingly, summary judgment will be granted in defendant's favor.

SANCTIONS

Defendant alleges that Nunes should be sanctioned under Rule 37(e), Fed. R. Civ. P., because he failed to take reasonable steps to preserve internal communications, resulting in the spoliation of potentially relevant evidence.  Specifically, NBCU asks the Court to infer that the deleted communications were unfavorable to Nunes on factual issues that were in dispute in this litigation, specifically the truth or falsity of the alleged defamatory statement.  Additionally, NBCU asks that it be awarded the attorneys' fees it incurred by its efforts to obtain the spoliated evidence.  The duty "to preserve evidence arises when the party has notice that the evidence is relevant to the litigation or when a party should have known that the evidence may be relevant to future litigation."  Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 436 (2d Cir. 2001) (citation omitted).

On August 3, 2021, Nunes filed this action as a sitting member of Congress and left his position five months later.  After his departure, physical and electronic files from Nunes' congressional office were not taken with him when he left the House of Representatives.  (ECF 146, Chase Dec. Ex. 1 at 27.)  Nunes also identified staffers under his direct supervision from the House Intelligence Committee and his personnel office as having relevant information related to the litigation, which would have been on the staffers' House email addresses and phones.  (Chase

---

[12] See Brimelow v. New York Times Co., 21-66-cv, 2021 WL 4901969, at *3 (2d Cir. 2021) (summary order) (finding that "ill will" towards the plaintiff is insufficient to show actual malice without evidence that the defendant had doubts as to the truth of the statement).

Dec. Ex. 2 at 7, 13.)  However, the House Intelligence Committee confirmed that it "did not locate any requests to preserve documents related to this litigation."  (Chase Dec. Ex. 4.)

Nunes' former communications director, Jacob Langer, testified that Nunes had a standing instruction to preserve documents related to all outstanding litigation.  (Langer Tr. at 133-34.)  But Langer acknowledged that he did not receive instructions, from Nunes or another staffer, to preserve emails or relevant documents in connection with this litigation.  (Id. at 141-42.)  Other former staff members said that they did not receive any instruction to preserve documents in connection with this litigation.  (Pappas Tr. at 53; Ciarlante Tr. at 64; Morrow Tr. at 71-72; Souza Tr. at 71-72.)  Additionally, plaintiff's counsel accepted six third-party subpoenas to Nunes' former staffers for relevant documents but failed to inform one of them of defendant's subpoena.  (Harvey Tr. at 162.)

Because the Court has found that Nunes has failed to prove actual malice and that NBCU is not liable for defamation, it need not adopt an adverse inference or otherwise sanction Nunes for spoliation.  See United States v. Google LLC, 23-cv-108, 2025 WL 1132012, *48 (E.D. Va. April 17, 2025) (Brinkema, J.) (declining to consider an application to strike Google's answer after finding liability on the part of Google on merits grounds).

CONCLUSION

For the foregoing reasons, NBCU's motion for summary judgment is GRANTED.  The Clerk of the Court is respectfully directed to terminate the pending motion (ECF 141), enter judgment for the defendant, and close the case.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       August 1, 2025